**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO.: 22-cv-22343

JORGE MONTEAGUDO ALBURQUERQUE

      Plaintiff,

v.

THE DE MOYA GROUP, INC.,
a Florida Profit Corporation,

      Defendant.

_____/

## DEFENDANT, THE DE MOYA GROUP, INC.'S MOTION FOR SANCTIONS AND INCORPORATED MEMORANDUM OF LAW

      Defendant, The De Moya Group, Inc. ("De Moya"), moves for sanctions, pursuant to Rule 11 of the Federal Rules of Civil Procedure, against Plaintiff, Jorge Monteagudo Alburquerque and his counsel, for filing and maintaining the instant action filed under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Florida Civil Rights Act ("FCRA"), and states:

### INTRODUCTION

      Plaintiff and his counsel knowingly filed a meritless claim of national origin discrimination and retaliation. After De Moya terminated him for sleeping on his Roller,[1] Plaintiff filed suit against his former employer, alleging violations of Title VII and the FCRA for national origin discrimination and retaliation. Plaintiff brought a national origin discrimination claim based on his race (Hispanic) and national origin (Cuban) against a company founded by Cubans, owned by Cubans, managed by Cubans, and where a majority of the workers are Hispanic. Plaintiff's two immediate supervisors, Manny Comes and Noel Leon, are both Cuban. When it was pointed out to Plaintiff's counsel that their complaint was deceptive because they conveniently did not include

---

[1] A roller is a heavy piece of equipment used to compact the surface of a roadway being constructed.

1

the national origin of the critical players, they dropped the national origin and race claim. However, they continued to pursue retaliation claims based on the plaintiff's complaint that he was not treated respectfully. Petty workplace grievances are not a basis for a lawsuit. Title VII is not meant to deal with petty workplace slights.

Plaintiff's counsel knew the Plaintiff's claims had no merit before filing suit because the Miami Dade County Commission on Human Rights ("MDCHR") issued a detailed memorandum that thoroughly outlined the reasons that Plaintiff's claim was not a violation of Title VII/FCRA. *See* MDCHR Determination attached as Ex. 1.

On February 2, 2023, after significant discovery had been exchanged, Reginald Clyne, lead counsel for De Moya, emailed Plaintiff's lead counsel, Nathaly Saavedra, advising her that this was a frivolous claim and requested that she voluntarily dismiss the claim, so that he could avoid filing a Rule 11 motion for sanctions. *See* February 2, 2023 email attached as Ex. 2. Ms. Saavedra replied with a recitation of the law for Rule 11 sanctions and stated their beliefs on their ability to establish their retaliation claim "***at the conclusion of discovery.***" *See id.* (emphasis added). Plaintiff's counsel's response all but admits that at the time of filing this action, they did not have a reasonable factual basis for filing this suit and no reasonable chance of success based on the legal theory used.  Mr. Clyne in a second attempt to avoid filing the instant motion sent a request to Ms. Saavedra requesting that she voluntarily dismiss the lawsuit.  She responded that if De Moya continued the litigation it would cost the company more money. See Email Exchange dated April 13-14, 2023 attached as Exhibit "3."

## RELEVANT FACTUAL BACKGROUND

On July 26, 2022, Plaintiff filed his initial six-count complaint alleging claims of discrimination and retaliation based on race and national origin under Title VII and the FCRA. [ECF. No. 1]. In the initial complaint filed by Plaintiff's counsel, Noel Leon is described as

"American" [*Id.*, ¶ 17], which is patently false because Plaintiff knew that Noel Leon is of Cuban origin. By alleging that Mr. Leon is American, Plaintiff's counsel began this lawsuit with the false impression that Noel Leon is a non-Hispanic, Caucasian. In response, De Moya filed a motion to dismiss and moved for a more definite statement [ECF. No. 9], highlighting the factual discrepancies in Plaintiff's allegations and legal deficiencies that were fatal to his Title VII and FCRA claims. Instead of withdrawing the complaint, Plaintiff and his counsel filed an amended complaint only alleging retaliation under Title VII and the FCRA. [ECF No. 13].

### A.  All Relevant Testimony Establishes Plaintiff Complained of Disrespect

In early September 2020, Plaintiff complained of Noel Leon's alleged disrespect to Chris De Moya, the owner of De Moya, who is also of Cuban descent. Mr. De Moya requested that Susan Giraldo, an administrative assistant for the company who is Colombian American, serve as a translator to ensure he understood Plaintiff. (*See* Ex. 4, De Moya 30(b)(6) Dep., p. 33:11-23). Mr. De Moya testified during this meeting that Plaintiff never complained of discrimination.

> Q:   But it's fair to say that you didn't understand everything, because otherwise you wouldn't have asked somebody to be there with you, correct?
>
> A:   Well, I understand he never mentioned anything about discrimination. It was a disrespect issue. He never mentioned anything about being unfair. It was very clear disrespect.

(Ex. 4, De Moya 30(b)(6) Dep., p. 34:3-17).

> Q:   Mr. De Moya, are you a Cuban American?
> A:   I am.
> Q:   Is your company owned by Cuban Americans?
> A:   It is.
> Q:   Was it founded by Cuban Americans?
> A:   It was.
> Q:   Is Noel Leon Cuban American?
> A:   Yes.
> Q:   Is Manny Comes Cuban American?
> A:   Yes.

Q:     If Mr. Albuquerque had told you that he had been discriminated against because he is Cuban American, would you have recalled that?

A:     I would have.

Q:     Did he ever say in your conversation when Susan Gillardo [sic] was present that he had been subject to discrimination.

A:     No.

Q:     Did he ever say that anyone used any racial slurs against him?

A:     He did not.

Q:     Did he ever say that anyone berated him because he is Cuban American?

A:     No.

Q:     Did he ever in any way, shape, or form mention discrimination in that conversation?

A:     No, he did not.

Q:     Did you learn of the allegation of discrimination for the first time when you received the EEOC Charge?

A:     Yes.

Q:     Did EEOC have finding in that case?

A:     Yes.

Q:     What was their finding?

A:     That we were not guilty of discrimination.

Q:     And this lawsuit was filed anyway?

A:     Yes, it was.

Q:     How do you feel about being accused of discriminating, as a Cuban American, against a Cuban American?

A:     It's infuriating.

(Ex. 4, De Moya 30(b)(6) Dep., pp. 67:16-69:17).

As a witness to the September 2020 discussion between Plaintiff and Mr. De Moya, Susan Giraldo's testimony supports the testimony of Mr. De Moya and Plaintiff indicating that the issue discussed in the September 2020 meeting was an alleged lack of disrespect by Mr. Leon. Ms. Giraldo testified in pertinent part as follows:

Q:     But you don't remember what was said?

A:     Not verbatim what was said. Just I know that he was agitated, angry at the whole situation with Noel Leon that day. I know that it was work related. I know that he might have felt – it seemed that felt treated rudely and disrespected. He kept on saying disrespected, that he felt disrespected.

Q:     Do you recall, did Mr. Monteagudo ever complain about discrimination?

A:     He did not.

> Q:   Did he ever complain about being discriminated against
>       because he was Cuban?
> A:   No, he did not.
> Q:   Did he ever say that anyone used a racial slur or a negative
>       statement as to his Cuban origin:
> A:   No, he did not.

(Ex. 5, Giraldo Dep., p. 57:9-59:11).

One of the most interesting facts about this case and its frivolity, is that Plaintiff's testimony supports De Moya's testimony that Plaintiff complained about disrespect when he had a dispute with his supervisor, who told him to work at another site, and Plaintiff objected. Plaintiff was deposed on two occasions.[2] In his first deposition, taken on October 19, 2022, Plaintiff testified as follows:

> Q:   Can you tell me what race you are?
> A:   Latin.
> Q:   What is your color?
> A:   White.
> Q:   What is your national origin?
> A:   Cuban.
> Q:   We're here today because you filed a lawsuit claiming that
>       you had been discriminated against based upon your national
>       origin and race.
> A:   Correct.
> Q:   And tell me how you were discriminated against.
> A:   It all started after I presented a complaint about an incorrect
>       procedure at work. It all started there.
> Q:   What was the incorrect procedure that you complained
>       about?
> A:   An action of disrespect in alternation [sic]3 by Noel Leon,
>       the supervisor of the project.

---

[2] During the first deposition, it came to light that Mr. Clyne's bar license renewal had not gone through.  Mr. Clyne answered that he does not handle trust accounts, and the Florida Bar required that he state that the Trust Accounts are managed in compliance with Florida Bar Regulations. This administrative denial was cleared up on the same day of the deposition when Mr. Clyne amended his response.  Plaintiff counsel insisted on a new deposition and it was agreed that the new deposition would take place.  Defense counsel stipulated they would not use the first deposition if Plaintiff's testimony was consistent. In his first deposition, Plaintiff only stated that he complained about "disrespect". In his second deposition he complained about "disrespect and discrimination". Despite the addition of the term "discrimination" the events described are clearly a workplace disagreement with a supervisor where neither race nor national origin were mentioned.

[3] "Alternation" should probably be "altercation".

> Q:  You said that you complained about Mr. Leon because he had a bad attitude and a lack of respect is that correct?
> Q:  And who did you complain to?
> A:  With the owner, Chris De Moya: . . .
> Q:  And when you went to the office in Tamiami Park, did you go into the conference room and speak with Mr. De Moya and Susan Giraldo?
> A:  Yes, there was a woman there, but I don't know her name.
> Q:  Was she helping translate?
> A:  Yes.
> Q:  And that's when you told them that you thought that Mr. De Moya had a bad attitude and treated you with a lack of respect?
> A:  Let me explain it to you. The lack of respect happened one day and he never asked to - -  he never apologize to anything. I tried to leave it at that not lose my job. But once, on a certain day, he told me that I had to go to 874. I explained to him that one of my tires was in bad condition and that I couldn't get on the expressway and asked if he had someone else that he could send. He responded no, that it had to be myself. That if I didn't go, I would be fired. . . .

(Ex. 6, Plt. Oct. 19, 2022, Dep., pp. 12:11-15:25).

Plaintiff's pertinent testimony from his second deposition is inconsistent with his first one because he then claims he was treated with disrespect *and discrimination*. Yet, Plaintiff's testimony from his second deposition describes the same workplace verbal dispute, and nothing in his description of events would support a discrimination claim. When asked about his issues with Noel Leon, Plaintiff testified as follows:

> Q:  Did you work for a supervisor by the name of Noel Leon?
> A:  Yes.
> Q:  Do you believe that Noel Leon treated you with disrespect and discourtesy?
> A:  Yes.
> Q:  Did you complain about Mr. Leon because he had a bad attitude and a lack of respect:
> A:  Yes, and because of discrimination.
> Q:  Why is your answer changing today from what you told me, under oath in your prior deposition on October 19th, 2022?

MS. ROCHA: Objection. Mr. Clyne, we had an agreement as to a conferral that deposition would be stricken, struck from the record with your reservation of rights.

M.R. CLYNE: And I'm now, I'm going into my reservation of rights. I told you if your client lied under oath, I would take it up with him and I would take it up with the court. So in his prior deposition, he never mentioned discrimination and now he is, so I'm asking him, why is he changing his testimony? Which is a legitimate question under cross examination, you can impeach a witness with prior sworn testimony. His testimony was sworn. So ---

Q:   Okay. When I asked you, under oath on October 19th, I see, the question was, You said that you complained about Mr. Leon because had a bad attitude and a lack of respect. Is that correct? And your answer was, yes. Do you recall that answer?

A:   Yes.

Q:   So today you're saying that you complained, and you complained to Chris De Moya, correct?

A:    Yes, I complained to Chris De Moya.

Q:   And was there a lady present when you made a complaint.

A:   Yes, one from the office. . . .

Q:   So, what did you tell Mr. De Moya about Mr. Noel and your working conditions?

A:   I explained to him that he wanted me to go to work at 874 and I said to him that I never, every time I told him that every time that he needed me to do some work, I would be available and told him yes. He told me one day in the morning, so that I would go to 874 before the project 552 in the turnpike. And I explained to him that I had problem with the tire in the front. If it was possible, for him to send somebody else because I was afraid. Because of that tire. Well he told me that if I do not go, you take it or leave. Those were his words, if you don't go, you're fired.

(Ex. 7, Plt. Nov. 17, 2022, Dep., pp. 16:1-19:10).

In response to Defendant's summary judgment, the plaintiff filed an affidavit. This was his third attempt to assert under oath some evidence that would support a discrimination claim. The plaintiff again reiterates "I was being disrespected and belittled by Mr. Leon. During my conversation with him I gave him examples of the way that he spoke to me and belittled me

because I did not speak English and I believed because of where I was from."  See Affidavit of

Jorge Alburquerque attached as Ex. 11.  This statement is highly suspicious, because Mr. Leon

does not speak English and needed an interpreter for his deposition.[4] Mr. Leon also testified that

he felt a camaraderie with the plaintiff because they were from neighboring villages in Cuba,

(See Ex. 10, Leon Depo. at 34). But taking the plaintiff statement as true, it still does not amount

to a report of discrimination.   As plaintiff explained in his two depositions, he was ordered by

his supervisor to go to a work site and did not want to go and when he was told that if he did not

go he would be terminated, he complained.  This is a pure workplace grievance that has nothing

to do with race, national origin, or the language that you speak. Plaintiff's counsel has not come

up with any evidence of discrimination and if reporting that you felt disrespected because your

boss gave you an order and you did not want to comply constitutes discrimination, then every

workplace in the United States would be deemed discriminatory.

     The law clearly provides that petty workplace grievances are not acts of discrimination.

*See Burlington Northern and Santa Fe Ry Co. vs. White, 548 U.S. 53, 68 (2006)(* "Title VII, we

have said, does not set forth a general civility code for the American workplace. . . .judicial

standards for sexual harassment must filter out complaints attacking the ordinary tribulations of

the workplace, such as the sporadic use of abusive language, gender -related jokes, and

occasional teasing.  An employee's decision to report discriminatory behavior cannot immunize

the employee from those petty slights or minor annoyances that often take place at work and that

all employees experience.")  *Ceus v. City of Tampa,* 803 Fed. Appx. 235, 247 (11th Cir.

2020)(Title VII does not prohibit or regulate workplace issues of civility or personality

conflicts.").  In one of this Court's decisions *Smith v. City of Fort Pierce,* 2:11-CV-14375-KMM,

---

[4] Mr. Leon testified that he speaks English "very badly".   Leon Depo. at 10.

2012 WL 12861131, at *7 (S.D. Fla. Aug. 28, 2012) *aff'd sub nom Smith v. City of Ft. Pierce, Fla.,* 565 Fed. Appx. 774 (11th Cir. 2014)("the majority of Plaintiff's claims of adverse employment action fail as a matter of law . . . because the actions attributed to Defendant are merely trivial and do not meet the requisite level of materiality.")  In this case, a supervisor ordering an employee to a different work site, perhaps, in not the nicest tone, is clearly a petty slight.

### B.  Monteagudo was Terminated for Sleeping on the Roller at Work

On October 7, 2020, Plaintiff was terminated for sleeping on a roller, which is a heavy equipment vehicle used to flatten roads. Jerry Nasso, the site superintendent, testified that Plaintiff was ordered to follow the grader.[5] When Mr. Nasso encountered the grader, Plaintiff and the roller were nowhere to be found. Mr. Nasso went to Ramp J, where Plaintiff was supposed to be working earlier that morning and found Plaintiff sleeping in the roller. (Ex. 8, Nasso Dep., p. 34:4-20). Mr. Nasso terminated Plaintiff the day after he found him sleeping for "Substandard Work," "Improper Conduct," and "Failure to Follow Instructions." (*See* Ex. 9, Termination Form). When Mr. Nasso terminated Plaintiff, he used another employee as a translator because Mr. Nasso does not speak Spanish and Plaintiff does not speak English. (Ex. 8, Nasso Dep. p. 63:1-16). Terminating an employee for sleeping in the workplace and not following instructions to follow the grader is a legitimate business reason for termination.

### C.  Plaintiff Knew De Moya's Management Team and his Direct Supervisors are Cuban

Plaintiff knew that the management team and his direct supervisors were of Cuban descent. Plaintiff counsel should have known of this fact if they had simply interviewed their own client as part of their pre-suit investigation. Plaintiff testified in pertinent as follows:

---

[5] A grader is heavy machinery used to break up the lime rock surface in a road project.

Q:      Your first supervisor was Noel Leon, right that was the one
        that you thought was disrespectful?
A:      Yes.
Q:      Do you speak English, Mr. Alburquerque?
A:      No. No.
Q:      Did Noel Leon speak Spanish?
A:      Yes.
Q:      And where is Noel Leon from?
A:      Cuba, but he is a U.S. citizen.
Q:      And Manny Comes, where is he from?
A:      He says he's not Cuban, that he's American because he
        came as a child.
Q:      Was he born in Cuba?
A:      Yes.
Q:      And Chris De Moya, is he also Cuban?
A:      He was born here.
Q:      But he is of Cuban descent?
A:      Yes.

*See* (Ex. 6, Plt. Oct. 19, 2022, Dep. 17:1-25).

Plaintiff's initial complaint [ECF No. 1] was knowingly deceptive as it leaves out critical,

descriptive information regarding the parties in this case. Counsel for Plaintiff was trying to make

it seem that Plaintiff was discriminated against by White Americans versus Cuban Americans so

that their client would have a cognizable claim. The pertinent portions of the complaint are as

follows:

17. On or about August of 2020, Plaintiff began working under the direct
    supervision of *Noel Leon (American)* (hereinafter "Leon")
19. In September 2020, Plaintiff complained about the discriminatory
    treatment to the owner of the company.
21. On or about October 2, 2020, Noel's son, *Alejandro Leon (white)*
    hereinafter "Alejandro") came to the site where Plaintiff was working
    and physically assaulted him.

*See* [ECF. No. 1] (emphasis added).

Plaintiff clearly knew that Noel Leon, Manny Comes,  Alejandro Leon, and Chris De Moya

were Cuban. Mr. Leon even testified that he had an affinity for Plaintiff because they came from

neighboring villages in the countryside of Cuba. In fact, several De Moya employees were from

Plaintiff's village. *See* Exhibit 10, Noel Leon Depo. at 34, 78-81. Thus, when Plaintiff raised the allegation of National Origin discrimination, he knew it was false.

Plaintiff's self-serving affidavit where he claims he was belittled because he speaks Spanish is clearly farcical as 70% of the De Moya workforce is Hispanic and Spanish is widely spoken, because De Moya hires a lot of recently arrived immigrants from Latin America like the plaintiff.

**D.     Plaintiff Should Have Known based on MDCHR Investigative Report That There Was No Legitimate Claim of Discrimination Against De Moya**

The MDCHR issued a comprehensive report based on their investigation that outlined in great detail the MDCHR's rationale for determining that "there is no probable cause to believe that Charging Party was subjected to unlawful employment actions." *See* Ex. 1, MDCHR Investigative Report. MDCHR found with regard to the claims of discrimination based on Race and National Origin as follows:

> Charging Party alleged he was discriminated against based on his race (Hispanic) and national origin (Cuban) when he was terminated. However, Charging Party provided no evidence that similarly situated individuals outside of his protected class were treated better or different than him. In fact, witnesses offered that N. Leon was highly respected among his peers and no other employee had ever made a complaint against him. . . . There was no indication that Charging Party was reprimanded because of his race and/or national origin. Additionally, the Respondent provided a list of new hires for a six month period in 2020, where it shows that fourteen (14) out of forty-one (41) persons hired, were of Cuban descent and twenty-eight (28) of them identified as Hispanic. They also reported that during that same period, fifteen (15) employees were involuntarily terminated. Six (6) of those employees were of Cuban descent, but none of them were under Leon's supervision. This does not seem like the actions of a company with discriminatory animus based on race or national origin.
>
> Moreover, Respondent provided a legitimate, non-discriminatory business reason for their actions. Respondent stated that Charging Party had been previously disciplined for various work performance

deficiencies and their sole reason for terminating him was because he fell asleep on the job.

*Id.* at p. 8.

The MDCHR also analyzed the Retaliation Claim and stated as follows:

In this case, Charging Party claimed he was terminated in retaliation for complaining about his supervisor and his supervisor's son. However, he provided no evidence that he participated in a protected activity for the purposes of retaliation under the anti-discrimination laws. Although there was evidence that he complained, it appears that the complaint was centered on the alleged physical altercation with A. Leon.

*Id.* at 8-9.

The MDCHR provided a clear analysis of the facts applied to the appropriate law and concluded that there was no discrimination based on his race and national origin and no grounds for a retaliation claim. Despite this clear analysis, Plaintiff and his counsel filed suit and forced De Moya to pay for an attorney to defend this frivolous case.

## **MEMORANDUM OF LAW**

### A.  **Legal Standard for Rule 11 Sanctions**

The purpose of Rule 11 sanctions is to reduce frivolous claims, defenses, or motions, and to deter costly meritless maneuvers." *Cook-Benjamin v. M.H.M. Corr. Services, Inc.*, 571 Fed. Appx. 944, 948 (11th Cir. 2014). Rule 11 sanctions are warranted when a party files an action that: (1) has no reasonable factual basis; (2) has no reasonable chance of success based on the legal theory used, or that cannot be advanced as a reasonable basis to change existing law; or (3) is filed in bad faith for an "improper purpose." *See, e.g., Cook-Benjamin* at 948 (11th Cir. 2014); *Williams v. Carney*, 266 Fed. Appx. 897, 898 (11th Cir. 2008); *see also* Fed. R. Civ. P. Rule 11(b). The plain language of Rule 11 establishes that a party and his counsel can be subject to sanctions for all "papers" presented to the court. *Turner v. Sungard Bus. Sys., Inc.*, 91 F.3d 1418, 1421 (11th Cir.

1996) ("it is well established that Rule 11 "applies to all papers filed in a suit."). Courts in the Eleventh Circuit have held that continued assertion of a Title VII or other discrimination claim that has no reasonable chance of success on the merits is sanctionable. *See Jackson v. Hall Cnty. Gov't, Georgia*, 568 Fed. Appx. 676, 679 (11th Cir. 2014) (finding district court did not abuse its discretion by awarding attorneys' fees under Rule 11 because attorney should have known there was no evidentiary support for claims); *see also Footman v. Cheung*, 341 F. Supp. 2d 1218, 1228–29 (M.D. Fla. 2004), *aff'd in part, appeal dismissed in part*, 139 Fed. Appx. 144 (11th Cir. 2005) (awarding attorneys' fees in A.D.A. case where plaintiff and his counsel asserted incorrect allegations in complaint).

In determining whether to impose sanctions, the district court must determine "whether the party's claims are 'objectively frivolous' in view of the facts or law—and then, if they are, whether the person who signed the pleadings should have been aware that they were frivolous; that is, whether he would have been aware had he made a reasonable inquiry." *Williams* at 898-99 (citing *Worldwide Primates, Inc. v. McGreal*, 87 F.3d 1252, 1254 (11th Cir. 1996)). A legal claim is frivolous if no reasonably competent attorney could conclude that it has any reasonable chance of success. *Uppal v. Wells Fargo Fin.*, 8:19-CV-2319-MSS-TGW, 2021 WL 519343, at *3 (M.D. Fla. Feb. 11, 2021), *appeal dismissed*, 21-10690-F, 2021 WL 2308779 (11th Cir. May 26, 2021). "If the attorney failed to make a reasonable inquiry, then the court must impose sanctions despite the attorney's good faith belief that the claims were sound." *Worldwide Primates*, 87 F.3d at 1254. Rule 11 allows for the imposition of sanctions on the attorney in addition to the client. *See id*.

## ARGUMENT

### 1. Plaintiff's Retaliation Suit Is Objectively Frivolous

Prosecution of meritless claims is not factually nor legally justified and, thus, sanctionable under Rule 11. *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003). Rule 11

places an affirmative duty on an attorney to inquire into both the legal and factual basis of a claim before filing suit. *See Worldwide Primates*, 87 F.3d at 1255. The affirmative duty to conduct a reasonable inquiry in the law is violated by failing to research legal precedent adequately or by seeking relief under nonexistent precedent. *Gutierrez v. City of Hialeah*, 729 F. Supp. 1329, 1332 (S.D. Fla. 1990).

There is not a single Eleventh Circuit case that supports a *prima facie* retaliation claim based on general allegations of feeling "disrespected" by a colleague. Furthermore, no factual or legal basis supports that Plaintiff's termination was a pretext for discriminating against him because he is Cuban. Had counsel conducted any meaningful research, they would have—and indeed should have—discovered the deficiencies in the proposed action for retaliation under Title VII and the FCRA. *See Cook-Benjamin*, 571 Fed. Appx. at 949 (finding sanctions were appropriate under Rule 11 and § 1927 "due to counsel's steadfast refusal" to drop FLSA and hostile work environment claims until the response to the defendants' summary judgment motion which "unnecessarily and unreasonably multiplied the litigation.").

To establish a *prima facie* case of retaliation under Title VII, Plaintiff must show that he: (1) engaged in statutorily protected expression, (2) suffered an adverse employment action, and (3) there was some causal relation between the two events. *Anduze v. Florida Atl. Univ.*, 151 Fed. Appx. 875, 877 (11th Cir. 2005) (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)). Once a plaintiff has established a *prima facie* case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action. *Id.*; *see also Perryman v. Johnson Prods. Co., Inc.* 698 F. 2d 1138, 1142 (11th Cir. 1983) ("At this stage of the inquiry, the defendant need not persuade the court that its proffered reasons are legitimate; the defendant's burden is merely one of production."). If that burden is met, the plaintiff

14

then bears the ultimate burden of proving, by a preponderance of the evidence, that the reason provided by the employer is a pretext for prohibited, retaliatory conduct. *Id.*

**a.   There Is No Legal or Factual Basis to Support Plaintiff Engaged in Protected Activity**

During his deposition, Plaintiff testified that on September 4, 2020, he complained to De Moya's owner, Chris De Moya, about his supervisor, Mr. Leon, because "he had a bad attitude and a lack of respect." (*See* Ex. 6, pp. 12:21-14:1). Plaintiff's complaints of disrespect are insufficient to establish a protected activity. *See Rodriguez v. Miami Dade Cnty. Pub. Hous. & Cmty. Dev.*, 776 Fed. Appx. 625, 626 (11th Cir. 2019). When confronted with the frivolousness of their claims due to a lack of a protected activity, Plaintiff's counsel implied they were relying on Plaintiff's good faith belief that Title VII had been violated and stated:

> "*we believe that at the conclusion of discovery,* Mr. Monteagudo will be able to establish that he had a good faith belief that he was being discriminated against and that his complaints constituted protected activity."

*See* Ex. 2 (emphasis added). Ms. Saavedra's response fails to recognize that the Eleventh Circuit's requirement to demonstrate "a good faith, reasonable belief" is not based on a plaintiff's subjective ideas or feelings. A plaintiff's burden to establish a good faith belief he was being discriminated against and that his complaints were protected activity *has a subjective and objective component. Ceus v. City of Tampa*, 803 Fed. Appx. 235, 245 (11th Cir. 2020) (emphasis added). To establish he engaged in a protected activity, a plaintiff "must demonstrate a subjective belief that the employer was engaged in unlawful employment practices and that his "belief was objectively reasonable in light of the facts and record presented." *Brown v. City of Opelika*, 211 Fed. Appx. 862, 864 (11th Cir. 2006); *Saffold v. Special Counsel, Inc*., 147 Fed. Appx. 949, 951 (11th Cir. 2005).

Plaintiff's complaints about Mr. Leon all center on him feeling disrespected because he was

ordered to go to a job site. Hence, Plaintiff's complaints had no relationship to national origin; they stemmed from a personality conflict with his Cuban supervisors. *See Saffold*, 147 Fed. Appx. at 951. There is no objective or subjective reason to believe that being ordered to perform a task by a supervisor is an act of national origin or race discrimination, particularly when the supervisor is the same race and national origin.

**b.   There is No Legal or Factual Basis to Establish a Causal Connection Between Plaintiff's Discrimination Complaints and the Decision to Terminate Him**

"To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *Brown*, 211 Fed. Appx. at 863–64. Plaintiff claims he made his complaints to Chris De Moya. The testimony from all parties involved in the complaint process is the same. Plaintiff complained about being treated disrespectfully by Mr. Leon, who ordered him to a job site to perform work tasks. This complaint is not a Title VII or FCRA complaint of discrimination, nor is it participation in an EEOC investigation. Thus, absent a protected activity, Plaintiff cannot establish a retaliation claim which requires reporting discrimination or opposing discrimination. *See* 42 U.S.C. § 2000e.

The decision maker behind Plaintiff's termination, Jerry Nasso, did not know any specific details regarding Plaintiff's complaint to Chris De Moya, and simply terminated Plaintiff for sleeping while on the job. *See* Ex. 8 (Nasso Dep., pp. 39, 41, 49-53).

**c.   There Is No Legal or Factual Basis to Challenge the Legitimate, Non-Retaliatory Reason for Plaintiff's Termination**

De Moya has maintained that Plaintiff was terminated because a supervisor found him asleep in a roller. The disciplinary report issued when Plaintiff was terminated states: "Substandard Work," "Improper Conduct," and "Failure to Follow Instructions" as grounds for his termination.

*See* Ex. 8. Sleeping on the job is prohibited, especially on top of a heavy piece of equipment.[6] Furthermore, Plaintiff's termination came after multiple warnings. It is evident that De Moya has provided a legitimate, non-retaliatory reasons for terminating an employee.

Plaintiff's simple denial that he was not sleeping is insufficient. "A plaintiff is not allowed to recast an employer's proffered non-discriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. A.I. Transport,* 229 F.3d 1012, 1030 (11th Cir. 2000). "It is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated." *Alexander v. Fulton Cnty., GA.,* 207 F.3d 1303, 1341 (11th Cir. 2000). In this case, Plaintiff expects to prevail by simply quarreling with De Moya's reason for terminating him.

## 2. Plaintiff's Counsel Failed to Make a Reasonable Inquiry into the Retaliation Claims and Continued This Litigation When It Was No Longer Tenable

Rule 11 imposes an affirmative duty on attorneys to conduct a reasonable inquiry into the validity of a pleading before it is signed. *Bernal v. All American Inv. Realty, Inc.*, 479 F.Supp. 2d, 1291, 1326 (S.D. Fla. 2007). The affirmative duty to inquire into the factual basis of a complaint prohibits an attorney from relying solely on "personal interpretation of the facts, conclusory allegations of fact, speculation, suspicion, rumor or surmise" to sustain reasonable belief in those facts and thus avoid liability under Rule 11 for failure to make reasonable inquiry into facts before signing a document. *See Gutierrez v. City of Hialeah,* 729 F. Supp. 1329 (S.D. Fla 1990). The Court must determine whether a reasonable attorney in like circumstances could believe his actions

---

[6] Mr. Nasso testified that sleeping on a piece of heavy equipment is a safety violation, even though he did not check safety violation on the termination form. *See.* Ex. 8, Nasso Dep., p. 43.

were factually and legally justified. *Kaplan*, 331 F.3d at 1255. In evaluating the sufficiency of the factual support, an attorney's good-faith belief that the claims were sound is irrelevant; only whether the attorney made a "reasonable inquiry" matters. *Worldwide Primates, Inc.*, 87 F.3d at 1254. Relevant factors to consider in determining the reasonableness of the inquiry include how much time was available for investigation, whether reliance upon representations of the client was necessary, whether the paper was based upon a plausible view of the law, and the extent to which factual development required discovery. *Gould v. Florida Atl. Univ. Bd. of Trustees*, 10-81210-CIV, 2011 WL 13227759, at *4 (S.D. Fla. Nov. 1, 2011).

Plaintiff's counsel had sufficient time to conduct a reasonable investigation into the Title VII and FCRA claims. The MDCHR's determination of no probable cause issued on December 1, 2021, explicitly states that "there was no probable cause to believe that a discriminatory employment practice has occurred." Ex. 1. Based on the MDCHR's conclusion, counsel should have known or did know that Plaintiff's discrimination claims did not support a lawsuit. *Id.* Yet, seven months later, Plaintiff's counsel filed the initial six-count complaint on July 26, 2022. De Moya Group was founded by Cubans, is managed by Cubans, and Plaintiff's two primary supervisors are Cuban. A majority of De Moya's workforce is Hispanic. Thus, allegations that Plaintiff was discriminated against based on his national origin (Cuban) and race (Hispanic) did not have legs at the case's inception. Plaintiff investigation should have revealed all of the above, and the MDCHR determination clearly provided an objective analysis of the claim and concluded that there was no discrimination.

### 3.  The Action Was Filed and Maintained in Bad Faith for Improper Purpose

The Eleventh Circuit has made it clear that when a plaintiff brings a frivolous suit for an improper purpose, as Plaintiff has done here, Rule 11 sanctions are appropriate. *See Taiyo Corp. v. Sheraton Savannah Corp.*, 49 F.3d 1514, 1515 (11th Cir. 1995). Rule 11 provides litigants the

incentive to "stop, think and investigate more carefully before serving and filing papers." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 398 (1990). The obligation not to file papers for an improper purpose is continuing. *See Turner*, 91 F.3d at 1422 (holding Rule 11 emphasizes the duty of candor by subjecting litigants to potential sanctions for insisting upon a position after it is no longer tenable). "A litigant's obligations with respect to the contents of these papers are not measured solely as of the time they are filed with or submitted to the court but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit." *Id*. An improper purpose may be inferred from the filing of frivolous papers or "the outrageous nature of the claims made." *In re Kunstler*, 914 F.2d 505, 518-19 (4th Cir. 1990). Pursuing a claim that lacks merit indicates lodging a suit in bad faith. *See Eisenberg Dev. Corp. v. City of Miami Beach*, 95 F. Supp. 3d 1376, 1382 (S.D. Fla. 2015).

As discussed above, Plaintiff's counsel's continued litigation of this matter, even after it became obvious that it is untenable, demonstrates bad faith. Such an improper purpose provides the grounds for this Court to grant De Moya's Motion for Sanctions. *See McDonald v. Emory Healthcare Eye Ctr.,* 391 Fed. Appx. 851 (11th Cir. 2010) (holding district court did not abuse its discretion in granting Rule 11 Motion based on sanctioned party's numerous Rule 11(b) violations, such as filing pleadings for the improper purpose of harassing the defendants and presenting claims that were frivolous and had no legal or factual support).  The theme behind the plaintiff's case seems to be reflected in her email, which is the "costs of litigating this case will only increase"  so you should settle this frivolous case. See Exhibit 3 Email from Nathaly Saavedra.

### 4.  Rule 11 Sanctions Are Appropriate

"Rule 11 sanctions are richly deserved in this case to punish plaintiff's conduct and deter future abuses against litigants and the judicial process." *Dean v. A.R.A. Envtl. Services, Inc*., 124 F.R.D. 224, 227 (N.D. Ga. 1988). Courts must assess Rule 11 sanctions to "deter repetition of the

conduct" that violates the Rule. Fed. R. Civ. P. 11(c)(4). Rule 11 does not list factors a court should consider in deciding the appropriate sanction for a Rule 11 violation. *See* Fed. R. Civ. P. 11 Advisory Committee Notes (1993). Rather, a trial court has broad discretion to choose the nature and the amount of the sanction to achieve the deterrent purposes of Rule 11. *See DiPaolo v. Moran*, 407 F.3d 140, 146 (3rd Cir. 2005).

The Eleventh Circuit has noted District Court judges' broad discretion in imposing sanctions to enforce Rule 11's "mandate against filing groundless complaints," stating**:**

> If Rule 11 is to be effective, a District Court Judge, in his or her broad discretion, must be able to impose whatever sanctions appear appropriate to combat the expense, inefficiency and backlog which the judicial process suffers because of wrongfully filed complaints and motions. It is the District Court Judge who sits at this bottleneck and who most accurately perceives the harms which rightful litigants suffer because of Rule 11 violations. No one is better situated to perceive the measure of the sanction necessary to achieve the goals which the rule contemplates.

*Collins v. Walden*, 834 F.2d 961, 965-66 (11th Cir. 1987). Furthermore, the Eleventh Circuit approves dismissal with prejudice and an award of attorneys' fees and costs as an appropriate sanction for frivolous suits filed for an improper purpose. *See Taiyo Corp.*, 49 F.3d at 1515 (affirming dismissal and imposition of monetary sanctions for action brought for improper purpose and not warranted by existing law or nonfrivolous extension of law).

WHEREFORE, Defendant, The De Moya Group Inc., respectfully requests that this Court sanction Plaintiff, Jorge Monteagudo Alburquerque, by dismissing his lawsuit  and award reasonable attorneys' fees and costs incurred defending this matter and grant any other further relief it deems just and proper given the circumstances.

## LOCAL RULE 7.1(a)(3) CERTIFICATE OF GOOD FAITH CONFERENCE

I, the undersigned attorney, certify that, prior to filing this motion, Plaintiff's counsel was contacted via email on February 2, 2023, March 22, 2023, and April 13, 2021 and requested to withdraw the Complaint. Plaintiff, through his counsel, was also served with a copy of this Motion twenty-one (21) days prior to filing of same, and still failed to withdraw the Complaint. Accordingly, there was an attempt to resolve this matter and no resolution was able to be obtained without Court intervention.

Respectfully submitted,

By:      /s/ *Reginald J. Clyne*
         Reginald J. Clyne, Esq:
         Florida Bar No.: 654302
         Chanelle Artiles, Esq:
         Florida Bar No.: 1006402
         QUINTAIROS, PRIETO, WOOD &
         BOYER, P.A.
         *Attorneys for Defendant, The De Moya
         Group, Inc.*
         9300 S. Dadeland Blvd., 4th Floor
         Miami, FL 33156
         Tel: (305) 670-1101
         Fax: (305) 670-1161
         Email: rclyne.pleadings@qpwblaw.com
                reginald.clyne@qpwblaw.com
                chanelle.artiles@qpwblaw.com
                andres.vidales@qpwblaw.com
                cecilia.quevedo@qpwblaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 17, 2023, the foregoing was electronically filed with the Clerk of Court via CM/ECT system, which will send a notice of electronic filing  to Plaintiff's counsel, Nathaly Saavedra and Juan J. Perez, with PereGonza The Attorneys, PLLC, at nathaly@peregonza.com and juan@peregonza.com.

/s/ *Reginald J. Clyne*