# Exhibit 1

MIAMI-DADE COMMISSION ON HUMAN RIGHTS
INVESTIGATIVE REPORT

RE:   CHR Charge No. F-8515
      EEOC Charge No. 15C-2021-00021

**Charging Party**
Jorge Monteagudo Albuquerque
3261 NW 18 Terrace
Miami, FL 33125

**Respondent**
The de Moya Group, Inc.
14600 SW 136 Street
Miami, FL 33186

## STATEMENT OF DETERMINATION

In accordance with Title VII of the Civil Rights Act of 1964, as amended ("Title VII"); Chapter 760 of the Florida Statutes, as amended ("Chapter 760"), and Chapter 11A of the Miami-Dade County Code, as amended ("Chapter 11A"), it is determined that there is **no probable cause** to believe that Charging Party was subjected to unlawful employment actions. Detailed below are the investigative findings, which led to this determination:

1. Jorge Monteagudo Albuquerque ("Charging Party") alleged he was subjected to unlawful discrimination and retaliation based on his race (Hispanic) and national origin (Cuban). He alleged that in August 2020, Noel Leon ("N. Leon") (Hispanic/Cuban), Supervisor, subjected him to discriminative and disrespectful comments, such as "Cubans are lazy." After complaining to the owner about the discriminatory treatment, Charging Party was transferred to another project under the supervision of Manuel Comes[1] (Hispanic/Cuban). On October 2, 2020, Alejandro Leon ("A. Leon") (Hispanic/Cuban), N. Leon's son, went to his work site to harass him. He alleged that A. Leon physically attacked him and threatened him. Charging Party reported the incident to Comes, to no avail. Consequently, on October 5, 2020, Charging Party filed a police report because he was concerned for his safety. The following day, Charging Party reported the incident to Jerome Nasso[2] (White/American), Superintendent. On October 7, 2020, Elena (LNU), from Human Resources, advised Charging Party they would be investigating. Later that same day, Nasso presented him with a write up for "sleeping on the job." Charging Party refused to sign the document and was terminated. He alleged that the charges were false and were used as a pretext for his termination.

2. Charging Party is a person claiming to be aggrieved under Title VII, Chapter 760, and Chapter 11A. On October 27, 2020, he filed the charge of discrimination with the Miami-Dade Commission on Human Rights (CHR); within 180 days of the alleged discrimination. The case was then forwarded to the Equal Employment Opportunity Commission (EEOC) for dual-filing.

3. The de Moya Group, Inc., ("Respondent") is an engineering and construction firm that constructs roads and bridges. Respondent conducts business in Miami-Dade County and is an "employer" within the meaning of Title VII, Chapter 760, and Chapter 11A.

---

[1] Charging Party did not identify Comes' last name in his Charge of Discrimination. Respondent provided the complete name at a later date.
[2] Charging Party did not identify Nasso's last name in his Charge of Discrimination. Respondent provided the complete name at a later date.

DEF00163

## RESPONDENT'S RESPONSE

1. In their position statement, Respondent stated they construct roads and bridges and due to the dangers of the job, they must make sure that their employees understand that there is no margin for error as safety comes first.

2. Respondent reported that Charging Party had been involved in several incidents and his attitude and failure to complete his assigned work had been well documented.

3. Respondent stated Charging Party was not satisfied working for the company. In September 2020, Charging Party walked into their main office with a "threatening demeanor," scaring the staff, and asked to speak with Christopher de Moya (Cuban American), owner. Susan Giraldo (Hispanic/Colombian), employee, served as interpreter translating from Spanish to English. In a raised voice, Charging Party stated he felt disrespected by N. Leon, but never mentioned discrimination based on race or national origin. He requested to be moved to another project. On September 14, 2020, Respondent transferred him to their Turnpike/Okeechobee 490 project.

4. Respondent stated N. Leon has been employed with them since 2007, and this is the first complaint made against him since he was hired. They reported that N. Leon is "very well respected by his peers."

5. Respondent refuted Charging Party's statement that Comes told him N. Leon had warned him about Charging Party being "problematic." Respondent stated N. Leon and Comes did not know each other, did not work together and did not have each other's phone numbers.

6. Respondent offered that once Charging Party was transferred, he again was unreliable in the completion of his assignments. He blocked A. Leon, supervisor, from entering the project to perform his Quality Control work. A. Leon became upset and got out of his truck where an argument ensued, and A. Leon told Charging Party to stop talking negatively about his father. On October 5, 2020, Charging Party filed a police report stating he was assaulted by A. Leon. Jose Batista (Hispanic/Cuban), another employee that was present during the incident, did not witness the assault.

7. Respondent stated that on October 6, 2020, Nasso terminated Charging Party for sleeping on a roller. However, his behavior from February through October 2020, included not following instructions, not completing his tasks, and not working safely.

8. Respondent stated Charging Party's work record has not been exemplary; he was given chance after chance; "it [was] his own behavior that got him terminated;" and "he has never taken responsibility for his actions." Case in point, Charging Party blamed Nasso for his termination.

9. Respondent stated they welcome employees of all nationalities and races and there was no discrimination nor retaliation against Charging Party. Charging Party was not treated any differently than any other employee. He was expected to perform his job and was warned many times about focusing and completing his work. Charging Party stood up to his supervisors by not performing any job he did not feel like doing and complained about working with certain crews. He was seen not performing his work, sitting around, leaving his work zone, and hiding.

## CHARGING PARTY'S REBUTTAL

DEF00164

1. During his rebuttal conference, Charging Party stated that he began his employment in August 2019 as a Finisher/Helper. He was hired by Fabricio Cedillo (Hispanic/Ecuadorian), Project Manager, and was assigned to work under the supervision of N. Leon.

2. Charging Party stated he did not know how many employees worked there, however, there people of various nationalities such as Haitian, Cuban, Colombian, and Nicaraguan, and their races varied.

3. Charging Party reported that he began having problems with N. Leon because he would make negative comments about Cubans (in Spanish), such as "you don't want to work because you're lazy." Specifically, he described an incident where Charging Party was asked to bring a roller tractor and he brought back the one with the rubber tires instead of the one with steel tires. N. Leon then said to him, "You Cubans are comemierdas," (you Cubans are shit eaters).

4. Charging Party stated workers were treated poorly. For example, he stated that while he was already working on a project on 137th Street, N. Leon called him to work on road 874. Charging Party advised him that he had a bad tire and was afraid to get on the expressway, but N. Leon threatened him to go or get fired; Charging Party ended up going as assigned.

5. Charging Party stated he was assigned as a spotter and while the operator was digging, a pipe broke. He acknowledged he was disciplined for that, but also mentioned that it only happened once. He denied any all other incidents and/or disciplinary actions Respondent claimed he was involved in.

6. Charging Party stated he thought he was treated less favorably than others because "he is not there to socialize; he is there to work." He stated he did not have a rapport with his supervisor, and he is not a snitch.

7. Charging Party stated he reported N. Leon's treatment to de Moya and was consequently transferred to another project under Nasso's supervision.

8. Charging Party mentioned that on October 2, 2020, while he was working on the new project, A. Leon drove up to him, got out of his truck, went up to him, and hit him on the chest. Charging Party denied blocking the entrance and stated there was another company working there that witnessed the incident; however, he did not give any specific names as witnesses to the incident. Charging Party stated he reported the incident to Comes, who told him he would speak with N. Leon.

9. Charging Party said that on October 5, 2020, the day after the incident with A. Leon, he filed a police report; the following day he gave the report to Pedro (LNU), Human Resources.

10. Charging Party alleged that both Leons, father and son, had issues with Tony Hernandez, DOT Inspector, and offered him as a witness. He also offered the name of two other co-workers as witnesses: Francisco Baldelomar (Hispanic/Nicaraguan) and Miguel Quiroz (Hispanic/Honduran).

11. Charging Party vehemently denies the allegations that on October 7, 2020, he was sleeping on the job; the cause for his termination.

## SUMMARY OF FINDINGS

1. Respondent submitted a copy of employees that were hired and discharged between the period of June 1, 2020, through December 31, 2020. There were 41 individuals hired whose national origins included: (21) Americans, (14) Cubans, (1) Indian, (1) Jamaican, (1) Colombian, (1) Mexican, (1) Israeli and (1) unknown. Those employees identified as (1) Asian, (6) Black, (28) Hispanic, and (6) White. There were 60 employees terminated, 15 were listed as involuntary discharges, including (8) Americans, (6) Cubans and (1) Israeli. Those employees identified as (2) Black, (10) Hispanic, and (3) White. None of those employees were under N. Leon's supervision.

2. Respondent submitted the New Hire Orientation package Charging Party signed on August 18, 2019, and a checklist of an Overview of General Safety. Also included was a "Policy of Safety," "Discrimination Policy," "Equal Opportunity" flyer, "Rights and Responsibilities of Employee Under FMLA," all translated in Spanish and signed by Charging Party on August 3, 2019.

3. Respondent reported that on February 21, 2020, Charging Party served as a spotter when an operator using an excavator hit the overhead AT&T lines. Neither of the spotters assigned to that job warned the operator that there was a utility line above him. Due to this error, damage to the lines occurred and the operator received a written disciplinary warning; the two spotters, including Charging Party, received verbal warnings.

4. Respondent also submitted a Disciplinary Warning presented to Charging Party dated March 24, 2020, describing an incident where the crew hit a water line. It was further described in a separate statement that Charging Party was one of two spotters who failed to warn the operator there was a water line underground. All three employees received warnings.

5. Respondent offered that on July 16, 2020, after N. Leon and a Construction Engineer Inspector had just inspected and passed the base rock on a project, Charging Party drove through the base rock rutting the length of the base rock. Due to Charging Party's carelessness, the base rock needed to be fixed and reinspected. N. Leon scolded both Charging Party and Baldelomar. The following day N. Leon had a safety meeting with the crews to ensure that would not happen again.

6. Respondent explained that Charging Party asked N. Leon and Cedillo to switch him to nights, but they were unable to switch him permanently because Christian Ferreras (Hispanic), the night Supervisor, had already hired new employees on his crew. Cedillo stated Charging Party requested night work or overtime and he (Cedillo) and Leon had him installing temporary barrier walls, fixing MOT, and traffic shifts. Cedillo stated Charging Party made the request, but never mentioned he had problems with N. Leon; he just said that most of his jobs had been working nights and he liked working nights. In an attempt to help Charging Party, Cedillo then asked Ferreras if he needed anyone at night, but was told he had already hired some guys.

7. Additionally, in his written statement, Cedillo stated Charging Party was involved in a physical altercation during his lunch break and away from the job site. Charging Party had been with Baldelomar and Angelica Rodriguez, co-worker, and an unknown man said something disrespectful to Rodriguez, which lead Charging Party to strike the man. The man called the police and they showed up to the main office looking for him and took his statement. Cedillo stated he did not know what happened after that incident.

8. Respondent stated that on September 4, 2020, N. Leon assigned Charging Party to clean the window between the road shoulder and the temporary barrier wall. The next day, N. Leon found that the work had not been performed. Leon asked Charging Party to join up with Fermin Jimenez (Hispanic/Mexican), Equipment Operator, to complete the prior day's assignment. Charging Party responded that he did not work with Jimenez. At that point, N. Leon advised

Charging Party to work together or he would be terminated. N. Leon made the decision to give Charging Party another chance.

9. In response to Charging Party's allegation that A. Leon had had an incident not only with him, but also with Hernandez, Respondent provided Workplace Incident Reports of incidents between Tony Hernandez (Hispanic/Dominican), FDOT Inspector, and other employees. The incidents were as follows:

   - Workplace Incident Report – March 2017. Incident between Hernandez and Cedillo where Hernandez and Eduardo Rodriguez, position unknown, had to be called to a job site and then Hernandez telling Cedillo that he had been "home, smoking a cigar, and drinking wine." Cedillo asked why would show up at the site inebriated and then later Hernandez and Rodriguez denied ever saying that.
   - Workplace Incident Report – Following the March 2017 incident. Another report was provided of issues between Hernandez and Cedillo about Hernandez making comments such as saying that Cedillo weas "flexing his pechito (chest)." Cedillo asked him whether Hernandez had been inebriated again, both Hernandez and Rodriguez denied that ever happened.
   - Workplace Incident Report – June 16, 2018. Incident between Hernandez and Lisa Kavadas, position unknown, where during a gas line rupture, Hernandez told Kavadas she was doing a bad job and provoking her. She ended up screaming at him.
   - Workplace Incident Report – Following the June 16, 2018, incident. Another report was provided of issues between Hernandez and Cedillo about Hernandez approaching him during an emergency situation where water had to be pumped and Hernandez told him that he didn't have a dewatering permit.
   - Workplace Incident Report - July 2018. Stated that Hernandez had an incident with Osmani Perez, Slout Group (SG) operator, regarding a damaged structure and that Hernandez spoke in an aggressive manner with employee.
   - Workplace Incident Report - July 24, 2018. Issues between Hernandez, Rodriguez, and Cedillo, regarding their treatment of Cedillo.
   - Workplace Incident Report - August 2018. Argument between Hernandez and Alain A. Perez, position unknown. Noel had to be called onsite to resolve the issue.
   - Workplace Incident Report - November 27, 2018. Hernandez and A. Leon had an argument over the way Hernandez spoke with an SG operator, consequently bringing dMG and CEI management to convene on the site to continue the base inspection and clear things between the employees. Noel had to be called onsite to resolve the issue.
   - Workplace Incident Report - November 27, 2018. Hernandez and N. Leon had an argument regarding a curb measurement and that Hernandez would not approve it.
   - Workplace Incident Report – March 27, 2019. Issue between Hernandez and Perez where Hernandez again spoke to Perez in a belligerent manner regarding moving a loader. Noel had to be called onsite to resolve the issue.
   - Workplace Incident Report – Unspecified date. Issue between Hernandez and Mario Adan, position unknown, regarding Hernandez approaching employee in a disrespectful and vulgar manner, proceeding to yell and curse at Adan. Cedillo had to be called onsite to resolve the issue.

10. Respondent provided a statement from Elena Valdes, (Cuban), Director of Insurance and Risk Management. She provided a summary of the events as described to her during a call on October 7, 2020, by Charging Party. She also provided a statement of an e-mail she received on October 7, 2020, from de Moya, stating that he had spoken with A. Leon and obtained a version of his events. He also commented that he could not recall any other employee complaining about N. Leon, and that N. Leon and Nasso did not know each other or have each other's phone numbers. De Moya mentioned that Charging Party's termination had nothing to do with what had happened previously and also stated that "the firing doesn't seem to have anything to do with the police filing as no one knew about it." According to de Moya,

DEF00167

5

Batista was interviewed as a witness, and he confirmed that A. Leon did not mount the roller nor make any physical contact with Charging Party. Valdes also noted that she again spoke with Charging Party on October 15, 2020, who told her during that call that A. Leon had been involved in an assault incident with Hernandez, the FDOT inspector, and she asked him to call her back with the contact information of the individual that could corroborate that. Later that afternoon, she received an e-mail from de Moya, who advised that the witness said "the assault never took place," and the disciplinary report Charging Party refused to sign was filled out and not blank like Charging Party alleged. His opinion was that Charging Party was terminated for sleeping on the job and that "no further action is required by us."

11. Respondent submitted a written statement from Giraldo, dated January 22, 2020, where she described Charging Party walking into the main office to speak with de Moya and recalls Charging Party's demeanor as "very mean." She stated Charging Party began pointing fingers at de Moya and his voice began to escalate as he spoke to him. He was asked to calm down and Charging Party requested to be transferred because he had been having issues with N. Leon and felt disrespected by him, however, he never mentioned discrimination. Giraldo stated she has been employed with the company for four (4) years and had never felt discriminated or belittled, and stated, "this company has upheld a professional atmosphere to the point where it has felt more like a second family."

12. Respondent submitted Employee Accident/Disciplinary Reports written by Comes in reference to Charging Party's performance. One report dated September 29, 2020, is a Written Warning for "Failure to Follow Instructions." The incident summary stated Charging Party was assigned to spot trucks and help with the grader, cleaning the stakes on the ground so the operator could see the grade mark. Charging Party was warned about sitting around and not working and not following instructions. Another undated report described Charging Party was warned for constantly disappearing out of his work zone. Comes approached him while he was hiding behind a light tower mass and told him "if he was caught again not being in his work zone [he] was going to be written with a disciplinary report." None of these reports were signed or dated by Charging Party.

13. Respondent submitted a Statement of Employee and the Miami-Dade Police Offense-Incident Report for the October 2, 2020, incident between Charging Party and A. Leon. A. Leon provided a statement noting he was performing an inspection with Batista and when they arrived at the inspection site, they noticed a roller operator was blocking the only existent path to the place where the inspection was to take place. He stated they started pointing fingers to get him out of the way, but Charging Party "refused to move." He stated he got out of the truck to tell him he was blocking access to the site. When he returned to the truck, Batista told A. Leon that was the man that had been making false and negative comments about N. Leon (his father). He then stated he stepped out of the truck again and asked Charging Party why he was making those kind of comments, "knowing what type of person and great supervisor [N. Leon] is." A. Leon stated Charging Party accepted that N. Leon is a "respectful and great person," and A. Leon's last words to him were "thank you."

14. Respondent also submitted a statement from Batista stating Charging Party had a "very rude attitude requesting us to move from his path," but they could not move since there were temporary walls on one side and a slope on the other. Batista further described that Charging Party "refused to take action and kept his attitude against us." He then described A. Leon got off the truck to talk to the worker and explain the reason they could not move. He stated A. Leon explained to Charging Party that "he was not having his best behavior when referring to a supervisor," but that was all that happened.

15. Respondent submitted a Termination of Employment form written by Nasso describing how Charging Party was found sleeping on a roller. He further stated, "all employees are told during our daily production meeting that when they finish their tasks or are not sure what to do, they

are to find a superintendent in the area to be given a new task. Sleeping on a roller is inexcusable." Charging Party refused to sign the form. Additionally, Respondent submitted an e-mail from Nasso to de Moya stating Charging Party never informed him of any incidents or altercations he may have been involved in previously. Nasso asserted that he did not know Leon and was not aware of any altercation between them, and that Charging Party was terminated for sleeping on the roller.

16. Respondent provided an additional statement from Carlos Cardona, Foreman, where he described Charging Party and stated, "from day one I know he wasted no time in talking negatively about Noel Leon in his previous position." Cardona offered that those who have worked with N. Leon have the utmost respect for him and his work ethic, his knowledge and employee interaction. He stated Charging Party was not a "model employee," avoided work and wandered from assigned work areas. He also stated Charging Party's complaints of discrimination of his race are "utterly ridiculous…the majority of the employees here are of Cuban decent [sic]." He stated that as a person of Puerto Rican descent, he has never experienced racism in any way, shape, form, or fashion. He stated that "employees are fairly given opportunities based on job performance." He also offered that he served as a witness/translator when Charging Party was presented with his termination. Charging Party was explained the seriousness of the offense, but he refused to sign the write-up.

17. On April 15, 2021, an interview was conducted with Tony Hernandez, MDX Project Engineer Consultant. Hernandez stated that he worked as a consultant for MDX, and he left the project in September 2020. He stated he had a physical altercation with A. Leon, but did not file charges. He stated that "the de Moya Group is very powerful, they a have a lot of political connections." Hernandez mentioned no other incidents relating to this charge.

18. On April 15, 2020, an interview was conducted with Francisco Baldelomar (Brown/ Nicaraguan), Foreman. He stated that sometimes "bosses/superintendents went off" and N. Leon "went off on them because of work." He mentioned that Leon was like that almost with everyone, but he had an issue with Charging Party because he complained against him. He said he never witnessed Charging Party doing anything wrong, but that in construction, employees get heat exhaustion and are tired and may rest under a tree; "they're humans, not machines." He also mentioned that Leon had problems with Quiroz, but did not provide specific examples. Quiroz has since left the company.

19. On April 15, 2020, attempts were made to schedule an interview with Miguel Quiroz, Equipment Operator, however he never returned the phone calls.

## ANALYSIS

**Disparate Treatment Claim:**

Courts use the analytical framework established by the Supreme Court in *McDonnell Douglas* when a plaintiff offers circumstantial evidence to prove a Title VII claim. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). A plaintiff may establish a *prima facie* case of discrimination by showing that: 1) s/he was a member of a protected group, 2) s/he was qualified for the job, 3) s/he was subjected to an adverse employment action, and 4) the employer treated similarly situated employees outside of his/her class more favorably. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). A plaintiff may show that he or she was subjected to an adverse employment action by showing a serious and material change in the terms, conditions, or privileges of employment. *Id.* at 971.

Once the plaintiff has established his or her *prima facie* case of discrimination, a rebuttable presumption arises establishing that the employer acted unlawfully. *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010). The employer may rebut the

DEF00169

7

presumption of discrimination by simply articulating a legitimate non-discriminatory reason for its action. *Alvarez*, 610 F.3d at 1264. After the employer has proffered a legitimate non-discriminatory reason for its action, the burden shifts back to the employee to produce evidence that the employer's proffered reason is pretext for discrimination. *Id.* To establish pretext, the plaintiff may identify "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered explanation. *Brooks v. County Com'n of Jefferson County, Ala.,* 446 F.3d 1160, 1163 (11th Cir. 2006). Therefore, pretext may be established only when it is shown that the employer's reason was false, and that discrimination was the real reason. *Id.* Ultimately, the burden of persuasion remains with the plaintiff to prove that he or she was intentionally discriminated against. *Id.*

Charging Party alleged he was discriminated against based on his race (Hispanic) and national origin (Cuban) when he was terminated. However, Charging Party provided no evidence that similarly situated individuals outside of his protected class were treated better or different than him. In fact, witnesses offered that N. Leon was highly respected among his peers and no other employee had ever made a complaint against him. A witness offered that N. Leon went off on them, but that he was like that with almost everyone. There was no indication that Charging Party was reprimanded because of his race and/or national origin. Additionally, the Respondent provided a list of new hires for a six-month period in 2020, where it shows that fourteen (14) out of forty-one (41) persons hired, were of Cuban descent and twenty-eight (28) of them identified as Hispanic. They also reported that during that same period, fifteen (15) employees were involuntarily terminated. Six (6) of those employees were of Cuban descent, but none of them were under Leon's supervision. This does not seem like the actions of a company with discriminatory animus based on race or national origin.

Moreover, Respondent provided a legitimate, non-discriminatory business reason for their actions. Respondent stated Charging Party had been previously disciplined for various work performance deficiencies and their sole reason for terminating him was because he fell asleep on the job. Charging Party admitted he was disciplined once before, but denied receiving any other disciplinary action.

Overall, Charging Party has not provided, nor has this investigation revealed, any evidence that Respondent's reason for the action taken was pretextual. Pretext may be established only when it is shown that the employer's reason was false, and that discrimination was the real reason. *Alvarez v. Royal Atlantic Developers, Inc.,* 610 F.3d 1253, 1264 (11th Cir. 2010). Ultimately, the burden of persuasion, which remains with the Charging Party to prove that he was intentionally discriminated against, was not met.

**Retaliation Claim:**

A *prima facie* case for retaliation is established when an employee shows that: 1) the employee engaged in statutorily protected expression, 2) the employee suffered an adverse employment action, and 3) the adverse employment action was causally connected to the protected expression. *See Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006).

In *University of Texas Southwestern Medical Ctr. v. Nassar*, No 12-484 (June 24, 2013), the U.S. Supreme Court held that the plaintiff must demonstrate that the employee's protected activity was the but-for cause of the alleged adverse action by the employer. Relying on what the Supreme Court views as "textbook tort law," this "standard requires the plaintiff to show 'that the harm would not have occurred' in the absence of –that is, but for – the defendant's conduct.

In this case, Charging Party claimed he was terminated in retaliation for complaining about his supervisor and his supervisor's son. However, he provided no evidence that he participated in a protected activity for the purposes of retaliation under the anti-discrimination laws. Although there was evidence that he complained, it appears that the complaint was centered on the alleged

DEF00170

8

physical altercation with A. Leon. Further, no one knew, except for Human Resources, that Charging Party had filed a police report against A. Leon for the altercation.

Moreover, Respondent articulated a legitimate, non-retaliatory business reason for terminating Charging Party's employment, as discussed above – Charging Party was found sleeping on the job while mounted on a roller and was terminated by Nasso. There was no evidence presented that Nasso and Leon knew each other or had each other's phone number. Furthermore, there was no evidence Charging Party's termination had anything to do with any previous incidents he may have had with his previous supervisor.

Charging Party has not provided, nor has this investigation revealed, any evidence that the Respondent's offered reasons for their actions were pretextual. Ultimately, the burden of persuasion, which remains with the plaintiff to prove that he was intentionally retaliated against, was not met.

## CONCLUSION

Based on the foregoing, it is determined that there is no probable cause to believe a discriminatory and/or retaliatory employment practice has occurred.

## RIGHT OF APPEAL

Under Chapter 11A, Code of Miami-Dade County, as amended, either party has the right to **request an appeal** of the findings or recommendations of the CHR and a hearing on such appeal shall be granted. **A request for appeal must be made via email to ofep@miamidade.gov or via certified mail with return receipt addressed to: Erin A. New, Division Director, Human Rights & Fair Employment Practices, Human Resources Department, 111 NW 1 Street, 21st Floor, Miami, Florida, 33128. Appeal requests submitted via facsimile or via telephone will not be accepted.** The request must be emailed or postmarked within fifteen (15) days of the date the you receive the final determination, which is calculated based on the date the e-mail was sent to the e-mail address you provided this agency or the date you received the final determination via USPS certified mail [if you did not consent to receive documents electronically]. If no appeal is timely filed, the recommendations shall become final orders and may be enforced in Circuit Court.

Dated this __1st__ day of __December__, 2021.

_____
Erin A. New, Division Director
Commission on Human Rights, Human Rights and Fair Employment Practices
Human Resources Department

Ec: Case file

DEF00171

9