UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.:  1:22-cv-22343-KMM Moore/Louis

JORGE MONTEAGUDO ALBUQUERQUE,

      Plaintiff,

vs.

THE DE MOYA GROUP, INC., a
Florida Profit Corporation,

      Defendant.
----------------------------------x

VIDEOCONFERENCE DEPOSITION OF
CHRISTOPHER DE MOYA

Taken on Behalf of the Plaintiff via videoconference

DATE TAKEN:     Friday, January 13th, 2023
TIME:           1:01 p.m. - 2:56 p.m.


Held remotely via videoconference



Examination of the witness taken before:
Carol Baer, FPR

Daughters Reporting, Inc.
101 Northeast 3rd Avenue
Suite 1500
Fort Lauderdale, Florida 33301

PLAINTIFF'S
EXHIBIT

3

```
 1    APPEARANCES VIA VIDEOCONFERENCE:

 2    Appearing for the Plaintiff:

 3         NATHALY SAAVEDRA, ESQUIRE
           JOCELYN ROCHA, ESQUIRE
 4         PEREGONZA THE ATTORNEYS, PLLC
           5201 Blue Lagoon Drive, Suite 290
 5         Miami, Florida 33126
           (786)650-0202
 6         nathaly@peregonza.com
           jocelyn@peregonza.com
 7

 8    Appearing for the Defendant:

 9         REGINALD J. CLYNE, ESQUIRE
           QUINTAIROS, PRIETO, WOOD & BOYER, P.A.
10         9300 S. Dadeland Boulevard, 4th Floor
           Miami, Florida 33156
11         (305)670-1101
           reginald.clyne@qpwblaw.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2

TESTIMONY OF CHRISTOPHER DE MOYA
3

Direct Examination by Ms. Saavedra:              5
4    Cross-Examination by Ms. Clyne:                 69
Redirect Examination by Ms. Saavedra:           73

5

6    Certificate of Oath:                            78

7    Certificate of Reporter:                        79

8    Errata Sheet:                                   80

9    Read Letter:                                    81

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    PLAINTIFF'S EXHIBITS

 2    NUMBER                DESCRIPTION                  PAGE

 3    Exhibit 1    Employee Accident/Disciplinary Report
                   DEF00100 - 00101                      66
 4
      Exhibit 2    Termination of Employment
 5                 DEF00099                               68

 6    Exhibit 3    E-mail from Fabricio Cedillo
                   DEF00073 - 00075                       75
 7

 8                    DEFENDANT'S EXHIBITS

 9    NUMBER                DESCRIPTION                  PAGE

10                        NONE MARKED

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                Videoconference deposition of CHRISTOPHER DE

 2   MOYA, taken remotely before Carol Baer, Florida

 3   Professional Reporter and Notary Public in and for the

 4   State of Florida at Large, in the above cause.

 5                THE STENOGRAPHER:  All right.  Mr. de

 6         Moya, please raise your right hand and I'll

 7         swear you in.

 8         Do you solemnly swear or affirm the

 9         testimony you're about to give will be the

10         truth, the whole truth, and nothing but the

11         truth?

12                THE WITNESS:  I do.

13   Thereupon:

14                CHRISTOPHER DE MOYA,

15   having been first duly sworn, was examined and testified

16   as follows:

17                DIRECT EXAMINATION

18   BY MS. SAAVEDRA:

19         Q    Good afternoon.

20         A    Good afternoon.

21         Q    May I please have you state your full name

22   for the record?

23         A    Christopher Homer de Moya.

24         Q    Good afternoon, Mr. de Moya.  My name is

25   Nathaly Saavedra.  I am one of the attorneys
```

1    representing the plaintiff in a lawsuit that he has

2    brought against the company, de Moya Group.  And I

3    will be asking you some questions today.

4              Have you ever been deposed before?

5    A    Nope.  I'm a virgin.

6    Q    Well, let me go over some ground rules for

7    today.  Hopefully it will be -- it won't be too

8    painful.

9              I will be asking you some questions and I

10   just ask whatever answer you can give me that is

11   true and complete, just to the best of your ability

12   today, please do so.

13             All I ask is that if you don't understand

14   a question, please let me know.  I'll be happy to

15   rephrase it.  Okay?

16   A    Okay.

17   Q    If your attorney states an objection,

18   unless he instructs you not to provide an answer, if

19   you understand my question, you can go ahead and

20   provide me an answer to the question as you

21   understand it.  Is that fair?

22   A    Sure.

23   Q    We can get a little conversational from

24   time to time.  As you can see, there is a court

25   reporter here and she's taking everything down that

```
 1    we're saying.  So all I ask is for purposes of

 2    making sure that the record is clear, that you let

 3    me finish my question and then so we're not talking

 4    over each other.  Okay?

 5         A    Okay.

 6         Q    And if you need a break at any point, just

 7    let me know and I'll be happy to take one.  All I

 8    ask is that you answer my question, whatever

 9    question, if one is pending, before we do so.

10         A    Got it.

11         Q    Last thing is to provide me your answers

12    out loud.  Although I may see you shaking your head

13    or nodding, there is a court reporter and we want to

14    make sure that the record shows everything that

15    transpired today.

16         A    Understood.

17         Q    Are you currently on any medication or

18    other substance that would prohibit you from giving

19    true and accurate testimony today?

20         A    No.

21         Q    And are you currently on any medication or

22    other substance that will prohibit you from

23    recalling events from 2020/2021?

24         A    No.

25         Q    And do you understand that you have been
```

1    designated by the company to testify on specific

2    topics?

3         A    Yes.

4         Q    And you're also here in your individual

5    capacity as a witness to the case, you understand,

6    correct?

7         A    Yes.

8         Q    Are you prepared to testify about the

9    topics listed on the Notice of Deposition?

10        A    Yes.

11        Q    And other than speaking to your attorney,

12   which I don't want to know anything about, what did

13   you do to prepare for today's deposition?

14        A    Just reviewed the stuff that we had

15   submitted to the EEOC and just kind of tried to jog

16   my memory of everything that transpired through

17   that.

18        Q    Did you have any conversations with anyone

19   other than your attorney?

20        A    No.

21        Q    So you mentioned that you reviewed the

22   response to the EEOC.  Are you referring to the

23   deposition statement?

24        A    The deposition topics, I went through that

25   and kind of went through everything there, the

```
 1   summary that Elena put together for us when her and

 2   I were working on the case together.  And that's

 3   about it.

 4           I mean, I know some of the topics are

 5   asking about wages and whatnot, so I went back and

 6   looked at some of the wage rates back then so I had

 7   an idea, if you were to ask me about that and, you

 8   know, stuff like that.

 9           Just went through the topics and kind of

10   looked through anything I had to try and jog my

11   memory of what you may ask me or may not ask me.

12       Q    Did you have any role in collecting

13   documents that were produced in this litigation?

14       A    I'm sorry.  Any what?

15       Q    Did you take part in collecting documents

16   that were produced in this litigation on behalf of

17   the company?

18       A    No.

19       Q    And what is your current role with the

20   company?

21       A    Vice-president in field operations.

22       Q    And how long have you held this position?

23       A    Probably about seven years; six, seven

24   years.

25       Q    Who reports to you in that position?
```

```
 1       A    I deal with all field project managers,
 2   superintendents.  I kind of oversee the operations,
 3   mainly in South Florida.
 4            Nobody reports directly to me on a daily
 5   basis, but I will travel our projects, contact our
 6   supervisors or project managers if I have any
 7   questions or I see something that doesn't look
 8   right.
 9            I make myself present to our employees.
10   So that's kind of how, you know, Mr. Monteagudo came
11   to me when he had an issue with his supervisor.
12       Q    How often are you at the job sites?
13       A    Every day.  I don't go to every job site
14   every day, but I try and hit all of our sites that
15   are local here once or twice a week, depending if I
16   get caught up in a meeting.  But I'm a nomad when it
17   comes to our projects.
18       Q    And when you are not at a particular job
19   site, do you have like an office where you work
20   from?
21       A    I actually don't because I travel so much.
22   My truck is mainly my office.  But if I go to a
23   site, I'll jump on the conference table if I got to
24   log onto my computer.  Sometimes I come here to our
25   main office and I'd log on and do e-mails and
```

1    whatnot.

2        Q    And did you attend college or any

3    vocational school?

4        A    Some college.

5        Q    Which school?

6        A    I went to Santa Fe Community College in

7    Gainesville and Miami-Dade College.

8        Q    What was your area of focus?

9        A    Construction management.

10        Q    Did you graduate?

11        A    I did not.

12        Q    Do you have any other profession -- any

13    other professional certificates or licenses?

14        A    No, I don't.

15        Q    How many people does the company or did

16    the company employ in 2020/2021, if you have an

17    average?

18        A    I'd say a few hundred.  Probably

19    between -- probably around 300 or so.  It's hard to

20    say.

21        Q    And how many departments does the company

22    have or did the company have during the same time

23    period, 2020/2021?

24        A    By departments, are we saying like bridge?

25    We have bridge.  We have roadway.  We are also

1    separated out into multiple companies.  So we have

2    The de Moya Group.  We have Asphalt Group.  So on

3    the Asphalt Group side of it, we have a paving crew,

4    we have construction crews, we have drainage crews.

5    We have our officer overhead, office personnel.  You

6    need an exact number?

7        Q    No, no, no.  I'm trying to get an idea of

8    the structure of the company.  So you mentioned that

9    there are some other companies, correct?

10       A    Correct.

11       Q    Can you explain the relationship between

12   the company and Asphalt Group?

13       A    Well, back in the early 2000s, I believe

14   it was, we purchased a company that was Brewer

15   Paving Company, I think they were called, and we

16   changed the name to The Asphalt Group.

17            Up until probably about four or five years

18   ago, that company strictly did paving, mainly for de

19   Moya Group.  Rarely, we would also subcontract out

20   to other contractors.  But that company has grown

21   and we've kind of split employees between the two

22   companies.

23            And now that company is also doing, other

24   than just paving, they're doing roadwork, they're

25   doing bridgework.  So we basically have two entities

```
 1   that are -- we do joint work together with and

 2   whatnot.

 3        Q    Was Mr. Monteagudo an employee of Asphalt

 4   Group during 2020?

 5        A    I believe he never got transferred to

 6   Asphalt Group.  He did work under the supervision of

 7   Asphalt Group when he requested his transfer and

 8   that's where we had available.  So he went to go

 9   work under Asphalt Group but his employment never

10   changed.

11        Q    And does the company -- does de Moya Group

12   have departments like human resources and an

13   administrative department?

14        A    Yes and no.  We are not kind of structured

15   that way.  We kind of all have our hand in

16   everything a little bit.

17             We have -- I guess Elena would be the

18   closest thing to our human resource manager, even

19   though we call her risk management.  But she's the

20   one that we have employees contact if they seem to

21   have an issue that they want to bring up with the

22   company.

23             She's very good at her job and -- but then

24   there's also girls in the office that when there's

25   an application, they will do the background check.
```

```
 1    They'll send it to a woman to do the background

 2    check or driving records and stuff like that for

 3    truck drivers or whatnot, but it's not an actual

 4    department.  She also does other things in the

 5    office.  We kind of multitask around here.

 6         Q    And when you're saying "she," who are you

 7    referring to?

 8         A    Lorena Jervis.

 9              She literally just processes the

10    information that's given to her to make sure that

11    the employee is eligible to work in the country and

12    stuff like that.

13         Q    Can you spell her last name, please?

14         A    J-E-R-V-I-S, I believe.

15         Q    And do you have any idea as to when she

16    started working for the company?

17         A    I can look it up but she's been here, I

18    believe, more than 10 years.

19         Q    Do you right now have any documents in

20    front of you?

21         A    I have just the summary of discussion that

22    I mentioned and the topics that were in the initial

23    that we sent.

24         Q    And I want to ask you right now, you can

25    put that away.  If I need to ask questions
```

1    specifically about those documents, I will be happy

2    to present those to you and we can pull them up.

3         A    Okay.

4         Q    Thank you.

5              So you mentioned that Elena was the

6    closest to an HR manager role, correct?

7         A    Yes.

8         Q    Was that the case during 2020 and 2021?

9         A    Yes.

10        Q    But she doesn't really have any

11   involvement when it comes to hiring and firing

12   employees, does she?

13        A    No.

14        Q    Can you describe to me the reporting lines

15   and relationship in a position as Mr. Monteagudo as

16   a laborer during 2020/2021?  Who did he report to?

17        A    Noel Leon was his original supervisor.  He

18   was a roadway superintendent, and I think his direct

19   foreman was Vladimir.  They called him Chico.  I

20   can't remember his last name.

21        Q    And Vladimir, what position was he?

22        A    He's like a foreman, a roadway foreman.

23        Q    And the roadway superintendent and the

24   foreman, who do they report to?

25        A    Typically the project manager, who was

16

1    Fabriocio Cedillo.

2         Q    And then the project managers report to

3    you?

4         A    To me, my brother.  We have senior project

5    managers and whatnot.  But, I mean, mostly for the

6    roadway stuff, it would be me.

7         Q    And who is Alisa de Moya?

8         A    My mother.

9         Q    What role does she play within the

10   company?

11        A    It's hard to say.  She does so many and

12   wears so many hats.  A lot of the financials, making

13   sure subcontractors are paid, making sure we have

14   money to pay subcontractors, making -- more of the

15   financial role.

16        Q    Does she handle any HR issues when it

17   comes to employees?

18        A    No.

19        Q    Does she conduct any investigations on

20   behalf of the company?

21        A    She doesn't do the investigations, no.

22   She'll put her nose in it.  She wants to know

23   everything that's going on in the company.  Her and

24   my father started this company back in 1986, and she

25   treats it as one of her children.

```
 1       Q      Understood.

 2              Who's the person that conducts the

 3    investigations when it comes to any complaints?

 4       A      That would be me.  I'm the one that

 5    handled this one.  I mean, we call on -- you know,

 6    I'll call on my supervisors to assist in said

 7    investigations and basically give the directives to

 8    get comments from this person or that person.

 9    That's kind of what we did on this case, just, I

10    think, this is the first for me so...

11       Q      And does the company have an employee

12    handbook or personnel manual?

13       A      Included in every application there's a

14    safety and the discrimination clauses and whatnot.

15    And we do have a safety manual.  It's like 40 pages

16    long.

17       Q      And those, I guess, policies and manuals,

18    who created them, if you know?

19       A      That's been an evolving thing for the last

20    30 years.  So it's probably a cumulative of my

21    father, my uncles, my brother, safety managers.

22    There's no one person that put it together.

23       Q      Are you at all involved in like revising

24    or modifying those manuals or handbooks?

25       A      I can be.
```

```
 1        Q     Have you been, though, in the last few
 2   years?
 3        A     No, I can't think of anything that I've...
 4        Q     You mentioned that the forms about
 5   discrimination and so forth, those are given to the
 6   applicants at the time that they fill out the
 7   application?
 8        A     Everyone has signed one of them, yes.
 9        Q     Do they receive a copy?
10        A     You got me on that.  I guess if they
11   request one, obviously they're allowed to keep it.
12   I would guess that not every single employee has
13   kept a copy of their application.
14        Q     Does the company provide any training
15   relating to the policies that it has in place, such
16   as discrimination or anti-retaliation policies?
17        A     Yes.  Every job site has the required
18   posters posted on equal employment opportunity and
19   equal employment treatment and everything.
20        Q     How are the trainings provided?
21        A     They're not specific.  Elena will give a
22   training on discrimination or whatnot.  Our safety
23   manager will give trainings on different subjects of
24   safety.  Sometimes we'll hire outside resources to
25   come in and do training on certain things.
```

1      Q      When was the last time that you hired an

2  outside resource to do some training?

3      A      They were actually doing one this morning

4  on how to use a particular piece of machinery at one

5  of our yards.  It's an ongoing thing that's never

6  ending really.  We're always trying to keep everyone

7  up to speed with everything, safety and whatnot.

8      Q      What is your understanding of the

9  company's equal employment opportunity

10  anti-discrimination policy?

11      A      That there's a zero tolerance and it's a

12  fireable offense if anyone discriminates against

13  anyone for anything whatsoever, as far as gender,

14  race or anything like that.

15      Q      And who is responsible for revising or

16  modifying that policy?

17      A      I don't think anyone's assigned to that.

18      Q      And you mentioned that there is training

19  that is ongoing.  Are supervisors trained in the

20  policy and what is allowed and what isn't allowed?

21      A      Yeah.  Yes, they are.  But none of it's

22  allowed so they know that.

23      Q      And how is that training provided?  Like

24  do they have to watch a video?

25      A      Elena most recently did it in person.

20

 1   What materials she used, I don't know.

 2        Q    Is everybody required -- who's required to

 3   attend to those trainings?

 4        A    I believe we did it from foreman up.  I'm

 5   not positive if they had all the employees sit

 6   through it or not.  I'd have to check with Elena.

 7        Q    And in 2020, do you know if there was any

 8   training provided?

 9        A    I don't know.

10        Q    Before the one that you're mentioning that

11   is the most recent, do you recall when was the last

12   one before that?

13        A    I don't recall.

14        Q    Do you have an idea as to how often those

15   trainings are provided?

16        A    I do not.

17        Q    Do you know who would know?

18        A    Not sure, no.

19        Q    Are there any records that are kept for

20   those trainings, like who attended?

21        A    Yeah, yeah.  There's log-in sheets.

22        Q    And where are those records maintained?

23        A    I'd have to look.

24        Q    You don't know where they are?

25        A    Off the top of my head, no, I don't.

```
 1        Q     Does the company have a policy about

 2   anti-retaliation in the workplace?

 3        A     That is in the same document in the

 4   application as the discrimination, which is in the

 5   application.

 6        Q     How does the company enforce the

 7   anti-discrimination and anti-retaliation policy that

 8   it has in place?

 9        A     This is our first ever issue with

10   discrimination -- well, alleged discrimination.

11        Q     My question is a little bit different.

12   How does the company ensure that there is no

13   discrimination or retaliation in the workplace?

14        A     If discrimination or retaliation is never

15   brought up and it's never witnessed, then nothing is

16   done about nothing.

17              If it comes up or if it's brought up, we

18   will address it accordingly, and we'll do our due

19   diligence, like we did in this case, to see whether

20   it was or was not an instance of it.

21              And most likely if we find someone is

22   discriminating against someone else, they are going

23   to lose their job, no matter who they are.

24        Q     Are employees required, by the company's

25   policy, to report any incident of discrimination?
```

```
 1       A     Say that one more time.

 2       Q     Are they required to report any incident

 3  of discrimination?

 4       A     Yes.

 5       Q     How can the employees file a report or a

 6  complaint about discrimination?

 7       A     They can do it through our office.  They

 8  can do it through Elena.  They can do it through --

 9  if it's an issue with their supervisor, they can go

10  to another supervisor.  They can call me, just like

11  Mr. Monteagudo did.  I make myself available to all

12  our employees.  And he knew that because he came

13  specifically asking for me.

14       Q     When you say that they could do it through

15  the office, who specifically would be in the office?

16  Who are you referring to?

17       A     Whoever answers the phone.

18       Q     There's not like a designated person,

19  right?

20       A     I mean, again, Elena would be the closest

21  thing to that.

22       Q     Earlier today Ms. Valdes testified that

23  she doesn't handle discrimination claims, that's not

24  part of her work.  Is that not a true statement?

25       A     I mean, she's been handling this.  I mean,
```

```
 1    is that her title?  No.  Like I said before, we wear

 2    a lot of hats in here and she gets involved where we

 3    ask her to get involved.  She's dealt with the

 4    employees.  Again, this is our first time.  We never

 5    had this in 30 years, so...

 6         Q    Is there a way that an employee can report

 7    a complaint in -- let me rephrase that.

 8              To report a complaint of discrimination,

 9    does the employee have to call, do they send an

10    e-mail, it could be done any way?

11         A    They can do it any way.  They can send an

12    e-mail.  They can show up at our office and ask to

13    speak to someone.  They can make a phone call to our

14    office and ask to speak to someone, and the

15    receptionist will put them -- ask me who, and we go

16    from there.  And it's usually me.  When it comes to

17    field personnel, it's me.

18         Q    And what are the steps that are put into

19    place to address a complaint of discrimination?

20    What do you do next?

21         A    I investigate.  I ask questions.  I look

22    for evidence, and whatever's provided to me, I use

23    that to decide.  I get multiple people's input.  I

24    ask about witnesses, who saw this, who heard this,

25    and make a decision accordingly.
```

1     Q    And do you keep notes or any type of

2   records regarding your conversations or

3   investigation?

4     A    I mean, you saw the notes and e-mails from

5   this one.  That's about it.  Again, this is the

6   first time I've ever had to deal with this.

7     Q    Do you request -- when you're asking

8   individuals or witnesses questions, do you ask them

9   to put anything in writing at the time?

10     A    Yes, I always ask for a written comment, a

11   written statement.

12     Q    Does the company have like a specific form

13   that they use to process this or...

14     A    We have like special report forms that

15   they can write on or they can just write on a

16   standard piece of paper.

17     Q    And does anyone assist you in conducting

18   these investigations that you are referring to?

19     A    I think I've already mentioned that, but

20   yes, I ask for assistance from my field personnel,

21   Elena assisted me with it, supervisors that are

22   involved with that particular employee.

23     Q    And the information that you collect and

24   put in writing, where is it stored?

25     A    In that particular employee's file.

1       Q     And where are the employees' files

2   located?

3       A     Here at our main office.

4       Q     Does everybody have access to them?

5       A     No.

6       Q     Who has access to the employee files?

7       A     Management, as in myself, my uncle, my

8   brother, my mother, my Aunt Cheryl.  The files are

9   actually in her office.

10      Q     Anyone else?

11      A     No.

12      Q     How does the company or how do you

13  determine whether a complaint has any merit?

14            MR. CLYNE:  Objection to form.  Vague.

15  BY MS. SAAVEDRA:

16      Q     You can answer, if you understand my

17  question.

18      A     I don't know how to answer that question.

19      Q     Does Elena have access to the employee

20  files?

21      A     I'm unsure of that.  I don't think I would

22  object to her having access to the files.

23      Q     As you sit here today, you don't know

24  whether or not she does?

25      A     Has she ever requested files?  No.  If she

1    requested to see the files on anything, I would let

2    her.  So, yes, she has access if she wishes to.

3         Q    Let me ask you this:  When it comes to

4    discrimination -- and the questions that I'm asking

5    you right now, I'm talking more in general terms.  I

6    understand that the situation with Mr. Monteagudo is

7    the first one that has arised that you have dealt

8    with, but my questions are more in terms of what

9    procedures are in place.  And we'll get to specifics

10   of this case in a minute.  Okay?

11        Is there a particular procedure that or is

12   it part of the procedure that an employee who

13   submitted the complaint is updated about the

14   investigation progress?

15        A    No.

16        Q    If the company determines that the

17   complaint doesn't have any merit or has merit -- let

18   me strike that.

19        If the company makes a determination that

20   there has been some type of discrimination or the

21   complaint has merit, does the individual that is

22   accused of discrimination, is he subject to

23   discipline?

24        A    Yes.

25        Q    What kind of discipline?

```
 1      A      Depends on the circumstance.

 2      Q      How does the company decide what

 3   discipline to impose?

 4      A      I don't even know how to answer that.  It

 5   depends on the circumstance.  It depends on was it

 6   intentional, was it not intentional, was it, you

 7   know -- it depends.  We'd determine that on a

 8   case-by-case scenario.

 9      Q      Are supervisors and foremen and above

10   trained in how to perform investigations of

11   complaints if they ever receive them?

12      A      No.

13      Q      If a foreman receives a complaint of

14   discrimination, is there a particular procedure in

15   place that -- as to how they're required to proceed?

16      A      They shall report it to their superior.

17      Q      And how are they aware that that is what

18   they're required to do?  Is it in writing?

19      A      I don't know.  I'm not sure if that

20   specifically states that in our form.  That's

21   general knowledge out here.  If there's something

22   that can't be taken care of at a certain level, you

23   move it up to the next level.  It's standard

24   procedure with anything, whether it's discrimination

25   or something else.
```

28

1       Q     So you mentioned that the records are kept
2    in the personnel file.  Other than the physical
3    copies, is there an electronic copy?
4       A     Sometimes there is; sometimes there isn't.
5       Q     And is it like a particular system or is
6    it just like a folder and putting things in there?
7       A     Just a file folder, old school.
8       Q     What kind of computer is this information
9    stored in?
10      A     What kind of computer?
11      Q     Is it a Mac?  Is it a Dell?  Is it a...
12      A     Some us use Macs.  Some of us use general
13   computers.  We have a server here with a cloud.  I
14   don't know what kind it is.  Again, I don't know --
15   not everything is electronic, so...
16      Q     Does the company -- for how long do you
17   keep those records online?  Forever?
18      A     I don't know.  Whatever is required by
19   law.  I don't know.  I don't know the answer to
20   that.
21      Q     Does the company like regularly delete or
22   clean up the archives over time?
23      A     I don't know.  I'm not part of the tech
24   department.
25      Q     Do you know who would know?

```
 1        A     I'd have to ask.

 2        Q     Is there a tech department?

 3        A     We have a tech company that handles our

 4   servers and whatnot.

 5        Q     Like a third party?

 6        A     Yes.

 7        Q     Who's that?

 8        A     360 -- I have to get the exact name.  May

 9   I look it up or do you want me to get back to you on

10   that?

11        Q     If you can provide that information to

12   your attorney, or while we're on break, and we'll

13   come back to it.

14              Has the company implemented any type of

15   litigation hold on the information in those systems

16   as it relates to this claim?

17        A     Not that I know of.

18        Q     What kind of e-mail does the company --

19   like what kind of server does the company use for

20   e-mail purposes?  Is it Gmail?

21        A     We have our own domain.  I think I use

22   Outlook on my computer.

23              MR. CLYNE:  We are in a corporate rep depo

24         so you're kind of going outside of the notice

25         topic areas.
```

30

1          MS. SAAVEDRA:  No, this is part of where

2     to keep records and the maintenance of the

3     records and where they are.

4          MR. CLYNE:  There's nothing about how we

5     store and manage our records in what I'm

6     looking at here.

7          MS. SAAVEDRA:  It's how you store the

8     records.  It's how you store the records for

9     the company.

10          MR. CLYNE:  I understand that.  But you

11     did a corporate rep depo and you didn't list

12     that, so he's not prepared to answer those

13     questions, is what I'm saying.

14          MS. SAAVEDRA:  I mean, he's also here in

15     his personal capacity, so to the extent that he

16     doesn't have knowledge, that's perfectly --

17          MR. CLYNE:  You can only do one depo and

18     then the other.  You can't mix them.  If you're

19     doing a corporate rep depo, then do a corporate

20     rep.  If you want to ask him in his individual

21     capacity, you can.  But you can't mix the two

22     because then you can't tell what is corporate

23     rep and what is individual.

24          MS. SAAVEDRA:  Well, we scheduled his

25     deposition in his individual capacity for today

1    and then we were told by your office that he

2    was also going to be testifying in the

3    corporate rep capacity.

4         MR. CLYNE:  So we are in the corporate rep

5    mode, I thought, right now.  I'm just saying

6    that what you're asking him is not related to

7    corporate rep.

8         MS. SAAVEDRA:  My understanding from the

9    e-mails from your office is that there wasn't

10   an issue that we were going to have to do them

11   separately.  I mean, I'll be happy to do that

12   if that's how you want to proceed.  But it was

13   your office who suggested that he was going to

14   be here in his corporate rep capacity.

15        MR. CLYNE:  Our office said that he was

16   the designated corporate rep.

17        MS. SAAVEDRA:  And that there was no need

18   for an additional date because his deposition

19   was already scheduled for today.

20        MR. CLYNE:  And that's all true.  But you

21   can't -- what I'm trying to say, when you're

22   doing a corporate rep, you do the corporate

23   rep, and then if you want to afterwards do the

24   individual, that's your right.  And we are

25   willing to do that.  That why he's here in both

```
1        capacities.  But you can't mix apples and

2        oranges and then say, well, he's here on both.

3        No.  So right now we are in the corporate rep

4        mode.

5            MS. SAAVEDRA:  I think that that should

6        have been -- if that is going to be your

7        position, that should have been stated from the

8        beginning because --

9            MR. CLYNE:  That's not my position, ma'am.

10       That's the way the law is.  You have the rule

11       of procedure that deals with corporate rep

12       depos and you designate topics for the

13       corporate rep depos, which you did, and we

14       answered those topics.  So I'm just trying to

15       keep -- I don't want to blur the lines between

16       the corporate rep and the individual.

17           MS. SAAVEDRA:  I understand your concern,

18       Counsel.  But what I'm saying to you is that we

19       scheduled the deposition today in his

20       individual capacity.  Then we requested the

21       corporate rep deposition.  And your office was

22       the one who stated he will be -- that he would

23       be testifying in both capacities.

24           I was not aware that you were going to ask

25       for the deposition -- because I wouldn't have
```

```
 1      agreed to that, if that was the case.  It's
 2      1 o'clock in the afternoon.  If you're asking
 3      me to do two different depositions in one
 4      starting at 1:00 o'clock, I'm not doing that.
 5           So we can continue in his personal
 6      capacity and we can schedule his corporate rep
 7      deposition for a later time.
 8           MR. CLYNE:  Whatever you want to do, but
 9      I'm just saying you can't blur them.
10           MS. SAAVEDRA:  We'll just continue with
11      the deposition.
12           MR. CLYNE:  What mode are we in right now?
13      Are you in corporate mode or are you in
14      individual mode?
15           MS. SAAVEDRA:  I'm going to proceed with
16      the deposition in his individual capacity.
17           MR. CLYNE:  Okay.
18   BY MS. SAAVEDRA:
19      Q    Mr. de Moya, when did you first meet
20   Mr. Monteagudo?
21      A    I think the first time I spoke with him
22   personally was the day of his complaint or his
23   request for transfer.
24      Q    And when was that, do you recall?
25      A    I don't recall what the date was.
```

34

 1    Somewhere October, I guess, of 2020 or something
 2    like that.
 3         Q    Tell me what happened that day.
 4         A    I was in a meeting and the meeting was
 5    interrupted by our receptionist, said that there was
 6    an employee that was downstairs that was very upset
 7    and was asking specifically to speak with me.  She
 8    did mention to me that he was making the girls
 9    nervous down here.  So I excused -- I'm sorry?
10         Q    Go ahead.  I'm sorry.
11         A    So I excused myself from my meeting to
12    come down and find out what the issue was.  And
13    Mr. Monteagudo was very -- what's the word -- I
14    mean, angry is one word but I'm trying to think --
15    he was aggressive.  He was not just asking me to be
16    transferred, but demanding I transfer him.
17              I had to ask him multiple times not to
18    point his finger at me because he was talking at me,
19    not to me.  We were able to calm him and listen to
20    him.
21              And every time he started telling his
22    story, he'd start amplifying again and basically
23    saying that he won't be disrespected, and that
24    Mr. Leon was disrespecting him in front of other
25    employees, and that he couldn't work for him and

```
 1    that I had to transfer him to another job.
 2              So I told him that I would look into the
 3    matter and talk to Mr. Leon, as well as other
 4    supervisors on other jobs, to find out if we had
 5    another location we could locate him.  And I forget
 6    how long, but within the next week or so, I believe
 7    I had him transferred to work under a different
 8    project, as requested.
 9         Q    What is the name of your assistant?
10         A    My assistant?
11         Q    I'm sorry.  The receptionist?
12         A    Susan Giraldo (sic).  I'm not sure how to
13    spell it.
14         Q    You said that during the meeting that --
15    you used the word "we."  Who are you referring to
16    when you use the word we?
17         A    The company.
18         Q    And who was part of that meeting?  Was it
19    just you and Mr. Monteagudo?
20         A    I asked Susan to join because I do speak
21    Spanish, but especially when somebody's either
22    speaking fastly or loudly, I kind of can -- I'm
23    self-taught so I kind of lose track.  So I asked her
24    just to be present in case I didn't understand
25    anything that he said.
```

36

```
1          Q     Was she translating for you while --

2          A     A little bit, yes.

3          Q     And so what was the situation that was

4    upsetting Mr. Monteagudo?  What did he tell you

5    happened?

6          A     That Noel was disrespecting him, got upset

7    with him and decided to move him to a different

8    person to work for, went to a different operation,

9    and he couldn't work for that particular person for

10   whatever reason.

11         Q     Did he tell you how he was being -- he

12   felt that he was being disrespected?

13         A     He said he was yelling at him, maybe

14   cursing at him.

15         Q     Did he say anything else about what

16   comments were being made to him by Mr. Noel?

17         A     No, no.  He just -- I remember him using

18   the word "disrespect" multiple times though.  He

19   kind of just kept saying the same thing over and

20   over again.

21         Q     And you mentioned that -- this is the

22   first time that you met Mr. Monteagudo?

23         A     I believe I said hello to him in passing

24   on the projects.  Like I said, I drive through, I

25   stop in on crews.  I ask how people are doing, this,
```

1    that and the other, but we'd never really had a

2    conversation.

3         Q    So after you told him that you were going

4    to talk to Leon and other supervisors, what did

5    Mr. Monteagudo say?

6         A    He calmed down.  I think he even thanked

7    me for looking into it, and left.  That's about it.

8         Q    And you mentioned that you did, in fact,

9    move him, correct?

10        A    Yes, ma'am.

11        Q    Why did you feel the need of having to do

12   that?  Why did you make that determination?

13        A    Because it seemed like the right thing to

14   do.  Sometimes people don't get along well.

15   Sometimes you move an employee to a different

16   setting and things change for the better.  I felt it

17   was the right thing to do at the time.

18             It's hard to find workers.  It has been

19   for years.  And if we can find a place for a worker

20   that's not working out at one place but he works out

21   at another, we are going to give it a shot.  Nobody

22   wants to fire anyone.  That's the worst thing a

23   supervisor has to do.

24             And I didn't want to tell him because he's

25   having issues with one supervisor that, well, it's

```
 1   this or nothing.  That's not the way we do things
 2   around here.  We try and make things work.
 3        Q    So it's the common practice --
 4        A    I mean, I felt in that particular
 5   situation, that was the practice that had to be --
 6   am I talking over you or are you talking over me
 7   that time?
 8        Q    I am.  I am.  I'm sorry.
 9        A    I made a judgment call.  Once I got him
10   calmed down and I felt -- again, I don't want to
11   lose employees because there aren't very many out
12   there right now.  So we tried him out somewhere
13   else.
14        Q    I understand how difficult it can be as a
15   supervisor in trying to keep your employees happy.
16   Was that something that -- like did he say something
17   alarming or that made you feel like he needed to
18   be -- it was better to kind of put them aside or
19   just because he said he was disrespectful?
20        A    Disrespect came out of his mouth multiple
21   times.  I won't be disrespected.  He disrespected
22   me.  That's -- I find that a lot in some of these
23   guys.  You know, it's bravado.  Sometimes things get
24   heated out there, you know.  People get
25   disrespected.  What can I say.
```

39

```
 1        Q     And do you move them to different job
 2   sites every time that happens?
 3        A     It's not the first time I've had to move
 4   someone because he didn't get along with his
 5   supervisor, yes.
 6        Q     How many times has it happened in the
 7   past?
 8        A     I don't know.
 9        Q     More than 10 times?
10        A     No, not that -- I don't think so.  I can't
11   say that definitively.  I've been doing this for 35
12   years.
13        Q     In the last two years, has it happened
14   more than once?
15        A     This is the only one I can think of in the
16   last couple years.
17        Q     Is it the only time that an employee
18   doesn't get along with their supervisor or that has
19   a problem with somebody that they work with?
20        A     No.
21        Q     I'm sorry?
22        A     No.
23        Q     Is it the first time that it's brought up
24   to your attention that somebody has an issue with
25   their supervisor?
```

1      A     No.

2      Q     Prior to meeting Mr. Monteagudo when he

3   went to see you at the office, had you ever received

4   any complaints or any comments from his supervisors

5   about his performance?

6      A     I understand that he was part of some -- I

7   know that he was written up for certain incidents

8   where he wasn't paying attention to something he was

9   supposed to.  And because of that, there was damage

10  to a utility.  I think there's a couple different

11  instances of that.  So, yes, I did know that there

12  have been issues.

13     Q     Did you know that at the time when he went

14  to see you?

15     A     No, I didn't, because, like I said, I have

16  over 300 employees.  I don't remember every instance

17  to detail.

18     Q     At that point, had you ever received any

19  complaints about him?

20     A     Not that I remember anything specific, no.

21     Q     So after Mr. Monteagudo left, did you

22  speak to Mr. Leon?

23     A     I did.

24     Q     Was it in person or over the phone?

25     A     In person, I believe.

```
 1        Q     Was anyone else present?

 2        A     I don't think so, no.

 3        Q     And what was that conversation like?  Tell

 4   me what you said to him.

 5        A     I told -- I first asked him what happened.

 6   And he explained to me that Mr. Monteagudo hadn't

 7   done what he was asked to have done, and that he was

 8   going to move him to where someone was more directly

 9   supervising him because he was not completing his

10   tasks.

11              And he said that he's not a very good

12   worker, that he was lazy, and he didn't completely

13   agree with me transferring him somewhere else.  But

14   I told him I was going to give him another chance.

15        Q     When you said that he didn't agree with

16   you transferring him to somewhere else, what do you

17   mean?  Like what did he want you to do?

18        A     Well, he was just telling me how he's not

19   a very good worker, that he doesn't show up to work

20   every day, he lets other guys do the work around

21   him, and he kind of strays away from doing the hard

22   work.

23        Q     Did Noel have the authority to terminate

24   an employee under his supervision?

25        A     Noel has the authority to terminate an
```

42

 1    employee, yes.

 2          Q    Did he have that authority at that time?

 3          A    In my opinion, yes.  All my supervisors,

 4    if there's an employee that is not doing what

 5    they're told to, they have the authority to do that.

 6    Noel is not that kind of guy, though.

 7          Q    So if Mr. --

 8          A    Sorry.  That was my fault.  Go ahead.

 9          Q    If Mr. Monteagudo was such a problem

10    employee as he was telling you, how come he was not

11    terminating him?

12          A    Again, lack of employees.  We'll take what

13    bodies we can.  And Noel is -- I'm trying to think

14    of the word for him.  He's very passive.  I'm sure

15    when you do your deposition with him, you'll realize

16    he's a very passive man.

17               He would probably, if someone were to be

18    terminated, want me to do it.  I don't want to say

19    he lacks the backbone, but he's a nice guy.

20               I've never had one issue with Mr. Leon,

21    with Noel, with any of the employees in his 15 years

22    here.  He is probably one of the most liked

23    supervisors we have.  And I don't -- I'm not making

24    that up.

25          Q    If he didn't agree with just transferring

1    Mr. Monteagudo -- excuse me.  If he didn't agree

2    with you transferring Mr. Monteagudo, then what was

3    his proposal?  What did he want you to do?

4         A    He didn't tell me what he wanted me to do.

5    I guess disagree might be the wrong term.  But he

6    basically was telling me that he is not a very good

7    worker and he doesn't know that he's going to be a

8    good worker on another project, is kind of what he

9    was inferencing to me.

10        Q    Did you or Mr. Noel, prior to transferring

11   Mr. Monteagudo, issue any type of warning or

12   coaching to Mr. Monteagudo for his poor performance?

13        A    On that particular instance, not to my

14   knowledge.

15        Q    Do you know why not?

16        A    I don't know.  I guess it was a two-sided

17   story.  I don't know.  I wasn't trying to put

18   another report in the man's file.  I was giving him

19   the benefit of the doubt, which, you know...

20        Q    Did you memorialize your conversation with

21   Mr. Leon?

22        A    No.

23        Q    Did you memorialize your conversation with

24   Mr. Monteagudo in any way?

25        A    Not until he was terminated.

1      Q      Why not?

2      A      I guess it's my mistake, isn't it?

3      Q      I'm just asking you why not.  Did you feel

4   like there was no need?

5      A      I didn't feel like there was a need.

6      Q      Why?  Why did you feel like there was no

7   need for that?

8      A      I don't know.

9      Q      You didn't find concerning the allegations

10  Mr. de Leon (sic) was making about Mr. Monteagudo's

11  performance?

12     A      I've already said I don't know why I

13  didn't do it.

14     Q      I'm asking you whether you found

15  concerning or alarming or a red flag any of the

16  things that Mr. de Leon (sic) was saying about

17  Mr. Monteagudo?

18          MR. CLYNE:  Objection to form.

19  BY MS. SAAVEDRA:

20     Q      You can answer.

21     A      I know I can answer, but I don't know what

22  the answer is to that so -- I didn't do it.

23     Q      Where did you transfer Mr. Monteagudo to?

24     A      You want an exact location?

25     Q      Well, under whose supervision?  Let me ask

 1    you that.

 2         A    Our head superintendent on the project,

 3    his name is Victor Suarez, but he wasn't working

 4    directly under him.  I called Victor, asked him if

 5    he could use a laborer, that we had a laborer that

 6    was having issues and requested a transfer.  And he

 7    said he could use a body.  So he put him underneath

 8    one of his supervisors.

 9         Q    Do you know the name of the supervisor?

10         A    Manny Comes.  I'm not sure how you

11    pronounce it.

12         Q    Did you know Manny?

13         A    Yeah.

14         Q    Did you follow up with Mr. Monteagudo

15    after you had transferred him to that location?

16         A    I did not.

17         Q    Did you have any other interactions with

18    Mr. Monteagudo after that?

19         A    I don't believe so, other than a passing

20    by wave.

21         Q    After that, did you ever get any

22    complaints or any comments about Mr. Monteagudo not

23    performing and not doing his job?

24         A    No, not personally, no.  Not until the

25    last one.  Well, no, that was it.

46

```
 1       Q    What are you referring to when you say the
 2  last one?
 3       A    When I found out that he was terminated.
 4  I didn't have any interaction with him then either,
 5  so no.
 6       Q    How did you find out that he had been
 7  terminated?
 8       A    I don't recall.
 9       Q    Do you know who made that decision to
10  terminate him?
11       A    I think his name was -- I forget his last
12  name.  Jerry.  He's one of our supervisors.
13       Q    And after you transferred Mr. Monteagudo
14  to this other job site, Noel had no supervision over
15  him, correct?
16       A    Correct.
17       Q    And what was the reason for his
18  termination?
19       A    I believe he was caught sleeping on a
20  roller.  It's a compactor, a piece of equipment.
21       Q    Has that happened before on other job
22  sites with other employees that you know of?
23       A    Not that I know of.
24       Q    Does the company have -- to your
25  knowledge, does the company have a disciplinary,
```

```
 1    like a progressive disciplinary policy?

 2         A     Yeah, it will be, you know, verbal

 3    warnings and written warnings and final warnings.

 4         Q     Is that policy in writing?

 5         A     No.

 6         Q     Is there a particular amount of, kind of

 7    like three strikes and you're out numbers of oral,

 8    written?

 9         A     No.  It's a case-by-case scenario.

10         Q     And who makes that determination?

11         A     Supervisors can.  I can.

12         Q     And what are the factors that influence

13    whether somebody gets a verbal warning or a written

14    warning or they get terminated?

15         A     I guess it depends on how severe the

16    instance is, severe the situation.

17         Q     In the time that Mr. Monteagudo got

18    terminated, was there any allegation that this had

19    happened prior to that, to his termination?

20         A     I heard after the fact that, yes, he had

21    issues of not working when he was supposed to.  As

22    far as sleeping, I don't know.  I don't think so.

23         Q     If an employee is going to be terminated,

24    does the company require that they issue a warning

25    first or it can be on one violation and you're
```

1    terminated on the spot?

2        A    It depends.  If an employee commits a

3    safety violation that could hurt someone else or

4    himself, that could be grounds for immediate

5    dismissal.

6            You know, if there's a minor infraction

7    or, you know, talking on the phone when they're not

8    supposed to, obviously I'm not going to fire someone

9    for talking on the phone one time.  If it happens

10   three times, you know, it comes down to the

11   situation or the infraction.

12           Falling asleep on a running machine that

13   can be propelled forward and backwards with other

14   people working around you, that's a pretty severe

15   safety violation.

16       Q    Are there other examples that you can

17   think of a severe safety violation or something that

18   you would consider a severe safety violation that

19   you could deem that it warrants dismissal, like

20   immediate dismissal on an employee?

21       A    I'm sure there's several.

22       Q    Just give me an example, if you can think

23   of any.

24       A    Other than falling asleep on a running

25   machine?

```
 1        Q     Yeah.

 2        A     I can't think of anything right now.  If I

 3   think of something, I will let you know.

 4        Q     Are you aware of any other employees that

 5   have been terminated for a severe safety violation

 6   on the first round?

 7        A     Not that I can recall.

 8        Q     The company tries not to terminate people

 9   because it's hard to find employees, right?

10        A     Yeah.

11        Q     Do you know if Jerry discussed the

12   decision to terminate Mr. Monteagudo, before he made

13   the decision, with anyone else?

14        A     Discuss with who?

15        Q     I'm not sure.  I'm asking if you know if

16   he discussed it with anyone.

17        A     I don't know if he discussed it with

18   Manny.  I don't know.

19        Q     So you don't know whether or not he did?

20        A     I don't know if he discussed it with

21   Manny, no.

22        Q     And you mentioned -- so when you found out

23   that he was terminated, you don't remember who told

24   you, right?

25        A     No.
```

50

1      Q      And was there something -- did you

2    participate in the termination or in any other --

3      A      No.

4      Q      When was the next time that you heard

5    about Mr. Monteagudo?

6      A      I'm sorry?

7      Q      Did you hear about Mr. Monteagudo after

8    that?

9      A      Like hear about him?

10     Q      Like did anything else arise, like was

11   brought to your attention regarding Mr. Monteagudo

12   after he was terminated?

13     A      I understand there was a circumstance

14   where he wasn't allowing someone else to do their

15   work; that he was blocking access to the work area;

16   that he claimed that Noel's son assaulted him and

17   that he had a police report filed against him; and

18   that there was a witness there that said that no

19   such assault happened.

20     Q      How did you first learn about these

21   allegations?

22     A      I don't remember how it came about.

23     Q      Do you remember who told you?

24     A      I think it might have been Elena, but I'm

25   not positive.  Another instance I heard from Manny

 1    Comes, that he had found Mr. Monteagudo hiding

 2    behind, I think it was a light plant or something,

 3    so he didn't have to work.

 4         Q    Was that before or after?  Well, it wasn't

 5    before --

 6         A    I heard that -- it was obviously before,

 7    right?  Before or after which, I guess?  Before the

 8    alleged altercation or the termination?

 9         Q    Let's go with the alleged altercation.

10    When did that happen?

11         A    I don't know the timeline on those anyway,

12    so I guess it's a moot point.

13         Q    So you don't recall how long after you

14    transferred him did you hear from Manny about

15    Mr. Monteagudo hiding?

16         A    I believe I didn't hear about that until

17    after the termination.

18         Q    What about hearing about Noel's son

19    assaulting Mr. Monteagudo, when did you hear about

20    that?  Do you recall?

21         A    I don't recall.  I want to say it was

22    after the termination, but I can't say that with any

23    certainty.

24         Q    Did you have any communications or any

25    conversations with any employee regarding

1    Mr. Monteagudo's termination?

2         A    Other than what we've spoke of, no.

3         Q    Do you know who was the person that

4    informed Mr. Monteagudo of his termination?

5         A    I believe I said that.  I thought it was

6    Jerry.  I think Jerry is the one that initiated it.

7         Q    And do you recall Mr. Monteagudo

8    contacted -- or were you aware that Mr. Monteagudo

9    contacted Ms. Valdes complaining about his

10   termination and how he felt that he was being

11   retaliated against?

12        A    I heard that after the fact, yes.

13        Q    Who did you hear it from?

14        A    Elena.

15        Q    What did she tell you?

16        A    That Mr. Monteagudo claimed that Noel

17   called the supervisors on the other project and told

18   them to get rid of him because he was no good.

19        Q    How did you get this information from

20   Elena:  In writing?  By phone?  In person?

21        A    I don't remember.  I mean, I'd like to add

22   to that, that I highly doubt that happened because

23   at that point, as I told you earlier, there are two

24   separate entities, and Noel had never even met

25   neither Manny or Jerry before any of this transpired

1    because they were working for separate companies on

2    separate job sites.  So I can't, you know, I can't

3    imagine how that would have ever transpired.  Also,

4    Mr. Leon doesn't speak any English and Jerry -- I

5    don't know why I can't remember his last name --

6             MR. CLYNE:  Nasso.

7             THE WITNESS:  Nasso.  Thank you.

8        A    Jerry doesn't speak a lick of Spanish.  So

9    for them to come together on that, I think is

10   farfetched.

11            MR. CLYNE:  Before I forget, for

12        Mr. Leon's depo, we're going to need a

13        translator.  So if you can organize that.  He

14        does not speak English.

15            MS. SAAVEDRA:  Okay.  No problem.

16   BY MS. SAAVEDRA:

17       Q    When Elena communicated this to you, what

18   else did she say?

19       A    I mean, that was the nuts and bolts of it.

20   I can't think of any other particulars.  But I

21   remember the first thing that went through my head

22   was what I just explained, that these two don't even

23   know each other, so there's no way they came

24   together to decide this as a retaliatory action.

25       Q    Did she request that any action be taken

54

```
 1   or made a recommendation that any action be taken?

 2        A    Taken on what?

 3        Q    About the complaint from Mr. Monteagudo.

 4   Like did the company address the complaint or

 5   investigate the complaint in any way?

 6        A    Yes, yes.  I talked to everyone.  They

 7   denied it.  That's when I believe we spoke about

 8   the -- what do you call it -- the attack on him by

 9   Mr. -- by Alejandro and spoke to witnesses that said

10   it never happened, people that I trust.  And I left

11   it at that.

12        Q    Tell me who did you speak to first?

13        A    In reference to what?

14        Q    When you investigated the complaint.  You

15   told me that you were the one that investigated the

16   complaint, right?

17        A    First person I called was Alejandro.

18        Q    And what did he tell you?

19        A    He told me that he was trying to approach

20   or enter the work area where Mr. Monteagudo was,

21   because Alejandro is a quality control supervisor,

22   or he was, and he was going to inspect the work in

23   the area Mr. Monteagudo was working, and that

24   Mr. Monteagudo parked the roller blocking him from

25   accessing the area.
```

1          And he told him that -- Mr. Alejandro Leon

2    told him that he needed to move, to give him access

3    to the work area, and he refused.  And I think they

4    got into words.  They shared some not-so-kind words

5    and that was about it.

6          Q    What did you say to Mr. Leon in response,

7    Alejandro in response to that?

8          A    I asked was there anyone else there that

9    witnessed it.  And he said, yes, he actually had

10   somebody in his truck with him, who I spoke to as

11   well.

12         Q    Who was that?

13         A    José Batista.

14         Q    Did you talk to him over the phone too?

15         A    I think I talked to him in person.

16         Q    Was anyone else present?

17         A    I don't remember.

18         Q    So tell me about your conversation with

19   Mr. Batista.

20         A    He confirmed what Alejandro told me, that

21   Alejandro never really even got out of his truck or

22   approached him.  But I believe he said he spoke to

23   him from the truck, from an open door, telling him

24   to move, and eventually I believe he did.

25         Q    Do you know what time this alleged

```
 1    incident happened?

 2         A    No idea.  I don't know time.  I don't know

 3    date.

 4         Q    And so after you spoke to Mr. Batista, did

 5    you speak to anyone else?

 6         A    I mean, I confirmed my original thought

 7    that Noel never would have called Jerry and he

 8    didn't even know who he was.  That's about it.

 9         Q    What do you mean?

10         A    Because Mr. Monteagudo alleged that Noel

11    called Jerry and told him to fire him.  And I

12    confirmed with Noel that he never made such phone

13    call and didn't even know who Jerry was when I asked

14    him about him.

15         Q    So you spoke to Noel next?

16         A    Yeah.  I mean, you're putting a timeline.

17    I'm not saying that's the timeline.

18         Q    That's fair.

19              So you also spoke to Noel.  And did you

20    speak to him over the phone or in person?

21         A    I don't know.

22         Q    So tell me, what did you tell him?

23         A    I had told him that Monteagudo was

24    alleging that he called Jerry to tell him that he

25    should fire him.  And he said that was ridiculous.
```

1    Whether those are the exact words -- he completely

2    denied it, say that, and he asked who Jerry was.

3         Q    Isn't there a directory for the company

4    for everybody?

5         A    There is.

6         Q    Is Jerry's name and number there?

7         A    I'm sure it is.

8         Q    So after he asked you who Jerry was, what

9    did you say?  Did you say anything else?

10        A    I don't remember exact conversation.

11        Q    Did you speak to anyone else?

12        A    Not that I can think of.

13        Q    Did you memorialize any of these

14    conversations?

15        A    Yeah, I believe I did with Elena.  I think

16    I -- I'm not sure.  I think I e-mailed her.

17        Q    You e-mailed Elena?

18        A    Yeah.  I believe all that was part of the

19    EEOC submittal.

20        Q    Did she respond to you after you e-mailed

21    her?

22        A    I don't remember.  I would assume she did,

23    but I don't specifically remember.

24        Q    What was the general sense of your e-mail?

25    What did you tell her?

58

```
1        A    After speaking with the people I spoke

2    with, I felt that it was -- the termination was

3    valid and that his claims were not.

4        Q    Did you speak to Jerry about how or when

5    he found him sleeping on the...

6        A    I don't remember if I spoke to Jerry about

7    that, no.

8        Q    So how did you arrive to the conclusion

9    that the termination was valid?

10       A    From the reports that I saw, the e-mails

11   stating that he was seen sleeping on the machine

12   and...

13       Q    An e-mail from who?

14       A    I don't remember.

15       Q    You stated that you talked to Alejandro,

16   you talked to José Batista, you talked to Noel?

17       A    Correct.

18       Q    And then e-mailed Elena?

19       A    Uh-huh.  I'm pretty sure I got -- I mean,

20   a termination report was filled out by, I believe,

21   Jerry, and it stated the instance of what

22   transpired.  So basically I had his statement from

23   that.  So I checked with --

24       Q    Did you speak to Mr. Monteagudo?

25       A    Did I speak to who?
```

```
 1        Q    To Mr. Monteagudo.

 2        A    I didn't.  He was already off site.

 3        Q    In that report, is it under some type of

 4   oath, that documentation or the statement that Jerry

 5   wrote?

 6        A    Is it under oath?  No.

 7        Q    I'm trying to -- what makes you take

 8   Jerry's word over Mr. Monteagudo's?

 9        A    What is Mr. Monteagudo's word?

10        Q    That he was not sleeping on the truck,

11   that that wasn't the reason for his termination.

12   Isn't that what he alleged?

13        A    What was Monteagudo's -- he thinks his

14   reason for termination was?

15        Q    Mr. de Moya, I appreciate you wanting

16   clarification.  But you're here.  This is the only

17   chance I get to ask you questions in your personal

18   capacity so let me ask you the questions.

19             You stated that you felt that the

20   termination was valid.  You based that on the report

21   that Jerry filled out, correct?

22        A    Yes, as well as Mr. Monteagudo's prior

23   issues.

24        Q    What prior issues?

25        A    When he was on the job with Noel, he had
```

```
 1   multiple incidents where he wasn't doing his job and
 2   there were broken utilities.  They found out that he
 3   was found hiding from work behind a light plant.
 4           And it's been an ongoing issue with him.
 5   We tried resolving it by changing the project.  It
 6   didn't work.  Mr. Monteagudo was let go because he's
 7   violating safety policy, he's not doing his job, and
 8   that's why he was terminated.
 9           Yes, I take the word of my supervisors who
10   I trust out there that have been doing this work for
11   a long time.
12       Q    Have you ever had -- go ahead.
13       A    I do not get involved in every termination
14   in my company.  I got involved in this one in
15   particular, gave the man a second chance with
16   another set of supervisors, and he failed again.  It
17   has nothing to do with anything else.
18       Q    Have you ever had a supervisor that was
19   not honest with you?
20           MR. CLYNE:  Objection.
21   BY MS. SAAVEDRA:
22       Q    You can answer.
23       A    Not that I know of.  Not anyone that still
24   works for me at least.
25       Q    How long was Jerry working for you at that
```

1   time?

2       A   A couple, three years maybe, two, three

3   years.  That's a guess, by the way.  I don't know

4   his hire date, but I can look it up for you.

5       Q   Alejandro Noel -- Alejandro Leon, I'm

6   sorry, you said that at the time he was a quality

7   control supervisor, right?

8       A   He's our quality control manager, yes.

9       Q   Manager.  How long had he been at that

10  position, if you recall?

11      A   A few years.  He started out as a quality

12  control technician, I think, seven years ago or so,

13  and he worked his way up to manager.

14      Q   What is an MOT manager?

15      A   Maintenance of traffic.

16      Q   What is the difference between a quality

17  control manager and an MOT manager?

18      A   Maintenance of traffic manager is someone

19  that's certified to do lane closures and detours and

20  stuff on the road, which a lot of our supervisors

21  have that certification.

22          The quality control manager, basically you

23  have to have one on every project, and he's in

24  charge of just that.  He's got to make sure, in this

25  particular instance he was going to check the lime

62

```
1    rock, which is the base that goes underneath
2    asphalt, so he has to go out and check and make sure
3    it's smooth enough, make sure it's at the right
4    pitch or angle or slope, has the proper density,
5    it's compacted enough.
6            In other instances -- he's in charge of
7    more than just doing the testing.  He has people
8    that test for him.  Same thing with concrete, you've
9    got to test concrete to make sure it's got the right
10   qualities and characteristics or whatever to make
11   sure it's going to hold up.  So he tests materials
12   to make sure they're up to code.
13       Q    You gave me the difference in, I guess,
14   qualifications.  But as a maintenance of traffic
15   manager, is there a difference in the duties between
16   an MOT and a quality control manager?
17       A    MOT works with the traffic in the roadway,
18   like controlling where traffic goes.  And the
19   quality control makes sure that the permanent road
20   that we're building meets the specifications.  I
21   don't know what maintenance of traffic has anything
22   to do with this, though.
23       Q    Does Mr. Alejandro Leon still work for the
24   company?
25       A    No.
```

```
 1        Q     When did he leave?

 2        A     He left, I'd like to say, five or six

 3   months ago to start his own business.

 4        Q     And up until the time of his separation

 5   from employment, what was his position?

 6        A     He was quality control manager for us, and

 7   then we had him -- we transferred him over to the

 8   Asphalt Group because he was a de Moya employee

 9   to -- he was like a superintendent, and then he

10   decided to go on his own.

11        Q     Why was he transferred to the other

12   company?

13        A     Upward movement.

14        Q     So he got a promotion?

15        A     I mean, he wanted to try at something

16   else.  But it's kind of a -- yeah, the quality

17   control work is underneath the superintendent.

18        Q     And who made the decision to transfer him

19   over?

20        A     It was a decision made by us and The

21   Asphalt Group.

22        Q     I'm sorry.  By who?

23        A     The Asphalt Group supervisor -- not

24   supervisor -- management.

25        Q     Can you give me a specific individual or
```

64

```
 1    you don't know?

 2         A     Grant Pool and Brent Norman.

 3         Q     On the end of de Moya, who made the

 4    decision?

 5         A     What do you mean, the end of de Moya?

 6         Q     Like somebody in The de Moya Group made

 7    the decision to transfer him over to the other

 8    company or no?

 9         A     It was -- we all decided to do it.

10         Q     Who's we?

11         A     Myself and The Asphalt Group guys.

12         Q     Anyone else?

13         A     No.

14              THE WITNESS:  Can we take a quick break so

15         I can grab some water, use the restroom?

16              MS. SAAVEDRA:  Yes, we can.  It's 2:28.

17         We can go off the record and take 10 minutes?

18              THE WITNESS:  Okay.  That's fine.

19              (Recess from 2:28 p.m. to 2:39 p.m.)

20              MS. SAAVEDRA:  We can go back on the

21         record.

22              We're agreeing to do the corporate rep on

23         another time, right?

24              MR. CLYNE:  If that's what you want, yeah.

25              THE WITNESS:  I won't have to time for it
```

```
 1       today.
 2            MR. CLYNE:  He's got an emergency that
 3       just popped up so he's got to leave around
 4       3:30.
 5            MS. SAAVEDRA:  Okay.  I'll try to go as
 6       quick as I can.
 7  BY MS. SAAVEDRA:
 8       Q    Let me ask you, Jerry Nasso, what was his
 9  role?  What was his title?
10       A    He's a superintendent.
11       Q    So he's above the supervisors, right?  Or
12  no?
13       A    We have different tiers of superintendent.
14  You can call him a supervisor, where Victor Suarez
15  would be his superintendent.  But we kind of call
16  him superintendent.  It's just a title really.
17       Q    When you were doing your investigation
18  about Mr. Monteagudo's complaints, did you -- you
19  didn't speak to him, right, to Mr. Nasso?
20       A    Jerry directly?
21       Q    Yes.
22       A    No, I just went off of his report.
23            MS. SAAVEDRA:  I want to show you what
24       I'll have marked as Exhibit 1 to this
25       deposition.
```

```
 1                    (Whereupon, Plaintiff's Exhibit Number 1

 2          was marked for Identification.)

 3   BY MS. SAAVEDRA:

 4          Q      For the record, this is Defendant Bates

 5   DEF00100.

 6                  Mr. de Moya, do you recognize this

 7   document?

 8          A      I see it, yes.

 9          Q      Have you seen it before?  Have you seen

10   the document before?

11          A      Yes.

12          Q      And can you tell us what it is?

13          A      It's a termination report or a

14   disciplinary slash termination report.  One of our

15   standard forms.

16          Q      When you reviewed this form, where did you

17   get it from?  From the personnel file?

18          A      I don't -- no, I don't know if it came in

19   an e-mail or I saw it cross my desk.

20          Q      Are the termination paperwork required to

21   be submitted to you directly?

22          A      No.

23          Q      And if there's an e-mail, do you recall

24   from who?

25          A      I don't recall.  I may have not seen it
```

```
 1    until the issue arose with EEOC.

 2         Q    And you mentioned that sleeping on the job

 3    while a machine is running is a safety hazard and

 4    that's the reason his termination was, in your

 5    belief, correct, right?

 6         A    Yes.

 7         Q    I'm going to go to Defendant's 101, the

 8    second page of this exhibit, and we're going to

 9    highlight for you the portion that -- do you see

10    where the highlighted portion is, that sentence that

11    says that -- right before it says:  And found

12    Mr. Monteagudo sitting on the power (sic) with his

13    eyes closed and head leaning back slightly.  The

14    power (sic) was not running.

15         A    It says the roller.

16         Q    The roller was not running.

17              Do you see that?

18         A    I do.

19         Q    What made you -- why were you under the

20    impression that it was?

21         A    Let me read it, please.

22         Q    Go ahead.

23         A    I assume that he meant that it wasn't

24    moving.

25         Q    Based on what do you make that assumption?
```

1      A    That was just an assumption.

2      Q    But you don't have any other evidence or

3  testimony or any knowledge of any other fact that

4  would support that, right?

5      A    I guess that's the case, from what I'm

6  reading here.

7      Q    And if the roller wasn't running, why is

8  that a violation that warrants dismissal, in your

9  opinion?  Does that change that?

10     A    Not necessarily, because this isn't his

11  first instance of not doing his job.

12          MS. SAAVEDRA:  I'm going to show you what

13          I'll have marked as Exhibit 2 for this

14          deposition, which is Defendant Bates 00099.

15          (Whereupon, Plaintiff's Exhibit Number 2

16          was marked for Identification.)

17  BY MS. SAAVEDRA:

18     Q    Do you recognize this document?

19     A    Yes.

20     Q    Can you tell us what it is?

21     A    Termination of employment.

22     Q    This is dated 10/7/2020.  It says,

23  involuntary termination.

24          Do you see where it says that if there are

25  any -- is there anywhere here in this document that

```
 1    would refer that's it's not the first -- that it's

 2    the first one, that it's the first violation or that

 3    it has been multiple violations?

 4         A    That doesn't say it on here, no.

 5         Q    So did you review this entire file when

 6    you made the determination that it wasn't his first

 7    violation?

 8         A    I spoke with his prior supervisors.

 9         Q    I'm asking you if you can give me an

10    answer, yes or no, did you review the entire file or

11    did you --

12         A    No.

13         Q    -- just speak to them and just reviewed

14    these two forms?

15         A    Yeah, I glanced at them and I listened.

16              MS. SAAVEDRA:  I think everything else we

17         can cover during the corporate rep so, unless

18         counsel has any questions, we can wrap up.

19              MR. CLYNE:  No.

20              MS. SAAVEDRA:  Okay.

21              MR. CLYNE:  No. let me have just one

22         question real quick.

23                        CROSS-EXAMINATION

24    BY MR. CLYNE:

25         Q    In your conversation with Mr. Monteagudo,
```

1   did he ever complain of discrimination to you?

2        A    No.

3        Q    Did he ever say that he's being

4   discriminated against because he's Cuban?

5        A    No.

6        Q    What national origin are you and your

7   family?

8        A    My father came from Cuba when he was five.

9        Q    Are a majority of your employees of

10  Hispanic origin?

11       A    Yes.

12       Q    Are his supervisors, Mr. Manny Comes and

13  Noel Leon, both Cuban Americans?

14       A    Natural born Cubans.  Whether they're

15  American citizens now or not, I don't know, but they

16  were both born in Cuba.

17       Q    Would it make sense to you that either one

18  of them would not like Cubans because they're from

19  Cuba?

20       A    No, that's ridiculous.

21       Q    In the years that you've worked with Noel

22  Leon, had anyone ever accused him of discriminating

23  against Cubans?

24       A    No.

25       Q    Or any Hispanics or any person at any

1   time?

2        A    No.

3        Q    How about Manny Comes, had he ever been

4   accused of any type of discriminatory action?

5        A    No.

6        Q    In the 35-year history of this company,

7   this is the first employment discrimination case

8   you've had?

9        A    I can't say that for a hundred percent

10  certainty.  It's the first one that I've been

11  involved in.

12       Q    Do you think it realistic that an employee

13  would be discriminated in your workplace based on

14  the fact that they're Cuban?

15       A    No.

16            MS. SAAVEDRA:   Form.

17  BY MR. CLYNE:

18       Q    Have other employees been fired for safety

19  violations?

20       A    I can't think of any examples, but, yes,

21  I'm sure.

22       Q    Based on your policies, can you fire

23  somebody immediately for a safety violation?

24       A    Yes.

25       Q    When a roller is -- if you're sleeping on

1    a roller that's not running, does that mean the

2    roller's not moving?

3         A    Yes.

4         Q    So the engine could be on but you're just

5    not moving?

6         A    Possible.  Depends.

7         Q    When you initially read this, did that

8    mean to you that he was on the roller that he was

9    supposed to have been working on and moving back and

10   forth and he was sleeping on the roller?

11        A    Yes.

12        Q    Can you fire an employee for not doing his

13   job?

14        A    Yes.

15        Q    Had this employee had multiple instances

16   where he was not doing his job?

17        A    Yes.

18        Q    And had that been under both supervisors?

19        A    Yes.

20        Q    So this wasn't the first instance where he

21   was found not to bc doing his job?

22        A    No.

23             MR. CLYNE:  Thank you.  No further

24        questions.

25             MS. SAAVEDRA:  Okay.  I have a few

```
 1          follow-ups, of course.
 2                    REDIRECT EXAMINATION
 3   BY MS. SAAVEDRA:
 4          Q     Counsel asked you, can you fire somebody
 5   who's not doing their job, and you said yes, right?
 6          A     Yes.
 7          Q     The company tried not to do that, based on
 8   your prior testimony today.  You try to give people
 9   chances, right?
10          A     Yes.
11          Q     You did that with Mr. Monteagudo?
12          A     I did.
13          Q     You also said that because of the history
14   and prior disciplinary actions is the reason why you
15   believed that, even though it wasn't really a safety
16   violation because he wasn't -- the machine wasn't
17   on, it validated the termination, correct?
18                And I forgot.  I didn't show you this on
19   Exhibit 2.  I'm going to put it back up, and I
20   wanted to ask you about it.  And I'll be done right
21   after that.
22                You see where it says, corrective measures
23   previously taken?  Do you see that?
24          A     I do.
25          Q     The comment says none?
```

1      A     I believe that's probably because he was

2    not working directly under Jerry prior to this; that

3    he had been working for Noel and Manny Comes.  So

4    that would be my assumption on that.

5      Q     Are prior disciplinary actions forever

6    taken into account when you're evaluating whether or

7    not to take the next action towards an employee?

8      A     Like I said, it all depends on a time

9    frame.  If there was prior instances five or six

10   years ago, you know, that would be taken into

11   account.

12           But Mr. Monteagudo was with us for just

13   over a year and had multiple issues and instances

14   where he wasn't doing his job, which some related in

15   damaging of public utilities, which costs a lot of

16   money.  It could have been -- somebody could have

17   gotten hurt because of it on the same account.

18     Q     Are you referring to the incident back in

19   January or February of 2020?

20     A     I don't know what -- I don't have dates

21   fresh in my head.  When he was still working under

22   Mr. Leon there were a couple instances where he

23   broke utilities when he was supposed to be spotting

24   the operator to make sure he didn't hit said

25   utilities.

1     Q    Wasn't there a report that Mr. Fabriocio

2  sent you saying that Monteagudo -- that that

3  wasn't -- that Mr. Monteagudo was not written up for

4  that because it wasn't his fault?

5     A    I'm not certain of the e-mail you're

6  talking about.

7     Q    Monteagudo was working with Luis Rivas and

8  he stepped away, but Luis continued working without

9  the spotter.  I can show it to you as Exhibit 3.

10          (Whereupon, Plaintiff's Exhibit Number 3

11      was marked for Identification.)

12  BY MS. SAAVEDRA:

13     Q    I'm just trying to keep it short because I

14  know you've got to leave.  Give me one second.

15          Do you recognize this document?

16          For the record, this is Defendant 73 to

17  75.  Do you recognize the document?

18     A    I mean, I recognize the names on it and

19  stuff.  I don't remember.

20     Q    I'm going to direct your attention to

21  section B where it says, Luis Rivas writeup.

22          Let me know when you're done.

23     A    Okay.

24     Q    Does that refresh your recollection as

25  to --

```
 1      A     I don't remember that part, but I see it
 2   now.
 3      Q     Was Mr. Rivas terminated for the damage
 4   that he caused?
 5      A     He was.
 6      Q     After this incident?
 7      A     I don't know if it was this incident or
 8   not.
 9      Q     Because in this document it says that he
10   was written up, not that he was terminated, correct?
11      A     I'm sorry?  I was reading.
12      Q     The document says that he was written up,
13   not that he was terminated, am I correct?
14      A     On the Rivas one?
15      Q     Yes, on this one that is on the screen
16   right now, section B.
17      A     Yes.
18      Q     So if he was terminated, it was probably
19   for a later incident, correct?
20      A     I would assume that, yes.
21           MS. SAAVEDRA:  I have no further
22      questions.
23           MR. CLYNE:  Thank you.
24           THE STENOGRAPHER:  Are you ordering this
25      one as well?
```

```
 1                    MR. CLYNE:  Yes, I am.

 2                    THE STENOGRAPHER:  Do you want a copy,

 3          Nathaly?

 4                    MS. SAAVEDRA:  Yes, ma'am.

 5                    (Signature reserved.)

 6                    (Deposition concluded at 2:56 p.m.)

 7                              -------

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE OF OATH

 2    STATE OF FLORIDA

 3    COUNTY OF ALACHUA

 4

 5              I, the undersigned authority, Florida

 6    Professional Reporter and Notary Public, State of

 7    Florida, certify that CHRISTOPHER DE MOYA remotely

 8    appeared before me on the 13th day of January 2023, and

 9    was duly sworn.

10              Signed this 31st day of January 2023.

11

12

13    _____
      CAROL BAER, FPR
14    Notary Public - State of Florida
      My Commission No.: HH 049984
15    Expires:  January 24th, 2025

16

17

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE OF REPORTER

 2    STATE OF FLORIDA

 3    COUNTY OF ALACHUA

 4

 5          I, CAROL BAER, Florida Professional Reporter,

 6    HEREBY CERTIFY that I was authorized to and did

 7    stenographically remotely report the foregoing

 8    videoconferenced deposition of CHRISTOPHER DE MOYA, that

 9    a review of the transcript was requested; and that the

10    foregoing transcript, pages 1 through 77, is a true and

11    complete record of my stenographic notes.

12          I FURTHER CERTIFY that I am not a relative,

13    employee, attorney, or counsel of any of the parties,

14    nor am I a relative or employee of any of the parties'

15    attorney or counsel connected with the action, nor am I

16    financially interested in the action.

17          Dated this 31st day of January 2023.

18

19

20    _____

21    CAROL BAER, Florida Professional Reporter

22

23

24

25
```