UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.:  1:22-cv-22343-KMM Moore/Louis

JORGE MONTEAGUDO ALBUQUERQUE,

        Plaintiff,

vs.

THE DE MOYA GROUP, INC., a
Florida Profit Corporation,

        Defendant.
----------------------------------x

VIDEOCONFERENCE DEPOSITION OF
ELENA VALDES

Taken on Behalf of the Plaintiff via videoconference


DATE TAKEN:      Friday, January 13th, 2023
TIME:            10:03 a.m. - 12:35 p.m.


Held remotely via videoconference




Examination of the witness taken before:
Carol Baer, FPR


Daughters Reporting, Inc.
101 Northeast 3rd Avenue
Suite 1500
Fort Lauderdale, Florida 33301

PLAINTIFF'S
EXHIBIT

4

```
 1   APPEARANCES VIA VIDEOCONFERENCE:

 2   Appearing for the Plaintiff:

 3        NATHALY SAAVEDRA, ESQUIRE
          JOCELYN ROCHA, ESQUIRE
 4        PEREGONZA THE ATTORNEYS, PLLC
          5201 Blue Lagoon Drive, Suite 290
 5        Miami, Florida 33126
          (786)650-0202
 6        nathaly@peregonza.com
          jocelyn@peregonza.com
 7

 8   Appearing for the Defendant:

 9        REGINALD J. CLYNE, ESQUIRE
          QUINTAIROS, PRIETO, WOOD & BOYER, P.A.
10        9300 S. Dadeland Boulevard, 4th Floor
          Miami, Florida 33156
11        (305)670-1101
          reginald.clyne@qpwblaw.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                          I N D E X

2

   TESTIMONY OF ELENA VALDES
3
   Direct Examination by Ms. Saavedra:              5
4  Cross-Examination by Ms. Clyne:                 89
   Redirect Examination by Ms. Saavedra:           91
5

6  Certificate of Oath:                            95

7  Certificate of Reporter:                        96

8  Errata Sheet:                                   97

9  Read Letter:                                    98

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1                    PLAINTIFF'S EXHIBITS

 2   NUMBER              DESCRIPTION            PAGE

 3   Exhibit 1   Defendant's Answer and Objections
                 to Plaintiff's Notice of Propounding
 4               First Set o Interrogatories        44

 5   Exhibit 2   Elena Valdes' Summary of Discussions
                 with Jorge Monteagudo
 6               Bates00087 - 00088                  50

 7   Exhibit 3   Blank Verification Form             76

 8

 9                    DEFENDANT'S EXHIBITS

10   NUMBER              DESCRIPTION            PAGE

11                     NONE MARKED

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              Videoconference deposition of ELENA VALDES,
 2  taken remotely before Carol Baer, Florida Professional
 3  Reporter and Notary Public in and for the State of
 4  Florida at Large, in the above cause.
 5              THE STENOGRAPHER:  Ms. Valdes, please
 6         raise your right hand and I'll swear you in.
 7         Do you solemnly swear or affirm the
 8         testimony you're about to give will be the
 9         truth, the whole truth, and nothing but the
10         truth?
11              THE WITNESS:  I do.
12  Thereupon:
13                   ELENA VALDES,
14  having been first duly sworn, was examined and testified
15  as follows:
16                   DIRECT EXAMINATION
17  BY MS. SAAVEDRA:
18      Q    Good morning.
19      A    Good morning.
20      Q    May I please have you state your full name
21  for the record?
22      A    Elena Valdes.
23      Q    Ms. Valdes, my name is Nathaly Saavedra.
24  I am one of the attorneys representing Mr. Jorge
25  Monteagudo in a lawsuit that he has brought against
```

1    The de Moya Group, and I will be taking your

2    deposition today.  Okay?

3         A    Perfect.

4         Q    Have you ever had your deposition taken

5    before?

6         A    I have.

7         Q    I'm just going to go over some ground

8    rules for today's purposes.  You may be familiar

9    with the process, but I just want to make sure that

10   we're both on the same page.

11            I will be asking you some questions.  If

12   you don't understand my question, please let me

13   know, and I'll be happy to rephrase it.  But if you

14   do give me an answer, I'm going to assume that you

15   understood my question and that your answer is true

16   to the best of your ability here today.

17            Is that fair?

18        A    That's fair.

19        Q    We can get a little conversational from

20   time to time.  I will do my best not to interrupt

21   you or talk over you.

22            And, please, I just ask you that you let

23   me finish whatever question and make sure of that

24   before you give me an answer.  As you can see, there

25   is a court reporter here, and we want to make sure

1    that the record is clear.  Okay?

2         A    Okay.

3         Q    Also, if you can please provide me your

4    answers out loud.  Although I may see you shaking

5    your head no or yes and I know what you mean, like I

6    said, there is a court reporter here and we want to

7    make sure that everything is on the record.

8         A    Okay.

9         Q    And if at any point you need a break,

10   please let me know, I will be happy to take one.  I

11   just need -- if there is a question pending, I do

12   ask that you give me an answer before we go ahead

13   and take a break.  Okay?

14        A    Okay.

15        Q    Are you currently on any medication or

16   other substance that will prohibit you from giving

17   true and accurate testimony here today?

18        A    No.

19        Q    Are you currently on any medication or

20   other substance that will prohibit you from

21   recalling events from 2020 until 2022?

22        A    No.

23        Q    How did you prepare for today's

24   deposition?

25        A    I had a meeting with our attorney,

1    Mr. Clyne, at the office.

2         Q    Did you meet with anyone else other than

3    your attorney?

4         A    Mr. Clyne's associate.

5         Q    I don't want to know anything about that

6    meeting.  I just want -- other than that meeting,

7    did you meet with anyone else outside of that?

8         A    No.

9         Q    At the meeting with your attorney, was

10   there anyone else present other than yourself and

11   the attorney?

12        A    There were other de Moya employees present

13   that are also giving deposition.

14        Q    And who was there?

15        A    Noel Leon, Chris de Moya, Manny Comes and

16   myself.

17        Q    And when did you have this meeting?

18        A    Yesterday.

19        Q    And was it in person?

20        A    Yes.

21        Q    And about how long, more or less, were you

22   in that meeting?

23        A    About an hour.

24        Q    Did you review any documents in

25   preparation for today's deposition?

```
 1        A     No.
 2        Q     Did you have any conversations with any of
 3   the individuals that were at the meeting after the
 4   meeting ended, either Chris, Noel, Manny?
 5        A     No.
 6        Q     You mentioned that you have had your
 7   deposition taken before, correct?
 8        A     Correct.
 9        Q     Can you tell me how long ago that was?
10        A     I don't remember.
11        Q     And what was it for, if you recall?
12        A     It was at a previous employer and so it
13   was years ago.  I used to be the chief claims
14   officer for a large organization so I gave
15   depositions frequently.
16        Q     Have you ever had your deposition taken
17   since you started working with de Moya Group?
18        A     No.
19        Q     Have you ever been a party to a lawsuit?
20        A     Yes.
21        Q     When?
22        A     I don't remember the specific dates, but
23   years ago.
24        Q     And which party were you, plaintiff or
25   defendant?
```

```
 1        A      I was the defendant.

 2        Q      And in what court, do you recall?

 3        A      I don't recall.

 4        Q      Was it in Miami-Dade?

 5        A      I believe so.

 6        Q      Other than that lawsuit, have you ever

 7    been a party to any other lawsuit?

 8        A      No.

 9        Q      Have you ever been arrested?

10        A      Never.

11        Q      Have you ever been convicted or charged

12    with a felony?

13        A      Never.

14        Q      And where do you currently live?

15        A      In Miami-Dade.

16        Q      Can you please state your full address for

17    the record?

18        A      7820 Southwest 182nd Terrace.

19        Q      What is the ZIP Code?

20        A      33157.

21        Q      And how long have you lived at this

22    address?

23        A      About two years.

24        Q      Do you rent or do you own?

25        A      I own.
```

```
 1         Q      And where do you currently work?

 2         A      The de Moya Group.

 3         Q      How long have you been working for The de

 4    Moya Group?

 5         A      Three years.

 6         Q      And what is the position that you

 7    currently hold?

 8         A      Risk manager.

 9         Q      Is that the position that you got hired

10    for?

11         A      Yes.

12         Q      And what are your duties as a risk

13    manager?

14         A      So I am responsible for ensuring that I

15    evaluate the company's risks associated with, you

16    know, any type of exposures involving employees,

17    automobiles, operations, et cetera.  And I evaluate

18    how best to handle those risks, whether we insure

19    them, self-insure them, et cetera.

20         Q      You said you've been working there for

21    about three years, correct?

22         A      Correct.

23         Q      Do you remember, what month did you start

24    working?

25         A      December.
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida  954-755-6401

1        Q    And other than ensuring and evaluating the

2    exposure to the company, do you have any other

3    duties in this position?

4        A    I also manage their claims.

5        Q    What do you mean by that?

6        A    So claims involving injuries to employees,

7    injuries to third parties, motor vehicle accidents,

8    operational type of incidents that result in claims

9    filed against the company, et cetera.

10       Q    And when you say that you manage those

11   claims, what exactly is it that you have to do in

12   relation to those claims?

13       A    So the claims are handled by claims

14   professionals who are hired by the insurer, but they

15   report to me on investigation, you know,

16   recommendations, you know, results of, you know, any

17   information that is received, et cetera.

18       Q    And you said those claim professionals

19   report to you?

20       A    On any claims involving The de Moya Group,

21   yes.

22       Q    And those claim professionals, is it like

23   a third party outside of The de Moya Group?

24       A    Correct.

25       Q    Do you have any employees that report

```
 1    directly to you at The de Moya Group?

 2         A    No.

 3         Q    And do you report -- who do you report to?

 4         A    So I report to Alvaro de Moya, who is the

 5    president of the company.

 6         Q    Have you been reporting to Mr. Alvaro de

 7    Moya since you started working with the company?

 8         A    I have, yes.

 9         Q    Do you report to anyone else?

10         A    No.

11         Q    Are there any other employees that hold

12    the same title of risk manager at The de Moya Group?

13         A    No.

14         Q    Has there been any other individual with

15    the same position as you in the last three years?

16         A    No, not to my knowledge.

17         Q    So other than managing the claims and

18    evaluating the exposures, do you have any other

19    duties in your position?

20         A    I mean, that pretty much covers it.  You

21    know, most issues with employees when they have

22    accidents on the job, things like that, sometimes

23    they don't result in claims, but I do handle those,

24    yeah.

25         Q    And what do you mean that you handle
```

1   those?  How do you do that?

2        A    So, for instance, let's say an employee is

3   injured while working for the company but does not

4   want to seek medical attention.  You know, we have a

5   recording system where we record every incident

6   associated with employees.

7             And, you know, I'll often engage with the

8   employee to ensure that they're okay, that they

9   understand their rights under the Florida workers'

10  comp statutes, to seek medical treatment, to file a

11  claim, et cetera.

12            So some of those engagements don't

13  necessarily involve claims, but I do get involved in

14  discussing the matter with employees.

15       Q    Is that reporting system associated with

16  employees limited to workers' comp or is it to any

17  issues that the employees may have?

18       A    Most incidents are documented in one way

19  or another.

20       Q    But you mentioned that when you engage in

21  this process of evaluating -- you know, if an

22  employee has an injury, for example, right, the

23  example that you gave me, is it just limited to

24  injuries at the workplace or does that reporting

25  system where you also get involved include other

1    types of reporting by an employee of other issues?

2         A    I really can only speak to the reports

3    that I see, so I don't know the answer to that

4    question.

5         Q    So other than workers' comp claims or

6    reports, have you seen any other kind of reporting

7    or have you been involved in any other reporting by

8    an employee in the last three years?

9         A    Other than what I previously explained,

10   no.  I mean, obviously, auto accidents, any type of

11   accident involving the company is documented by

12   virtue of a report, and I do get involved in

13   reviewing every one of those reports.  But other

14   than that, the answer is no.

15        Q    And what is your educational background?

16        A    So I studied finance, graduated, gosh, I

17   want to say 1981.  Started working in insurance

18   immediately thereafter and have been in some sort of

19   insurance-related role my entire career.

20        Q    And after you graduated from finance, did

21   you have any other -- did you have any other

22   programs or graduates?

23        A    No.

24        Q    Do you have any degrees or certificates?

25   Have you earned any in the last...

```
 1        A     I have a bachelor's in finance and I have
 2   a -- I'm fully licensed by the State of Florida with
 3   a 220 agent's license, which is an insurance
 4   license.
 5        Q     How often do you have to renew your 220
 6   agent's license?
 7        A     Every two years.
 8        Q     When was the last time that you renewed
 9   it?
10        A     I don't remember.  I have to check.
11        Q     And in your role as a risk manager with
12   the company, did you undergo any training or program
13   in preparation for that?
14        A     No, not with the company.  My training is
15   my experience since 1981 working in the field.
16        Q     Working with the company, are you at all
17   involved in any claims or reports of discrimination
18   or retaliation by an employee?
19        A     Normally I am not.
20        Q     Why do you say "normally"?
21        A     I mean, I may answer a question, you know,
22   posed, but I'm not involved in HR matters.
23        Q     Is there at any point where you do
24   become -- like where you are brought into a matter
25   of a claim or a complaint of discrimination by an
```

```
 1   employee?
 2        A    Normally I am not.  Again, I may answer a
 3   question here and there, but normally I am not
 4   involved in that process.
 5        Q    When are you involved in a situation like
 6   that?
 7        A    In an HR matter?
 8        Q    No.  In handling a complaint of
 9   discrimination, if any?
10        A    Normally I am not involved.  I am not
11   involved.
12        Q    I guess I'm trying to clarify because you
13   say normally you're not involved, so that makes me
14   believe that sometimes there are circumstances where
15   you are.  Is that correct?
16        A    Okay.  So let's remove the word normally
17   and let's have my response reflected as I am not
18   involved in HR matters.
19        Q    Do you know whether de Moya has a policy
20   regarding discrimination and anti-retaliation?
21        A    I don't know.
22        Q    When you were hired, were you provided any
23   paperwork when you started working for the company?
24        A    When you say provided paperwork, I did
25   fill out an employment application.
```

18

```
 1        Q     Okay.

 2        A     And I did get subsequent paperwork

 3   associated with, you know, verification of my

 4   ability to work, my W, you know, 9 form, all of that

 5   information.  And then, of course, when I became

 6   eligible for benefits, I got paperwork associated

 7   with benefits.

 8        Q     Does the company have any employee

 9   handbooks?

10        A     I believe they do.

11        Q     Is a copy provided to the employees at any

12   point, do you know?

13        A     I don't know.

14        Q     Did you receive one when you started

15   working with them or at any point in your

16   employment?

17        A     I don't remember.

18        Q     Have you received any training on any of

19   the policies that the company has related to

20   discrimination or retaliation, if any?

21        A     No.

22        Q     Are you familiar with the procedures or

23   process that the company may have in place for an

24   employee to report an instance of discrimination?

25        A     No, that would -- that would not fall
```

1    within my area.

2         Q    So you haven't handled any complaints of

3    discrimination during your employment with the

4    company?

5         A    Correct.

6         Q    Are you familiar with the laws that

7    prohibit discrimination in the workplace?

8         A    I am.

9         Q    In your position as a risk manager, do you

10   have to make any assessments of a potential

11   discrimination claim being filed against the company

12   by an employee?

13        A    As far as assessments, can you elaborate

14   on that question?

15        Q    In your position as a risk manager, do you

16   have to review any documentation or provide your

17   opinion or be involved in any way when a claim of

18   discrimination by an employee is filed?

19        A    Again, I do not get involved in

20   discrimination matters.  That is not something I

21   handle.

22        Q    What about if an employee files a charge

23   of discrimination against the company?

24        A    I do not handle those.

25        Q    Do you know if the company has any

20

1    policies regarding how to handle complaints and

2    grievances by employees?

3        A    I don't know.

4        Q    Do you know if there's any policies in

5    place by The de Moya Group regarding disciplinary

6    action or use of progressive discipline?

7        A    I do know that we do document disciplinary

8    actions.  So the answer is, the company's policy is

9    that we document any disciplinary actions.

10       Q    And how did you learn about this policy?

11       A    Obviously, I get -- so I'll give you a

12   for-instance.  I handle automobile accidents.  And

13   there are situations where an employee may be

14   involved in an at-fault accident where the employee

15   is disciplined and/or dismissed from employment

16   because of the accident, for safety reasons.  So I

17   do see documentation on disciplinary action taken

18   with that employee.

19       Q    Are there specific forms that the company

20   has to use for those disciplinary actions?

21       A    We have internal reporting forms, yes.

22       Q    Are there different types of internal

23   reporting forms that are available?

24       A    Yes, there are many types of internal

25   reporting forms.

21

```
 1        Q     And since you mentioned that you don't
 2   handle complaints of discrimination or even if a
 3   charge of discrimination is filed, do you know who
 4   in the company is in charge of handling them?
 5        A     I do not know.
 6        Q     In your role as a risk manager, are you in
 7   contact with supervisors and managers directly when
 8   you're handling or when you're managing a claim?
 9        A     Yes, often.
10        Q     And in your role as a risk manager, are
11   you in charge of conducting any type of
12   investigations?
13        A     I am, yes.
14        Q     Is there a specific procedure that is in
15   place for you when you're conducting an
16   investigation?
17        A     Well, as I mentioned before, the procedure
18   is we document an incident through various incident
19   reporting forms.
20              I review that documentation and I inquire
21   about additional factual information associated with
22   the documentation.  And then I move forward from
23   that, whether it's appropriate to report it to the
24   third-party claims handler, or if it's something
25   that we will handle internally, I sometimes handle,
```

```
 1    you know, small matters internally.

 2         Q    When an incident occurs, and you mentioned

 3    that the procedure is to first document the

 4    incident, who is the person that is responsible for

 5    doing the initial documentation?

 6         A    Usually -- documentation usually is done

 7    by supervisors or superintendents or managers.  At

 8    times, they're done by specific employees.  You

 9    know, when it's a minor matter, it's documented by

10    the employee, but normally it's the supervisor.

11         Q    And are they required to send that form,

12    once completed, to you directly?

13         A    Yes.  Yes.

14         Q    And how do you get those forms, by e-mail?

15         A    Normally by e-mail.

16         Q    Is there any other ways that those forms

17    are submitted to you?

18         A    I normally get them by e-mail.

19         Q    And when you say that you may inquire for

20    additional information, if you do have to inquire

21    about additional information, who do you contact?

22         A    It varies, depending on the incident.

23         Q    If you have a question -- let's say that

24    an employee has a work-related injury and a

25    supervisor fills out the report and it's sent over
```

1    to you, and you need a little bit more details about

2    the accident.

3          Do you contact the employee directly or do

4    you contact the supervisors?

5    A    Sometimes both.

6    Q    Do you request that any information -- any

7    additional information is provided to you in

8    writing, or is it sufficient to just have a

9    conversation?

10   A    Normally, I'll have a conversation for the

11   additional information and document it.  And then,

12   you know, again, if it's reported to our third-party

13   insurer, it's reported by me and then it's

14   documented at that third-party insurer's claims

15   site.

16   Q    Do you have to submit your documentation

17   to anyone inside within -- I'm sorry -- within the

18   company after you're done doing your investigation?

19   A    No.  I report to company principals on a

20   monthly basis with regard to claim matters that have

21   been filed against the company.  And, you know, I'll

22   report on a regular basis as to the status of those

23   open matters.

24   Q    Who are those company principals?

25   A    So Alvaro de Moya, who is my boss, and

24

```
 1    then I'll report -- depending on the incident, I'll

 2    report sometimes to the operational folks, which

 3    would be Chris de Moya, sometimes A.J. de Moya.  It

 4    depends on the nature of the incident.

 5         Q    Can you give me an example as to when you

 6    would have to report to Chris de Moya?  Like when

 7    would you have to do that?

 8         A    So Chris is very involved in operations,

 9    so, you know, when there's an update on something,

10    he usually gets copied so he knows and he can stay

11    in the loop on what is happening.

12         Q    So when you report the status once a

13    month, you always copy Chris then?

14         A    Yes.

15         Q    Is there anyone else that you keep updated

16    as to the statuses of the claims that you're

17    handling or the investigations that you're handling?

18         A    No.

19         Q    And I just want to make sure I understood

20    you correctly.  You mentioned that you report it

21    once a month.  You also said something about you

22    keep them updated on any open matters.

23              Can you explain to me what you meant by

24    that?

25         A    So any claim filed against the company
```

```
1    that is in an open status, I report on a monthly

2    basis the status of those matters.  No sense in

3    reporting closed matters.

4         Q    Right.  Do you do any reporting more than

5    once a month?

6         A    No.

7         Q    And once you complete an investigation and

8    make a determination of whether or not you need to

9    report it to the insurance, is there anything else

10   that you are required to do in order to finalize the

11   investigation or the claim?

12        A    Again, it all depends on the incident.

13        Q    Do you know who Mr. Jorge Monteagudo is?

14        A    I don't know him personally, no.

15        Q    But do you know who he is?

16        A    I know he is a former employee.

17        Q    Do you know who supervised him?

18        A    I think multiple individuals supervised

19   him, but I'm not sure who supervised him directly,

20   no.

21        Q    Do you know what position he had with the

22   company?

23        A    I believe he was a laborer but, again, I'm

24   not 100 percent sure.

25        Q    When was the first time that you heard
```

26

```
 1    about Mr. Monteagudo?

 2         A    When Mr. Monteagudo called me.

 3         Q    And when was that?

 4         A    I don't remember the exact date, but I

 5    want to say it was around October of 2020.

 6         Q    And why did Mr. Monteagudo call you?

 7         A    Well, you know, as I mentioned previously,

 8    I do have occasion to speak to employees about

 9    incidents, right, whether they're work-related

10    incidents, automobile accidents, et cetera.  So I

11    believe Mr. Monteagudo got my number from a fellow

12    employee.

13         Q    Okay.  Do you know what employee that was?

14         A    I don't, no.  I didn't ask him.

15         Q    Tell me, what was your first interaction

16    with Mr. Monteagudo?  He called you and what

17    happened?

18         A    Yeah.  So he called me basically to say

19    that, you know, he had been working on a project and

20    he felt that the supervisor was disrespectful

21    towards him, and that he subsequently went to the

22    main office and spoke to, I believe it was Chris de

23    Moya, and reported, you know, that he didn't like

24    working with this supervisor and that he would

25    appreciate being transferred to another job.  And I
```

1   do believe that his request was accommodated and he

2   was transferred to another project.

3            So he explained all of this to me.  And

4   then said that in the other project, he had been

5   recently dismissed from employment because they

6   allege that he was sleeping on the job, and he

7   wanted to report to me that he was not sleeping on

8   the job and that he felt that, you know, the folks

9   that he reported to were very disrespectful towards

10  him.  And he wanted an investigation done about, you

11  know, his involvement with these employees that were

12  disrespectful.

13       Q    When he called you, was there anyone else

14  with you during that conversation?

15       A    No.

16       Q    And what did you tell Mr. Monteagudo in

17  response to everything that you just mentioned?

18       A    So I explained to him that, you know, I

19  appreciated the phone call and that I would ensure

20  to report his concerns to the proper individuals at

21  de Moya Group who would look into it.

22       Q    And who were you referring to when you

23  said that you would refer it to the proper

24  individuals?

25       A    Chris de Moya.

```
1          Q     Why Chris de Moya?

2          A     He's in charge of operations.  He's a

3    corporate representative.

4          Q     Did you explain to Mr. Monteagudo that you

5    don't handle or investigate any type of claims of

6    discrimination or anything like that?

7          A     No.

8          Q     Why not?

9          A     Because my role as the risk manager is to

10   assist employees any way that I can, so I don't turn

11   employees away.  I simply told him that I would

12   ensure that his concerns were reported to the proper

13   individuals for review and investigation.

14         Q     When he called you, did he call your cell

15   phone or did he call a landline in your office?

16         A     He called my cell phone, which is the

17   number that everybody has.

18         Q     And what is that number?

19         A     (305) 546-6077.

20         Q     When you say that everybody has that

21   number, how do you know that this number is provided

22   to everyone at the company?

23         A     Because we have a company directory, and

24   that is the number that is listed for me.

25         Q     Is that a cell phone that the company
```

1    provides you with?

2         A    No.  That's a personal cell phone.

3         Q    And who is the provider?

4         A    AT&T.

5         Q    Has it been AT&T for the last three years?

6         A    Yes.

7         Q    So after you told Mr. Monteagudo that you

8    would ensure that his concerns were reported and

9    addressed, did he say anything else?

10        A    No.  He thanked me for my time and, you

11   know, appreciated the conversation.

12        Q    Did you ask him any other information or

13   said anything else to him?

14        A    Again, I don't remember the conversation

15   explicitly because it's been a while, but the gist

16   of it was basically understanding what his concerns

17   were.

18             And, again, he explained that he felt that

19   they were being disrespectful towards him and he

20   felt that he was dismissed from employment for

21   something that he had not done.

22        Q    And when you say "they" were being

23   disrespectful, do you know who?

24        A    Well, he made reference to his supervisor

25   Noel Leon.

30

```
1        Q     Anyone else?

2        A     I don't recall that there was anybody else

3   involved in his concerns.

4        Q     Did you document this conversation with

5   Mr. Monteagudo?

6        A     I believe I sent a follow-up e-mail.

7        Q     Did you fill out any paperwork or made any

8   notes regarding your conversation with him?

9        A     I don't remember.

10       Q     You mentioned earlier that normally that

11  is your process though, right?

12       A     So I normally take notes.  And once I, you

13  know, send the information either to my third-party

14  insurers or through e-mail, I destroy those notes.

15             So as far as incident reporting, I

16  didn't -- you know, I didn't complete any type of

17  incident reporting because that's not my area.  That

18  was something that I reported up through operations

19  and let operations take it from there.

20       Q     Do you keep any -- your testimony here

21  today is that you don't keep any physical forms or

22  files, correct, of this type of reporting because

23  it's not what you handle?

24             MR. CLYNE:  Objection to form.

25
```

1    BY MS. SAAVEDRA:

2         Q    You can answer if you understand my

3    question.

4         A    So as far as keeping forms, you know, if

5    there is an incident report that is completed, those

6    incident reports are kept by the company, right?   So

7    I don't complete incident reports.

8         Q    And as you sit here today, you don't --

9    can you recall whether or not you have any folders

10   or documents related to the conversation that you

11   had with Mr. de Moya -- I'm sorry -- with

12   Mr. Monteagudo?

13        A    I do not have any folders regarding that

14   conversation.

15        Q    Other than the e-mail that you sent to

16   operations, do you have any other documents that are

17   related to this incident?

18        A    I do not.

19        Q    So when you said that you reported to

20   operations, you're specifically referring to

21   Mr. Chris de Moya, correct?

22        A    Correct.

23        Q    Did you include anyone else or report it

24   to anyone else other than Mr. de Moya?

25        A    Again, I don't remember.

32

```
1        Q    Is your standard process to inform anyone
2   else other than the company principals of these type
3   of incidents?
4        A    I normally just report to company
5   principals.
6        Q    How did you report the complaint from
7   Mr. Monteagudo to Mr. de Moya?
8        A    By virtue of an e-mail that I sent to him,
9   and then we had a subsequent conversation, telephone
10  conversation.
11       Q    Was the conversation over the phone the
12  same day?
13       A    I don't remember.
14       Q    Was there anyone else who participated in
15  this phone call?
16       A    No.
17       Q    So tell me, who initiated the call?
18       A    I did.
19       Q    So do you recall generally what the
20  conversation, what exactly was discussed?
21       A    Exactly what Mr. Monteagudo had
22  represented to me, that he felt that his supervisors
23  were disrespectful towards him, and that he felt
24  that he was dismissed for something that he had not
25  done.
```

```
 1        Q      How did Chris de Moya respond to that?

 2        A      Again, I don't remember.

 3        Q      Do you remember if you said anything else

 4   to Mr. de Moya at that time?

 5        A      I don't remember.  It's been a while.

 6        Q      What was Mr. de Moya's response after you

 7   reported it to him?

 8        A      He said he'd look into the matter, but I

 9   don't remember anything more specific than that.

10        Q      Did you follow up with Mr. de Moya after

11   that phone call?

12        A      I did not.

13        Q      And why not?

14        A      I didn't hear from Mr. Monteagudo again so

15   I assumed that the matter had been taken care of.

16        Q      So it's your testimony here today that you

17   only spoke to Mr. Monteagudo once?

18        A      I remember one conversation.  If he called

19   me to follow up, I can't remember that, so I don't

20   know.  That's the answer to that question.

21        Q      At the end of your conversation with

22   Mr. Monteagudo, did you tell him that you would

23   follow up with him?

24        A      I told him that I would ensure that I

25   would report the matter to the company principals
```

1   and that an investigation would be done in response

2   to his concerns.

3        Q    And what is your e-mail address with the

4   company?

5        A    Elena.Valdes@deMoya.com.

6        Q    And does anyone else have access to your

7   e-mail?

8        A    Not to my knowledge.

9        Q    Other than the phone call in October that

10  you just mentioned about Mr. Monteagudo, do you

11  recall hearing about Mr. Monteagudo again after

12  that?

13       A    I do not.

14       Q    So it was a one-time conversation with him

15  and you never heard his name again?

16       A    Again, I don't -- I cannot say for sure

17  that I only had one conversation with him because

18  this happened a while ago.

19       Q    There may have been a follow-up

20  conversation?

21       A    There may have been.  I don't recall.

22       Q    Other than the communications that you may

23  have had, the first phone call and then maybe a

24  follow-up conversation, do you -- regarding this

25  initial complaint of his termination, did you ever

1    have to deal with anything related to Mr. Monteagudo

2    or his employment with The de Moya Group after that?

3        A    No.

4        Q    Did you ever conduct an investigation as

5    to the claims and the complaint Mr. Monteagudo

6    brought to your attention?

7        A    I engaged in the claims once the

8    litigation was filed.

9        Q    And when was that?

10       A    I don't know.  I'm not sure when that was

11   filed.  I guess that's a question for the attorneys.

12       Q    Who informed you that there was a

13   litigation that was filed?

14       A    It may have come through e-mail.  I don't

15   remember.

16       Q    Can you please describe what your

17   involvement was once the litigation started?

18       A    So with any litigation filed against the

19   company, I am the person that engages defense

20   counsel to respond to the litigation.

21       Q    So tell me what steps you took once you

22   were informed that there was a litigation against

23   the company.

24       A    I immediately sent that litigation to

25   Mr. Clyne, who is our attorney.

```
 1        Q     Did you have any other involvement after
 2   that?
 3        A     I've had conversations with Mr. Clyne on a
 4   number of occasions and I also attended a recent
 5   mediation.
 6        Q     Did you conduct any investigation or
 7   reviewed any documentation in relation to responding
 8   to the litigation?
 9        A     All that was done through Mr. Clyne's
10   office.
11        Q     I'm asking if you reviewed any documents
12   or provided any documents to your attorney on behalf
13   of the company.
14        A     I did.
15        Q     What documents did you review?
16        A     The complaint.
17        Q     Other than the complaint, did you review
18   any internal documents?
19        A     Internal documents to the extent that we
20   have information in Mr. Monteagudo's file, et
21   cetera, that was all provided to my attorney.  I
22   don't remember the specifics of the documentation
23   provided.
24        Q     What I am asking is, whether you
25   personally reviewed or were the person that provided
```

```
 1   that documentation to the attorney.
 2            MR. CLYNE:  Objection.  You're starting to
 3       invade the attorney-client privilege.
 4            So anything that you communicated to me is
 5       privileged and I'm going to object to you
 6       disclosing anything.
 7   BY MS. SAAVEDRA:
 8       Q    Let me rephrase the question.
 9            Is it your testimony that after you
10   received -- after you received the litigation, did
11   you conduct an investigation on the claims in the
12   lawsuit?
13       A    Any investigation would have been sent to
14   our attorney to conduct.
15       Q    So the answer is no, you did not conduct
16   an internal investigation, correct?
17       A    Well, correct -- again, it is -- whatever
18   information and investigation and follow up I did
19   was in conjunction with working with my attorney at
20   my attorney's request.
21       Q    So before you contacted counsel, did you
22   conduct an internal investigation on the claims that
23   were filed in the complaint?
24            MR. CLYNE:  Objection to the form.  Vague
25       and also asked and answered.
```

1    BY MS. SAAVEDRA:

2        Q    You can answer.

3        A    So, again, I explained what communication

4    I had with Mr. Monteagudo.  I explained that I

5    further engaged Chris de Moya about the allegations

6    of Mr. Monteagudo.  I did not have any involvement

7    thereafter until the filing of the litigation.

8        Q    So at the time the litigation was filed,

9    it's a very simple question, whether or not you

10   conducted an internal investigation as to the claims

11   that were in the complaint once the same was filed,

12   yes or no?

13           MR. CLYNE:  Objection to form.  Asked and

14       answered.

15   BY MS. SAAVEDRA:

16       Q    If you give me a yes or no, that will be

17   the answer.  You haven't answered my question so I

18   can't move on.

19           MR. CLYNE:  I would say that she has, but

20       go ahead.

21       A    Any investigative efforts was done in

22   conjunction with counsel.

23   BY MS. SAAVEDRA:

24       Q    So yes, you did conduct an investigation?

25           MR. CLYNE:  Objection.  Counsel's

```
 1         testifying.
 2    BY MS. SAAVEDRA:
 3         Q    Is that correct?  Is that your testimony?
 4         A    Through the coordination with counsel.
 5         Q    Was there anyone else that was involved in
 6    the processing or the handling of the investigation
 7    once the litigation was filed?
 8         A    I don't know the answer to that question.
 9    I don't know who counsel spoke to other than me.  I
10    don't know.
11         Q    Did you work with anyone else in the
12    company to assist in the process of the litigation?
13         A    I worked with counsel on that.
14         Q    So no one else from the company?
15         A    Again, everything is coordinated through
16    defense counsel once a litigation is filed.
17         Q    That is not my question.
18         A    I can't speak for what they did.  You
19    know, counsel, you know, may have reached out to
20    somebody else.  I don't know the answer to that
21    question.
22         Q    I'm not asking you about information that
23    your counsel has done.  I'm asking if you worked
24    with anyone in the company to assist in the response
25    or the handling of this litigation, a yes or a no?
```

```
 1        A     Okay.  It's not a yes or a no answer.  I
 2   can't give you a yes or a no.  Any time litigation
 3   is filed, everything that happens from the point of
 4   litigation through discovery is handled by counsel.
 5        Q     Did you conduct any interviews?
 6        A     I did not.
 7        Q     Did you speak to any of the employees that
 8   were mentioned in the complaint?
 9        A     Through -- did I speak to employees that
10   were mentioned in the complaint?
11        Q     Yes.
12        A     I did not.  It was all handled by counsel.
13        Q     Did you review any correspondence or
14   documentations that was related to Mr. Monteagudo's
15   termination or employment?
16        A     To the extent that I had to provide the
17   information to defense counsel.
18        Q     How did you obtain those documents to
19   provide to counsel?  Who did you get them from?
20        A     The personnel file.
21        Q     Who holds the personnel file?
22        A     They're filed in the corporate office.
23        Q     Is there a specific person that is in
24   charge of maintaining those files?
25        A     I don't know.
```

1      Q     Who did you contact to get the personnel

2   file?

3      A     I don't have to contact anybody.  I'm the

4   company's risk manager.  I know where they're kept.

5      Q     So you just brought the file and scanned

6   it and sent that over?

7      A     Correct.

8      Q     Did you receive any inquiries from any of

9   the -- from the supervisor or from any other

10  individual in the company about this litigation and

11  the status of it?

12           MR. CLYNE:  Objection.  And I'd caution

13      you that any conversations you had with me that

14      you may have communicated to anyone else is

15      still considered privileged because it's all

16      part of the attorney-client privilege.

17           Also, anything that I did as part of the

18      investigation is work product so that would

19      also be privileged, so I don't want you to

20      discuss any of those items.

21  BY MS. SAAVEDRA:

22      Q     Aside from, you know, with the exceptions

23  that counsel has identified, did you speak to anyone

24  about the status of the litigation or anything that

25  needed to get done in relation to that?

```
1       A     Only through counsel.

2       Q     Did you create any reports or any other

3   documentation in support of -- strike that.

4             Did you ever receive any complaints about

5   Mr. Monteagudo?

6       A     No.

7       Q     Do you know whether there was any

8   employment deficiencies that the company claims

9   Mr. Monteagudo had during his employment?

10      A     That's a question for his supervisor.

11      Q     I'm asking if you have any knowledge

12  whether or not he had any employment deficiencies.

13            MR. CLYNE:  Again, Ms. Valdes, anything

14      that I've communicated to you regarding this,

15      you have to do -- can only be based on your own

16      independent knowledge, not based on any

17      communication we've had.

18            THE WITNESS:  Fair enough.  Thank you for

19      clarifying.

20      A     So I don't have personal knowledge, no.

21  BY MS. SAAVEDRA:

22      Q     Do you know who Alisa de Moya is?

23      A     Yes.

24      Q     Who is she?

25      A     She's one of the principals of de Moya
```

```
 1    Group.
 2        Q    At the time that Mr. Monteagudo called,
 3    did you report that phone call or that complaint to
 4    Alisa de Moya?
 5        A    I don't recall reporting anything to Alisa
 6    de Moya.
 7        Q    And do you know what her position is?
 8        A    I believe it's corporate treasurer, but I
 9    am not a hundred percent certain.
10        Q    Do you know who Noel Leon is?
11        A    Yes.
12        Q    Who is he?
13        A    He's one of our supervisors.
14        Q    Prior to your phone call -- after your
15    phone call with Mr. Monteagudo, but before -- did
16    you speak to Noel Leon?
17        A    I did not.
18        Q    Have you ever had any conversations other
19    than through counsel with Mr. Leon about
20    Mr. Monteagudo?
21        A    No.
22        Q    Do you know who Carli Davis is?
23        A    Carli Davis?  No.
24        Q    Carli Bailey.  Sorry about that.
25        A    Oh, Carli Bailey, yes.  She works at de
```

44

1    Moya Group.

2        Q    Do you know what her position is?

3        A    I know that she assists Alisa de Moya, but

4    I'm not sure what her position is.

5        Q    And do you know who Jerry Nasso is?

6        A    I believe he's one of our supervisors as

7    well.

8        Q    Do you know if he was plaintiff's

9    supervisor, Mr. Monteagudo's supervisor?

10       A    I believe he was, yes.

11            MS. SAAVEDRA:  I'm going to show you what

12       I'll have marked as Exhibit 1 to this

13       deposition.  We're going to put it up on the

14       screen.

15            (Whereupon, Plaintiff's Exhibit Number 1

16       was marked for Identification.)

17            MR. CLYNE:  What is Exhibit 1?

18            MS. SAAVEDRA:  It's going to be the

19       responses to the interrogatories.

20    BY MS. SAAVEDRA:

21       Q    Ms. Valdes, we're going to go ahead and

22    scroll through the pages.  Please let me know if you

23    recognize this document.  Give me one second.  I'm

24    having technical difficulties.

25            Have you seen this document before?

1      A    I believe this was something that was

2    prepared by counsel.

3      Q    I'm asking whether you have seen the

4    document before today.

5      A    Oh, no.  Well, I don't remember.

6      Q    For the record, this is Defendant's Answer

7    and Objections to Plaintiff's Notice of

8    Interrogatories.

9           Ms. Valdes, let me show you page 2 of this

10   document.  These are interrogatories that were sent

11   to the company to provide responses in relation to

12   this litigation.  The first interrogatory says,

13   state the name and address of the person answering

14   these interrogatories and their position or

15   relationship with the party to whom the

16   interrogatories are directed.

17          And then the answer was:  Elena Valdes,

18   director of insurance and risk management, with the

19   assistance of counsel.

20          Do you see that?

21      A    Yes, I do.

22      Q    Do you recall assisting in providing the

23   responses to this these interrogatories?

24      A    I don't recall, but I likely assisted

25   because I handle litigation filed against the

46

 1   company.

 2        Q    Question Number 2 asks about, who are the

 3   individuals that you believe have information

 4   pertaining to the facts of the complaint.  Here

 5   there's a few individuals listed.

 6             Do you recall how you were able to collect

 7   this information in order to provide this response?

 8        A    I mean, I don't remember.  I don't

 9   remember how -- where I got the information from,

10   but I did work with counsel, so -- but this looks

11   like the individuals that Mr. Monteagudo worked for

12   during the time that he worked for the company.

13             Susan Giralder, she works in the office.

14   She's one of our administrative professionals.

15   Everybody else looks like they're either a principal

16   of the company or a supervisor.

17        Q    The next page is page 3.  It asked

18   about -- Interrogatory Number 3, it asked about the

19   individuals who had a supervisory role over

20   plaintiff during his employment.  And there are two

21   individuals that are identified.

22             Mr. Noel Leon, supervised plaintiff from

23   August 14th, 2019 to September 14th, 2020.

24             Do you see that?

25        A    Yes, I do.

```
 1        Q    Do you recall how you confirmed that this
 2   information is accurate?
 3        A    I would have gotten information from the
 4   personnel file.
 5        Q    In the personnel file, do they have a
 6   description, a job description for each of their
 7   employees?
 8        A    No.
 9        Q    Earlier you had mentioned that Jerry Nasso
10   was a supervisor too, right?
11        A    Jerry Nasso was his supervisor, I believe,
12   for a very short period of time after he requested
13   to be transferred.
14        Q    Is there a particular reason why he wasn't
15   included here or is that Jeremy?  Is that the second
16   one?
17        A    Yeah.  Jerome Nasso is Jerry Nasso.  Jerry
18   is just short for Jerome.
19        Q    Got it.  And why is he not identified as a
20   supervisor of the plaintiff on number 3?  Is there a
21   particular reason?
22        A    There's no -- there's no particular
23   reason.  I know that Jerry Nasso and Manny Comes
24   worked together.  So, you know, it may be that Manny
25   Comes supervised him directly and Jerry may have had
```

1    indirect supervision.  I'm not sure.

2         MS. SAAVEDRA:  Give me one second, please.

3    Can we go off the record for a second?

4         MR. CLYNE:  That's fine.

5         (Pause in proceedings.)

6         MS. SAAVEDRA:  Counsel, before I continue

7    with the interrogatories, I do want to put on

8    the record that we did not receive a

9    verification form on this.

10         Is there one that's going to be provided?

11         MR. CLYNE:  Yeah.  I actually thought that

12    Elena was going to be here in the office.  I

13    thought we'd sent it to you, so I'm going to

14    get another one and send it to you.

15         MS. SAAVEDRA:  Okay.  So as I stated in my

16    e-mail, we'll reserve the right to revisit this

17    document once we receive the verification form.

18         MR. CLYNE:  That's fine.  But there's

19    nothing that's going to change in the document.

20    I thought the verification form was sent.  You

21    guys say you don't have it so we're sending it

22    again.

23         MS. SAAVEDRA:  Let me see.  Maybe we can

24    pull up the verification form, even though it's

25    not filled out.  Give me one second.  I'll

```
1          check.  In the meantime, let's just go.
2    BY MS. SAAVEDRA:
3          Q    Ms. Valdes, do you -- and I want to make
4    sure that we're clear.  When you said that the other
5    time that you were involved with anything that has
6    to do with Mr. Monteagudo once the litigation began,
7    aside from the phone call in October, I want to
8    clarify.
9               When you say once the litigation began,
10   are you referring to the filing of the complaint or
11   are you referring to a filing of the charge of
12   discrimination?
13         A    I am referring to the filing of the
14   complaint.
15         Q    Okay.  Did you have any involvement at all
16   when a charge of discrimination was filed by
17   Mr. Monteagudo?
18         A    I did not.
19         Q    Did you have any request for information
20   by anyone in the office or one of the principals to
21   assist in responding to the charge of
22   discrimination?
23         A    No.
24              MS. SAAVEDRA:  I'm going to show you what
25         I'll have marked as Exhibit 2.  It's the charge
```

50

```
 1        of discrimination that was filed by

 2        Mr. Monteagudo.

 3   BY MS. SAAVEDRA:

 4        Q    Have you seen this document before,

 5   Ms. Valdes?  No, I'm sorry.  That's not it.  You

 6   don't have to answer that.

 7             While we look for that document, let me

 8   ask you this:  Did you ever speak or did you ever --

 9   were you ever contacted by Ms. de Moya regarding

10   your conversation with Mr. Monteagudo?

11        A    I don't recall.

12        Q    Were you ever asked to provide a summary

13   of your conversation with Mr. Monteagudo?

14        A    I don't recall.

15        Q    Prior to the litigation?

16        A    I don't recall.

17        Q    So it's possible that you have?

18             MR. CLYNE:  Objection to form.

19        A    Again, I don't recall.  I mean, this

20   happened a long time ago.

21             MS. SAAVEDRA:  I'm going to show you what

22        I'll have marked as Exhibit 2 of this

23        deposition.  This is Defendant's Bates 87 and

24        88.

25             (Whereupon, Plaintiff's Exhibit Number 2
```

```
 1        was marked for Identification.)

 2   BY MS. SAAVEDRA:

 3        Q    Ms. Valdes, do you recognize this

 4   document?

 5             MR. CLYNE:  Can you make it bigger?  I

 6        can't see it at all.

 7             MS. SAAVEDRA:  Yeah.

 8        A    Okay.

 9   BY MS. SAAVEDRA:

10        Q    Have you seen this document before?

11        A    I think it may be notes associated with my

12   conversations with Mr. Monteagudo.

13        Q    So notes that you prepared?

14        A    Yes.

15        Q    And do you recall when you prepared this

16   summary?

17        A    No, I don't recall.

18        Q    It's dated 10/7/2020 and it says

19   10:00 a.m. on the top.  Do you see that?

20        A    Yes.

21        Q    Do you know what that date represents?

22        A    It looks like it represents the date of a

23   phone call.

24        Q    Do you recall if you prepared this summary

25   the same day that you received the phone call?
```

```
 1          A    I don't recall.

 2          Q    I'm going to give you a minute, if you can

 3     go ahead and read the first paragraph on the page

 4     and let me know when you're ready.

 5          A    I'm ready.

 6          Q    In the middle of the paragraph, it says:

 7     He believed Noel did not appreciate this and felt he

 8     was retaliating against him, and he was moved to

 9     crew working under Fermin Jimenez.  Jorge asked him

10     not to transfer him to this crew as did he not like

11     that crew and was ignored.

12               Do you see that?

13          A    Yes.

14          Q    Do you recall Mr. Monteagudo mentioning

15     that he felt that he was being retaliated against?

16          A    I do not recall.

17          Q    Do you recall if you mentioned that

18     specifically to Chris or any of the other principals

19     at de Moya Group?

20          A    I don't recall.

21          Q    Let's go on to the second paragraph.

22          A    Okay.

23          Q    In this paragraph it says that he

24     reported -- he had to call the cops.

25               Do you see that, and that he filed a
```

1   police report?

2        A     Yes, I see that.

3        Q     And do you recall that part of the

4   conversation with Mr. Monteagudo?

5        A     I do not recall.

6        Q     Your conversation -- is it a safe

7   representation, based on your notes, that the

8   conversation with Mr. Monteagudo was a little bit

9   more in detail than just saying that he felt that he

10  was being disrespected, right?

11       A     Well, I can say that these are notes that

12  I prepared after speaking with Mr. Monteagudo.  So

13  to the extent that the detail would have been much

14  fresher in my mind immediately following the

15  conversation, these would be a much broader

16  reflection of Mr. Monteagudo's allegations.

17       Q     And where are these notes kept?

18       A     Again, this would have been put in the

19  personnel file.  I would have sent this to Chris de

20  Moya who I reported the conversation that I had with

21  Mr. Monteagudo.  So it looks like this made it to

22  the personnel file.

23       Q     You didn't put it in the personnel file

24  yourself, did you?

25       A     I did not, no.  I did not.

```
 1        Q    Did you keep a copy of this summary report

 2   in your file?

 3        A    No, I do not have a copy of this, no.

 4        Q    And other than the Chris de Moya, did you

 5   send it to anyone else?

 6        A    I don't recall.

 7        Q    Related to this litigation, we have served

 8   the company with a request for production of

 9   documents that may be related to the litigation.

10             Have you performed any searches of your

11   inbox or any other documents in your possession that

12   may be responsive to this litigation and provided

13   those documents to your counsel?

14        A    Yes.

15             MS. SAAVEDRA:  Counsel, to the extent that

16        the e-mails exist where she sent this over to

17        other parties within the company, we would ask

18        that those documents be provided because they

19        have not been.

20             MR. CLYNE:  Okay.  If they're available,

21        then we will provide them.

22   BY MS. SAAVEDRA:

23        Q    Ms. Valdes, is there a particular reason

24   why the documents wouldn't be available?

25        A    Well, again, you know, these conversations
```

```
1    happened two years ago.  I'm not sure, you know,
2    what the capacity of our e-mails is.
3              I can tell you that there are times where
4    I'm looking for older e-mails and they're no longer
5    there.  So I think our third-party IT company does
6    do like cleanups of e-mails after a certain period,
7    but I don't know what that criteria is.
8         Q    You have not personally deleted any
9    e-mails that are related to this litigation,
10   correct?
11        A    Correct.
12        Q    And do you recall if you sent an e-mail to
13   Chris de Moya the same day that you spoke to
14   Mr. Monteagudo?
15        A    I don't recall.
16        Q    If we can go to the last part, to this
17   part where it starts with "immediately following
18   this discussion," and let me know when you're ready.
19        A    Okay.  I'm ready.
20        Q    Does this refresh your recollection as to
21   whether you sent this information to anyone else?
22        A    I really don't remember.
23        Q    On your notes you state that you sent an
24   e-mail to Chris de Moya and Fabriocio Cedillo.
25              Do you see that?
```

1       A     I see that.

2       Q     And who is Mr. Cedillo?

3       A     Again, I don't know one hundred percent

4    what his position is, but he may be a project

5    manager.

6       Q     But he's not an executive in the company,

7    right?

8       A     I'm not sure if project managers are

9    considered executives.

10      Q     He's not one of the individuals that you

11   report to correct, the principals?

12      A     Correct.

13      Q     So why did you send this e-mail to him as

14   well?

15      A     Again, he may have been a project manager,

16   so just for the record, you know, these are notes

17   that I would have prepared immediately following a

18   conversation with Mr. Monteagudo.

19            So it looks like this is trying to

20   document, you know, information that was received or

21   alleged during that conversation and then my

22   follow-up.

23            So I don't remember why this Fabriocio

24   Cedillo would have been copied.  It may have been

25   that he was a project manager within close proximity

1    to the project that Mr. Monteagudo worked for.

2         Q    When we were reviewing Exhibit Number 1,

3    which was the interrogatories, and the question

4    number 3 that asked about who supervised

5    Mr. Monteagudo, his name was not in that response,

6    correct?

7         A    Correct, because project managers don't

8    supervise employees.

9         Q    And so if you continue reading on, it says

10   that you recommended interviews with all employees

11   that have knowledge of these allegations and

12   documenting the interview as, at the time, I

13   believed that the employee would likely file an

14   employment practice claim and/or a complaint with

15   the EEOC.

16             Do you see that?

17        A    I do.

18        Q    What made you believe that there was going

19   to be a claim filed?

20        A    Mr. Monteagudo's demeanor was that of

21   anger when he and I had a conversation.  So

22   typically when employees are that angry, they can,

23   or they likely result to taking it a step further,

24   which the allegations -- the step further would have

25   been the EEOC.

 1              Again, I'm the risk manager.  I'm supposed

 2    to communicate exposures to the company, right?  So

 3    back then it looks like, based on what I wrote here,

 4    that I was communicating that there was likely

 5    exposure moving forward beyond just the conversation

 6    with Mr. Monteagudo.

 7         Q    Based on your notes, is it fair to say

 8    that the conversation that Mr. Monteagudo had with

 9    you described either a potential discrimination,

10    that he felt that he was being treated differently

11    or being treated in retaliation of his complaints?

12    Is that a fair assessment?

13              MR. CLYNE:  Objection to form, compound.

14         A    No, it is not.

15    BY MS. SAAVEDRA:

16         Q    So what made you -- just his demeanor,

17    just because he was upset, that's what made you

18    believe that he would file a claim?

19         A    Correct.

20         Q    What made you think that the complaint

21    would be with the EEOC and not in a civil claim?

22              MR. CLYNE:  Objection to form.  The EEOC

23         is a civil claim.

24         A    And it's an employment-related matter,

25    which is the correct platform for employment-related

1    matters.

2    BY MS. SAAVEDRA:

3        Q    But he also complained that he was

4    physically attacked by an employee, did he not?

5        A    Again, in accordance with these notes,

6    yes.  I don't remember that conversation, but I did

7    document it.  So I can only testify that the notes

8    are a better reflection of the conversation since

9    they would have been prepared much closer to the

10    date.

11        Q    Did that cause any concern for you as the

12    risk manager for the company, that another employee

13    had assaulted or there was allegations that another

14    employee had assaulted Mr. Monteagudo?

15        A    Well, with regard to concern, any incident

16    involving employees who reach out to me and, you

17    know, they're reporting something, you know, that

18    could possibly be adverse, all of those are

19    concerns.  So I document and I, you know, get the

20    right principals involved to ensure that we look

21    into matters.

22        Q    Did you request copies of the police

23    report or any of the court documents that

24    Mr. Monteagudo mentioned he filed against Mr. Leon?

25        A    I did not.

60

```
 1        Q     And did you look into the allegations
 2   against Mr. Alejandro Leon and his conduct towards
 3   Mr. Monteagudo?
 4        A     I did not.
 5        Q     Why not?
 6        A     Because this would have been handled by
 7   operations.
 8        Q     And as a risk manager, you were not
 9   concerned about the potential liability for the
10   company based on an employee's conduct, improper
11   conduct and assault?
12             MR. CLYNE:  Objection to form.
13        Mischaracterizes prior testimony.
14        A     Again, these notes reflect a conversation
15   and allegations made by Mr. Monteagudo.  These notes
16   do not reflect, you know, any verification that
17   these allegations are true and correct.
18   BY MS. SAAVEDRA:
19        Q     I understand.  I mean, but in your notes,
20   you do state that you recommended interviews with
21   employees because you believed there was a potential
22   employment claim that Mr. Monteagudo may file, but
23   you were not making any comments or recommending any
24   interviews or investigations about a claim of
25   another employee assaulting?
```

```
 1        A      Again, I testified earlier that I had
 2   subsequent conversations with Chris de Moya, and I
 3   may have made recommendations to Chris to speak to
 4   employees, to try to validate some of these
 5   allegations.
 6        Q      So tell me what you generally remember
 7   having that conversation with Mr. de Moya.
 8        A      I don't remember the specifics.
 9        Q      And as you stated earlier, this summary is
10   a better and more detailed -- it memorializes better
11   your conversations with both Mr. Monteagudo and
12   Mr. de Moya, right, than your memory as you sit here
13   today?
14        A      So, no.  So this does reflect notes taken
15   after my conversation with Mr. Monteagudo.  Okay?
16   And it does reflect information that I would have
17   received in follow-up to conversation with Chris de
18   Moya.
19        Q      So in the next paragraph, it goes on to
20   say -- it says 10/7/2020.
21               Before I go on to that one, do you recall
22   at what time you sent that e-mail to Chris de Moya
23   and Fabriocio Cedillo?
24        A      I do not.
25        Q      In the next paragraph it says:  On
```

1    10/7/2020 you received an e-mail from Chris de Moya

2    stating the following.

3              If you can just take a minute and read

4    this and let me know when you're ready.

5         A    Okay.

6         Q    Do you remember the communication from

7    Mr. de Moya?

8         A    I do not.

9         Q    Do you recall if anyone else was involved

10   or added to this e-mail response from Chris to you?

11        A    I do not.

12        Q    Is it Mr. Chris de Moya's role or is part

13   of his role to do investigations when it comes to

14   complaints against other employees or discriminatory

15   treatment?

16        A    Chris de Moya is in charge of operations.

17   He's a corporate representative, so he is involved

18   in a lot.

19        Q    Are there procedures put into place for

20   the company of how these investigations are supposed

21   to be conducted and by whom?

22        A    I don't know the answer to that question.

23        Q    In that paragraph, it says:  Alejandro --

24   third sentence or fourth sentence.

25              It says:  Alejandro does admit to telling

63

1    Jorge that he had been hearing from other employees

2    Jorge had been talking badly about his father and he

3    did not like it.  Alejandro was with José Batista at

4    this time and we will have him give a statement as

5    well.

6                 Do you see that?

7    A    I do.

8    Q    Did you ever receive the statements from

9    either Alejandro or Mr. Batista?

10    A    No.

11    Q    I'm going to go to the next page and the

12    paragraph that starts:  I spoke to Victor and he

13    will be getting a statement from Jerry, the grader

14    operator that was working with Jorge, and anyone

15    else that may have input to the situation.

16                 Do you see that?

17    A    Yes.

18    Q    Do you know who Victor is?

19    A    No.

20    Q    Do you recall whether or not any

21    statements were provided?

22    A    I do not recall.

23    Q    Is it possible that you received

24    statements from these individuals?

25    A    I did not receive any statements from

1    these individuals.

2        Q    And then the last sentence in that

3    paragraph, it says:  Chris further added that he

4    interviewed José Batista prior to allowing Alejandro

5    to speak with him, and he confirmed that Alejandro

6    did not mount the roller, nor make any physical

7    contact with Mr. Monteagudo.

8            Do you see that?

9        A    I do.

10       Q    So I'm a little confused because the first

11   part of that paragraph, it says:  I spoke to Victor

12   and he will be getting statements.  And then in the

13   middle it says:  Chris further added that he

14   interviewed.

15           So who wrote this paragraph, I guess, is

16   what I'm trying to understand?

17       A    So, again, these seem to be a reflection

18   of notes that I would have prepared closer to the

19   incident.  So, you know, these notes are reflective

20   of information that Chris de Moya is providing.

21       Q    So whenever they're in quotation marks is

22   the actual response that you received from Mr. de

23   Moya, correct?  If you put it in quotation marks?

24           MR. CLYNE:  Objection to form.

25       Mischaracterizes the document.

```
 1        A     And I'm not sure how to answer that
 2   question either because, you know, these are just
 3   notes, you know, following the incident.  So, you
 4   know, I don't know where what Chris wrote ends and
 5   then what I'm writing begins.  Again, they're notes.
 6        Q     Ms. Valdes, these are your notes, am I
 7   correct?
 8        A     Yes, that is correct.
 9        Q     Do you have a specific format that you
10   follow when you create the summary reports?
11        A     No.
12        Q     So in the base of the form, it appears
13   that you wrote:  10/7, 4:18 I received an e-mail
14   from Chris de Moya stating the following, open
15   quote, and then the entire paragraph, and then
16   closed the quote.
17              Since I don't have the e-mails, I cannot
18   verify whether or not that's part of the
19   communication.  But it seems to me that you kind of
20   copy and pasted on the e-mail, and then the
21   paragraph that follows is your notes.  I just want
22   to clarify.  If I'm incorrect --
23        A     Can you go down to the paragraph that
24   follows so I can read what that says?
25        Q     Of course.
```

66

1        A    So I never spoke to Victor.  So this may

2    have been a continuation of Chris' notes and I just

3    didn't add the quotes.  Okay?

4        Q    Okay.  That makes sense.  Thank you.

5        A    Okay.  And then maybe there should have

6    been a paragraph, you know, before the word Chris.

7        Q    Okay.

8        A    You know, this looks like it may have been

9    my note, Chris, after a conversation with Chris.

10   Again, I'm making an assumption because I don't

11   remember any of this.

12       Q    The next part of the summary is that it

13   says:  10/15, 11 a.m. I received a call from

14   Mr. Agudo.

15            I'm assuming it's Mr. Monteagudo, is that

16   correct?

17       A    Yes.  I misspelled his name, it seems

18   like.

19       Q    And I'll let you finish reading that

20   paragraph and just let me know when you're ready.

21       A    Yeah.  I can't see the right because I've

22   got the...

23       Q    I'm sorry?

24       A    It looks like I had a subsequent

25   conversation with Mr. Monteagudo on the 15th, and

1   then I guess he was calling to follow-up.  And I

2   explained that an investigation into the allegations

3   was underway.

4           He offered additional information in

5   support of his allegations of assault involving

6   Mr. Leon's son.  He claims there was an incident

7   with an FDOT inspector by the name of Tony.  He

8   didn't know the man's last name, but the man was of

9   Dominican descent -- so I guess I wrote that -- who

10  he claimed was also assaulted by the same individual

11  on a different occasion.

12          I asked him to call me back with the

13  contact information of this individual who could

14  corroborate this information.

15      Q   When you stated:  I explained that an

16  investigation into the allegations was underway --

17      A   Yes.

18      Q   -- was that a true statement?

19      A   Of course.

20      Q   Based on your knowledge, who was

21  conducting that investigation?

22      A   Chris de Moya.

23      Q   And do you recall when you e-mailed Chris

24  and Fabriocio the information that Mr. Monteagudo

25  provided you with?

```
1       A    I do not recall.

2       Q    And then the last part of your summary, it

3  says:  10/15 at 2:00 p.m., I received the following

4  e-mail from Chris de Moya.  We have witnesses that

5  this assault never took place and that the

6  disciplinary report he refused to sign was indeed

7  filled out and not blank.  In my opinion, no further

8  action is required by us.  He was terminated for

9  sleeping on the job.  His termination had nothing to

10 do with retaliation, as Noel Leon and the supervisor

11 who terminated him, Jerry, had never met nor had any

12 conversations.  If he wishes to press charges

13 against Alejandro, that is between the two of them.

14 It appears the man is lying about the entire account

15 and we have no place for him here.

16          And you put:  Given the directive from

17 Chris de Moya that no further action was required, I

18 made no additional inquiries.

19          Do you see that?

20      A    I do.

21      Q    First, did you get a copy of the

22 disciplinary report that allegedly was filled out

23 and not blank?

24      A    No, I did not.

25      Q    Did you receive anything from Mr. de Moya
```

```
 1    in support of like their -- the investigation or the

 2    witnesses that he claimed?

 3         A    I did not.

 4         Q    And when you say no further action -- I

 5    made no additional inquiries, had you -- my

 6    understanding is that you never made any inquiries

 7    as to the status of the investigation.  Is that a

 8    true statement?

 9              MR. CLYNE:  Objection to form.

10         Mischaracterizes the notes and document.

11    BY MS. SAAVEDRA:

12         Q    You can answer.

13         A    Repeat the question, please.

14         Q    Other than reporting to Mr. de Moya via

15    e-mail the conversations that you had with

16    Mr. Monteagudo, did you ever follow up or make any

17    inquiries as to the status of the investigation by

18    Mr. de Moya?

19         A    I did not.

20         Q    So when you say, I made no additional

21    inquiries, what did you mean by that?

22         A    Again, the notes previous to this sentence

23    note that Mr. Monteagudo called me for a follow up,

24    right?  So I did not make additional inquiries after

25    Chris reported what the results of his investigation
```

1  was.

2      Q     Did you speak to Mr. Monteagudo to let him

3  know?

4      A     I did not.

5      Q     Did you ask whether somebody was going to

6  reach out to him?

7      A     I don't remember that.

8      Q     Do you know if anyone did?

9      A     I do not know.

10      Q     And at the bottom, right underneath the

11  last sentence, is that your signature block for the

12  company?

13      A     I normally don't put "Nationality Cuban."

14  But other than that, the rest of the information is

15  correct.  I mean, my nationality is Cuban, but I

16  normally don't put that in my signature area.

17      Q     Yeah.  I found that strange.

18            Do you know how that got there?

19      A     I don't remember.  I really don't know.

20      Q     But you were not the one that put it

21  there, correct?

22      A     No, no, that is incorrect.  I don't

23  remember -- I mean, it may have been that someone

24  asked me, make sure that you identify what your

25  nationality is on the notes.  I don't really

```
 1   remember why I would have put that in there.
 2        Q    Who would have asked you to do that?
 3        A    I don't remember.
 4             MR. CLYNE:  Objection.  Calls for
 5        attorney-client communications.
 6   BY MS. SAAVEDRA:
 7        Q    This report -- you stated earlier this
 8   report was prepared shortly after your conversation
 9   with Mr. Monteagudo, correct?
10        A    That is correct.
11        Q    So it was prepared before you were aware
12   that there was a complaint filed against the
13   company, correct?
14        A    The information contained here are notes
15   following the conversations right when it took
16   place.
17        Q    I'm asking you when did you prepare this
18   document.
19        A    I don't know.
20        Q    Is it possible that you prepared this
21   document after the complaint or before the complaint
22   was filed?
23        A    I don't know when I prepared this
24   document.
25        Q    I'm putting back on Exhibit 1, Ms. Valdes,
```

```
 1    which is the responses to the interrogatories.  And

 2    on question number 2 where we asked for the

 3    defendant to identify all the individuals that may

 4    have knowledge, Mr. Fabriocio is not identified in

 5    this list, is he?

 6         A    No, it seems like he is not.

 7         Q    Is there a particular reason why he wasn't

 8    included as a person with knowledge, yet you copied

 9    him on the e-mails regarding your conversations with

10    Mr. Monteagudo?

11         A    Like I mentioned, I don't know why I would

12    have copied him on the e-mails.  He may have been a

13    project manager.  I don't know.

14         Q    But why wasn't he identified as a person

15    with knowledge by you?

16         A    Project managers don't supervise

17    employees.

18         Q    But that's not the question.  If you read

19    the interrogatory, it asked for anyone with

20    knowledge regarding information for the facts

21    alleged in this lawsuit or anything underlying the

22    subject matter of this action, and state the nature,

23    substance and source of the knowledge that you

24    believe the person has.

25         A    Okay.
```

1      Q      So the question is the same:  Why --

2      A      When these interrogatories were answered,

3    I did not have any knowledge that Fabriocio had

4    knowledge of this matter so his name was not put on

5    here.

6      Q      But in your summary that we just went

7    over, which is now Exhibit 2, you state that you

8    e-mailed Chris and Fabriocio.

9      A      Again, Fabriocio may have been a project

10   manager, and as a matter of professional courtesy,

11   when there's a matter that is under review or

12   investigation that involves a specific project,

13   professional courtesy is to let the project manager

14   know.

15     Q      So he did receive some information about

16   the allegations here?

17     A      I don't know the answer to that question.

18   I don't know.

19     Q      You sent the e-mail to him, did you not?

20     A      I don't remember sending the e-mail.  This

21   happened a long time ago.

22     Q      That's what the note says.  But now is

23   that summary that you prepared not accurate?

24            MR. CLYNE:  Objection to form.

25

74

1    BY MS. SAAVEDRA:

2         Q    You can answer.

3         A    I prepared the summary based on the

4    information that was available at the time.  The

5    summary would have been, you know, accurate at the

6    time that I prepared it.

7              MS. SAAVEDRA:  We can take a 10, 15-minute

8         break so I can go through my notes.

9              THE STENOGRAPHER:  What time do you want

10        to come back?

11             MS. SAAVEDRA:  Let's do 12:05.

12             (Recess from 11:52 a.m. to 12:05 p.m.)

13   BY MS. SAAVEDRA:

14        Q    I have a few more questions.

15             Ms. Valdes, are you or have you ever been

16   involved, in the three years that you've been

17   employed with the company, have you ever been

18   involved in the process of terminating an employee?

19        A    No.

20        Q    Have you ever been involved in the

21   decision making of terminating an employee before

22   it's executed?

23        A    No.

24        Q    Do you have any involvement in the hiring

25   of employees at de Moya Group?

1      A     No.

2      Q     Have you ever had any involvement in the

3  hiring process?

4      A     No.

5      Q     And as the risk manager for the company,

6  does your job duties include -- is it just to assess

7  the liability that the company may face on a

8  potential claim, or does it also include putting a

9  plan as to how to limit that exposure?

10     A     So we have a safety division that really

11  does, you know, the limitation of exposure on the

12  front end.  I'm more involved on the back end.

13     Q     Is that safety division employees within

14  The de Moya Group?

15     A     Yes.

16     Q     And who are the employees that are a part

17  of that division?

18     A     I know the main safety manager, his name

19  is James Ankrum.  I don't know if there are others.

20     Q     Was James employed by de Moya Group in

21  that particular position back in 2020?

22     A     I believe so.

23     Q     Did you inform James of your belief that

24  Mr. Monteagudo may file a claim of discrimination

25  against the company at any point?

```
 1              MR. CLYNE:  Objection to form.

 2        A    No.

 3              MS. SAAVEDRA:  I'm going to show you what

 4        I'll have marked as Exhibit 3 to the

 5        deposition.

 6              (Whereupon, Plaintiff's Exhibit Number 3

 7        was marked for Identification.)

 8   BY MS. SAAVEDRA:

 9        Q    For the record, this is just a blank

10   verification form that was part of the

11   interrogatories.

12              Ms. Valdes, have you seen this document

13   before?

14        A    I don't recall.

15        Q    In answering the interrogatories, the

16   person that is identified or asked to answer the

17   interrogatories on behalf of the company is required

18   to sign a verification form just confirming and

19   verifying that all the information that was provided

20   in the responses are true to their best knowledge

21   and belief.

22              Given that you're the person that answered

23   the interrogatories, have you executed a

24   verification form in companionship to the answers

25   that you were provided?
```

```
 1      A     I don't remember.

 2      Q     Is it possible that you did?

 3      A     I may have.  I just don't remember.

 4      Q     For the summary that we looked at before

 5    the break that you prepared, do you know what the

 6    purpose of you creating that document was?

 7      A     Again, the documents were notes following

 8    conversations with Chris de Moya and Mr. Monteagudo.

 9    What the purpose of creating the document is, again,

10    I mentioned earlier that I document matters, you

11    know, when I'm involved in either a conversation or

12    whatever, and that document seems to be those notes,

13    that the documentation of the conversations.

14      Q     So you have no reason to believe that the

15    summary that we have presented and reviewed during

16    today's deposition was prepared for any other

17    purpose, correct, other than to document?

18      A     Correct.

19      Q     I just have a few questions about some of

20    the interrogatories that were provided.  We're going

21    to pull Exhibit 1 back up on the screen and we're

22    going to go to page 5 of the document, Interrogatory

23    Number 11.

24            Interrogatory Number 11, Ms. Valdes, if

25    you can take a look and read the question and the
```

78

```
 1    answer and let me know when you're ready.
 2          A    Okay.  I'm ready.
 3          Q    So as you sit here today, do you believe
 4    that the answer to this interrogatory is complete --
 5    is full and complete?
 6          A    Okay.  Yes.
 7          Q    And it's true and accurate to the best of
 8    your knowledge, correct?
 9          A    Correct.
10          Q    So the question asked what actions were
11    taken by the defendant when plaintiff made a
12    complaint of disparate treatment by Mr. Leon on
13    January 22nd, 2020, and to identify the steps -- the
14    individuals that were involved and what steps were
15    taken.
16                The response that was provided was:
17    Plaintiff never made a complaint of disparate
18    treatment.  He was told to complete an assignment he
19    had failed to finish.  Initially refused to do the
20    work and was told he would be terminated if he did
21    not.  He felt this was disrespectful and complained
22    to Chris de Moya.
23                Do you see that?
24          A    Yes.
25          Q    How do you know that he never complained
```

1    about disparate treatment?

2        A    Because any report of complaints was not

3    shared with me.  There was no documentation of any

4    complaints.  And this is referring to something that

5    happened in January of 2020.

6        Q    And when there is a complaint, the

7    procedure is to include any documentation to

8    memorialize those complaints in the personnel file,

9    correct?

10        A    I'm sorry.  Can you repeat that?

11        Q    Yeah.  You testified earlier today that

12    the company's procedures are to document any

13    complaints that may come up and make sure that they

14    make it to the personnel file, correct?

15        A    Correct.  Correct.

16        Q    So your testimony is that because there

17    was no documentation regarding any complaint in

18    January by Mr. Monteagudo that that didn't happen,

19    correct?

20        A    I don't know if it happened or not.  I can

21    tell you that there was no documentation that it

22    happened.

23        Q    And if we go on to question number 13,

24    question 13 says:  If defendant maintained any

25    progressive disciplinary policies during the

```
 1    relevant time frame, state the nature of said policy

 2    and identify any documents which relate to your

 3    response.

 4              And it says:  Plaintiff has a progressive

 5    disciplinary policy.  I'm assuming it's defendant

 6    has a progressive disciplinary policy.  Please

 7    reference policy manual.

 8              Do you see that?

 9    A     Yes.

10    Q     No policy manual was provided to us in the

11    response or the responsive documents.

12              Do you have a copy of that?

13    A     This would have been provided through

14    counsel.

15              MS. SAAVEDRA:  Counsel, to the extent that

16         the document is in your possession, if you

17         could please produce it, because the same was

18         not received.

19         MR. CLYNE:  I thought it was produced.

20         I'll double-check.  Usually we Bates stamp

21         everything so I'll know pretty quick.

22         MS. SAAVEDRA:  I appreciate that.  Thank

23         you.

24    BY MS. SAAVEDRA:

25    Q     Question number 14.  Ms. Valdes, if you
```

```
 1    can just take a minute and let me know when you're
 2    ready, question and answer, please.
 3         A    Okay.
 4         Q    As you sit here today, does this answer
 5    represent the true and accurate -- is it true and
 6    complete, the response that was provided to this
 7    interrogatory?
 8         A    It's true, but perhaps not complete.
 9         Q    How so?
10         A    Because the investigation was being
11    conducted in conjunction with Chris de Moya and
12    Chris' name is not on there.
13         Q    And I thought you testified earlier that
14    you did not conduct any investigation, you just
15    reported it to Chris de Moya.
16              Did I misunderstand you?
17         A    No, you did not misunderstand me.  Again,
18    I think the word investigated is being used loosely
19    in the response to the interrogatories.
20              It probably should read, you know, the
21    issue was handled with Elena Valdes' involvement
22    instead of investigated.  I think it's just a matter
23    of a grammatical error.
24         Q    I respectfully disagree with you.
25              But when you say that it was with your
```

1   involvement, you have testified at length that your

2   involvement was limited to informing or reporting to

3   Chris de Moya the information that you received from

4   the client -- from Mr. Monteagudo?

5        A    Right.  Correct.

6        Q    You had no other involvement, is that

7   correct?

8        A    Again, my involvement has been

9   communication.

10       Q    Right.  You did not conduct any

11  investigations?

12       A    So how do you define investigation, before

13  I answer that question?

14       Q    Well, you tell me, how do you define that

15  term?

16       A    To me an investigation is when you engage

17  multiple parties and question multiple parties about

18  the pattern of events.  And I did not do that and

19  that has been my testimony.

20       Q    Okay.  I just wanted to make sure I was

21  clear that you did not question anyone regarding any

22  of the events?

23       A    That is correct.

24       Q    Number 15 asked whether Alejandro Leon

25  completed an application form for employment with

1    the defendant prior to the date that he was hired by

2    the defendant, and if so, to identify who reviewed

3    the application.

4            And in your response it just says:  Yes,

5    human resources.

6            But it doesn't identify the individual.

7    Isn't this information in the personnel file?

8       A    The answers to the interrogatories were

9    prepared from reviewing information in the personnel

10   file.  So that's the response.  Every employee of de

11   Moya Group completes an application, and that's in

12   the personnel file.

13      Q    Would you agree with me that human

14   resources is not a person, right?

15           MR. CLYNE:  I'm sorry.  I couldn't hear

16      the question.  Could you repeat it, please?

17           MS. SAAVEDRA:  Yeah, I'll rephrase.

18   BY MS. SAAVEDRA:

19      Q    Who is part of the human resources at de

20   Moya or who was considered human resources at de

21   Moya in 2020?

22      A    I don't know the answer to that question.

23      Q    Do you know who was or who is considered

24   human resources at de Moya in 2021?

25      A    I don't know.  I don't know the names of

84

```
 1   the individuals that do human resource functions.  I
 2   don't know.
 3        Q    Is there a human resources department?
 4        A    Not to my knowledge.  Again, human
 5   resources is something that is handled by multiple
 6   individuals, including supervisors, et cetera.
 7        Q    So in your response, when you identify
 8   human resources as the person who reviewed the
 9   application, if in your understanding and knowledge
10   there is no human resources, who are you referring
11   to?
12        A    So there's individuals that review
13   applications before an employee is hired, and that's
14   a human resource function, so that's the intent of
15   the response to this specific answer or, excuse me,
16   to this specific question.
17        Q    Who are those individuals?
18        A    So there's a multitude of people.  So when
19   someone applies to work for the company, there are
20   administrative people that receive that application
21   and then there's review of those applications and
22   maybe subsequent interviews done at the project
23   level.
24             And, again, it varies on the type of
25   employment that the person is seeking.  So I think
```

```
 1    the intent here is to let you know that, you know,

 2    not just one person would review an application, but

 3    a series of individuals that have human resource

 4    responsibility.

 5         Q    For an individual in the position of a

 6    quality control manager, who is the person that

 7    handles the interviewing and makes the decision

 8    making, if you know?

 9         A    I don't know.

10         Q    What about for individuals or employees

11    that work as laborers, like Mr. Monteagudo did?

12         A    So, again, same answer as my previous

13    response.

14         Q    You don't know who would it be?

15         A    I don't know specifically.  It varies.

16         Q    So the response should state, individuals

17    in the administrative department and supervisors,

18    not human resources, because you testified that one

19    doesn't exist and hasn't existed at de Moya,

20    correct?

21         A    To me, human resource is a function and

22    not an individual.

23         Q    The question asked for an individual.

24         A    Okay.

25         Q    So the answer is not complete as you sit
```

1    here today, correct?

2              MR. CLYNE:   There is no specific

3         individual.  I think that's the answer that

4         we're giving you.

5    A     Yeah, exactly.

6              MS. SAAVEDRA:  Counsel, I would ask that

7         if you have an objection, you can state your

8         objection, form, but not to instruct the

9         witness as to how to answer the question or

10        testify on her behalf.

11   BY MS. SAAVEDRA:

12   Q     Go to Interrogatory Number 6.

13   Interrogatory Number 6 asks for who held the

14   position of laborer from January 2019 to March 2021

15   and to complete the chart below.

16             The answer just says:  See spreadsheet.

17             There was no attachment to your responses.

18   Do you recall if whatever was supposed to be

19   attached was something that you prepared or

20   something that you printed out of the system?

21   A     Correct.  We have a system that, you know,

22   tracks our employees and payroll and so forth.  And

23   I would have sent counsel a spreadsheet with the

24   information that this question is asking for.

25   Q     And the spreadsheet, was it prepared by

```
 1   you or by the system?

 2        A    Well, it's information that I get from our

 3   payroll system.

 4             MS. SAAVEDRA:  And, Counsel, I'd just ask

 5        if you could provide that attachment because it

 6        was not included in the response.

 7             MR. CLYNE:  Okay.

 8             MS. SAAVEDRA:  Thank you.

 9   BY MS. SAAVEDRA:

10        Q    Interrogatory Number 10, if you could read

11   that question and the answer and let me know when

12   you're ready, please.

13        A    Okay.

14        Q    In the response, it states that

15   supervisors have the discretion to reprimand orally

16   or give a written warning or terminate the employees

17   violating de Moya's policies, correct?

18        A    Yes.

19        Q    Is there some guideline as to how those

20   warnings or disciplinary actions are taken in a

21   progressive manner?

22        A    It's definitely subject to the discretion

23   of the supervisor.  You know, most incidents that

24   involve major safety violations are handled very

25   aggressively.  And I would say that a good majority
```

1    of the employees that violate a significant safety

2    policy are dismissed after the violation.

3         Q    You have no involvement in that, whether

4    it's investigation or decision making?

5         A    I do not, no.

6         Q    And in your answer you just -- you state:

7    We have a weekly safety meeting.

8              Who do you refer to when you're saying

9    "we" have a weekly safety meeting?

10        A    We, as in supervisors, project managers,

11   safety professionals, you know, people on the actual

12   job site.

13        Q    You're not involved or a part of those

14   meetings, correct?

15        A    Correct.

16        Q    Are you briefed in any way as to the

17   information discussed during those meetings?

18        A    Sometimes I am.

19        Q    Under what circumstances are you informed

20   or briefed?

21        A    I work closely with the safety manager,

22   James Ankrum.  So he and I will have regular

23   conversations about what's happening in the field

24   and the things that he is thinking of improving.  We

25   just work in conjunction with each other.

1      Q      Did you ever receive or discuss any issues

2   or safety violations or allegations thereof of

3   violations committed by Mr. Monteagudo during his

4   employment?

5      A      I did not receive that information, no.

6      Q      And as you sit here today, do you recall

7   ever having a conversation or, you know, being

8   briefed about any issues or incidents that occurred

9   while he worked there?

10     A      I don't recall because this happened a

11   while ago.

12           MS. SAAVEDRA:  I have no further

13      questions.  Thank you so much for your time.

14           MR. CLYNE:  I have one or two follow-up

15      questions.

16                 CROSS-EXAMINATION

17   BY MR. CLYNE:

18     Q      Ms. Valdes, in your conversations with

19   Mr. Monteagudo, did he ever complain of

20   discrimination to you directly?

21     A      It wasn't discrimination.  He complained

22   that they were being disrespectful towards him.

23     Q      And his supervisor, Noel Leon, what

24   national origin is he?

25     A      I believe he's Cuban.

1        Q    And Manny Comes, what national origin is

2   he?

3        A    Manny is Cuban.

4        Q    Chris de Moya, his family originally

5   migrated from where?

6        A    Cuba.

7        Q    And your national origin?

8        A    Cuban.

9        Q    Would it make sense to you that Cuban

10  Americans would be accused of discriminating against

11  another Cuban American based on his national origin?

12            MS. SAAVEDRA:  Objection.

13        A    No, it does not make sense.

14  BY MR. CLYNE:

15        Q    Did Mr. Monteagudo ever say to you that he

16  was discriminated against?

17        A    No, not that I can recall.

18        Q    Did he ever say that he was being treated

19  differently because of his national origin,

20  specifically, being Cuban?

21        A    No.

22        Q    In your notes, you wrote down to the best

23  of your recollection what transpired at the time,

24  correct?

25        A    Correct.

```
 1         Q    So if he had said to you that I feel like
 2    I'm being discriminated against based on my national
 3    origin, would you expect that to be reflected in
 4    your notes?
 5         A    Absolutely.
 6              MR. CLYNE:  Thank you.  No further
 7         questions.
 8              MS. SAAVEDRA:  I have one follow-up.
 9                   REDIRECT EXAMINATION
10    BY MS. SAAVEDRA:
11         Q    As we discussed, Ms. Valdes, today, the
12    notes show that Mr. Monteagudo did complain about
13    more than just feeling that he was being
14    disrespected, did he not?
15         A    Again, as I testified, you know,
16    Mr. Monteagudo was pretty angry when he called me.
17    So, you know, the notes are prepared as -- you know,
18    to document the gist of the conversation that I had
19    with Mr. Monteagudo.
20              And he repeatedly, in a very angry manner,
21    said that there had been lack of respect, and he
22    repeated that over and over and over again.
23              So, you know, that's what I'm testifying
24    to because that's exactly what I remember.  You
25    know, the notes are reflective of, you know, what I,
```

1   you know, documented at the time of our

2   conversation.

3        Q    I understand that it's been some time

4   since the conversation and that the notes reflect a

5   better and more detailed report as to what the

6   conversation was.

7             And in your notes, you state that he

8   believes Noel did not appreciate this and felt he

9   was retaliating against him, and he was moved to the

10  crew working on 874 under Fermin Jimenez.

11       A    Yes.  Again, I prepared these notes a

12  while back.  But I will say that Mr. Monteagudo

13  never used the word retaliation.  This is a

14  description of information that I received or

15  perceived at the time that I prepared the notes.

16  But, you know, what I recall from the conversation

17  is that he was very angry.

18       Q    How do you remember that he did not use

19  that word?  How do you have recollection of that

20  specifically?

21       A    I don't.  I don't have any recollection

22  that he used those words.

23       Q    So he might have used the word.  In fact,

24  you use that word specifically in your report.  So

25  what makes you believe that he didn't use it?

```
1       A    Again, I'm speaking from recollection and
2   I'm saying that, A, he was angry; and, B, he
3   constantly said that he had been disrespected.
4       Q    And you do not recall --
5       A    And I do have that --
6            (Overlapping speakers.)
7       Q    And as you sit here today, you have no
8   recollection to make you believe that he did not use
9   the word retaliating against him, do you?
10      A    Again, the most I recollect, you know,
11  this is, you know, two and a half years plus after
12  the fact, is that he was angry and he felt like they
13  were being disrespectful against him.
14      Q    And everything else that's in your report?
15           MR. CLYNE:  Objection to form.
16  BY MS. SAAVEDRA:
17      Q    Correct?
18      A    Again, my report is a reflection of notes,
19  that's it.  It's a reflection of notes following a
20  conversation.  And, you know, I can't say if he used
21  a word, if he didn't use a word.  I don't remember
22  him using that word.
23      Q    Do you have any reason to believe that any
24  information that was part of this report that you
25  prepared is not true?
```

94

```
1        A     No, of course not.
2              MS. SAAVEDRA:  I have no further
3     questions.
4              MR. CLYNE:  We'll read.  Thank you.
5              THE STENOGRAPHER:  Are you ordering this
6     now?
7              MR. CLYNE:  Yes, I will.
8              MS. SAAVEDRA:  And I'll get a copy.
9              THE STENOGRAPHER:  So who's ordering the
10    original?  Mr. Clyne, you're ordering the
11    original then?
12             MR. CLYNE:  Yes, I'll order the original.
13             MS. SAAVEDRA:  Copy.
14             (Signature reserved.)
15             (Deposition concluded at 12:35 p.m.)
16                     -------
17
18
19
20
21
22
23
24
25
```

```
 1                    CERTIFICATE OF OATH

 2    STATE OF FLORIDA

 3    COUNTY OF ALACHUA

 4

 5            I, the undersigned authority, Florida

 6    Professional Reporter and Notary Public, State of

 7    Florida, certify that ELENA VALDES remotely appeared

 8    before me on the 13th day of January 2023, and was duly

 9    sworn.

10            Signed this 31st day of January 2023.

11

12

13    _____
      CAROL BAER, FPR
14    Notary Public - State of Florida
      My Commission No.: HH 049984
15    Expires:  January 24th, 2025

16

17

18

19

20

21

22

23

24

25
```

```
 1                   CERTIFICATE OF REPORTER

 2    STATE OF FLORIDA

 3    COUNTY OF ALACHUA

 4

 5            I, CAROL BAER, Florida Professional Reporter,

 6    HEREBY CERTIFY that I was authorized to and did

 7    stenographically remotely report the foregoing

 8    videoconferenced deposition of ELENA VALDES, that a

 9    review of the transcript was requested; and that the

10    foregoing transcript, pages 1 through 94, is a true and

11    complete record of my stenographic notes.

12            I FURTHER CERTIFY that I am not a relative,

13    employee, attorney, or counsel of any of the parties,

14    nor am I a relative or employee of any of the parties'

15    attorney or counsel connected with the action, nor am I

16    financially interested in the action.

17            Dated this 31st day of January 2023.

18

19

20    _____

      CAROL BAER, Florida Professional Reporter
21

22

23

24

25
```