UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.:  1:22-cv-22343-KMM Moore/Louis


JORGE MONTEAGUDO ALBURQUERQUE,

        Plaintiff,

vs.

THE DE MOYA GROUP, INC., a
Florida Profit Corporation,

        Defendant.

----------------------------------x

VIDEOCONFERENCE DEPOSITION OF
MANUEL COMES

Taken on Behalf of the Plaintiff via videoconference


DATE TAKEN:      Friday, February 3rd, 2023
TIME:            10:02 a.m. - 12:13 p.m.


Held remotely via videoconference



Examination of the witness taken before:
Carol Baer, FPR


Daughters Reporting, Inc.
101 Northeast 3rd Avenue
Suite 1500
Fort Lauderdale, Florida 33301

PLAINTIFF'S
EXHIBIT

**5**

```
 1    APPEARANCES VIA VIDEOCONFERENCE:

 2    Appearing for the Plaintiff:

 3         NATHALY SAAVEDRA, ESQUIRE
           JOCELYN ROCHA, ESQUIRE
 4         PEREGONZA THE ATTORNEYS, PLLC
           5201 Blue Lagoon Drive, Suite 290
 5         Miami, Florida 33126
           (786)650-0202
 6         nathaly@peregonza.com
           jocelyn@peregonza.com
 7

 8    Appearing for the Defendant:

 9         REGINALD J. CLYNE, ESQUIRE
           ANDRES F. VIDALES, ESQUIRE
10         QUINTAIROS, PRIETO, WOOD & BOYER, P.A.
           9300 S. Dadeland Boulevard, 4th Floor
11         Miami, Florida 33156
           (305)670-1101
12         reginald.clyne@qpwblaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                          I N D E X

2

    TESTIMONY OF MANUEL COMES
3
    Direct Examination by Ms. Saavedra:              5
4

5   Certificate of Oath:                            81

6   Certificate of Reporter:                        82

7   Errata Sheet:                                   83

8   Read Letter:                                    84

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    PLAINTIFF'S EXHIBITS

 2    NUMBER              DESCRIPTION                  PAGE

 3    Exhibit 1    Employee Accident/Disciplinary Report
                   dated 9/29/2020 DEF00091              66
 4
      Exhibit 2    Employee Accident/Disciplinary Report
 5                 DEF00090                              70

 6    Exhibit 3    HR Discipline Record of Jorge
                   Monteagudo DEF00143                   72
 7
      Exhibit 4    Termination of Employment
 8                 DEF00123 - 00129                      76

 9    Exhibit 5    Incident Report dated 10/5/2020
                   DEF00095 - 00098                      78
10

11

12                    DEFENDANT'S EXHIBITS

13    NUMBER              DESCRIPTION                  PAGE

14                       NONE MARKED

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              Videoconference deposition of MANUEL COMES,

 2    taken remotely before Carol Baer, Florida Professional

 3    Reporter and Notary Public in and for the State of

 4    Florida at Large, in the above cause.

 5              THE STENOGRAPHER:  Please raise your right

 6         hand and I'll swear you in.

 7              Do you solemnly swear or affirm the

 8         testimony you're about to give will be the

 9         truth, the whole truth, and nothing but the

10         truth?

11              THE WITNESS:  Yes, ma'am.

12    Thereupon:

13                    MANUEL COMES,

14    having been first duly sworn, was examined and testified

15    as follows:

16                    DIRECT EXAMINATION

17    BY MS. SAAVEDRA:

18         Q    Good morning.  Can I have you please state

19    your full name for the record?

20         A    Manuel Comes, C-O-M-E-S.

21         Q    Good morning, Mr. Comes.  My name is

22    Nathaly Saavedra.  I am the attorney representing

23    Mr. Monteagudo in a lawsuit that he has brought

24    against de Moya Group, and I will be asking you some

25    questions today.
```

1          Have you ever had your deposition taken
2     before?
3          A     Years ago.
4          Q     Let me go over some ground rules for
5     today.  Like I said, I'm going to be asking you some
6     questions throughout the day.  And if I ask you a
7     question and you don't understand my question,
8     please let me know and I'll be happy to rephrase it.
9               If you give me an answer, I'm going to
10    assume that you understood my question.  Okay?
11         A     Yes, ma'am.
12         Q     And we can get a little conversational
13    from time to time.  You may be able to know where
14    I'm going before I finish my question.  Because
15    we're doing this through Zoom and there's a court
16    reporter here today, who's taking everything down, I
17    would ask you to please just make sure you let me
18    finish my question and then you can give me a
19    response.  We want to make sure that the court
20    reporter is able to hear us both.  Okay?
21         A     Yes, ma'am.
22         Q     If you give me an answer, please make sure
23    that the same is out loud.  I can see you shaking
24    your head or nodding and understand what you mean
25    but, like I said, there's a court reporter and we

```
 1   make sure --

 2        A    Yes.  Yes, I understand.

 3        Q    If you need a break, please let me know

 4   and I'll be happy to take one.  All I ask is that if

 5   there's a question pending, you answer my question

 6   before.  Okay?

 7        A    Okay.  Yes.

 8        Q    Are you currently on any medication or

 9   other substance that would prohibit you from giving

10   true and accurate testimony today?

11        A    No, ma'am.

12        Q    Are you currently on any medication or

13   other substance that would prohibit you from

14   recalling events from 2019 and 2020?

15        A    No, ma'am.

16        Q    And you understand that your testimony

17   here today is under the penalty of perjury, correct?

18        A    Yes.

19        Q    Do you have any documentation in front of

20   you right now?

21        A    No.

22        Q    And where are you located right now

23   physically?

24        A    Where am I located?

25        Q    Yeah.  Where are you right now?
```

```
 1        A    Over here at the lawyer's office.

 2             MS. SAAVEDRA:  And just for the record,

 3        Counsel, who's in the room with you guys, since

 4        I don't see you?

 5             MR. CLYNE:  Reginald Clyne and Andres

 6        Vidales.

 7   BY MS. SAAVEDRA:

 8        Q    Mr. Comes, did you do anything to prepare

 9   for today's deposition?

10        A    Did I what?

11        Q    Did you do anything to prepare for the

12   deposition today?

13        A    No.

14        Q    Did you speak to anyone in preparation for

15   today?

16        A    No.

17        Q    Did you review any documents?

18        A    No.

19        Q    Did you talk to anyone about you having to

20   come here today and give your testimony?

21        A    No, ma'am.

22        Q    You mentioned that you had previously

23   given a deposition before.  What was that related

24   to?

25        A    That was personal.  It wasn't related to
```

9

```
1   business.
2        Q    So you've been a party to a lawsuit
3   before?
4        A    I've been a party to what?
5        Q    To a lawsuit.
6        A    Yes.
7        Q    When?
8        A    Like I said, that's personal.  It's
9   irrelevant to this.
10       Q    Mr. Comes, I get to ask you all the
11  questions today.  And unless your attorney instructs
12  you not to answer, you have to answer my questions.
13       A    Okay.
14       Q    So when was it that you were party to a
15  lawsuit?
16       A    This was back in -- it was '04, '05,
17  something like that.
18       Q    In what county or what court?
19       A    What county, what court?
20       Q    Yes.
21       A    Miami.
22       Q    And were you the plaintiff or were you the
23  defendant?
24       A    I was a plaintiff.  It was an accident
25  that I had.
```

```
1        Q     A car accident?

2        A     An accident that I had.

3        Q     Have you ever been arrested?

4        A     Yes.

5        Q     How long ago?

6        A     Back in 2000.

7        Q     And for what?

8        A     It was some airbags.  It was an airbag.  I

9   had a body shop back then and there was a -- there

10   was a sting that they did and they tried to get me

11   with something about airbags.  It was a trap they

12   were trying to get me on.  I beat that case.

13       Q     What were you charged with?

14       A     Altered airbags or something like that.

15       Q     Were you convicted?

16       A     No.

17       Q     What is your current address?

18       A     17910 Northwest 82nd Court, Hialeah,

19   Florida 33015.

20       Q     Other than the accident and the criminal

21   charges that you mentioned, is there any other

22   lawsuits that you have been a party of?

23       A     No.

24       Q     What is your cellphone number?

25       A     (305)609-9800.
```

1      Q      And how long have you had this number for?

2      A      Three years.

3      Q      Is this the same number that you used

4  during your employment with de Moya?

5      A      Yes, ma'am.

6      Q      Is this cellphone provided by the company

7  to you?

8      A      Yes.

9      Q      And who's your service provider?

10      A      I think it's Verizon.  I think.  I'm not

11  really sure.

12      Q      I won't ask you to do it right now, but I

13  will ask that during the break, you take a look at

14  your cellphone and see if you can verify that for

15  me.  Okay?

16      A      T-Mobile.  I never even noticed it.

17      Q      What is your current position -- are you

18  currently working at de Moya Group?

19      A      Yes.  I'm with the Asphalt Group, not de

20  Moya.

21      Q      How long have you been employed by Asphalt

22  Group?

23      A      It's going on three years.

24      Q      Have you ever worked for The de Moya

25  Group?

```
 1        A     Have I ever worked -- no.

 2        Q     And what is your position with the Asphalt

 3   Group?

 4        A     I'm the road superintendent.

 5        Q     And how did you find out about the

 6   position with Asphalt Group?

 7        A     I was in another job and that job was

 8   going slow, and I talked to The de Moya Group and

 9   they offered me the position.

10        Q     Who did you speak to in The de Moya Group?

11        A     Frank de Moya.

12        Q     Did you know him from a prior time?

13        A     Yes.

14        Q     From where did you know him?

15        A     I used to be a superintendent for the city

16   of Hialeah Gardens, which is right -- their yard

17   used to be right in back of the projects that we

18   were doing in Hialeah Gardens.

19        Q     Were you interviewed?

20        A     Yes.

21        Q     Who interviewed you?

22        A     What?

23        Q     Who interviewed you?

24        A     It was Grant Cool and Chris de Moya.

25        Q     Were you hired right away?
```

1        A    Yes.

2        Q    Who made the decision to hire you, if you

3    know?

4        A    I guess the team.

5        Q    And who's the team?

6        A    Back then, I mean, it's Grant Cool, Chris

7    de Moya.

8        Q    Anyone else?

9        A    The de Moya Group is big, ma'am.  I'm sure

10   they talked among themselves.  And the two that

11   interviewed me, hired me from my experience.

12       Q    Were you hired as a road superintendent?

13       A    Yes, I was.

14       Q    And what are your job responsibilities and

15   duties in that position?

16       A    Pretty much make sure the job gets done.

17       Q    And how do you do that?

18       A    I'm the one that's in charge of the

19   decision making on what equipment's being used, what

20   material's being used, work areas.

21       Q    Anything else?

22       A    No.  That's pretty much it.

23       Q    Are you the person responsible for hiring

24   and firing anyone in the crew?

25       A    I could hire and I could fire, yes.

14

```
 1        Q     Are you the one responsible to do that?

 2        A     Myself, I speak for myself, yes.  Other

 3   superintendents, they have the same authority.

 4        Q     Do you have to get your -- if you decide

 5   to hire or fire somebody, do you have to get that

 6   approved by anyone?

 7        A     You know, we talk amongst, you know, the

 8   group and my boss, which is Victor Suarez.  He's the

 9   general superintendent.  We'll bring it to his

10   attention.  We'll agree on the person if he's

11   suitable for the job, you know, and for the

12   position.

13        Q     So you report to Victor Suarez, correct?

14        A     That is my boss, yes, ma'am.

15        Q     Has he been your direct supervisor since

16   you started?

17        A     Since day one.

18        Q     Do you report to anyone else?

19        A     No.  Pretty much him.

20        Q     Are you responsible for assigning the work

21   to the crews that you have working under you?

22        A     Yes.

23        Q     Do you create schedules?

24        A     What?

25        Q     Do you create schedules?
```

```
1       A     Yes.

2       Q     How often do you create a schedule, like

3   every day for the next day?

4       A     We usually pre-plan ahead two, three, four

5   weeks ahead.

6       Q     Is there anyone else that participates in

7   creating that plan or that schedule?

8       A     My boss, Victor Suarez.

9       Q     Anyone else?

10      A     I'm sure he speaks to the -- he has

11  meetings which I don't know about it with, you know,

12  the company, with the owners, because he reports

13  directly to the owners.

14      Q     And who is the person that makes the

15  decision as to what individuals are going to be

16  working on what crew?

17      A     The company hires them and they distribute

18  them to wherever they're needed throughout the job

19  site.

20      Q     And when you say the company hires them,

21  you're referring to who, the Asphalt Group or de

22  Moya?

23      A     It could be de Moya.  De Moya Group and

24  Asphalt Group, they're two different companies and

25  sometimes they'll need some people for The de Moya
```

```
 1    Group or sometimes they'll need for the Asphalt
 2    Group.  So they'll ask us if we need any employees,
 3    and the position that's needed and the personnel.
 4         Q    But you said that the company hires them,
 5    so I was just trying to make sure that, for the
 6    record, I know who you're talking about when you
 7    refer to the company.
 8         A    The company has obviously a website, I
 9    believe.  They have -- there's bulletin boards out
10    throughout the whole project.
11         Q    What is the name, though?
12         A    What's what?
13         Q    You're saying the company has pictures
14    throughout the entire project, correct?
15         A    Yeah, where they will be asking for, you
16    know, operators needed, truck drivers needed, and
17    all that.
18         Q    And that marketing that you're referring
19    to, when you say "the company," are you referring to
20    The de Moya Group or Asphalt Group?
21         A    Both.  Right now, it's the Asphalt Group
22    that has that bulletin board.
23         Q    When you say "the company," you're
24    referring to both of them?
25         A    Both, yeah.  I mean, my responsibility is
```

```
 1    Asphalt Group.  Within my facility, there are
 2    bulletin boards that we have acquiring personnel for
 3    different positions:  Truck driver, operators,
 4    laborers, everything.
 5            So the company -- obviously, I don't know
 6    every individual that comes on board.  So they go to
 7    the company like anybody else and they fill out the
 8    application, and the company runs, I guess, a
 9    background and so forth.  And then once they have
10    clearance, they'll say, hey, who's needing this
11    personnel?
12       Q    Mr. Comes, I don't mean to ask like -- I'm
13    not trying to ask you the same question again, but I
14    just want to be clear.
15            When you're saying the company does all
16    the background search and stuff like that, who are
17    you referring to?
18       A    HR.  HR.
19       Q    But from which company?
20       A    Well, I'm going to say Asphalt Group
21    because that's who I work for.  I don't know what
22    happens in The de Moya Group.
23       Q    When you were hired, did you fill out any
24    paperwork?
25       A    Of course.
```

1       Q     And did it say Asphalt Group or did it say

2  de Moya?

3       A     Asphalt Group.

4       Q     In your capacity as a superintendent, have

5  you worked in any projects that are under The de

6  Moya Group?

7       A     No.

8       Q     And in the three years that you have been

9  there, have you worked on more than one project?

10      A     No.

11      Q     And what project have you worked on?

12      A     I'm working on the HEFT.  HEFT is the

13  Turnpike.  We're expanding the Turnpike, adding more

14  lanes, new bridges.  It's a big project.

15      Q     And can you give me an idea as to the area

16  where that project is located?

17      A     We have the project from I-75 all the way

18  down to Northwest 106th Street, which is Flagler

19  Station.

20      Q     How many people do you have that report

21  directly to you?

22      A     Right now, I mean, there's -- we have --

23  there's other superintendents on the job site, so we

24  all break up the groups.  So right now in my group,

25  I have, including myself, I have three guys right

```
 1   now and myself.

 2        Q    So a total of four superintendents for the

 3   HEFT project?

 4        A    No, not four superintendents.  Four

 5   employees that are on the roster.

 6        Q    And what is their position?

 7        A    Operators.

 8        Q    Do you have any supervisors under your

 9   supervision?

10        A    No.

11        Q    And the HEFT project, as you named it,

12   does it have like a job number that it's referred to

13   as?

14        A    490.

15        Q    And does the project have like different,

16   I guess...

17        A    Segments?

18        Q    Right.

19        A    Yeah, it does.

20        Q    How many?

21        A    Like my segment right now is from

22   Okeechobee Road to I-75.  That's segment -- jeez.

23   I'm not sure if it's segment 2 or 3.

24        Q    And how long have you been working in that

25   particular segment?
```

```
1        A     Since three years ago.

2        Q     And you haven't worked in any other

3   segments?

4        A     No.

5        Q     And so you mentioned that there are other

6   superintendents in the HEFT project, is that

7   correct?

8        A     Yes.

9        Q     How many others?

10       A     There's a few.  I believe there's four of

11  us.

12       Q     Do you know their names?

13       A     On the road division, it's myself, Manuel

14  Comes; Alan Musely (phonetic), Jerry Nasso and Luis

15  Llanos.

16       Q     I'm sorry.  Can you spell the last name of

17  Luis?

18       A     Luis Llanos.  Two Ls.

19       Q     And have they been in the project for like

20  the same or longer time than you have?

21       A      Jerry, Alan and myself, we pretty much

22  started at the same time.  Luis Llanos has been with

23  the company for -- I don't know.  I can't say the

24  years.  I don't know, but he's been there for quite

25  awhile.
```

```
 1      Q    And they're longer than you have, right?

 2      A    Yes.

 3      Q    So you mentioned that in your particular

 4  segment, you have four operators?

 5      A    No.  We've got more than that under my

 6  supervision.

 7      Q    Do any of the other superintendents work

 8  in the same segment as you?

 9      A    Yes, Alan.

10      Q    For the entire time that you've been

11  there?

12      A    Yes.

13           Jerry Nasso was at my segment in the

14  beginning.  And I think for the past eight months,

15  probably 10, 11 months, he's been working at the

16  other segment down from Okeechobee Road to 106.

17  That's another segment over there.

18      Q    So for a little over two years, he was in

19  your segment?

20      A    Yes.

21      Q    So for those two years, Jerry, Alan and

22  yourself, the three of you were in the same segment?

23      A    Correct.

24      Q    So under your supervision, you mentioned

25  you have four operators.  Has that changed since you
```

22

1    started that project?

2        A    Yeah.  I mean, they come and go.

3        Q    In 2020, did you have four operators or

4    did you have more?

5        A    No, we had more.

6        Q    How many did you have in 2020?

7        A    That's when we first started the project.

8    I don't know.  We had quite a bit.  I don't recall.

9        Q    Did you have supervisors at that time?

10       A    Supervisors, no.

11       Q    Did you have any foremen?

12       A    Foremen in my segment, no.

13       Q    And so you said you had more than four.

14   Do you think that you had more than 10 operators in

15   2020?

16       A    Oh, yes.

17       Q    More than 20?

18       A    Yes.

19       Q    More than 50?

20       A    More than what?

21       Q    Fifty.

22       A    Fifty, no.

23       Q    And did they report to anyone else other

24   than you at the time?

25       A    Yeah, all three of us, different

1    superintendents.

2         Q    So any of the operators that were working

3    under your supervision would also be reporting to

4    Alan and Jerry?

5         A    Yes.

6         Q    Do you have any other employees working in

7    the projects, other than the operators under your

8    supervision?

9         A    I mean, under my roster, like I said, I

10   take their production reports every week, but there

11   are -- you know, I'm in charge of everybody there

12   also.  It's a group effort.  It's a team effort.  So

13   it's not that we have one particular person that we

14   just cater to.

15            You know, Alan's people, Alan's got

16   employees and operators and laborers.  I would also

17   supervise them.  There's not one particular person

18   that we don't -- that we don't, you know, supervise.

19   But just in our production report, we'll have, you

20   know, different people under our production reports.

21        Q    Help me understand a little bit.  I know

22   nothing about the industry.

23            Why are there groups assigned to each one

24   of you if the three of you kind of work together to

25   supervise everybody?

24

```
 1        A    Like I said, we're a team.  We help each
 2   other out.
 3        Q    Do you create any type of schedules or,
 4   you know, plan for the people that are under Alan's
 5   supervision or Jerry's supervision?
 6        A    We would meet and see what's the most
 7   important, you know, area; what's the strong point
 8   that we need that day.  And amongst us, we decide
 9   who's going to go where.
10        Q    And how often do you meet?
11        A    We meet every single morning.
12        Q    The three of you do?
13        A    No.  Before, yes.  Right now, it's just Al
14   and myself.
15        Q    When you say before, are you referring to
16   2020?
17        A    Yes.  We meet every day for safety
18   orientation, every single one.
19        Q    Is the safety orientation just the three
20   of you or with other groups?
21        A    All the employees.  Whoever's working that
22   day.
23        Q    And who leads those meetings for safety?
24        A    There's no specific.  It could be him,
25   myself, either/or.
```

25

```
 1        Q     When you say "him," who are you referring
 2   to?
 3        A     Alan.
 4        Q     What about Jerry?
 5        A     Jerry, like I said, he's on the other
 6   segment right now.  He's on the south side.
 7        Q     And what about in 2020, would the three of
 8   you attend the meetings every morning for safety?
 9        A     Correct.
10        Q     And either one of the three of you could
11   lead the meetings?
12        A     Yes.
13        Q     And other than the safety meetings, did
14   the three of you meet separately to plan and
15   coordinate?
16        A     We would meet separately?  Well, we would
17   meet with our boss.  Victor Suarez is our boss.
18   He'll tell us what's -- you know, what's -- you
19   know, the strong point for which area are we going
20   to be working at.  From there, we take over.
21        Q     How often did you meet with Victor Suarez?
22        A     There's no specific, ma'am.  Some jobs
23   will be -- some jobs will take a week, some jobs
24   will take a few months.  You know, if there's
25   something that came up that needed to be done, he
```

```
1    would meet with us and say this area needs to get
2    done, and then we would plan accordingly.
3         Q    Other than the meetings that you're
4    referring to with Victor and the morning safety
5    meetings, did you have any regular interaction or
6    meetings with Alan and Jerry?
7              MR. CLYNE:  Objection to form.  You keep
8         mixing up time frames.  Are you talking about
9         2020 or are you talking about now?  And I've
10        kind of let it go, but...
11             MS. SAAVEDRA:  Sure.  I will clarify.
12   BY MS. SAAVEDRA:
13        Q    In 2020.
14        A    Okay.  What about it?
15        Q    Did you meet -- other than the two
16   meetings that you mentioned about meeting with
17   Victor, right, and the three of you and the safety
18   meetings, did you, Alan and Jerry meet on a daily
19   basis to discuss anything that was going on with the
20   projects?
21        A    Yeah.  I mean, not daily, but we would --
22   you know, yeah, we would talk about the projects, of
23   course.
24        Q    Would you do that in person or would you
25   do that like over the phone?
```

```
1        A    Either/or, depending on how busy we are or

2   wherever we're at.

3        Q    And in 2020, did you have any de Moya

4   Group employees working under your supervision?

5        A    Yes.  There was a mixture in the

6   beginning.

7        Q    Do you recall who?

8        A    No, ma'am.

9        Q    Were they assigned to that particular

10  project from the beginning or did they come in?

11       A    They came in -- they came in from other

12  projects.  De Moya has been around a lot longer than

13  the Asphalt Group.  So whenever they were done at

14  whatever segment they were at, whatever job site

15  they were at, if the employees -- obviously, they're

16  not going to get rid of them.  So they'll bring them

17  onto the project and put them to work wherever

18  needed.

19       Q    And if you have an employee that you're

20  having issues with their performance, did you

21  discuss that with Jerry or Alan at the time in 2020?

22       A    Did we discuss it?  No.  I mean, if I have

23  a problem with any of my employees, I would talk to

24  Victor Suarez about them.

25       Q    Did you have the authority to fire anyone
```

1    in the group that was working under Alan or Jerry?

2        A    Yes, ma'am.

3        Q    Did you have to discuss that with Jerry or

4    Alan at the time?

5        A    No.

6        Q    Did you have to discuss it with Victor

7    before you took the action?

8        A    We don't have to discuss it.  We do it out

9    of courtesy.  If we have an employee that's being a

10   problem, you know, because, I mean, I myself, I give

11   people a lot of chances and I speak to them.  I'm

12   not the kind of person that just gets up on an

13   employee and, you know, starts -- first of all, I

14   don't disrespect anybody.  All my employees, nobody

15   there talks bad about me because I treat them very

16   fair and very respectful.  And I've never had issues

17   with employees as far as that.

18            Now, employees, when they start getting

19   where they don't do what they're supposed to be

20   doing and I speak to them over and over and over,

21   giving them chances, because everybody needs a job,

22   and if they don't take care of their jobs, I don't

23   have no choice.

24       Q    When you say that you speak to them over

25   and over, if you had a situation where you spoke to

29

```
1    an employee about a particular issue they were doing
2    wrong, did you communicate that to Alan and to
3    Jerry?
4         A    No, no.  I would talk to the employee and
5    I will give them advice:  You're doing this.  You're
6    doing that.
7              I would give them pretty much a verbal.
8    And not -- and not so much just a verbal, but
9    sometimes advice because everybody -- we're all
10   human.  Everybody makes mistakes.  And I try -- you
11   know, you can be having a bad day.  You know, an
12   employee can be having a bad day, so I overlook a
13   lot of things.
14        Q    Did you document it in any way?
15        A    Do I document when I talk to the employee?
16        Q    Yeah.
17        A    No.  Only if I'm going to write them up.
18        Q    And in 2020, you mentioned that the group
19   that you were supervising was between 20 and 50
20   people, right, somewhere there?
21        A    Well, I imagine we had four or five guys
22   per group.  So I had four or five guys.  Jerry had
23   four or five guys.  Alan had four or five guys.  So
24   yeah, 15, 20 employees.
25        Q    So it's in total with the three of you?
```

30

1    A    We probably had, you know, 20 guys when we
2    first started.
3    Q    So if one particular employee you were
4    always -- let's say you always saw him doing
5    something improper and you spoke to them and spoke
6    to them again.  You never mentioned it to Jerry or
7    Alan so they could keep an eye out for it?
8    A    No, no.  If I'm trying to do good to an
9    employee, I don't start talking, you know, where
10   it's going to become gossip.  First of all, I don't
11   gossip and I'm not going to be talking trash.  I
12   never talk trash about anyone.
13          So if I have an issue with an employee,
14   it's between that employee and myself that I'm
15   talking to.  And I try to keep it one on one to give
16   them a chance so things just don't start escalating.
17   Q    Was there a different procedure that you
18   followed in terms of how you disciplined an employee
19   from Asphalt Group versus an employee from de Moya
20   Group?
21   A    Ma'am, I don't care if you're from the
22   moon.  I'm going to treat you the same.
23   Q    Did you know any superintendents that work
24   for de Moya Group directly?
25   A    Do I know any superintendents that work

1    for de Moya Group?

2        Q    Yes.

3        A    Luis Llanos is one of them.  He's with The

4    de Moya Group.  I mean, there's a bunch of them.

5    There's the bridge superintendent, Manny Lima.  You

6    have Juan Carlos.  He's been with The de Moya Group

7    for a long time too.  That's pretty much the only

8    people I know there.

9        Q    In 2020, did you interact with the

10   superintendents from The de Moya Group at any point?

11       A    What do you mean interact?  In what way?

12   What are you trying to say?

13       Q    Let me rephrase.

14            So in 2020, if you, let's say, for

15   example, needed additional people, would you contact

16   somebody from de Moya Group?

17       A    No.  I'd contact the office to see what

18   applicants were available and to see if anybody new

19   came over.  And then I would talk to the

20   superintendents, "Hey, can I use this guy for a

21   while," or, "Can I use this operator for a while?"

22   And, I mean, pretty much we all -- you know, we work

23   as a team.

24       Q    Do you guys have like a directory for The

25   de Moya Group employees or Asphalt Group employees?

```
1         A    No.  At least I don't.  I don't know if
2    they do.  I don't.
3         Q    Did you ever transfer somebody that was
4    working under your supervision to a project from The
5    de Moya Group?
6         A    No.  Like I said, my employees come to me
7    and they don't want to leave.  Everybody wants to
8    come work for me.
9         Q    That's a good problem to have.
10        A    It is.  It is.  Because, I mean, I'm not
11   exaggerating.  You ask anybody about Manny Comes,
12   there's not one bad word about me.
13        Q    Let me ask you:  Do you know who Fabricio
14   Cedillo is?
15        A    Fabricio Cedillo?  No.
16        Q    Do you know who Francisco Baldelomar is?
17        A    Nope.
18        Q    Do you know who Gustavo Rivas is?
19        A    Who?
20        Q    Gustavo Rivas?
21        A    No.
22        Q    Prior to The de Moya Group, where did you
23   work?
24        A    I worked for Downrite's.  I was working
25   for Hialeah Gardens.  I've been -- I'm 58.  I've
```

```
1    been in the construction business in and out since I

2    was a kid.

3         Q    Understood.

4              So the job right before Asphalt Group was

5    Downrite's you said?

6         A    No.  It was Smith & Company.  I'm sorry.

7         Q    How long did you work there?

8         A    Maybe about a year and a half.  That's

9    when I was offered this position at the Asphalt

10   Group.  I was also working on the Turnpike.

11        Q    When you say that you were offered that

12   position, did they reach out to you or did you reach

13   out to them?

14        A    Originally, I reached out because the work

15   where I was at was going slow, so I reached out to

16   Frank de Moya.  And it just so happens that they

17   were just starting the -- they were just getting

18   ready to kick off the Turnpike project, and he said

19   go see the office and speak to Grant and Chris.  And

20   I did and I was hired right away.

21        Q    And before the Smith & Company position,

22   where did you work?

23        A    Downrite's.

24        Q    How long did you work there?

25        A    About two years.
```

34

```
 1        Q     What position did you have at that job?

 2        A     Superintendent.

 3        Q     And did you attend high school?

 4        A     No, I did not.

 5        Q     Do you have any certificates or licenses

 6   that you personally hold?

 7        A     I have a OSHA.  I'm certified OSHA.  I got

 8   a nice recommendation letter from the mayor of

 9   Hialeah Gardens.

10        Q     That has some weight on it.

11        A     Oh, yeah.

12        Q     OSHA certified, so is that something you

13   have to renew every few years?

14        A     No.  It's an OSHA 20.  It's pretty much

15   the top.

16        Q     Any other licenses or certificates that

17   you hold?

18        A     No.

19        Q     Do you know who Carlos Cardona is?

20        A     Carlos Cardona, yes.

21        Q     Who is he?

22        A     He is the person that's in charge of the

23   trucks.  He's the manager for the trucks, the

24   superintendent.

25        Q     I'm sorry.  He's the manager for what?
```

1       A     He's the supervisor for the trucks.  He's

2  the one that we call to order fill if we need any

3  fill for the project or any trucks.  We call him and

4  he schedules it.

5       Q     Is he a de Moya employee or Asphalt Group

6  employee?

7       A     That's a good question.  I've never really

8  asked.  I believe he's a de Moya.

9       Q     And you interact with him often?

10      A     Every day.

11      Q     By phone, in person?

12      A     Either/or.  If he's by the project, he'll

13  ask us what we need for tomorrow.  Or if he's not,

14  he'll call us.  He'll call myself or Alan,

15  either/or.

16      Q     Do you know who Jeremy Nasso is?

17      A     Jerry Nasso?

18      Q     Yes.

19      A     Yes.  That's the other superintendent that

20  worked with us back in 2020.

21      Q     Do you know Noel Reyes (sic)?

22      A     Noel, actually, I met him just recently

23  with this deposition.

24      Q     Before the litigation, you never met him

25  before?

1      A      Nope.

2      Q      So you mentioned that you worked under

3   Mr. Reyes (sic) in the Turnpike project, correct?

4      A      Mr. Who?  Reyes, no.

5      Q      Victor.

6      A      Victor Suarez.

7      Q      I'm sorry.  Victor Suarez.

8              You worked under Victor Suarez in the

9   Turnpike project, correct, when you first started?

10     A      Correct.

11     Q      And do you recall what time frame, what

12  year that was?

13     A      I started March 10th, 2020.

14     Q      And in that project, you were working also

15  in your capacity as a superintendent, correct?

16     A      Correct.

17     Q      Did you have any supervisors that reported

18  to you then?

19     A      No.

20     Q      Who reported to you at that project?

21     A      Reported to me?

22     Q      Yeah.  Who did you supervise at that

23  project?

24              MR. CLYNE:  Objection.  Asked and answered

25          three times.

1    BY MS. SAAVEDRA:

2         Q    You can answer.

3         A    Answer what?

4         Q    In the project at the Turnpike, right?

5         A    Who?

6         Q    When you first started in that project, is

7    that where you had the five to 10 operators under

8    your supervision?

9         A    Well, not under my supervision.  Under all

10   three of us.

11        Q    And is your testimony today that Noel

12   Reyes (sic) did not work at that project?

13             MR. CLYNE:  Are you trying to say Noel

14        Leon or Noel Reyes?

15   BY MS. SAAVEDRA:

16        Q    Noel Leon.  I'm sorry.

17        A    No.  No, he wasn't.

18        Q    Do you know who Miguel Quiroz (phonetic)

19   is?

20        A    Miguel who?

21        Q    Quiroz.

22        A    Miguel Quiroz, no, I do not.

23        Q    Do you know who Mr. Monteagudo is?

24        A    Jorge?

25        Q    Yes.

38

```
1        A     Yes.

2        Q     When did you first meet him?

3        A     When he came to the project.

4        Q     And do you recall when that was?

5        A     Not exactly, no.

6        Q     And was he, at the time, an Asphalt Group

7   employee?

8        A     No, I don't know.  I believe he came from

9   The de Moya Group, I believe.

10       Q     Do you know how he was transferred or the

11  reason --

12       A     No.

13       Q     -- he transferred over?

14       A     He was transferred, I guess, because we

15  needed personnel.  That's, like I said, when we

16  first started.

17       Q     So when you first started, you didn't have

18  enough people working in the project?

19       A     You never have enough people.  That's a

20  massive project.

21       Q     How did you go about getting the help that

22  you needed?

23             MR. CLYNE:  Objection.  Asked and answered

24       twice.

25
```

39

```
 1              MS. SAAVEDRA:  Counselor, I'm going to ask
 2      you to please keep your objections to form.
 3              MR. CLYNE:  I'm going to ask you not to
 4      ask the same questions over and over.
 5              MS. SAAVEDRA:  This is my chance to ask
 6      questions.
 7              MR. CLYNE:  We've got bulletins.  We've
 8      got websites. I understand that, but you still
 9      need to, like, not ask the same questions.
10              MS. SAAVEDRA:  I'm going to ask you to
11      please just keep your objections to form.
12              MR. CLYNE:  Asked and answered is a form.
13              MS. SAAVEDRA:  That's a speaking objection
14      and it's improper.
15              MR. CLYNE:  No.  It's telling you that
16      you've asked the same question over and over.
17              MS. SAAVEDRA:  Madam Court Reporter, can
18      you read the last question back.
19              THE STENOGRAPHER:  Sure.
20              (Whereupon, the question was read back as
21      follows:)
22              "Q How did you go about getting the help
23      that you needed?"
24      A     I told you guys already.
25
```

```
 1    BY MS. SAAVEDRA:

 2        Q    Okay.  How was that?

 3        A    I guess through advertisement,

 4    applications, employees from other projects that

 5    were finished with the project and they came on

 6    board.

 7        Q    Did you speak to somebody at The de Moya

 8    Group to tell them that you needed help and see who

 9    could be coming to help?

10        A    First of all, I don't speak to -- for

11    that, I don't speak to The de Moya Group.  I speak

12    to our bosses, which the person in charge of that is

13    Victor Suarez.  He's my boss.  And when I say I need

14    an employee, I speak to him or I'll call HR and see

15    if anybody is available.

16        Q    Who in HR?

17        A    In HR is Cathy.

18        Q    Do you know her last name?

19        A    I don't recall.

20        Q    Do you recall if you called Cathy or if it

21    was Mr. Suarez who you told that you needed the help

22    when Mr. Monteagudo was transferred?

23        A    Mr. Monteagudo just came on board.  He was

24    brought on.  I guess he was in another project of de

25    Moya.  And for whatever reason, they got done over
```

```
 1    there.  I never even found out.  I needed the help.
 2    He came on board and he stayed.
 3         Q    So your testimony is that you don't recall
 4    the specifics?
 5         A    How he came on board?
 6         Q    Uh-huh.
 7         A    No, I do not.
 8         Q    And as you sit here today, you don't know
 9    who made the decision to transfer him?
10              MR. CLYNE:  Objection.  Asked and answered
11         three times.
12    BY MS. SAAVEDRA:
13         Q    You can answer.
14         A    No, I don't know who brought him on board.
15         Q    What was his position when he was
16    transferred over?
17         A    He was a laborer.
18         Q    And what were his duties?
19         A    His duties is pretty much labor work.
20    Labor work is anything that has to do on the ground.
21    Labor is also -- I mean, we'll teach him how to run
22    a roller.  It's a simple machine.  And just help out
23    on the ground, whatever we need.
24         Q    And as a laborer, who did he directly
25    report to?
```

42

```
1        A    I don't recall if he was on my roster or
2    not back then because my roster has changed, you
3    know, a few times with different employees.  They
4    switch them back and forth.  I'm not sure.  I think
5    I had him on my roster back then.
6        Q    What is a roster?  Can you explain that to
7    me?
8        A    A roster is where you write the production
9    reports for the performance of the employee.
10       Q    And is that something that you prepare or
11   something that is given to you?
12       A    No, I prepare.
13       Q    And how do you know which individuals are
14   going to be working under your roster from one
15   minute to the next?
16       A    No, it's not one day to the next.  That
17   could change.  It could change when an employee is
18   needed for another area, depending on their
19   experience, different tasks throughout the company
20   to see who's needed where.
21            And pretty much, I mean, it could be on
22   your roster for a month.  It could be on your roster
23   for a year.  It depends on the employee and the
24   position that they have.
25       Q    Who did he work with when he was working
```

43

```
 1   under your supervision?

 2        A    I believe he was on my roster, like I

 3   said.

 4        Q    Was he working with an operator

 5   specifically?

 6        A    He was working -- I had him on the -- he

 7   was working behind the grader, the motor grader.  He

 8   pretty much worked with him, clearing the stakes and

 9   the blue tops.  Blue tops are another stake, but

10   it's a nail that's on the ground with a little

11   feather.  That's a reference point for the operator,

12   for the grader operator.

13        Q    When you said that he was working with

14   him, who are you referring to?

15        A    With the roller grader.

16        Q    What is his name?

17        A    I don't remember who it was back then.  We

18   have different motor graders.

19        Q    Was that somebody that was also

20   transferred from The de Moya Group or somebody that

21   worked for Asphalt Group?

22        A    I don't recall, ma'am, if it was de Moya

23   or Asphalt.

24        Q    Did you interact often with Mr.

25   Monteagudo?
```

1        A        Did I what?  I'm sorry.

2        Q        Interact with him often?

3        A        No.  I mean, interact in what way?  We

4    give the job duties of what's needed to be done on

5    that day.  You know, he'll go -- if he has to call

6    me, you know, he'll call, just wave me down.  You

7    know, whoever has my phone will call me.  But no,

8    interact as far as one on one like that, no.

9        Q        In general, how did he perform in his

10   position?

11       A        Oh, boy.  Like I said, I gave that man so

12   many chances.  I could have gotten rid of that man a

13   long time ago before those incidents.  I kept

14   talking to him, advising him.  He was the kind of

15   employee that would pretty much -- the motor

16   grader -- if the person on the ground, the laborer,

17   is not clearing the stakes and not clearing the blue

18   tops, the motor grader cannot do his job and cut the

19   lime rock.

20              What he does is cuts the lime rock to

21   leave it for finish grade.  After the finish grade

22   is where the asphalt comes on.  That's the final

23   lift.  And if that person is not on the ground

24   constantly cleaning those feathers, the motor grader

25   cannot work.

```
 1              Normally, we would have like two guys on
 2    the ground helping the motor grader.  Jorge would
 3    find every excuse to walk away from his duty, hide
 4    behind a tree, you know, to get shade, which that's
 5    fine.  We don't have no problem with that.  We've
 6    told the employees, because that's part of our
 7    safety meetings:  Hydration and to work safe.  And
 8    there's no problems with an employee stepping away
 9    and taking a quick break to get out from the sun
10    because we do work directly under the sun.
11              But that man would find every minute -- I
12    mean, literally, every time I turn around,
13    Monteagudo is nowhere to be found.  I'd look around,
14    look around.  He's hiding behind a piece of
15    equipment, behind a tree, you know, or anywhere
16    other than his work site.  I'll come by and say,
17    "What are you doing? Why are you away from your job
18    site?  This man needs you over here."
19              And pretty much, he would push off his
20    work out to the other laborer.  The other laborer
21    would have to work twice because Monteagudo couldn't
22    keep up with the motor grader.  So that being said,
23    when I started seeing -- this is how lenient I was
24    with this man.  When I started seeing that, I put
25    him on top of a roller, okay, so he don't have to be
```

 1   on the ground.

 2            And even then, that man would step away

 3   from his job site, not use the roller where he was

 4   supposed to be rolling.  He would go to different

 5   areas that he wasn't supposed to be.  And then the

 6   next thing you know, the roller's stopped.

 7   Monteagudo is, literally, with his eyes closed

 8   laying back and the roller running.

 9            That roller is a big piece of machine.

10   While he's in his little trance, whatever he was

11   sleeping or not, and he hits that lever and that

12   roller starts going forward, there could be a person

13   in the front, a person in the back.  It could be

14   anything.  It could be next to a ditch.  And it's a

15   big safety hazard.

16            So I told him, I said, "What are you

17   doing?"  He didn't just do it one time.  Finally,

18   after I told him various numerous times, I wrote him

19   up.  And even then, I didn't even suspend him.  I

20   just wrote him up, and he still kept on doing it.

21       Q    Okay.  There was a lot there, so let me

22   try and unpack.

23            Did you have these issues of when he was

24   on the ground -- let me just start there.  When he

25   was on the ground, how soon after he started working

1    under your supervision did you start having these

2    issues?

3         A    Oh, boy.  It wouldn't be every single day.

4    He would have perfect days.

5         Q    Was it like a month after he started?

6         A    I don't know.  I don't keep tags on every

7    single employee.  I got a big responsibility to be

8    running that job site and keeping with my schedules

9    than having to be constantly worrying about one

10   employee.  I can't.  I have contractors.  I have a

11   lot of people under me.

12        Q    The physical area where the project is is

13   a big area?

14        A    Humongous.

15        Q    Are you able to see everyone from any

16   given point where you're at on the ground?

17        A    The project is probably four and a half,

18   five miles.  No, you can't.

19             I'm constantly driving around the project

20   with my pickup truck -- you know, with the company

21   truck.  And I go out to the different job sites, to

22   the different work zones that we're working on that

23   day.

24             And, I mean, you would think that an

25   employee that sees a boss coming by would have a

```
 1    little bit of common sense and work.  That man
 2    didn't give a darn who was coming by.
 3         Q    But you said that that was part of the
 4    safety policies, right, like for them to make sure
 5    that they're not in the sun all day, that they're
 6    hydrating and so forth?
 7         A    That's very important.
 8         Q    So how do you know that -- you're making
 9    an allegation, or at least that's what I'm
10    understanding, and please correct me if I'm wrong,
11    that he was never working; that he was always taking
12    breaks.  How do you know that if it's such a big
13    area and you were not always there?
14              MR. CLYNE:  Objection to the --
15         A    No, hold on.  Hold on.  It's fine.  It's
16    fine.  I'll answer this.
17              Listen, first of all, I didn't say taking
18    breaks.  Okay?  I said we don't have specifics as
19    far as taking breaks.  If you yourself got there and
20    you're working and you feel that you're heated, you
21    know, the heat's too unbearable, you need to take a
22    break, we will not punish.  And when I mean punish,
23    we will not reprimand you for that because we don't
24    want anybody falling down on us as far as a heat
25    stroke.  Because heat strokes have symptoms.
```

```
 1    There's signs of a heat stroke.

 2            But when a heat stroke finally hits you,

 3    you'll faint and you won't even know what happened

 4    to you.  And I've had that.  You know, I've seen

 5    that.  And that's one thing that we very, very --

 6    especially on the hydration side, that we tell the

 7    employees, you know, how do you want to say it?

 8    It's an honest -- it's an honest request that you

 9    ask the employee not to abuse the advantage that

10    we're giving you, the opportunity.  And we're giving

11    that because of safety issues.

12            But when you as a person abuse, constantly

13    stepping away from your job site and always, I don't

14    know, like being elusive, I mean, you will come by,

15    you're looking because you have specific people in

16    different areas and you know who's in that area that

17    day.  And when you see one employee on the ground

18    constantly following that motor grader and you don't

19    see the other person, you look for that person.

20            And then when I would find him, I'm like,

21    "What are you doing?  Please, we need this done.

22    Are you okay?"  I would ask him, "Are you okay?  Do

23    you have any physical problems that I need to know

24    of, you know, that I can help you with here because

25    we need this job done."  And he would just say, "No,
```

```
1    I'm just taking a break."  And I'd say, "Okay.  Take

2    five minutes.  You know, five minutes or whatever

3    you need, and get back."

4            Leave out of the area.  Come back a

5    friggin hour later or even less or whatever, depends

6    on where you're at, the man's doing it again.  Like

7    I said, he had days that he was a perfect employee.

8    He had weeks that was -- we never had issues with

9    him.  But he would get into his little sporadic

10   moments, he was uncontrollable.

11   BY MS. SAAVEDRA:

12       Q    How many times do you recall that you

13   found him taking breaks multiple times within an

14   hour or two a day?  How many times did that happen?

15       A    I lost count.

16       Q    More than 10 times?

17       A    Oh, yeah.  I mean, that comes back to when

18   we first started talking.  That I myself, I came

19   from the shovel.  I didn't just jump into the

20   construction industry and became a superintendent.

21   I worked that shovel.  I started on that shovel.

22   Okay?

23            First of all, I respect everybody.  But

24   being that I have that experience with what that

25   shovel is, I respect those on the ground.  And I'm
```

1    super lenient, super.  I'm probably too lenient.  I

2    should have -- if that would have been the case, I

3    should have gotten rid of him a long time ago, but I

4    didn't because I have compassion on people.

5             And I didn't want to fire him.  I didn't

6    fire him.  I wrote him up and that was -- I believe

7    it was twice, and that was not -- I hate -- I cannot

8    stand to write up a person.

9      Q    Let me stop you right there so I don't

10   keep asking you the same question.

11            He started around September 2020 working

12   with you?

13     A    I don't know the exact date.  I'm sorry.

14     Q    That's okay.

15            Is there something that maybe I can help

16   you remember with?

17     A    As far as what?  His starting date?

18     Q    Yeah, when he started working with you.

19   Do you know how long he was working with you?

20     A    Months, I guess.  Months, half a year.  I

21   don't know.

22     Q    So you mentioned that the whole situation

23   of you finding him taking breaks constantly

24   throughout the day happened more than 10 times?

25     A    Throughout the day?  In one day?

1        Q     No.  I'm saying that happened multiple

2    occasions, multiple days?

3        A     Yeah, yeah, yeah, yeah, yeah.

4        Q     And you also said that there are weeks

5    that he was a perfect employee?

6        A     Yeah.  Weeks, you know, he was right on

7    cue.  You know, I used to pat him on the back.  I'm

8    like, "Hey, nice."  The job was getting done.

9    Construction is teamwork.  If you don't have a team,

10   you don't have nothing.

11       Q     Well, let me ask you this, Mr. Comes.  If

12   he was working -- if I can represent to you that he

13   was transferred to that project in September of

14   2020, and then his termination was October 7th of

15   2020, that's approximately, what, four weeks, three

16   weeks?

17       A     I don't remember exactly the dates, ma'am.

18   I really don't.

19       Q     Okay.  Do you recall, had there been more

20   than 10 times that you had talked to him about, you

21   know, taking multiple breaks and asking him what was

22   wrong before you put him on the roller?

23       A     I didn't count the times I spoke to him.

24   But when I seen that he was having problems keeping

25   up with the person on the ground, I tried moving him

```
 1    into another position, which is also part of the

 2    labor duty which is the roller.  And I figured he

 3    was going to do good on that.

 4         Q    So before you transferred him, as you sit

 5    here today, you cannot tell me whether it happened

 6    more than two, three times, 10 times?

 7              MR. CLYNE:  Objection.  Asked and

 8         answered.  He said multiple times three or four

 9         times.

10         A    I don't know exactly how many times.

11    BY MS. SAAVEDRA:

12         Q    But it's possible that it was less than 10

13    times?

14         A    No, it's not possible.  It could have been

15    20 times.  I don't remember.  I spoke to him out of

16    courtesy many times.

17         Q    And the roller, isn't that a machinery

18    that you have to be very careful with?

19         A    Oh, yes.

20         Q    Would you consider that the roller is more

21    dangerous than the shovel that he was working with

22    before?

23         A    Anything is dangerous.  You can be with a

24    shovel and you can hit a 9,000 volt conduit and

25    you're dead.  So everything has danger.
```

```
 1              So no, shovel work is also very dangerous
 2    too.  It's not just shoveling a little dirt out of
 3    the way.  A laborer, they can be what's called
 4    potholing.  Pothole means that you are uncovering
 5    conduits.  You're uncovering electric lines.  You
 6    could be uncovering fiber lines, whichever.  You
 7    break a fiber line, it could cost you thousands of
 8    dollars.  You hit a power line and guess what's
 9    going to happen to you?  Either you're going to be
10    dead or you're going to end up in the hospital.
11              So everything has its danger.  Not just
12    because you're on a shovel you're safe.  That's not
13    the reason I took him off the shovel.  I took him
14    off the shovel because he couldn't keep up
15    physically walking behind the roller.
16         Q    And you said that you found him sleeping
17    on the roller multiple times?
18         A    Yeah.
19         Q    Isn't that a safety violation?
20         A    It sure is.
21         Q    And isn't that grounds for dismissal?
22         A    Sure is.
23         Q    And you didn't report it?
24         A    I just told you before, I am very lenient.
25    I tried to keep it where he would understand and not
```

1    do it anymore, but it did not seem to matter to him.

2         Q    Did you ever receive any complaints about

3    Mr. Monteagudo?

4         A    No.

5         Q    Did anyone else raise any concerns

6    regarding his performance to you before?

7         A    No.

8         Q    When you're going to issue a writeup, do

9    you have specific forms that you use for Asphalt

10   Group employees versus The de Moya Group?

11        A    All the sheets that we have are Asphalt

12   Group.  I work for the Asphalt Group, not de Moya

13   Group.

14        Q    Right.  But if you have an employee from

15   The de Moya Group, you don't have to have a specific

16   form for that?

17        A    No.

18        Q    When a de Moya Group employee gets

19   transferred over, do you receive any type of file

20   for that employee to know if there are any issues?

21        A    No, ma'am.

22        Q    Do you know whether Asphalt Group has any

23   policies regarding the use of disciplinary action

24   and whether it's progressive?

25        A    I don't understand your question.

```
 1      Q    Is there a policy for the company
 2  establishing how discipline should be issued to
 3  employees?
 4      A    No.  I mean, the policy has always been
 5  verbal, written and, you know, sometimes suspended.
 6  Or if it's a critical matter, dismissal on the spot.
 7      Q    Is that in writing somewhere that you
 8  know?
 9      A    No.
10      Q    Did you receive any type of training when
11  you started working for the Asphalt Group?
12      A    No.
13      Q    Are employees or laborers allowed to use
14  cellphones when they're operating machinery?
15      A    No, never.
16      Q    Is that also a violation?
17      A    If anybody's to use a cellphone while
18  they're on top of a machine, they must park the
19  machine.  Okay?  They cannot be operating ever a
20  machine while they're on the phone.
21           The only time that we allow that -- no
22  personal, nothing personal, not of that YouTubing or
23  looking through the Web.  It has to be an emergency.
24      Q    When you issue a writeup to an employee,
25  what do you do with that form after you fill it out?
```

1   Do you have to send it somewhere?

2      A    I take it to HR.

3      Q    Is there a particular individual at HR?

4      A    Well, Cathy is part of the HR.  She gets

5   that form and, I guess, she sends it to the main

6   office.  I don't know her procedures, but I take it

7   to Cathy.

8      Q    Do you have to report the writeup to

9   anyone else?

10     A    No.

11     Q    Do you discuss the writeup in your safety

12  meetings in front of the other employees?

13     A    No, no.

14     Q    Do you advise your supervisor and

15  colleagues about the writeup during your meeting?

16     A    Of course not.

17     Q    I'm sorry?

18     A    Of course not.

19        MS. SAAVEDRA:  I think this is a good

20     point to take a quick break.  If we can do 10

21     minutes.

22        THE WITNESS:  Okay.

23        (Recess from 11:18 a.m. to 11:41 a.m.)

24        MS. SAAVEDRA:  Back on the record.

25

58

```
 1    BY MS. SAAVEDRA:

 2         Q    Mr. Comes, you understand you're still

 3    under oath, correct?

 4         A    Yes, ma'am.

 5         Q    Did you speak to anyone regarding your

 6    testimony --

 7         A    No, ma'am.

 8         Q    -- while we were on break?

 9         A    No, ma'am.

10         Q    Did you review any documents or anything

11    else?

12         A    Nope.

13         Q    Earlier you talked about that you're

14    responsible for preparing a production report.  Did

15    I understand that correctly?

16         A    Yeah.  Whatever work duties we had that

17    day, yeah.

18         Q    It's a daily report?

19         A    It's a daily report, yeah.

20         Q    And what's in that report?  What specific

21    information do you have to put in it?

22         A    Employee so and so worked -- well, not the

23    laborers.  If you're talking about the laborers, no.

24    The production reports, the laborers pretty much,

25    you put them with whatever operator they were
```

59

1    working that day.  You, more or less, brief them

2    what they did, the stations that they were working

3    at.  And, I mean, yeah, pretty much.

4         Q    In the report, you list what operator was

5    assigned to what specific area?

6         A    Yes.

7         Q    And do you list who was put with a

8    specific operator on a given day as to laborers or

9    no?

10        A    If that person's on the roster, you put

11   them with whoever they're with that day, yes.

12        Q    Any other information that's part of that

13   report?

14        A    No.

15        Q    Do you write any incidents about employees

16   or if they had any accidents or anything else on

17   that report?

18        A    No, not on that report.  That report

19   pretty much -- that's for payroll.  That works for

20   payroll and the production of that day.  You know,

21   so the department can have the hours for the

22   payroll.

23        Q    Understood.

24             Each of the superintendents in 2020 had to

25   fill out a production report every day?

60

```
 1        A     Everybody.

 2        Q     And what do you do with that report at the

 3   end of the day?

 4        A     No, it's not every day.  You make the

 5   production report.  And then once a week, you send

 6   it to Victor, to the office, to my boss.

 7        Q     Do you send it to anyone else?

 8        A     No, just Victor.

 9        Q     Other than whatever you write on that

10   production report, do you make any notes for your

11   own self, like while you're working on the project?

12        A     No.  The notes on there -- pretty much if

13   the person's out that day, you have to -- you know,

14   when you put zero for their hours or so, you explain

15   why they were out that day, if they're out sick, on

16   vacation, if it's a holiday.

17        Q     In 2020, did you have to meet with Chris

18   de Moya to discuss how the project was going and the

19   progress?

20        A     No.

21        Q     Earlier before the break, you mentioned

22   that you were the person that terminated

23   Mr. Monteagudo?

24        A     I did not --

25              MR. CLYNE:  Objection to form.
```

1       A    No, I did not terminate him.  I never said

2  that.

3  BY MS. SAAVEDRA:

4       Q    Okay.  But you do know, obviously, that he

5  was terminated, right?

6       A    Yes.

7       Q    Tell me when did you find out about his

8  termination?

9       A    I'm not sure if that day he was terminated

10 I was there or not.  But I found out that he was

11 just terminated.  Jerry, when he came back, he --

12 because Jerry, to what I remember, he was looking

13 for Mr. Monteagudo or something and then that

14 incident happened.

15      Q    What incident?

16      A    That he was asleep on the roller with the

17 roller on.  And he was not as lenient as I was.  He

18 dismissed him.

19      Q    So your testimony is that it was Jerry who

20 found him sleeping on the roller and terminated him?

21      A    That day he was terminated, yes.

22      Q    How did you find out that he was

23 terminated?

24      A    Not seeing him there the next day.

25      Q    So when he didn't show up, what did you

```
 1    do?

 2         A    I asked what happened.

 3         Q    What did you ask?

 4         A    I needed him on the -- where they were

 5    working with the grader, on the roller.

 6         Q    Do you remember who specifically you

 7    asked?

 8         A    No.  I just asked in our meeting in the

 9    morning.  I didn't see him.  I didn't see him, then

10    that's when he pulled me to the side and told me

11    that he terminated him.

12         Q    Who pulled you to the side?

13         A    Jerry.

14         Q    So was it in the safety meeting or was it

15    that you asked the grader and he's the one that told

16    you?

17         A    No.  The grader didn't say nothing.  He

18    didn't know what happened.

19         Q    So at the safety meeting, do you do roll

20    call?

21         A    Of course.

22         Q    Is there a form that you guys fill out to

23    make sure when you're going through the names as to

24    who's there and who's not?

25         A    Every safety meeting, there's a sign-in
```

1    sheet that everybody signs in the safety meeting.

2        Q    So that particular morning, the next day

3    that Mr. Monteagudo got terminated, you realized

4    that he wasn't there how?  You were looking for him?

5        A    Not looking for him specifically.  I

6    didn't see him there.  I asked Alan and Jerry, and

7    Jerry told me that he fired him the day before

8    because of the incident with the roller.

9        Q    Did he say anything else?

10       A    No.

11       Q    Did you say anything else?

12       A    No.

13       Q    You testified earlier, at least that's

14   what I understood, so please correct me if I'm

15   wrong, did you ever find Mr. Monteagudo sleeping on

16   the roller yourself?

17       A    Yes.

18       Q    When was that?

19       A    I don't know, ma'am.  On different

20   occasions.  I don't recall exactly when, what date,

21   what hour.

22       Q    Was it like a few days before his

23   termination?

24       A    Like I just told you, I don't recall

25   exactly when, but it was prior to that, yes, a few

1    times.

2         Q    After Jerry told you that he fired

3    Monteagudo, did you say anything else to him?

4         A    You asked me already.  I said no.  I

5    adjusted my day and I got somebody else to fill his

6    position.

7         Q    How did you get somebody else?

8         A    What do you mean?  I made adjustments in

9    the group that we have, with the employees that we

10   had.

11        Q    So people that were already on your

12   roster?

13        A    Not my exact roster.  Whoever is there

14   that morning.

15             You keep asking me the same questions over

16   and over.  I don't understand why.

17        Q    I'm not asking you the same questions.

18   And I apologize if you feel that way.  I'm trying to

19   understand.  I wasn't there.  I don't know the

20   system, so I'm trying to understand how it works.

21        A    You're trying to flip this over and over.

22   My answer is going to be the same to you all the

23   time.

24        Q    Mr. Comes, I understand.  That is how this

25   works.  I understand that it may seem like I'm

```
 1    repeating myself, but --

 2         A    It's like you're trying to catch me on

 3    something.  I don't understand what's your purpose.

 4         Q    No, I'm not trying --

 5         A    I'm explaining over and over and you keep

 6    asking me the same question over and over, you know.

 7    This is ridiculous.

 8         Q    This will be over as soon as you answer my

 9    questions.  And I understand you may think --

10         A    I answered yes.

11         Q    This is the only time I have -- let me

12    finish.  This is the only time that I have to ask

13    you questions.

14              Did you speak to Mr. Monteagudo after he

15    was terminated?

16         A    No, I did not.

17         Q    Did anyone ask you or did you speak to

18    Chris de Moya at any point prior to Mr. Monteagudo's

19    termination about him?

20         A    No.  Why would I?

21         Q    And is it your testimony that you never

22    spoke -- prior to this litigation starting, you

23    never spoke to Mr. Noel Leon?

24         A    I didn't even know the man.

25         Q    Do you know Alejandro Leon?
```

```
 1      A     Alejandro Leon, he is, I think, QC,
 2   quality control.
 3            MS. SAAVEDRA:  Let me pull up what I'm
 4      going to introduce as Exhibit 1 to this
 5      deposition.  It's going to be Defendant's 91.
 6            (Whereupon, Plaintiff's Exhibit Number 1
 7      was marked for Identification.)
 8   BY MS. SAAVEDRA:
 9      Q     Mr. Comes, if you can take a look at the
10   document that's on the screen and let me know when
11   you have reviewed it.  If I need to zoom in, please
12   let me know.
13      A     Yes, I see it.  There you go.  I don't
14   have my glasses.  I'm sorry.
15      Q     Is that better?
16      A     Right there.  Right there.  Stop.
17      Q     Do you recognize this document?
18      A     Yeah.
19      Q     What is it?
20            MR. CLYNE:  He's reading.  Give him a
21      chance.
22      A     Yeah, that's what I spoke to you about
23   before about the employee on the ground being with
24   the grader operator, cleaning the stakes so the
25   grader operator can see his points.
```

```
 1    BY MS. SAAVEDRA:

 2         Q    So this was before you transferred him to

 3    the roller, correct?

 4         A    Yes.

 5         Q    And the date on this form is 9/29/2020,

 6    correct?

 7         A    September, yes.

 8         Q    Did you fill out this report the same day

 9    that the incident occurred?

10         A    The same day.

11         Q    Is that your signature?

12         A    Yes, it is.  And he refused to sign the

13    form.

14         Q    When did you speak to Mr. Monteagudo about

15    this writeup?  Tell me what happened that day,

16    whatever you recall.

17         A    Exactly that.  He was stepping away from

18    the work zone and leaving the workload on the other

19    laborer that was there.  Whoever it was, I don't

20    remember who it was.  And he just kept, I don't

21    know, hiding from working.

22         Q    So did you speak to Mr. Monteagudo before

23    you prepared the writeup or not?

24         A    Of course.

25         Q    That same day?
```

```
1        A     Of course.  And before that, a bunch of

2   times before, like I told you.  I would approach him

3   out of his work zone and I would ask him, "Why are

4   you out of your work zone," as we spoke before.  And

5   he would say, "No, I'm just taking a quick break,"

6   and so forth like I explained in the past.

7        Q     And did you prepare the writeup like in

8   your car after you spoke to him and gave it to him

9   to sign or what was the time frame on that?

10       A     My office is my truck, ma'am.

11       Q     Right.  So did you prepare the writeup

12  right after you spoke to him?

13       A     Yes.

14       Q     And what did he tell you when you

15  presented it to him?

16       A     He was upset.  He didn't want to sign and

17  walked away.  That was right there grounds, you

18  know, pretty much for dismissal.  And I made

19  myself -- I just ignored that part because, like I

20  said, I like people to correct themselves and

21  hopefully get better.

22            You know, in the construction industry, I

23  don't know how your field is, but there's not too

24  many -- nobody wants to work pretty much.  I mean,

25  it's very hard to find good help.  So when you have
```

1    help, you try and keep them.

2        Q    And, at this point, you knew that he

3    was -- he could be a good employee because, like you

4    mentioned, he had good weeks, correct?

5        A    Yeah.  He's a nice guy.  He never gave

6    me -- I mean, as far as being, you know,

7    disrespectful or nothing like that, he was never --

8    we never disrespected each other because I don't

9    give anybody dis -- I don't disrespect anybody, so

10   nobody disrespects me.

11       Q    After you prepared the writeup and you had

12   the conversation with him, you sent this to HR,

13   correct?

14       A    Yeah, I sent it to Cathy.

15       Q    Do you recall if you wrote anything about

16   this on your report -- on your progress report?

17       A    No, you don't write none of that on your

18   progress report.

19       Q    And do you see right next to your

20   signature, it says Manuel Comes and it says Cuban.

21   Did you write that?

22       A    No.

23       Q    Was that there when you prepared the

24   writeup?

25       A    I don't remember, ma'am.  I don't remember

1   seeing that.

2       Q    Is that normal for you to put where you're

3   from on the writeups?

4       A    No.

5       Q    You are Cuban, right?

6       A    Huh?  I didn't write that.

7       Q    Are you Cuban?

8       A    I am Cuban.

9       Q    Were you born in Cuba?

10      A    I was born in Cuba, raised here.  Don't

11  ask me about Cuba because I don't know nothing about

12  Cuba.

13      Q    How long ago did you move to the United

14  States?

15      A    Jeez, I think it was '70.

16           MS. SAAVEDRA:  I'm going to show you what

17      I'll have marked as Exhibit 2 to this

18      deposition.  And this is, for the record,

19      Defendant's 90, Bates 90.

20           (Whereupon, Plaintiff's Exhibit Number 2

21      was marked for Identification.)

22  BY MS. SAAVEDRA:

23      Q    I'll scroll down.  Let me know when you're

24  ready, Mr. Comes.

25      A    Whoa, whoa.  Move it over to, I guess, my

```
 1    left.  Yeah, right there, disappearing from his work

 2    zone.

 3         Q    Do you recognize this document?

 4         A    I sure do.  That's what I was talking

 5    about that he would be disappearing.

 6         Q    And that is your handwriting, correct?

 7         A    Yes, it is.

 8         Q    And that is your signature, correct?

 9         A    That is my signature.

10         Q    And your name and your Cuban nationality,

11    is that your handwriting?

12         A    No, it is not.

13         Q    Do you recall when this happened or when

14    you issued this writeup?

15         A    No.

16         Q    Do you recall if it was before the one

17    that I showed you previously?

18         A    I don't recall.  Let me see the date.

19    There's no date on it.

20         Q    Right.  Is that something that you

21    normally do?

22         A    No, no.  I missed that one.

23         Q    As you sit here today, you have no

24    recollection as to when this was prepared and when

25    it happened?
```

72

```
1          A    I do not, ma'am.

2          Q    Was that intended to be a written warning,

3     verbal warning?

4          A    A written.

5               I'm surprised the office didn't call me

6     out on that one because they're pretty intense

7     about, you know, every piece a paper being filled

8     out right.

9          Q    Is it possible that they did?

10         A    That they did what?

11         Q    That they maybe requested you to -- I

12    mean, that they e-mailed you or contacted you in any

13    way about the lack of date?

14         A    I don't recall.  I don't see why they

15    would have not asked me to put a date or anything on

16    there.

17              MS. SAAVEDRA:  I'll show you what I'll

18         have marked as Exhibit 3 of this deposition,

19         which is Defendant's 143.

20              (Whereupon, Plaintiff's Exhibit Number 3

21         was marked for Identification.)

22    BY MS. SAAVEDRA:

23         Q    Mr. Comes, let me represent to you this

24    document has been provided to us by the company, and

25    it's supposed to be the HR discipline record for
```

1    Mr. Monteagudo.

2         A    Never seen that.

3         Q    If you see at the bottom of the screen, it

4    has the numbers to the left, it has numbers 1

5    through -- if you can look at number 8.  Do you see

6    that?

7         A    Okay.

8         Q    9/14/2020.

9         A    Okay.

10        Q    So it appears from the record that the

11   company had Mr. Monteagudo was transferred to

12   project number 490 on or about September 14th, 2020.

13        A    Okay.

14        Q    Do you have any reason to dispute that

15   that's correct?

16        A    I don't have no reason to dispute because

17   I don't know when he was transferred.

18        Q    So as I showed you Exhibit 1, which was

19   the writeup that was dated September 29th, 2020.

20             If he was transferred on September 14th,

21   2020, that is approximately two weeks between the

22   transfer and the writeup, a week?

23        A    A week.

24        Q    Is that correct?

25        A    More or less, yeah.

74

```
 1        Q    But you stated earlier that you gave him

 2   multiple verbal coaching before you resulted to

 3   write him up, didn't you?

 4        A    Yeah.

 5        Q    So it all happened in one week?

 6        A    If that's the dates, I guess so.

 7        Q    Do you consider a two-week period a long

 8   time to give your employee chances?

 9        A    There's no specific time frame.  I mean,

10   pretty much you -- every person -- every personnel

11   is valuable -- invaluable, every one.  But that's

12   why you try and not coach.  I'm not going to say

13   coach.  You try to advise.  I'm nobody to coach

14   anybody.

15             I'm advising him to please step up and be

16   a team player.  And those dates that you're talking

17   there, our project was pretty intense.  We were

18   moving a thousand some loads a day, you know,

19   filling canals.  There was a hundred and something,

20   200 trucks in a day.  It was a very, very busy

21   moment.

22             So as far as your time frame, I'm sorry, I

23   can't tell you exactly because back then, your mind

24   is very rattled as far as your workforce, your

25   workload.  You're trying to juggle and keep that up
```

1    in the air, make sure that egg don't fall on the

2    ground.

3        Q    And with everything that you had going on,

4    you made it a point to speak to Mr. Monteagudo on

5    multiple times, as you stated earlier, correct,

6    before you gave him the writeup in that two-week

7    period.

8        A    If it was a two-week period, whatever it

9    was, yeah.  Because he's the one that was having the

10   problem.  And I was trying to keep him from not --

11   from having to do whatever happened to him.

12       Q    You also testified that he had good weeks.

13   So how is it that in the two-week period he had good

14   weeks and also you coach him or talked to him 10

15   times or more?

16       A    You're talking about two years ago.  I

17   can't tell you exactly what time, what date, a week

18   or whatever.  What I'm trying to tell you is, when

19   he was by my side, me, I gave him plenty of chances,

20   plenty of chances.  Whether it was in that week

21   frame, two weeks or whatever it was, I don't have no

22   time frame on that.

23       Q    I understand that you don't have a

24   recollection of the dates, which is why I'm

25   presenting these documents to you to help you with

1    that.

2           I'm just trying to understand the timeline

3    as your testimony today.  Let me ask you:  You also

4    stated that, you know, there's different dangers;

5    all jobs you had at the job site were in a way

6    dangerous, correct?

7       A    In the construction industry, everything

8    is dangerous.

9       Q    Anything that has to do with safety, one

10   thing is not more dangerous than the other, correct,

11   in your eyes?

12      A    Every -- I mean, every task, every

13   operation has its danger.

14           MS. SAAVEDRA:  I'm going to show you what

15      I'll have marked as Exhibit 4 to this

16      deposition.  It is Defendant's 123 through 129.

17           (Whereupon, Plaintiff's Exhibit Number 4

18      was marked for Identification.)

19   BY MS. SAAVEDRA:

20      Q    Do you know who Manuel Lima is?

21      A    He's the bridge superintendent.

22      Q    Did he work under your supervision?

23      A    No.  That's a totally different division.

24      Q    Is that your signature where it says

25   supervisor's signature?

```
 1        A     No.

 2        Q     Do you know whose signature that is?

 3        A     Nope.

 4        Q     This is not from roadway, your division,

 5   correct?

 6        A     No.  Well, he's in the bridge department.

 7   He's the one that runs the bridges.

 8        Q     Did you see any of the termination

 9   paperwork that was prepared for Mr. Monteagudo's

10   termination?

11        A     No.

12        Q     After Mr. Monteagudo initiated his legal

13   claim, did anyone ask you -- after his termination,

14   did anyone ask you to assist in getting statements

15   or assist in the investigation of his claim?

16        A     No.  I didn't even know about this

17   litigation until I was subpoenaed for this

18   deposition.

19              MS. SAAVEDRA:  Understood.

20              I'm going to show you what I'll have

21        marked as Exhibit 5 of -- well, before I do.

22   BY MS. SAAVEDRA:

23        Q     Do you recall whether Mr. Monteagudo

24   advised you of an issue that he had with Alejandro

25   Leon?
```

78

```
 1       A     No, I do not.

 2       Q     Are you aware that they had an

 3   altercation?

 4       A     No.

 5             MS. SAAVEDRA:  So let me show you what

 6       I'll have marked as Exhibit 5 of this

 7       deposition.  It's Defendant's 95.

 8             (Whereupon, Plaintiff's Exhibit Number 5

 9       was marked for Identification.)

10   BY MS. SAAVEDRA:

11       Q     Have you seen this document before?

12       A     Have I seen that document?  No, I have

13   not.

14       Q     This is a police report that

15   Mr. Monteagudo filled out after he was assaulted by

16   Mr. Alejandro Leon.

17       A     That's the first news to me, ma'am.

18       Q     So is your testimony here today that

19   Mr. Monteagudo never mentioned this to you?

20       A     Nope.  I try not to get personal with the

21   employees, ma'am.

22       Q     And the date of his termination, were you

23   not at the site that day, do you recall?

24       A     I don't recall if I was there that day or

25   not.
```

```
1        Q     If you were out of the site on a
2   particular day, is there a production report that is
3   prepared on your behalf?
4        A     No.
5              MS. SAAVEDRA:  Let's just take five
6         minutes, but I think I'm done.  Let me just go
7         over my notes.  Give me five minutes.
8              MR. CLYNE:  And in case I forget, I will
9         take a copy of this.  And if she doesn't order,
10        I will order.
11             (Recess from 12:11 p.m. to 12:12 p.m.)
12  BY MS. SAAVEDRA:
13        Q     Mr. Comes, you stated that you sent out
14   the writeup to HR.  How did you send that to them,
15   by e-mail?
16        A     No.  I take it to the office.
17        Q     Personally?
18        A     Yeah.
19             MS. SAAVEDRA:  I have no further
20        questions.  Thank you so much for your time.
21             THE WITNESS:  Thank you.
22             MR. CLYNE:  No questions and we'll read.
23             MS. SAAVEDRA:  I'm not ordering right now.
24             THE STENOGRAPHER:  Then are you ordering
25        this, Mr. Clyne?
```

1          MR. CLYNE:  Yes, I'll order.

2          MS. SAAVEDRA:  And I'll send you the

3      exhibits in a few.

4          MR. CLYNE:  I want a full transcript and a

5      mini for everything I get.

6          (Signature reserved.)

7          (Deposition concluded at 12:13 p.m.)

8                  ----------

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    CERTIFICATE OF OATH

2    STATE OF FLORIDA

3    COUNTY OF ALACHUA

4

5         I, the undersigned authority, Florida

6    Professional Reporter and Notary Public, State of

7    Florida, certify that MANUEL COMES remotely appeared

8    before me on the 3rd day of February 2023, and was duly

9    sworn.

10        Signed this 15th day of February 2023.

11

12

13    _____
      CAROL BAER, FPR
14    Notary Public - State of Florida
      My Commission No.: HH 049984
15    Expires:  January 24th, 2025

16

17

18

19

20

21

22

23

24

25
```

```
1                    CERTIFICATE OF REPORTER

2    STATE OF FLORIDA

3    COUNTY OF ALACHUA

4

5            I, CAROL BAER, Florida Professional Reporter,

6    HEREBY CERTIFY that I was authorized to and did

7    stenographically remotely report the foregoing

8    videoconference deposition of MANUEL COMES; that a

9    review of the transcript was requested; and that the

10   foregoing transcript, pages 1 through 80, is a true and

11   complete record of my stenographic notes.

12           I FURTHER CERTIFY that I am not a relative,

13   employee, attorney, or counsel of any of the parties,

14   nor am I a relative or employee of any of the parties'

15   attorney or counsel connected with the action, nor am I

16   financially interested in the action.

17           Dated this 15th day of February 2023.

18

19

20   _____
     CAROL BAER, Florida Professional Reporter
21

22

23

24

25
```