UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.:  1:22-cv-22343-KMM Moore/Louis


JORGE MONTEAGUDO ALBUQUERQUE,

        Plaintiff,

vs.

THE DE MOYA GROUP, INC., a
Florida Profit Corporation,

        Defendant.
----------------------------------x

VIDEOCONFERENCE SECOND DEPOSITION OF
ELENA VALDES

Taken on Behalf of the Plaintiff via videoconference


DATE TAKEN:       Monday, March 6th, 2023
TIME:             12:57 p.m. - 2:35 p.m.


Held remotely via videoconference




Examination of the witness taken before:
Carol Baer, FPR


Daughters Reporting, Inc.
101 Northeast 3rd Avenue
Suite 1500
Fort Lauderdale, Florida 33301



PLAINTIFF'S
EXHIBIT

6

```
 1    APPEARANCES VIA VIDEOCONFERENCE:

 2    Appearing for the Plaintiff:

 3         NATHALY SAAVEDRA, ESQUIRE
           PEREGONZA THE ATTORNEYS, PLLC
 4         5201 Blue Lagoon Drive, Suite 290
           Miami, Florida 33126
 5         (786)650-0202
           nathaly@peregonza.com

 6

 7    Appearing for the Defendant:

 8         REGINALD J. CLYNE, ESQUIRE
           QUINTAIROS, PRIETO, WOOD & BOYER, P.A.
 9         9300 S. Dadeland Boulevard, 4th Floor
           Miami, Florida 33156
10         (305)670-1101
           reginald.clyne@qpwblaw.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                        I N D E X

2

    TESTIMONY OF ELENA VALDES
3
    Direct Examination by Ms. Saavedra:                5
4

5   Certificate of Oath:                               66

6   Certificate of Reporter:                           67

7   Errata Sheet:                                      68

8   Read Letter:                                       69

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    PLAINTIFF'S EXHIBITS

 2      NUMBER              DESCRIPTION              PAGE

 3      Exhibit 1    Defendant's Corrected and Amended
                     Answers and Objections to Plaintiff's
 4                   First Set of Interrogatories          10

 5      Exhibit 2    Asphalt Group Employee Accident/
                     Disciplinary Report DEF00100 - 00101  15
 6
        Exhibit 3    Elena Valdes' Summary of Discussions
 7                   with Jorge Monteagudo DEF00087 - 00088 19

 8      Exhibit 4    Composite of Documents of Employees
                     who were terminated or disciplined
 9                   DEF00105 - 00142                       25

10      Exhibit 5    HR Terminated Employees between
                     06/01/20 to 12/31/20 DEF00056         29
11
        Exhibit 6    Composite of Documents
12                   DEF00047 - 00075                      37

13      Exhibit 7    E-mail Chain DEF00148 - 00149         41

14      Exhibit 8    E-mail Chain DEF00144 - 00147         43

15      Exhibit 9    E-mail Chain DEF00155 - 00160         47

16      Exhibit 10   List of Laborers DEF00267             58

17      Exhibit 11   HR Discipline Record for Jorge
                     Monteagudo DEF00143                   59
18
        Exhibit 12   Harassment Training Documentation
19                   DEF00268 - 00274                      61

20      Exhibit 13   Termination of Employment of
                     Alejandro Leon DEF00216               63
21

22

23

24

25
```

```
 1              Videoconference second deposition of ELENA

 2   VALDES, taken remotely before Carol Baer, Florida

 3   Professional Reporter and Notary Public in and for the

 4   State of Florida at Large, in the above cause.

 5              THE STENOGRAPHER:  Please raise your right

 6         hand and I'll swear you in.

 7              Do you solemnly swear or affirm the

 8         testimony you're about to give will be the

 9         truth, the whole truth, and nothing but the

10         truth?

11              THE WITNESS:  I do.

12   Thereupon:

13                   ELENA VALDES,

14   having been first duly re-sworn, was re-examined and

15   testified as follows:

16                   DIRECT EXAMINATION

17   BY MS. SAAVEDRA:

18         Q    Good afternoon, Ms. Valdes.

19         A    Good afternoon.

20         Q    Can you please state your full name for

21   the record?

22         A    Elena Valdes.

23         Q    And where are you currently?  Where are

24   you physically located today?

25         A    I'm in a conference room in my attorney's
```

```
 1   office.

 2        Q     Is there anyone there with you?

 3        A     Attorney Reginald Clyne is here with me.

 4        Q     Anyone else?

 5        A     No.

 6        Q     And from the deposition that we took last

 7   time, you know, the same kind of ground rules will

 8   apply.

 9              I will be asking you some questions.  And

10   if you don't understand my question, I would ask you

11   to please let me know and I'll be happy to rephrase

12   it.

13              If you do give me an answer to the

14   question, I'm going to assume that you understood my

15   question and that you're answering that question to

16   the best of your ability.  Is that fair?

17        A     Fair.

18        Q     And if you need a break at any point,

19   please let me know and I'll be happy to take one.

20   All I ask is that you give me a response to whatever

21   pending question, if there is any.  Okay?

22        A     Okay.

23        Q     And you understand that you're under oath

24   today?

25        A     Yes.
```

1      Q     You understand that your answers are

2    subject to the penalty of perjury?

3      A     Yes.

4      Q     Are you currently on any medication or

5    other substance that would prohibit you from giving

6    true and accurate testimony today?

7      A     No.

8      Q     Are you currently on any medication or

9    other substance that will prohibit you from

10   recalling events from 2020 to the present date?

11     A     No.

12     Q     Do you have any documents in front of you

13   right now?

14     A     I do not.

15     Q     Do you remember me taking your deposition

16   about the facts of this case?

17     A     Yes.

18     Q     Your deposition was on January 13th, 2023,

19   and you appeared via Zoom, correct?

20     A     Correct.

21     Q     And physically where were you at that

22   time?

23     A     In my office.

24     Q     And a court reporter was present to take

25   down everything that was said during that

1  deposition, correct?

2     A   I don't know.  There was no court reporter

3  in my office.

4     Q   Right.  But via Zoom, the court reporter

5  is here today.  She appeared the same way last time

6  I deposed you.

7        Do you remember that?

8     A   Okay.  I don't really remember the court

9  reporter, but that's okay.

10    Q   At your deposition, you were under oath,

11  the same oath that you just took today, correct?

12    A   Yes, correct.

13    Q   And are you still employed by The de Moya

14  Group?

15    A   Yes.

16    Q   Since your deposition on January 13th,

17  have you taken any time off of work?

18    A   Actually, yes.  The last week and first

19  week of February, I took a one-week vacation.  I

20  went on a cruise with my family.

21    Q   And you said last week?

22    A   The last week of January and first week of

23  February.

24    Q   And other than those two weeks, had you

25  been out of the office or from work since

```
 1   January 13th, 2023?

 2        A    No.

 3        Q    And since your deposition on January 13th,

 4   2023, have you assisted in the production of

 5   documents or in responding to amended

 6   interrogatories for this lawsuit?

 7        A    Yes.

 8        Q    What did you assist with?

 9        A    I assisted with reviewing the amended

10   responses and I assisted with, through the

11   assistance of my IT department, finding e-mails that

12   were archived.

13        Q    And how many times did you review the

14   final amended responses that were going to be

15   provided?

16        A    Once.

17        Q    Do you remember when that was?

18        A    No, I don't remember.

19        Q    Was it a few days after the depo?

20        A    I don't remember.

21             MS. SAAVEDRA:  I'm going to show you what

22        I'll have marked as Exhibit 1 to this

23        deposition.

24             And, for the record, this is Defendant,

25        The de Moya Group, Inc.'s Corrected and Amended
```

10

```
1          Answers and Objections to Plaintiff's First Set
2          of Interrogatories.  This exhibit has nine
3          pages.
4               (Whereupon, Plaintiff's Exhibit Number 1
5          was marked for Identification.)
6     BY MS. SAAVEDRA:
7          Q    And, Ms. Valdes, do you recognize this
8     document?
9          A    Yes.
10         Q    And is this your signature on the last
11    page on the verification page?
12         A    Yes.
13         Q    This is not the first responses to
14    interrogatories that you assisted with in relating
15    to this claim, is it?
16         A    That is correct.
17         Q    And what basis did you have for signing
18    the responses and for stating on behalf of the
19    corporation that the responses were accurate?
20         A    So are you referring to this document or
21    are you referring to the first response?
22         Q    No, I'm referring to this document.
23         A    Okay.  So your question is, under what
24    basis do -- can you repeat the question?
25         Q    Sure.  So the verification page says:  I
```

1    declare under penalty of perjury that I have read

2    the foregoing and that the facts stated therein are

3    true to the best of my knowledge and belief.

4            Do you see that?

5        A    Yes.

6        Q    My question was:  What basis did you have

7    for signing this verification form where you declare

8    under penalty of perjury that you have read the

9    facts and that they are true to the best of your

10   knowledge and belief?

11       A    Well, that's after my review of the

12   responses on the documents.

13       Q    Did you review anything else other than

14   the responses?

15       A    No.

16       Q    Did you do anything differently than the

17   first time to ensure that you provided responses to

18   interrogatories that were true and accurate?

19       A    Well, information became available after

20   the review of archived e-mails, so additional

21   information was added to this response.

22       Q    And what information was it that became

23   available after?

24       A    It was information that was contained in

25   the e-mails that were found through the archive

12

 1   system.

 2        Q    Any other documents that you reviewed or

 3   that became available after?

 4        A    Like I said, there were the archived

 5   e-mails.

 6        Q    Any other documents than the archived

 7   e-mails?

 8        A    No.

 9        Q    Do you recall how many of those e-mails?

10        A    I don't recall.  There were several, but I

11   don't know the number specifically.

12        Q    Did you have an opportunity to review the

13   document and make sure that all the information here

14   is true?

15        A    Yes.

16        Q    You understood that the answers provided

17   on behalf of the company by you are under the

18   penalty of perjury?

19        A    Yes.

20        Q    Ms. Valdes, if you can please read

21   interrogatory number 7 and the amended answer and

22   let me know when you're ready.

23        A    Okay.

24        Q    If you need me to make it bigger, let me

25   know.

13

```
 1        A      Okay.

 2        Q      What did you do in order to provide and

 3   ensure that this response, this amended response,

 4   was correct on behalf of the company?

 5        A      I reviewed e-mail information concerning

 6   other safety violations involving other employees.

 7        Q      Did you find any e-mails regarding that

 8   subject?

 9        A      Yes, I did.

10        Q      What e-mails did you find that were

11   related to that subject?

12        A      So as a risk manager, I am notified

13   normally through e-mail of incidents involving

14   accidents, employees.  And as I learned through IT,

15   those e-mails are archived.  And I had documentation

16   on similar incidents whereby employees had been

17   involved in either accidents or safety violations

18   for the company, and those violations had led to

19   their termination.

20             In my review of the documents, I didn't

21   find any incident or communication, other than this

22   one, involving Mr. Monteagudo for termination for

23   sleeping during working hours or while operating

24   equipment.

25
```

14

```
 1    BY MS. SAAVEDRA:

 2         Q    So when you said "other than this one,"

 3    what are you referring to?

 4         A    I'm referring to reports involving other

 5    employees that had issues that led to their

 6    dismissal.

 7         Q    In the response, it says:  Plaintiff was

 8    terminated for the safety violation of sleeping

 9    while operating a motorized heavy equipment vehicle

10    known as a roller while the engine was running,

11    thus, placing his co-workers and the public in

12    danger.

13              Do you see that?

14         A    Yes, I do.

15         Q    And how did you make sure that this

16    information was accurate?

17         A    This information was documented in his

18    records and documented by his supervisor.

19         Q    And is your testimony here today that his

20    records show that he was terminated for a safety

21    violation?

22         A    Yes.

23         Q    Do you recall what records are those?

24         A    The records in his personnel file.

25              MS. SAAVEDRA:  Let me stop this exhibit
```

```
 1          for a second.  I'm going to show you what I'll

 2          have marked as Exhibit 2 to this deposition.

 3          This is Defendant's 100 to 101.

 4                (Whereupon, Plaintiff's Exhibit Number 2

 5          was marked for Identification.)

 6   BY MS. SAAVEDRA:

 7          Q     Ms. Valdes, do you recognize this

 8   document?

 9          A     Yes.

10          Q     Is this what you're referring to when

11   you're talking about the documents in

12   Mr. Monteagudo's file?

13          A     Yes.

14          Q     What is this document?

15          A     It's the document that was completed after

16   the incident where he was found sleeping on the

17   roller by a supervisor.

18          Q     And where in this document does it say

19   that he was terminated for a violation of safety

20   rules?

21          A     Well, if somebody is found sleeping on a

22   piece of equipment that is running, isn't it common

23   knowledge that that is a safety violation?

24          Q     Is that your understanding?

25          A     The supervisor may not say it's a safety
```

1    violation, but I, as a risk manager, can tell you

2    this is a safety violation.

3         Q    And where in this document do you see that

4    it says that the roller was running at the time that

5    he was found sleeping, allegedly sleeping?

6              MR. CLYNE:  Can you make it larger or --

7         unless you want me to show it to her because we

8         can't see it.

9              MS. SAAVEDRA:  Is that better?

10             MR. CLYNE:  Yeah.  The only problem is, is

11        that the pictures of everybody is blocking.

12             THE WITNESS:  Is blocking like half of

13        what the --

14             MS. SAAVEDRA:  That's something that

15        you've got to fix on your end.  I don't think

16        that I have the ability to do that.

17             MR. CLYNE:  Let me see if I can close you

18        out.  I don't know.

19             MS. SAAVEDRA:  You can minimize it.

20             THE WITNESS:  Okay.  That's better.  Thank

21        you.

22   BY MS. SAAVEDRA:

23        Q    Are you done reading it, Ms. Valdes?

24        A    Yes.

25        Q    Can you tell me where in this document

1    does it say that the roller was running at the time

2    that they found Mr. Monteagudo?

3        A    It doesn't say that it wasn't running.

4    But information that was shared after -- when the

5    supervisor was questioned, the supervisor did report

6    that the roller was on.

7        Q    You testified a little bit earlier that

8    when you were answering these interrogatories, you

9    did it based on the documents in his file.

10          So now you're telling me that your

11   testimony has changed and that the response was

12   based on also the information provided by the

13   supervisor?

14       A    So it's not that my testimony has changed,

15   you know.  I'm basing the information on what I had

16   as far as documentation, including reports and

17   e-mail information that came from different

18   individuals that investigated Mr. Monteagudo's

19   termination.

20       Q    Okay.  In this document, it actually says

21   that the roller was not running.

22          Do you see that?

23       A    Yes, I see that.

24       Q    And do you have any report or e-mail

25   information that would dispute what was written on

18

```
1     this termination documentation?
2         A    Well, without looking at it, I don't know
3     how to answer that question.
4         Q    From your review of documents and
5     production of documents, can you recall any specific
6     document that you used to say that Mr. Monteagudo --
7     that that machine was operating and was on at the
8     time that Mr. Monteagudo was found on the roller?
9         A    I do remember that my notes indicated that
10    the machine was on at the time that he was found
11    sleeping.
12        Q    What notes?
13        A    The notes that I took when I originally
14    became involved with this matter, which is when
15    Mr. Monteagudo called me to complain about his
16    supervisor being disrespectful.
17        Q    Any other document that you recall states
18    something differently from what it says on that
19    report, on the final -- on the termination sheet?
20        A    I don't recall.
21        Q    You don't recall if there are any other
22    documents?
23        A    No.
24        Q    Could there be any other documents?
25        A    I don't believe so, no.
```

```
 1              MS. SAAVEDRA:  So let me show you what
 2         I'll have marked as Exhibit 3 to this
 3         deposition.  And for the record, this is
 4         Defendant's 87 and 88.
 5              (Whereupon, Plaintiff's Exhibit Number 3
 6         was marked for Identification.)
 7    BY MS. SAAVEDRA:
 8         Q    Ms. Valdes, is this the report, the notes
 9    that you're referring to?
10              MR. CLYNE:  Can you make it larger again,
11         please?
12              MS. SAAVEDRA:  Is that better?
13              MR. CLYNE:  Yeah.
14    BY MS. SAAVEDRA:
15         Q    Are these the notes that you're referring
16    to?
17         A    So this is a summary that I prepared from
18    my notes following my discussions about this
19    incident.
20         Q    So is this what you were referring to
21    earlier that you reviewed and which you used in
22    support of your response to interrogatory number 7?
23         A    I used this information, that is correct.
24         Q    And I'll give you a chance.  Can you tell
25    me where exactly is it that you have information
```

20

1    that says something differently than what it says on

2    the termination paperwork?

3         A    Can you go back up?  Okay.  Can you go

4    back down?  Okay.

5         Q    Now I'll go to the second page.

6         A    Okay.  Can I see the bottom?  Okay.

7              So in my note dated 10/15 of '20 -- down,

8    down, please.  Yeah.  So 10/15/20 at 2:00 p.m., I

9    had a conversation -- or I received an e-mail from

10   Chris de Moya.

11             And he was reporting back that

12   apparently -- because he was involved in this

13   investigation and he was reporting back that there

14   was witnesses that no assault took place, because

15   there was allegations of an assault.

16             And that is when Chris de Moya mentioned

17   that he was actually terminated for sleeping on the

18   job, and explained to me that he was sleeping on a

19   piece of equipment that was on.

20             Now, it may not be reflected in these

21   notes, but that's what was reported to me.  So

22   that's why I indicated that in the interrogatories.

23        Q    When did he tell you that he was sleeping

24   on the job on machinery that was on?

25        A    It was on October 15th of '20.

1      Q      And how do you remember that he told you

2   that if it's not part of your notes and that is not

3   what the report says?

4      A      Well, I would not have made up that he was

5   sleeping on a roller that was on.  So this is

6   information that I obtained from Chris de Moya

7   himself who was conducting an investigation.

8      Q      And when did you prepare this summary?

9      A      Is there a date on the top of it?  I don't

10   remember.  If I didn't date it, I don't remember the

11   date.  See if there's a date below.  Did I sign

12   this?  Yeah, no, I don't know.  I don't remember

13   when I...

14      Q      If it is not part of this report, is there

15   any other document that would reflect what you're

16   testifying here today, that Mr. de Moya told you

17   that the machine was on at the time?

18      A      If you haven't -- if you don't have a copy

19   of that document, then there isn't, because I gave

20   you everything that I was able to find.

21      Q      So, as you sit here today, do you recall

22   what particular document it is?

23          MR. CLYNE:  Objection.  Mischaracterizes

24      her testimony.  I don't know there's a

25      document, but we've given you everything she

1       could find.

2            MS. SAAVEDRA:   Counsel, please keep your

3       objections to form, and let the witness testify

4       as to what she remembers.

5       A    So as to the documents, I have provided

6  counsel with everything that we found on this

7  matter.

8  BY MS. SAAVEDRA:

9       Q    I understand.  What I'm asking you is,

10 you're testifying that you provided an answer to

11 interrogatory number 7, where you're saying that

12 he -- that Mr. Monteagudo was terminated for a

13 safety violation, sleeping on the job while

14 operating a motorized heavy equipment, even though

15 the termination paperwork says that it wasn't on.

16 And you're telling me that there were other

17 documents that stated that it was.

18            I'm asking you, what documents did you use

19 to respond to the interrogatories in that form?

20      A    Well, this was told to me by Chris de Moya

21 who conducted an investigation.  If it is documented

22 in the form of a document or an e-mail, whatever is

23 the documentation that I have produced, is the

24 documentation that exists.

25            But I assure you that I would not make

23

```
 1   something like that up.  I put that information on

 2   there because it was reported to me.

 3        Q    But you don't recall when it was reported

 4   to you?

 5        A    I do not.

 6        Q    And you don't recall in what manner it was

 7   reported to you?

 8        A    I do not.

 9        Q    And you don't know if there are any

10   documents that might help you remember?

11        A    I would have to, you know, look at the

12   documentation that his supervisors filled out

13   following the incident and see if something else

14   indicates this, but I assure you that this is the

15   information that was shared with me.

16        Q    Well, are there any other documents, other

17   than Exhibit 2 which I showed you, related to his

18   termination?

19        A    Well, as far as documents, we have

20   produced everything that we have on this matter.

21        Q    Ms. Valdes, you just said that you would

22   have to review the documents that his supervisor

23   prepared.

24             As you sit here today, other than the

25   termination paperwork that I showed you, is there
```

24

```
1    any other document that you're referring to?

2        A    Again, there's no other document that I'm

3    referring to.  The information that I put in my

4    Answers to Interrogatories is information that was

5    shared with me.  And it's truthful, to the best of

6    my knowledge.

7        Q    And let me go back to interrogatory number

8    1 -- I'm sorry -- interrogatory responses, Exhibit

9    Number 1.

10            The interrogatory asked for the name of

11   employees in the same or similar position as

12   plaintiff, whom defendant issued discipline for

13   sleeping during work hours.  And your response --

14   and then it asked for information regarding those

15   violations.

16            And in your response, you said that -- you

17   state:  Please see documents Bates stamped 105 to

18   142 and Defendant's 56 for information regarding

19   other employees who have been terminated or

20   otherwise disciplined for violation of workplace

21   safety policies.  Correct?

22       A    Correct.

23       Q    And that de Moya has conducted a

24   reasonable inquiry and diligent search and has

25   determined that it has no additional information
```

1    responsive to this interrogatory.

2          Do you see that?

3    A    Yes, I do.

4          MS. SAAVEDRA:  So let me show you

5    Defendant's 105 to 142, as Exhibit 4.

6          (Whereupon, Plaintiff's Exhibit Number 4

7    was marked for Identification.)

8    BY MS. SAAVEDRA:

9    Q    Defendant 105, can you tell us what this

10   document is?

11   A    So this is an example of a totally

12   unrelated incident that was documented involving a

13   safety violation.

14   Q    And this is for an employee at a project,

15   project number or job number 495, correct?

16   A    Correct.

17   Q    And this is dated June 14th, 2022,

18   correct?

19   A    Yes, correct.

20   Q    That is a different project than the one

21   where Mr. Monteagudo worked, correct?

22   A    I'm not sure which projects Mr. Monteagudo

23   worked because he worked for two different projects.

24   Q    At the time of his termination, he was

25   working at 490, was he not?

```
 1        A     490, okay.

 2              MR. CLYNE:  If you know.  Don't agree if

 3        you don't know.

 4   BY MS. SAAVEDRA:

 5        Q     If you know.

 6        A     I don't know.  I don't know for sure.

 7        Q     The next termination -- this is for -- the

 8   name of the employee is Wilfredo Exposito, whose job

 9   title was a truck driver.

10              Do you see that?

11        A     Yes.

12        Q     So he wasn't a laborer like Mr. Monteagudo

13   was?

14        A     He was a truck driver, correct.

15        Q     It's a different position, right?

16        A     Different position.

17        Q     These are all related to his termination.

18              Now, the next termination documentation

19   that was provided is Defendant's 114.  This is dated

20   May 26th, 2022, correct?

21        A     Correct.

22        Q     And this is for another employee whose job

23   title is also truck driver, correct?

24        A     Correct.

25        Q     The next one is for Defendant's 123, and
```

1    this is for an employee, Mr. Garcia, who was

2    terminated on May 25th, 2022, correct?

3        A    Correct.

4        Q    And he was terminated because it's the

5    third incident in one year.

6             Do you see that?

7        A    Yes.

8        Q    And he was also a driver, correct?

9        A    No, that is incorrect.  He's a pile

10   driver, which some laborers do pile-driving

11   activity.  And in this case, you know, he was

12   categorized as a pile driver.  But pile drivers and

13   laborers are one and the same.

14       Q    So is your testimony that Mr. Monteagudo

15   was also a pile driver?

16       A    He could have been.  It varies.

17       Q    Was he at the time of his termination?

18       A    I don't know if he also had pile-driving

19   responsibilities as part of his work.

20       Q    And in Mr. Garcia's termination -- I'm

21   sorry -- yeah, Mr. Garcia.  It says that it was the

22   third accident in one year, correct?  So he had

23   multiples in the past?

24       A    Yes.  Well, the third incident, correct.

25       Q    The next one is for an employee whose name

1   is Mr. Fletcher, and the date of the incident is

2   November 17th, 2022, correct?

3          A    Correct.

4          Q    And he received a written warning, is that

5   right?

6          A    That's what the form indicates, so yes,

7   that's correct.

8          Q    The next one we have is Defendant's 133,

9   dated October 28th, 2022 for Mr. Rodriguez, correct?

10         A    Correct.

11         Q    And his title was a foreman.

12              Do you see that?

13         A    Yes.

14         Q    Okay.  And it was because he got into an

15   accident where there was damage to the truck?

16         A    Correct.

17         Q    He wasn't terminated, right?

18         A    The form indicates he received a written

19   warning.

20         Q    So the last one that you provided -- the

21   last form that we were provided was for Defendant

22   Corrales, which is here.  He was on job number 490

23   and the date of the incident is February 2nd, 2022,

24   correct?

25         A    Yes.

```
 1       Q     And Mr. Corrales was suspended for three
 2   days.
 3             Do you see that?
 4       A     Yes.
 5       Q     And it was for an accident that he caused
 6   and there was some damages as a result of the
 7   incident, correct?
 8       A     Correct.
 9       Q     After reviewing all of this documentation
10   that was provided of other employees, can you tell
11   me why are these for actions from 2022 only?
12       A     I don't understand the question.  Can I
13   tell you why I provided them, is that the question?
14       Q     Right.  So on interrogatory number 7, it
15   asks for employees that were in the same employment
16   position as plaintiff.  And the only employees that
17   were provided or the documents were provided were
18   for employees in 2022.
19             There are no reports for 2020 or 2021,
20   correct?
21       A     None that I could find.
22             MS. SAAVEDRA:  I'm going to show you
23       Exhibit 5.
24             (Whereupon, Plaintiff's Exhibit Number 5
25       was marked for Identification.)
```

```
1    BY MS. SAAVEDRA:

2         Q    In the response, you mentioned that to

3    look at Defendant's 56 for information regarding

4    employees who have been terminated or otherwise

5    disciplined for violating workplace safety policies.

6    So I'm going to show you Defendant's 56.

7              Do you recognize this document,

8    Ms. Valdes?

9         A    I do recognize the document, yes.

10        Q    Can you tell us what it is?

11        A    So this is a report that shows employees

12   with termination dates that terminated employment

13   for one reason or another between the dates June 1st

14   of 2020 to December 31st of 2020.

15        Q    And in this report, were you the person

16   who ran this report or was able to get the

17   information?

18        A    I did it with the help of an IT person,

19   yes.

20        Q    And in this report, it shows there are

21   some laborers who were terminated in 2020 and who

22   had a disciplinary record.  I have highlighted a few

23   of them.

24             Do you see that?

25             MR. CLYNE:  The highlight is very faint.
```

```
 1      A     I don't see the highlights, but I see a

 2   listing of many employees.

 3   BY MS. SAAVEDRA:

 4      Q     Is that better?  Are you able to see it

 5   there?

 6            MR. CLYNE:  Not really.

 7      A     No.

 8            MS. SAAVEDRA:  Let me see if I can change

 9        the color.  Maybe that will help.

10            MR. CLYNE:  Now you can see it.

11   BY MS. SAAVEDRA:

12      Q     Did you make a search for these employees

13   and their disciplinary record in order to provide a

14   full response to this interrogatory?

15      A     I did, and I did not find any information.

16      Q     So your testimony is that you reviewed for

17   all of these individuals but you were not able to

18   find any records of their disciplinary action?

19      A     That is correct.  Now, the word

20   "involuntary" can mean, you know, sometimes

21   employees don't show up to work.  So, you know,

22   sometimes they go through, you know, the process of,

23   you know, giving us two weeks' notice, giving us one

24   week's notice, whatever, and that is considered a

25   voluntary resignation, if you will.  But the
```

32

```
 1   involuntary ones also include employees that just
 2   don't come back.
 3       Q    Okay.  But in your response you state that
 4   this report, Defendant's 56, will give us
 5   information regarding other employees who have been
 6   terminated or disciplined for violating workplace
 7   safety policies.
 8            How do I know which ones are the ones
 9   that --
10       A    I want to be clear, the employees that
11   were either disciplined or terminated for violating
12   safety policies were the other examples that you
13   showed me where I showed you the writeup, I showed
14   you the police reports or, you know, I showed you
15   pictures sometimes of areas where they were working.
16   That is the information that is meant to document
17   that response to that interrogatory.
18            This information, I also was requested by
19   counsel to provide a report showing employees hired
20   during a certain period and employees that
21   terminated their employment with us during a certain
22   period.  And that's what this is.
23       Q    In this report it says that these
24   individuals have a disciplinary record, right?
25       A    Can I see the caption where it says --
```

```
 1              MR. CLYNE:  Scroll down a little bit so we
 2      can see the top.
 3      A     Okay.  Okay.
 4 BY MS. SAAVEDRA:
 5      Q     So do you see where it says:  Disciplinary
 6 record, yes?
 7      A     Yes, I do see that.
 8      Q     And did you take any steps to see what
 9 those records were and whether or not they were
10 regarding safety violations?
11      A     No, I did not have any additional
12 information.  I couldn't find anything so I produced
13 what I was able to find.
14      Q     Okay.  But that wasn't my question.  My
15 question was whether or not you looked for these
16 specific individuals to make that determination.
17      A     I looked through and I went through the
18 system to see what I could find documenting
19 information, and I sent you what I could find.
20      Q     Which were only reports for 2022?
21      A     That's all I could find, correct.
22      Q     And which were all individuals that were
23 not laborers?
24      A     Some were truck drivers and there's one
25 that could have been a laborer that was shown as a
```

34

1    pile driver.  Sometimes laborers do pile-driving

2    activities.

3         Q    Let me go back to -- for interrogatory

4    number 9, please go ahead and read the interrogatory

5    and the answer, and let me know when you're ready.

6         A    Okay.

7         Q    Can you please tell me what did you do in

8    order to provide this response on behalf of the

9    company?

10        A    Again, I reviewed the information that was

11   available, which is in the personnel file, and I

12   reviewed my notes associated with the incident.

13        Q    Okay.  In your response, it says:  See

14   response to interrogatory number 5.

15             Do you see that?

16        A    Uh-huh.  Yes.

17        Q    So here is interrogatory number 5.  Go

18   ahead and please read it and let me know when you're

19   ready.

20        A    Okay.  Can you scroll down?  Okay.

21        Q    Can you please tell me, as it relates to

22   interrogatory number 9, how is the interrogatory

23   number 5 related to that, to the response?  So how

24   is it related to the decision to terminate

25   Mr. Monteagudo?

```
 1       A    So it refers to number 5 because number 5

 2  gives you a summary of incidents that were

 3  documented that involved his performance at work.

 4  So, you know, there was an incident February 21st of

 5  2020.  Go back up to number 5, please.

 6       Q    (Complies.)

 7       A    Okay.  So February 21st of 2020.  Then

 8  there was another incident March 24th of 2020,

 9  July 16th of 2020, September 4th of 2020, and then

10  there was the incident of him sleeping on the

11  roller.  So the intent is to show the pattern of

12  issues with the employee.

13       Q    So is it your testimony today that the

14  disciplinary history was the reason for his

15  termination or is it just to show the history?

16       A    It's to show the history, to give you a

17  full picture of issues that we had with this

18  employee.

19       Q    Was his disciplinary history a reason for

20  his termination, based on your understanding?

21       A    So that's not a question for me.  I did

22  not make the decision to terminate him.  That's a

23  question for his supervisor.

24       Q    You were the person that answered these

25  interrogatories on behalf of the company.  So what
```

36

```
 1   information -- based on your understanding and
 2   review of documents and everything else, what is
 3   your understanding?
 4        A    My understanding is that this is an
 5   individual who had various incidents that were
 6   documented by various supervisors.  And then there
 7   was one incident that rose to a very serious level,
 8   meaning the one with the safety violation and him
 9   sleeping on the job, and that led to his
10   termination.
11        Q    So only the last incident was what led to
12   his termination?
13             MR. CLYNE:  Objection.  Mischaracterizes
14        her testimony.  She'll stand by what she
15        previously stated, stand by the record.
16             MS. SAAVEDRA:  Counsel, again, can you
17        please keep your objections to form and let the
18        person, Ms. Valdes, answer the question, unless
19        you're going to instruct her not to answer.
20             MR. CLYNE:  Objection.  Asked and
21        answered.
22             You can read the transcript for the
23        previous answer, which fully explains that.
24   BY MS. SAAVEDRA:
25        Q    Ms. Valdes, if the last incident that led
```

1    to Mr. Monteagudo's termination had happened and

2    Mr. Monteagudo did not have the history that the

3    defendant alleges he had in performance, would that

4    action have led to his termination?

5        A    I don't know.  I think so, but I don't

6    know because I'm not the one that makes that

7    determination.

8        Q    Based on interrogatory number 5, do you

9    know at the time of February 21st, 2020, where did

10   you find this information as to the first alleged

11   disciplinary action that was taken?

12       A    This would have been his personnel file.

13       Q    Do you recall what specific document it

14   was?

15       A    I do not.

16           MS. SAAVEDRA:  In your response, you

17       referred to Defendant's 47 to 75, so I'm going

18       to add Exhibit 6, Defendant's Bates 47 to 75.

19           (Whereupon, Plaintiff's Exhibit Number 6

20       was marked for Identification.)

21   BY MS. SAAVEDRA:

22       Q    Ms. Valdes, I'm going to direct your

23   attention to a specific page, if you can just give

24   me one second.

25           Have you seen this Defendant's 70, Bates

1    70, have you seen this document before?

2            MR. CLYNE:  Can you make it bigger?  We

3        can't see it.

4    BY MS. SAAVEDRA:

5        Q    Are you able to see it?

6        A    Yes.

7        Q    Do you recall seeing this document before?

8        A    I don't recall seeing it but, again, I've

9    seen many documents.

10        Q    So in your response, it says, regarding

11    the first incident, are there any documents that

12    evidence this verbal warning from what you recall,

13    sitting here today?

14        A    Again, I don't recall.  If it's noted on

15    there, there's documentation of it.  It may have

16    been a conversation I had with the supervisor.  I

17    don't know about documentation.  If we didn't

18    produce it, then, you know, it probably is not in

19    writing.  I'm not sure.

20        Q    I'm going to go to interrogatory number

21    11.  Please go ahead and read the interrogatory and

22    the answer and let me know when you're ready.

23        A    Okay.

24        Q    What did you do in order to provide this

25    amended response on behalf of the company?

```
 1      A    So I, you know, reviewed information along

 2   with my counsel because the interrogatories were

 3   completed and responded to along with the help of

 4   counsel.

 5      Q    You were not present when Mr. Monteagudo

 6   complained in September of 2020, correct?

 7      A    No, no.  I was not present during any of

 8   this.  I became aware of this incident because

 9   Mr. Monteagudo called me to tell me about it, but I

10   was not present during any of the exchanges, no.

11      Q    And the phone call with Mr. Monteagudo,

12   the first time that you spoke to him, was in October

13   of 2020, correct?

14      A    I don't recall the date, but he did reach

15   out to me via telephone, yes.

16      Q    He had already been terminated at that

17   point?

18      A    I don't -- I don't recall.  I'm sorry.

19      Q    And answer number 14, it says to identify

20   all persons who have knowledge of plaintiff's

21   complaints regarding the mistreatment by Alejandro

22   Leon on October 2nd.

23           Go ahead and read your amended answer and

24   let me know when you're ready.

25      A    Okay.
```

40

1      Q    Do you recall what did you do in order to

2  provide the response on behalf of the company?

3      A    Yes.  This information was provided by the

4  work location and information that was obtained by

5  Chris de Moya.

6      Q    In this response, it says that you and

7  Chris de Moya investigated this issue.

8          Do you see that?

9      A    Yes.

10     Q    During the last deposition, you advised

11 that the response was incomplete.

12         Do you recall that?

13     A    No.

14     Q    And you also told me that the answer was

15 not complete because you did not investigate.

16         Do you recall that testimony?

17     A    Well, again, the word investigate is used

18 loosely.  To the extent that I had communication

19 with Mr. Monteagudo, I think that is part of an

20 investigation, because I reported his allegations to

21 my management staff.

22     Q    So other than speaking to Mr. Monteagudo,

23 you testified in your earlier deposition that you

24 had no other involvement, is that correct?

25     A    Well, I had involvement once litigation

1    was filed because I handle all litigation for the

2    company.

3         Q    So when Mr. Monteagudo called you, you

4    were not involved in any part of investigation, is

5    that correct?

6         A    The information that Mr. Monteagudo shared

7    with me, I did report to my management.

8         Q    Other than reporting it, was there any

9    other involvement by you at that time, investigating

10   his complaint to you?

11        A    The investigation was conducted by Chris

12   de Moya.  I was not involved, no.

13             MS. SAAVEDRA:  Let me show you what I'll

14        have marked as Exhibit 7 to this deposition.

15             (Whereupon, Plaintiff's Exhibit Number 7

16        was marked for Identification.)

17   BY MS. SAAVEDRA:

18        Q    Ms. Valdes, just for the record, this is

19   Defendant's 148 and 149.  I'm going to the bottom of

20   the e-mail.  This is an e-mail from you to Fabricio

21   on October 7th, 2020.

22             Do you see that?

23        A    Yes, I do.

24        Q    And in this e-mail, it says:  Please call

25   me ASAP.  I received a call from Jorge Monteagudo

42

```
 1    with serious allegations of battery by the son of

 2    Noel Leon, who also works for de Moya.  I am copying

 3    Chris, Alisa and Carli so they are aware of this.

 4              Do you see that?

 5        A    I do.

 6        Q    Did you speak to Fabricio?

 7        A    I did not.  He did not return my call --

 8    or return my e-mail, I should say.

 9        Q    Did you send this e-mail to Fabricio

10    before or after you reported the call to

11    Mr. de Moya?

12        A    I don't recall.

13        Q    Did you report the allegation to Mr. de

14    Moya separately?

15        A    I copied him on this e-mail.

16        Q    So this is where you reported to Chris de

17    Moya the incident?

18        A    I don't recall if this is when I reported

19    it or if this was a follow-up.  I don't recall.

20    This was an e-mail I wrote, but I don't recall if it

21    came first or if I reported it before that.  I'm not

22    sure.

23        Q    And then you received an e-mail from

24    Carli.  Do you see that?

25        A    Yes.
```

43

```
 1        Q    Do you recall what you did after you
 2  received this response from Carli?
 3        A    She mentions in her e-mail that James
 4  would know, so I may have called James, who is our
 5  director of safety.
 6        Q    Tell me what was the conversation with
 7  James.
 8        A    I don't think James had any information.
 9  I don't recall him having any information.
10        Q    What is his last name?
11        A    Ankrum.
12             MS. SAAVEDRA:  I'm going to show you what
13        I'll have marked as Exhibit 8, Defendant's
14        Bates number 144 to 147.
15             (Whereupon, Plaintiff's Exhibit Number 8
16        was marked for Identification.)
17  BY MS. SAAVEDRA:
18        Q    Ms. Valdes, do you recognize this
19  document?
20        A    It looks like an e-mail from Alisa de
21  Moya.
22        Q    Do you recall receiving this e-mail?
23        A    I don't recall it, no.
24        Q    This is your e-mail address, correct?
25        A    Yes.
```

44

```
 1        Q    You have no reason to dispute you did, in
 2   fact, receive it, correct?
 3        A    I'm sure I received it.  I just don't
 4   recall receiving it.
 5        Q    Do you recall responding to Alisa on
 6   January 22nd, 2021?
 7        A    Again, I don't recall, but if it's in the
 8   form of an e-mail from me, then it happened.
 9        Q    And in your e-mail on January 22nd, this
10   is page Defendant's 145, in your e-mail it says:  As
11   previously communicated, I had phone conversations
12   with Mr. Monteagudo several times as he reported
13   these allegations.  I will review my notes and I
14   will prepare a narrative for everyone to review
15   today.
16             Do you see that?
17        A    Yes, I do.
18        Q    Okay.  When you said that you spoke to
19   Mr. Monteagudo several times, do you recall how many
20   times you actually spoke to him?
21        A    I do not recall.
22        Q    Was it more than twice?
23        A    I do not recall.
24        Q    And in your e-mail, you said that you will
25   review your notes.
```

```
 1              What notes were you referring to?
 2       A    I had handwritten notes on my conversation
 3  with Mr. Monteagudo.
 4       Q    And where are those notes?
 5       A    Once I prepared the narrative, I didn't
 6  think it was important to keep them and I threw them
 7  away.
 8       Q    At this point, you knew that there was
 9  litigation that started, didn't you?
10       A    I don't remember.
11       Q    So Ms. Alisa de Moya's e-mail advised
12  you-all that there was an EEOC charge filed, did she
13  not, on January 21st?
14       A    But to me, EEOC is not litigation.
15  Litigation is a lawsuit.  So, yes, there was an EEOC
16  claim filed.
17       Q    In the summary that you prepared based on
18  those notes, is it the summary that I showed you
19  earlier today?
20       A    Yes.
21       Q    And your testimony is that at this point,
22  you didn't think that this was in litigation, you
23  didn't have any duty to not destroy any evidence?
24            MR. CLYNE:  Objection.  Asked and
25        answered.
```

46

```
 1   BY MS. SAAVEDRA:

 2        Q    Is that correct?

 3        A    I went through my notes and I prepared a

 4   narrative, and that is the information that we have

 5   in writing as to the information that I had on my

 6   notes.

 7        Q    You destroyed those notes, correct?

 8             MR. CLYNE:  Objection --

 9        A    They were handwritten notes, yes.

10             THE STENOGRAPHER:  I'm sorry.  What was

11        the objection?

12             MR. CLYNE:  Asked and answered three

13        times.

14   BY MS. SAAVEDRA:

15        Q    And then in this chain of e-mails, Chris

16   de Moya sent this e-mail on January 21st at 5:30 in

17   the afternoon.  I'll let you read it and you let me

18   know when you're ready.

19        A    Okay.

20        Q    Did you assist Alisa in the investigation

21   or in the response to the charge of discrimination?

22             MR. CLYNE:  Objection to form.

23        A    I responded to Alisa's request that she

24   made via e-mail.

25
```

```
 1   BY MS. SAAVEDRA:

 2        Q    What was the request?

 3             MR. CLYNE:  Objection to form.  Asked and

 4        answered.  Go ahead.

 5        A    In her e-mail, I believe she was asking

 6   those that were involved in any way, shape or form

 7   with this matter to send her information.  And

 8   that's exactly what I did.  That's where my notes

 9   came in, my summary.

10             MS. SAAVEDRA:  I'm going to show you what

11        I'll have marked as Exhibit 9.  And Exhibit 9,

12        just for the record, is Defendant's 155 through

13        160.

14             (Whereupon, Plaintiff's Exhibit Number 9

15        was marked for Identification.)

16   BY MS. SAAVEDRA:

17        Q    Ms. Valdes, do you recognize this e-mail

18   chain?

19             MR. CLYNE:  You have to go slower.  You

20        just flashed it and we could not see it at all.

21   BY MS. SAAVEDRA:

22        Q    I'm going all the way to the bottom

23   because it starts from the oldest to the newest on

24   the top.

25             So the first e-mail on the e-mail chain is
```

1    from Alisa de Moya to a group that included you, and

2    the subject was:   Jorge Monteagudo terminated

3    October 7th, '20, sleeping on the roller.

4              Do you see that?

5    A    Yes.

6    Q    You recognize this e-mail?

7    A    It's an e-mail sent by Alisa, yes.

8    Q    And then after that e-mail, Chris de Moya

9    responded with the statement that you read earlier,

10   correct?

11   A    Correct.

12   Q    Then after that, Alisa provided an e-mail

13   on January 22nd, 10:22 a.m., asking for everybody to

14   write statements, correct?

15   A    Correct.

16   Q    And then on January 22nd at 10:30 a.m.,

17   that's where you sent the e-mail that you have had

18   conversations with him and you reviewed your notes

19   and will prepare a narrative, correct?

20   A    Correct.

21   Q    Then on January 22nd at 10:39, Alisa

22   responded to you only saying:   Thank you.   You're

23   always very helpful.   Welcome to HR issues.

24             Do you see that?

25   A    Yes.

1      Q      In your deposition on January 13th, you
2  told me you were not involved in HR issues.
3             Do you recall that testimony?
4      A      I do.
5      Q      Can you explain to me then why is Alisa
6  telling you, welcome to HR issues?
7      A      It's a form of speech.  Right?  It's like
8  her telling me, welcome to my world.
9      Q      Understand.  At that point, you were not
10 involved with HR issues, correct?
11     A      I'm not involved in HR issues, no.
12     Q      Then on January 22nd, it says:  See
13 attached as promised.  I thought it best just
14 sending it to you and not copying anyone else in
15 case you want to keep this information confidential.
16            Do you see that?
17     A      Yes.
18     Q      Do you recall what was the attachment that
19 you sent to her on that date?
20     A      It was probably my notes.
21     Q      The summary that we discussed earlier?
22     A      Correct.
23     Q      Could it be any other document?
24     A      No.
25     Q      And then on January 25th, Alisa sent you

1    an e-mail where she says:  Thank you.  And I have

2    attached the police report.  It looks very serious.

3            Do you see that?

4    A    Yes.

5    Q    Do you recall reviewing this documentation

6    and the attachment with José Batista's statement?

7    A    I don't recall.

8    Q    Why would she share with you any

9    statements?

10   A    Because I'm the company's risk manager and

11   she cares what I think.

12   Q    And then in the e-mail she also says:

13   Keep me posted on anything else you hear.

14           Do you see that?

15   A    Yes.

16   Q    Were you conducting or assisting with the

17   investigation or the reports at this time?

18   A    No.  My involvement basically was the

19   conversation I had with Mr. Monteagudo.  And then

20   the actual investigation was being done by Chris de

21   Moya.

22   Q    Okay.  Then on January 25th, you sent this

23   e-mail to Alisa.  And I will give you an opportunity

24   to review it.  Let me know when you want me to move

25   it.

51

```
 1       A    So go ahead, ask me questions.
 2       Q    Do you recall sending this e-mail to
 3   Alisa?
 4       A    I recall sending numbers 1, 2, 3 and 4,
 5   anything that is noted in black.  Those were my
 6   thoughts.
 7       Q    What about what is in red, who is that
 8   from?
 9       A    That would have been Alisa's response.
10       Q    Under the number 1 -- I'm sorry.  On point
11   number 2, you also said that:  I'd encourage some
12   digging into his past.
13            Do you see that?
14       A    Yes.
15       Q    Why?  Why was that relevant or why did you
16   think it was relevant?
17       A    In my conversation with Mr. Monteagudo, he
18   gave me the impression that he had done this before.
19   You know, that he had complained about issues with
20   disrespect before.
21       Q    Okay.  So how is that relevant to what you
22   were doing in this particular case?
23       A    I just thought it was recommended that,
24   you know, they look into his past to see if he has
25   made these allegations with any other employer in
```

1   the past.

2        Q    Why?

3        A    Because I felt that Mr. Monteagudo had

4   been down this road before.  It was just a feeling

5   he gave me.

6        Q    What road?

7        A    Complaining of issues with disrespect with

8   other employers.

9        Q    Is a complaint of disrespect something

10  that concerned you in any way?

11            MR. CLYNE:  Objection to the form.

12  BY MS. SAAVEDRA:

13       Q    You can answer.

14       A    So I recommended that they dig into his

15  past because I felt that this was a repeat pattern

16  involving this individual.

17       Q    What was a repeat pattern?

18       A    His complaint of issues with employers

19  being disrespectful.

20       Q    And a complaint of an employer being

21  disrespectful is something that caused you concern

22  why?

23            MR. CLYNE:  Objection.  Asked and

24       answered.

25

```
 1   BY MS. SAAVEDRA:

 2        Q    You can answer.

 3        A    These are my thoughts regarding Alisa

 4   reaching out to me on someone who has filed an

 5   allegation of EEOC.

 6        Q    Ms. Valdes, I'm asking you why you felt

 7   that it was relevant or a concern.

 8        A    Because I think anybody's past is

 9   relevant.  And if they have a repeat pattern, I

10   think that's relevant.

11        Q    Okay.  Did you think that it was important

12   for Ms. Alisa to speak to Manuel Comes or to

13   Alejandro regarding intimidating Mr. Monteagudo

14   after he had complained about Mr. Noel -- Leon Noel?

15             MR. CLYNE:  Objection, compound.

16        A    I really don't understand the question.

17   But the one that was conducting the investigation

18   was Chris de Moya.  Alisa was responding to the

19   EEOC.

20   BY MS. SAAVEDRA:

21        Q    In your point number 1, you say:  Usually

22   when someone resorts to filing a police report,

23   there is some validity to their story, even if it's

24   exaggerated.

25             Do you see that?
```

54

```
 1       A    I do.

 2       Q    And in response, Ms. de Moya responded to

 3  you:  His statement does contain lies.  Noel would

 4  not discriminate him for his national origin or

 5  race.  He himself is Cuban.  However, like any

 6  supervisor, he did not want to tolerate an employee

 7  who outright refused to follow his order and

 8  instructions.

 9            Do you see that?

10       A    I do.

11       Q    Did you feel that it was important for the

12  company to review or address any type of issues

13  that -- or anything that -- the allegations that

14  Mr. Monteagudo was making against Mr. Manuel Comes

15  or Alejandro, that he was being retaliated against

16  for his complaints?

17            MR. CLYNE:  Objection to form.  It's like

18       three questions in one.  Can you break it down,

19       please?

20  BY MS. SAAVEDRA:

21       Q    Ms. Valdes, do you understand my question?

22       A    No.

23       Q    When you got this response from Ms. de

24  Moya, did you feel that it was important for Ms. de

25  Moya to review Mr. Monteagudo's complaints about
```

```
 1   retaliation, whether to speak to Manuel Comes or

 2   anyone else?

 3        A    Again, this is outside of, you know, my

 4   duties.  I don't deal with EEOC so I usually don't,

 5   you know, say -- I offered her my thoughts, which

 6   are 1 through 4 in black, and then everything else

 7   is her perspective, so...

 8        Q    So in number 4 you say:  When I asked

 9   Mr. Monteagudo if there were witnesses to the

10   alleged assault, he said that the employee riding in

11   the truck with the aggressor was his friend.

12   Although he likely saw what happened, he would never

13   go against his friend.

14             Do you see that?

15        A    Yes, I do see that.

16        Q    Who are you referring to?  Who would never

17   go against his friend?

18        A    Whoever the witness was.  Apparently there

19   was a witness to the alleged assault between

20   Monteagudo and the other employee that he said

21   assaulted him, and apparently there was somebody

22   with that other employee that was that employee's

23   friend, so I'm trying to explain that in bullet

24   number 4.

25        Q    So the friend that was -- I'm sorry.  The
```

56

1    person that was driving with Alejandro Noel was

2    whose friend, Mr. Monteagudo's or Alejandro's?

3         A    Well, the sentence says it was Alejandro's

4    friend.  So this is based on what Mr. Monteagudo

5    represented to me, so I'm just reporting what

6    Mr. Monteagudo is representing to me.  Whether this

7    is true or not, I don't know.

8         Q    And was the last part of the sentence, he

9    would never go against his friend, was that your

10   opinion or was that something that Mr. Monteagudo

11   told you?

12        A    Mr. Monteagudo told me that.

13        Q    Do you know who was this person?

14        A    No.

15        Q    According to the e-mail, Ms. Alisa de Moya

16   actually, at this point, told you that there had

17   been other claims of discrimination against the

18   company, correct?

19        A    Yeah.  In the next paragraph, she notes

20   other incidents of EEOC.  She would have handled

21   that.  I have no knowledge of those incidents.

22        Q    And she also told you any help would be

23   greatly appreciated, correct?

24        A    Correct.

25        Q    So for this last point, when

```
 1    Mr. Monteagudo told you this, would you have made a

 2    note of this?

 3         A    Again, I don't recall.  I mean, you're

 4    asking me some questions of my notes going back

 5    years, so I don't recall if it was in my original

 6    notes or not.

 7              Obviously, this is something that I'm

 8    trying to document, so this is what Mr. Monteagudo

 9    told me.

10         Q    Well, in your responses to the

11    interrogatories, you identified Mr. Bosaneto

12    (phonetic) as an individual with knowledge as to

13    what happened with Alejandro, did you not?

14              MR. CLYNE:  Objection to form.

15         A    Okay.  So what's the question?

16    BY MS. SAAVEDRA:

17         Q    So in response to interrogatory number 14,

18    you identify José Batista and then you identify

19    yourself as individuals with knowledge as to what

20    happened on October 2nd, correct?

21         A    Correct.

22         Q    How did you know that José Batista had

23    knowledge about what happened?

24         A    I think this is the friend.

25         Q    The friend.  Whose friend?
```

```
 1        A     Alejandro Leon's.

 2        Q     So did you speak to or do you know if

 3   anyone else spoke to José?

 4        A     I don't know.  Chris de Moya was

 5   conducting the investigation.

 6              MS. SAAVEDRA:  Let me show you what I'll

 7        have marked as Exhibit 10 to this deposition.

 8              MR. CLYNE:  Just for the record, the judge

 9        said 90 minutes for this depo.  We're getting

10        close to that time period.

11              MS. SAAVEDRA:  Thank you, Counsel.  I have

12        10 more minutes is what I have left.  I'm

13        watching the clock as well.

14              (Whereupon, Plaintiff's Exhibit Number 10

15        was marked for Identification.)

16   BY MS. SAAVEDRA:

17        Q     Ms. Valdes, I'm going to show you Exhibit

18   10, which is Defendant's 267.

19              Have you seen this document before?

20        A     Can you scroll down so I can see the

21   heading?

22        Q     That's all there is.  There's no top or

23   bottom.

24        A     Okay.

25        Q     Do you recall if you printed this report
```

```
 1    for the company?

 2         A    I recall running various reports at

 3    counsel's request with certain information.  So I

 4    think this is a report of laborers that worked for

 5    the company during a specific period.

 6              MS. SAAVEDRA:  If we can go off the record

 7         just for a few minutes so I can just review my

 8         notes.  We can come back at 2:30, and then I'll

 9         finish up.

10              MR. CLYNE:  So we've got seven minutes

11         left.

12              MS. SAAVEDRA:  Right.  Let's take a

13         10-minute break and then I'll come back and

14         finish.

15              (Recess from 2:22 p.m. to 2:38 p.m.)

16              MS. SAAVEDRA:  All right.  Ms. Valdes, I'm

17         going to show you Exhibit 11, which is

18         Defendant's 143.

19              (Whereupon, Plaintiff's Exhibit Number 11

20         was marked for Identification.)

21    BY MS. SAAVEDRA:

22         Q    Have you seen this document before?

23         A    Yes.

24         Q    What is it?

25         A    It's the computer documentation of the HR
```

60

```
 1   discipline record that was entered, put into

 2   Mr. Monteagudo's file.

 3        Q    Who inputs this information into the

 4   system?

 5        A    I don't know.

 6        Q    It's not you?

 7        A    No.

 8        Q    You see on September 14th, 2020, it says

 9   that Jorge was transferred to 490 and Noel did not

10   have any communication with him again.

11             Do you see that?

12             MR. CLYNE:  You have to make it bigger.

13        It's so tiny.  There's no way we can read it.

14   BY MS. SAAVEDRA:

15        Q    Do you see that?

16        A    Now we see it, yeah.  That's what it says.

17        Q    As you sit here today, you don't know who

18   entered this note into the system?

19        A    I do not.

20        Q    Did you inquire as to why this information

21   was put into the system?

22        A    I did not.

23        Q    What is this warning notice, do you know?

24        A    I do not know.

25             MS. SAAVEDRA:  And I'm going to show you
```

```
 1              Exhibit 12, which is Defendant's 68 through 74.

 2                   (Whereupon, Plaintiff's Exhibit Number 12

 3              was marked for Identification.)

 4    BY MS. SAAVEDRA:

 5         Q    Ms. Valdes, have you seen these documents

 6    before?

 7         A    Yes.

 8         Q    What are they?

 9         A    It's an internal company training that was

10    done of all supervisory staff on harassment,

11    harassment training.

12         Q    This is dated for 2022, correct?

13         A    Yes, June of 2022.

14         Q    Who provided this training to the

15    managers?

16         A    I did.

17         Q    Was this the first time you provided this

18    type of training to managers at de Moya Group?

19         A    It was the first time that I was involved.

20    I did this in conjunction with our safety director,

21    James, and James and I did it together in 2022.

22         Q    Before this June 2022, do you know, and

23    before you were involved, do you know who provided

24    this training to the supervisors or if there was any

25    training to the supervisors?
```

```
1              MR. CLYNE:  Objection to the form of the

2         question.  It's three questions.

3    BY MS. SAAVEDRA:

4         Q    You can answer.

5         A    I do not know who provided the training in

6    prior years.

7         Q    Was there a training in prior years?

8         A    I believe there's yearly training for

9    harassment.

10        Q    How do you know that?

11        A    I said I believe.  I'm not a hundred

12   percent sure, but harassment training is something

13   that the company does regularly.  And I was asked to

14   do it, along with James, in 2022.

15        Q    Are there any documents that are related

16   to the training prior to June 2022?

17        A    None that I could find.

18        Q    Have you understood all my questions

19   today?

20        A    I have.

21        Q    Is there anything that you would like to

22   change as you sit here today?

23        A    No, I don't believe so.

24        Q    Is there anything else about this case

25   that you haven't testified to that you would like to
```

```
 1   tell me about?

 2        A    No.

 3        Q    Ms. Valdes, were you involved in

 4   Mr. Alejandro Leon's termination?

 5             MR. CLYNE:  Objection.  Asked and

 6        answered.

 7        A    No.

 8             MS. SAAVEDRA:  Alejandro Leon's

 9        termination, I haven't asked about that.

10        A    No, I'm not involved in terminations, no.

11             MS. SAAVEDRA:  So let me show you the last

12        exhibit for today.

13             (Whereupon, Plaintiff's Exhibit Number 13

14        was marked for Identification.)

15   BY MS. SAAVEDRA:

16        Q    Is this your signature?

17        A    Yes.

18        Q    This is a termination of employment of

19   Mr. Leon.  If you're not involved, why is it that

20   you signed this form?

21        A    His supervisor at the joint venture was

22   supposed to present this to him.  They had scheduled

23   a meeting in the morning, and apparently the

24   supervisor had had some sort of illness, and I

25   received a call like at 6:00 a.m. asking me to fill
```

1    in for Mr. Martin.  So I presented this form and I

2    signed it in Mr. Martin's absence.

3         Q     Who asked you to present it on his behalf?

4         A     Francisco Martin.

5         Q     He was the one who contacted you and asked

6    you to do it on his behalf?

7         A     Yes.

8         Q     If you're not involved in HR, why is that

9    something that would fall under something that you

10   needed to do?

11        A     It's not that I needed to do.  He asked me

12   as a favor.  He's an employee of the joint venture.

13   So, you know, as the risk manager, he felt that for

14   confidentiality reasons, that I was, you know, a

15   good executive to fill in for him, and that's all I

16   did.

17        Q     Was there anyone else with you at the

18   time?

19        A     Alejandro Leon was there.

20        Q     Anyone else?

21        A     No.

22              MS. SAAVEDRA:  I have no further

23        questions.  Thank you.

24              MR. CLYNE:  We'll read.  No questions.

25              THE STENOGRAPHER:  Are you ordering this

```
1        right now?

2             MS. SAAVEDRA:  Not right this second, no.

3        I'll send you the exhibits.

4             MR. CLYNE:  And we'll wait till she

5        orders.  Thank you.

6             (Signature reserved.)

7             (Deposition concluded at 2:35 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    CERTIFICATE OF OATH

2    STATE OF FLORIDA

3    COUNTY OF ALACHUA

4

5            I, the undersigned authority, Florida

6    Professional Reporter and Notary Public, State of

7    Florida, certify that ELENA VALDES remotely appeared

8    before me on the 6th day of March 2023, and was duly

9    sworn.

10           Signed this 22nd day of March 2023.

11

12

13   _____
     CAROL BAER, FPR
14   Notary Public - State of Florida
     My Commission No.: HH 049984
15   Expires:  January 24th, 2025

16

17

18

19

20

21

22

23

24

25
```

```
1                    CERTIFICATE OF REPORTER

2    STATE OF FLORIDA

3    COUNTY OF ALACHUA

4

5           I, CAROL BAER, Florida Professional Reporter,

6    HEREBY CERTIFY that I was authorized to and did

7    stenographically remotely report the foregoing

8    videoconferenced second deposition of ELENA VALDES, that

9    a review of the transcript was requested; and that the

10   foregoing transcript, pages 1 through 65, is a true and

11   complete record of my stenographic notes.

12           I FURTHER CERTIFY that I am not a relative,

13   employee, attorney, or counsel of any of the parties,

14   nor am I a relative or employee of any of the parties'

15   attorney or counsel connected with the action, nor am I

16   financially interested in the action.

17           Dated this 22nd day of March 2023.

18

19

20   _____
     CAROL BAER, Florida Professional Reporter
21

22

23

24

25
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida  954-755-6401