UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 1:22-cv-22343-KMM
Moore/Louis


JORGE MONTEAGUDO ALBURQUERQUE,

                    Plaintiff,

v.

THE DE MOYA GROUP, INC.,
a Florida profit corporation,

                    Defendant.
_____/

        VIDEOCONFERENCE DEPOSITION
                OF
        CHRISTOPHER HOMER DE MOYA
as Corporate Representative for THE DE MOYA GROUP, INC.


    Taken on behalf of the Plaintiff via videoconference


DATE TAKEN:  Monday, February 13, 2023
TIME: 10:01 a.m. - 12:21 p.m.


        Held remotely via videoconference


        Examination of the witness taken before:
        Jamie D. Mackrell, Court Reporter
        Daughters Reporting, Inc.
        101 Northeast 3rd Avenue
        Suite 1500
        Fort Lauderdale, Florida 33301

PLAINTIFF'S
EXHIBIT

8

```
 1    APPEARANCES VIA VIDEOCONFERENCE:

 2

 3    ON BEHALF OF THE PLAINTIFF:

 4    PEREGONZA THE ATTORNEYS, PLLC
      NATHALY SAAVEDRA, ESQUIRE
 5    5201 Blue Lagoon Drive
      Suite 290
 6    Miami, Florida 33126
      786-650-0202
 7    nathaly@peregonza.com

 8

 9    ON BEHALF OF THE DEFENDANT:

10    QUINTAIROS, PRIETO, WOOD & BOYER, P.A.
      REGINALD J. CLYNE, ESQUIRE
11    9300 South Dadeland Boulevard
      4th Floor
12    Miami, Florida 33156
      305-670-1101
13    reginald.clyne@qpwblaw.com

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                          INDEX

 2

 3   Testimony of  CHRISTOPHER HOMER DE MOYA

 4                                                Page

 5     Direct Examination
       by Ms. Saavedra                             5
 6

 7     Cross-Examination
       by Mr. Clyne                                67
 8

 9   Redirect Examination
     by Ms. Saavedra                               70
10

11   Further Cross-Examination
     by Mr. Clyne                                  71
12

13   Further Redirect Examination
     by Ms. Saavedra                               72
14

15   Certificate of Oath                           73
     Certificate of Reporter                       74
16   Errata Sheet                                  75
     Read and Sign letter                          76
17

18

19

20

21                        - - - -

22

23

24

25
```

```
 1                        EXHIBITS

 2   Plaintiff's
     EXHIBIT              DESCRIPTION              PAGE
 3

 4   1          Notice of Deposition              7

 5   2          personnel file                    12

 6   3          safety checklist                  16

 7   4          Asphalt Group application         21

 8   5          termination docs                  51

 9   6          Amended Answers to Interrogatories  59

10   7          Safety and Health Plan            61

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              Videoconference deposition of CHRISTOPHER HOMER

 2   DE MOYA taken remotely before Jamie D. Mackrell, Court

 3   Reporter and Notary Public in and for the State of Florida

 4   at Large, in the above cause.

 5              THE COURT REPORTER:  Please raise your right

 6        hand.

 7              Do you swear or affirm that the testimony you

 8   are about to give will be the truth, the whole truth, and

 9   nothing but the truth?

10              THE WITNESS:  Yes.

11              THE COURT REPORTER:  Thank you.

12   Thereupon --

13              CHRISTOPHER HOMER DE MOYA,

14   having been first duly sworn or affirmed, was examined and

15   testified as follows:

16                     DIRECT EXAMINATION

17   BY MS. SAAVEDRA:

18        Q.   Good morning, Mr. De Moya.

19        A.   Good morning, Nathaly.

20        Q.   Can you please state your full name for the

21   record?

22        A.   Christopher Homer De Moya.

23        Q.   Okay.  Mr. De Moya, you have had your deposition

24   taken before by me, correct?

25        A.   Yes.
```

1     Q.   Okay.  And the ground rules are going to be the

2  same today.  I will be asking you some questions.  If you

3  don't understand my question, please let me know and I will

4  be happy to rephrase it.  Okay?

5     A.   Okay.

6     Q.   If you do give me an answer, I'm going to assume

7  that you understood my question and that your answer is

8  truthful to the best of your ability.

9     A.   Okay.

10     Q.   And if you need any breaks, please let me know

11  and I will take one.  I just ask that whatever question is

12  pending, you give me an answer before we take that break.

13  Okay?

14     A.   Okay.

15     Q.   And where are you physically right now?

16     A.   At my attorney's office.

17     Q.   Okay.  Is there someone else in the room with

18  you?

19     A.   Yes.  Reggie's here.

20     Q.   Anyone else?

21     A.   Nope.

22     Q.   And do you have any documents in front of you?

23     A.   The deposition topics.

24     Q.   Are you currently on any medication or other

25  substance that would prevent you from giving true and

1    accurate testimony today?

2        A.   No.

3        Q.   Are you currently on any medication or substance

4    that would prevent you from recalling events from 2019 to

5    2020?

6        A.   No.

7        Q.   Other than meeting with your attorney, what did

8    you do to prepare for today's deposition?

9        A.   That was it.

10       Q.   Did you meet with anyone else?

11       A.   No.

12       Q.   Did you review any documents to prepare for this

13   deposition?

14       A.   Just the deposition topics.

15       Q.   Did you review any transcripts?

16       A.   No.  Just the depositions and, you know, some

17   payroll stuff.

18       Q.   What depositions did you review?

19       A.   The deposition topics.

20       Q.   And you understand that you have been designated

21   by the De Moya Group to testify on those topics, correct?

22       A.   Yes.

23            (Exhibit No. 1 was marked for identification.)

24   BY MS. SAAVEDRA:

25       Q.   I want to show you what I will have marked as

8

1    Exhibit 1 to this deposition.  For the record, this is the

2    Notice of Deposition for today.

3              Mr. De Moya, is this the same document that you

4    have before you?

5    A.    Well, all I have is the specific list of

6    deposition topics.

7    Q.    Look at the screen.  Is this the same thing that

8    you're looking at?

9    A.    Yes, that's what I have in front of me.  Reggie

10   just gave me the coversheet that you showed me originally.

11   Q.    Are you prepared to testify about the topics on

12   this deposition notice?

13   A.    Yes.

14   Q.    The first topic on this Notice of Deposition is

15   Plaintiff's work duties for the Defendant.  Can you please

16   tell us what information do you know about what his duties

17   were?

18   A.    As a laborer, he is expected to do just that,

19   any work whether it's with a shovel, or tape measure,

20   working on the floor with operators.  You know, whatever

21   is required.

22   Q.    And as a laborer, he worked under whose

23   supervision?

24   A.    He's had, I believe, multiple supervisors.  Noel

25   Leon was his superintendent initially I believe.  And

1    under Noel, he had a foreman that went by the name of

2    Chico I think his name was -- I don't even remember his

3    name.  Everyone called him Chico -- before he was

4    transferred to Manny Comes on another project.

5        Q.   When he was transferred to work under Manny

6    Comes, was there anyone else who supervised the Plaintiff's

7    work?

8        A.   Directly, no.  I believe his supervisor was

9    Manny.  There were other supervisors on the project, but I

10   believe Manny was the one who gave him his daily

11   operations.

12       Q.   What was Manny Comes' position at the time?

13   Supervisor?

14       A.   He was supervisor-superintendent.

15       Q.   Do you know what other supervisors were there on

16   the project?

17       A.   Jerry Nasso was another supervisor on the

18   project that worked in a similar area as him.  But there

19   were several others that really I don't think had any

20   other interactions with him.

21       Q.   Do you know who those were?

22       A.   Alan Nuzal (phonetic), Victor Suarez, Juan

23   Carlos Roman.  Those were basically our roadway

24   supervisors on that particular project.

25       Q.   And who would the supervisors report to?

1      A.   Victor Suarez was the senior superintendent, or

2   general superintendent of this particular project.   So

3   Jerry, Alan, Manny, and Juan Carlos report to Victor.

4      Q.   And each supervisor has like their own group of

5   laborers that they work with?

6      A.   Foremen and laborers, yes.   So you'd basically

7   have -- the supervisor would have one, two, maybe three

8   different groups that would have a foreman.   Or sometimes

9   there was no foreman, there would just be an operator and

10   his laborer doing a particular task.

11      Q.   The second topic on the notice is the Plaintiff's

12   work schedule.   Do you know what Mr. Monteagudo's schedule

13   was when he worked with Manny Comes?

14      A.   Basically, it would be a Monday through Friday

15   schedule that's standard, 7:00 a.m. to 4:30, 5:30.   It all

16   depends.

17      Q.   And did he work any overtime during that time?

18      A.   Yeah.   We basically work ten-hour days.   So

19   usually Friday is pretty much all -- once we hit 40 hours,

20   you hit overtime.   My guess is he would probably average

21   48, 50 hours.   Sometimes exceed that if we had to work on

22   a weekend to get a certain task done by a certain date.

23      Q.   Was the schedule the same when he was working

24   under Noel Leon?

25      A.   Yes.   That's basically our schedule

1    company-wide.  It varies, but that's on average.

2         Q.   Are there morning and night shifts?

3         A.   Sometimes.  I mean, a lot of projects do because

4    we work in traffic and sometimes you are not allowed to

5    close lanes of traffic during the day for obvious reasons.

6    So, yes, sometimes there's night shifts.  Most nights

7    there's night shifts depending on the project I guess I

8    should say.

9         Q.   Is there a specific requirement to designate

10   somebody for the morning shift or the night shift?

11        A.   No.

12        Q.   Who makes the determination as to who is working

13   in a particular area or a particular shift?

14        A.   The supervisors and willingness to work day or

15   night.

16        Q.   Is that for all projects at all times?

17        A.   Yeah.  Pretty much.

18        Q.   And Mr. Monteagudo worked under Noel Leon's

19   supervision.  Do you know from what date to what date?

20        A.   I don't recall exact dates.  I think he was

21   hired in October, but I don't remember specifics.

22        Q.   All right.  Did you review any payroll documents

23   or records that reflected the dates of employment and work

24   history of Mr. Monteagudo with the company?

25        A.   I glanced over it, yes.

1      Q.    What documents did you review, if you recall?

2      A.    The payroll documents has a printout that was

3   given to me that showed wages and whatnot.

4      Q.    Does the company maintain personnel files for

5   each employee?

6      A.    Yes.

7      Q.    Who is in charge of maintaining those personnel

8   files?

9      A.    I don't know who in the office does it.  We have

10   a few women in the office that work -- I guess there's

11   more than one contributor.

12      Q.    Who do you believe are those individuals?

13      A.    I guess if I had to call about a file, I would

14   call Cheryl Riley.

15      Q.    And what is her position?

16      A.    I don't know if she has a specific title.  She

17   is just an office assistant I guess.

18      Q.    Did you review Mr. Monteagudo's personnel file

19   before today's deposition?

20      A.    Not really, no.

21            (Exhibit No. 2 was marked for identification.)

22   BY MS. SAAVEDRA:

23      Q.    I'm going to show you what I will have marked as

24   Exhibit 2 for today's deposition.  And for the record, this

25   is the Defendant's Bates number 22 to 35.

1             Mr. De Moya, I'm just going to scroll.  Please

2    let me know if you need me to slow down.  Have you seen

3    this document before?

4             A.    This specific one?  No.

5             Q.    I'm on Page 3 of Defendant's Bates 00004.  Do you

6    know what this document is?

7             A.    It's a background checklist.

8             Q.    Do you know who Fabricio Cedillo is?

9             A.    Yeah.  He was the project manager of that

10   project at the time.

11            Q.    Does the company maintain certain forms and

12   requirements once they hire an employee that need to be

13   filled out?

14            A.    You mean like the application?

15            Q.    Yes.  I'm asking if there are specific documents

16   they are required to fill out upon hiring an employee?

17            A.    Yes.  There's multiple that are within the

18   application.  Whether it's government documents, or safety

19   procedures, or safety policies.

20            Q.    And who is required to provide those documents to

21   the employee?

22            A.    Whatever supervisor is hiring the employee.

23            Q.    Do you know who was the supervisor that hired

24   Mr. Monteagudo?

25            A.    I believe it was Fabricio Cedillo.

14

```
 1        Q.    When Mr. Monteagudo was hired, do you know who

 2   filled out all the paperwork with him?

 3        A.    No.

 4        Q.    At the time that Mr. Monteagudo was hired, do you

 5   know if he was provided any type of training regarding the

 6   policies of the company?

 7        A.    I don't know.

 8        Q.    Is there a procedure that the company has in

 9   place to ensure that all employees are trained in policies

10   and procedures of the company?

11        A.    Just that they have to read through the

12   application that states the procedures and policies and

13   sign off that they read it.

14        Q.    And what policies are part of the application

15   that you are referring to?

16        A.    Safety policy, discrimination policy, drug-free

17   workplace policy to name a few.  I don't know every one

18   off the top of my head.

19        Q.    What was the reporting line or relationship

20   between Mr. Monteagudo and Mr. Fabricio Cedillo?

21        A.    What do you mean by that?

22        Q.    Like did Mr. Monteagudo report directly to

23   Fabricio Cedillo at any point during his employment?

24        A.    On a daily basis?  No.  I think he would report

25   directly to Noel.
```

```
 1        Q.    And did Noel Leon report to Fabricio directly?

 2        A.    Report to him on a daily basis?

 3        Q.    Who would be his direct supervisor?

 4        A.    Yes.  Fabricio is the project manager.  Noel is

 5   the superintendent.  So that would be one and two on that

 6   particular project.

 7        Q.    And Manuel Comes reported to Victor Suarez you

 8   mentioned, correct?

 9        A.    Correct.

10        Q.    Let me go back to Exhibit 2.  Look at Defendant's

11   00008 and 007.  Do you recognize this document?

12        A.    The document itself, yes.

13        Q.    What is it?

14        A.    It's the application.

15        Q.    And this is Mr. Monteagudo's application for

16   employment, correct?

17        A.    Yes.

18        Q.    This is dated August 5, 2019, correct?

19        A.    Yes.

20        Q.    And going back to Defendant's 0004 of Exhibit 2,

21   it appears that Mr. Monteagudo was hired on August 14,

22   2019, correct?

23        A.    That's what it says, yes.

24        Q.    Do you have any reason to dispute that is the

25   date that he was hired?
```

1     A.   No.

2     Q.   And it says that he was hired for job number 552;

3   is that correct?

4     A.   Yes.  That's the particular project that he was

5   hired to work on.

6     Q.   And project 552, is that where Mr. Noel worked

7   at?

8     A.   Yes.

9     Q.   In Exhibit 2, like I was showing you -- let me

10   strike that.

11          (Exhibit No. 3 was marked for identification.)

12   BY MS. SAAVEDRA:

13     Q.   I will show you what I have marked as Exhibit 3

14   to this deposition, and this is Defendant's 57 to 60.

15   Mr. De Moya, do you recognize this document?

16     A.   Yeah, I guess.  Yes.

17     Q.   What is it?

18     A.   Looks like some sort of checklist that's in part

19   of our application for safety reasons.

20     Q.   Do you know what this document is used for?

21     A.   I guess that would be the procedure that the

22   superintendent or supervisor goes through with the

23   employees upon hire.

24     Q.   Are the supervisors trained as to how to do this

25   with the new hires?

1       A.    Yes.

2       Q.    Who provides that training?

3       A.    His supervisor.  It would be Fabricio or myself.

4       Q.    How often is that training provided to the

5    supervisors?

6       A.    I don't know.  Once maybe.  I don't know.

7       Q.    And you said you provide that training sometimes?

8       A.    I don't remember if I went over it with Noel.

9    But if it's required, I can.

10       Q.    Okay.  So tell me what the process is to go

11    through this new hire orientation process that the

12    supervisors are required to follow with their new hires.

13       A.    It's pretty self-evident there.  Just basically

14    it's a checklist that you go through, and you go through

15    point by point.

16       Q.    When you say you go "point by point," what do you

17    mean?

18       A.    Management's Safety Commitment and Policy, you

19    can go over the safety policy.  Responsibilities, tell

20    them what to do.  I mean, do we want to go through the

21    whole list?

22       Q.    When you go through the Management's Safety

23    Commitment/Policy, is there a document that is presented to

24    the employee?

25       A.    It is part of the application.

1      Q.    What do you mean?

2      A.    The application comes as a package.  Part of

3   that package includes a safety policy that the employee is

4   to read through and sign off on that they have read

5   through it.

6      Q.    Are they given a copy?

7      A.    Yes.

8      Q.    Is there another document regarding the employee

9   job site responsibilities that is provided to the employee

10  too?

11     A.    No.

12     Q.    Of these points that are listed here on the first

13  page, are there any other documents that accompany or are

14  given to an employee at the time of hire?

15     A.    I don't believe so.

16     Q.    So how are the supervisors required to go through

17  these topics that do not have additional documents with the

18  employees?

19     A.    From experience.  Explaining verbally.

20     Q.    Number five on this checklist says "review of

21  company safety policy and contact phone numbers."  Do you

22  see that?

23     A.    Yes.

24     Q.    Is there a document that accompanies this topic

25  on the checklist?

1        A.    Yes.  It's part of the application.

2        Q.    And the contact phone numbers, are they included

3   as part of this policy?

4        A.    They are included as part of the application.

5        Q.    And a copy is provided to the employee?

6        A.    Yes, upon request.  I don't know if we give them

7   out to everyone, but it's readily available.

8        Q.    And this policy regarding the clothing, is that

9   in writing as well?

10       A.    Other than where it says it right here, I don't

11  know if that's in the actual safety policy as a whole.  I

12  would have to review that.  But it says it right there.

13       Q.    And you mentioned that you may train a supervisor

14  as to how to go through this with the new hires.  Is it at

15  the beginning of their hire when they're hired as

16  supervisors?

17       A.    It would be more upon request.  If there was

18  something they didn't understand, they could ask.

19       Q.    Okay.

20       A.    It's pretty straightforward.

21       Q.    And they go through this with a new hire employee

22  more than once?

23       A.    Well, they do weekly safety meetings on every

24  job site that covers different things on different days.

25  We have a safety manager that would provide subjects for

1    the supervisors to go over sometimes, depending on

2    something that happened the previous week, or just

3    something that comes through an organization that has good

4    topics.

5         Q.   But is this specific new hire orientation

6    checklist --

7         A.   That's one time --

8         Q.   -- required to do more than once?

9         A.   No.  That's a one-time thing.  For this specific

10   one, yes.  I apologize for talking over you.

11        Q.   That's okay.  It happens.

12             The date on this form is August 9, 2019,

13   correct?

14        A.   Yes.

15        Q.   Now, if we go down to Exhibit 3, this is

16   Defendant's 59, there is another new hire orientation

17   checklist with Mr. Monteagudo's name and it's dated

18   September 16, 2019.  Do you see that?

19        A.   Yes.

20        Q.   Do you know why there are two different -- two

21   checklists with different dates for Mr. Monteagudo which

22   are titled the same?

23        A.   I don't know.

24        Q.   And this is also done by Mr. Noel Leon, correct?

25        A.   That's what it says, yes.

1       Q.   Do you recall when Mr. Monteagudo was transferred

2   over to under the supervision of Mr. Comes?

3       A.   Do I recall --

4       Q.   Or do you know when Mr. Monteagudo was

5   transferred over?

6       A.   I don't remember the date, no.

7       Q.   What project was Mr. Manuel Comes working on?

8       A.   Do you want a name?  Description?  Our company

9   project number?  What do you want?

10      Q.   How do you normally refer to the projects?  By

11  number?

12      A.   Yes.  It would be project 490.

13      Q.   And that project was under the De Moya Group as

14  well?

15      A.   No.  That project is actually a joint venture

16  between The De Moya Group and The Asphalt Group.

17      Q.   Are all the policies and procedures from The De

18  Moya Group applied to the projects that are joint ventures

19  with The Asphalt Group?

20      A.   Yes.

21           (Exhibit No. 4 was marked for identification.)

22  BY MS. SAAVEDRA:

23      Q.   Let me show you what I will have marked as

24  Exhibit 4 of this deposition.  For the record, this is the

25  Defendant's 61 to 67.  Mr. De Moya, do you recognize this

1    document?

2         A.   Yes.

3         Q.   What is it?

4         A.   Looks like the application of employment.  I

5    think that's the safety policy.  My Spanish is okay.

6         Q.   Do you read and write Spanish?

7         A.   I'm sorry?

8         Q.   Do you read and write Spanish?

9         A.   Not particularly, no.  I can decipher some

10   things.

11        Q.   So Defendant's 61 through 62 appear to be the

12   security rules; is that correct?

13        A.   Yes.  I guess that's what "reglamento de

14   seguridad" is.

15        Q.   Is this for both companies, The De Moya Group and

16   The Asphalt Group, correct?

17        A.   Yes.

18        Q.   Are there any other safety rules that apply that

19   are not listed in this application document, if you know?

20        A.   I don't know.  It's an evolving thing, so there

21   could possibly be differences.  I don't know the answer to

22   that.

23        Q.   How often are they revised, if you know?

24        A.   Other than the annual government documents that

25   are required to be filled out, I don't know.

23

```
 1        Q.   I meant the application -- the copies of the
 2   application policies.  Do you know how often they are
 3   updated?
 4        A.   I don't know.
 5        Q.   Do you know who updates them?
 6        A.   No.
 7        Q.   Do you know if this -- this form on Defendant's
 8   63 says "revised January 10, 2019."  Do you know if this
 9   version has been revised since then?
10        A.   I don't know.
11        Q.   Do you know who would know?
12        A.   No.
13        Q.   Defendant's Page 64, it says "policy of no
14   discrimination" and it's in Spanish.  Do you see that?
15        A.   Yes.
16        Q.   Do you know if the company maintains a version in
17   English of this policy?
18        A.   Yes.
19        Q.   What is your understanding of this policy?
20        A.   That acts of discrimination are not allowed.
21        Q.   Is there training provided to the supervisors as
22   to the policy?
23        A.   I believe there has been.
24        Q.   When do you believe the training was provided?
25        A.   I don't know.
```

24

1       Q.    Who is the person in charge of providing this

2   training?

3       A.    Elena Valdez.

4       Q.    Anyone else?

5       A.    Not that I can think of.

6       Q.    And is there a person that's in charge of

7   maintaining the policy and updating, if needed, the written

8   version of it?

9       A.    Not to my knowledge.

10      Q.    And do you know if Mr. Noel Leon was ever trained

11  as how to handle a report or process a claim of the

12  discrimination, harassment, or retaliation?

13      A.    I think he has, but I'm not certain.

14      Q.    Do you know who would know?

15      A.    Noel.

16      Q.    Do you know who would have given him that

17  training?

18      A.    I would think Elena.

19      Q.    Is there any documentation that would reflect

20  that, if you know?

21      A.    I would assume so, but it's an assumption.

22      Q.    Mr. De Moya, in Exhibit 1, which was the topics

23  of deposition -- I'm going to put that back up.  Topic

24  number nine says, training that the Defendant has provided

25  to its officers, directors, managers, supervisors, and

1    employees regarding how to handle, report, process, or

2    otherwise address claims of discrimination, harassment, or

3    retaliation; the materials provided to attendees during any

4    training; the frequency of the training, and the timing of

5    such training, and the staff involved in providing such

6    training during the period of time between January 1, 2019

7    and December 31, 2020.  Do you see that?

8        A.   I do.

9        Q.   And as I mentioned earlier today, you are here to

10   testify as to these topics, correct?

11       A.   Yes.

12       Q.   Are you telling me you don't know whether

13   Mr. Noel as a supervisor received that training during that

14   period of time?

15       A.   I assumed if we had documentation it was

16   provided to you.

17       Q.   As a corporate representative, do you have any

18   information as to this topic?

19       A.   Just that Elena was the one that would have done

20   the training, and I don't have documentation of it in

21   front of me.

22       Q.   When you prepared for today's deposition and

23   reviewed the topics, what steps did you take to ensure that

24   you had the information that you needed as to a specific

25   topic?

1       A.   I just -- I read through this, and I assumed

2    that telling you that this was Elena's department and that

3    she would have provided you this information.

4       Q.   Did you speak to Elena?

5       A.   I did not.

6       Q.   Why not?

7       A.   I didn't feel it was necessary.

8       Q.   Why not?

9       A.   Because I didn't feel it was necessary.

10       Q.   Do you know what the training as to how to handle

11    a claim of discrimination consists of?

12       A.   No.

13       Q.   Do you know if there are any materials provided

14    to the trainee?

15       A.   I'm pretty certain Elena provided the

16    supervisors materials for that.

17       Q.   But you don't know what materials those are?

18       A.   No, ma'am.

19       Q.   Do you know if there's any notices or posters

20    that are anywhere in the area of work where employees visit

21    that provides any information as to the policies of

22    discrimination and/or how to report those?

23       A.   Yes.  Every project has a poster board with all

24    equal employment policies and laws.

25       Q.   And what is the procedure that those posters

1    identify as a way an employee can report discrimination if

2    they feel they have been treated unequally?

3         A.   I don't understand the question.

4         Q.   Let me rephrase.  Is there contact information

5    that is contained in those posters that you referred to?

6         A.   Yes.

7         Q.   Whose contact information is it?

8         A.   I don't know.  I think maybe Carli Bailey was on

9    there.  They are legal posters that are required for us to

10   post on every job site.  I assume there is an EEO office

11   contact and other governmental numbers for specific

12   topics.

13        Q.   Are there any internal contact information that

14   the employees are provided to report or claim

15   discrimination?

16        A.   I know it's in our application where it has the

17   contact information.  Specific company contacts, I'm not

18   certain.  But everyone that fills out an application

19   has -- you know, the main office phone number is there,

20   address, and whatnot.

21        Q.   You mentioned earlier that you weren't sure

22   whether or not the employees would receive a copy of those

23   applications; is that correct?

24        A.   I don't know if we automatically print out a

25   copy of the application or not.  But if they have it in

1    their possession, and we need a copy, they can either make

2    one or we'd be more than willing to make one for them.

3         Q.   And if it's not done immediately, do you know

4    when it would be provided to them?  Only when they request

5    it?

6         A.   Yes.  Upon request.

7         Q.   So if they hadn't requested a copy of those

8    policies and -- strike that.

9              We were talking about the notices and posters

10   that provides any information to the employees, and you

11   mentioned that they may have the federal information and

12   the contacts of the EEOC and so forth.  Do you know

13   whether those posters have any of the Defendant's contact

14   information for the employee to report any incident of

15   discrimination?

16        A.   I don't know if those notices have anything, but

17   they have our information.

18        Q.   Say that one more time.  I'm sorry.

19        A.   I don't know if the posters we put up have

20   company contact information, but the company contact

21   information is provided to every employee through the

22   application.

23        Q.   You stated earlier that it was upon request only,

24   did you not?

25        A.   If they want a copy, yes.  But they are given

```
 1    that copy and sign it prior to submitting it to the

 2    company.  All the information is there.  It's theirs to

 3    use.

 4         Q.   How can they use it if they don't have a copy of

 5    it?

 6         A.   They can request a copy of it.  They can make

 7    their own copy of it if they take the application home

 8    with them.

 9         Q.   How do you know they can take the application

10    home with them?

11         A.   Because I have given them out myself in the

12    past.  It's quite a large application to fill out.  Some

13    prefer to sit in the office and fill it out themselves.

14    Some will take it home and bring it back the following

15    day.

16         Q.   Do you know if Mr. Monteagudo took the

17    application home?

18         A.   I don't know.

19         Q.   Do you know who would know?

20         A.   I don't know -- Noel maybe.  I don't know who

21    gave him the application.  Fabricio, if he gave him the

22    application, if he filled it out in the office.  I don't

23    know.

24              They are given a copy of the discrimination

25    policy.  So what they do with it is up to them.
```

```
 1              THE WITNESS:  I'm just going to step away from

 2         the camera real quick to pour a cup of water.  It

 3         doesn't need to be a break.

 4              MR. CLYNE:  I've got multiple screens of Zoom

 5         open.  I'm going to try to close them.

 6    BY MS. SAAVEDRA:

 7         Q.   Mr. De Moya, do you know what is --

 8                   (Brief recess.)

 9    BY MS. SAAVEDRA:

10         Q.   Okay.  Mr. De Moya, I lost you for a second

11    there.  I don't know if you heard the question.

12         A.   You started to, and then we lost you.

13         Q.   Do you know if the employees like Mr. Monteagudo

14    are given any information as to how to report a claim of

15    discrimination with the company?

16         A.   In the application I believe it explains how to

17    do so, and the discrimination policy that they are given.

18         Q.   What is your understanding of that policy?

19         A.   That they are told to contact the office.  I

20    think Carli Bailey was the one -- which she's actually

21    Carli Moore now, but she's the one that's specifically

22    noted in it, which that's actually something we probably

23    need to change.  But her specific name is there, and the

24    main office's phone number is on the form I believe.

25         Q.   Are there any other ways that an employee can
```

```
 1    report a claim of discrimination?
 2         A.   They can report it to any supervisor or myself.
 3    I believe my phone number is on the application.  Several
 4    of our supervisors' contact information is there as well.
 5    But the best way would be to call the office.
 6         Q.   And --
 7         A.   Or just --
 8         Q.   Go ahead.
 9         A.   I was going to say or just report personally to
10    the office.
11         Q.   And what happens after the company receives a
12    report of discrimination?
13         A.   We would do an investigation and call anyone who
14    may have been a witness or whatnot.
15         Q.   When you say "we would do an investigation," who
16    are you referring to?
17         A.   It would be myself, I would ask Elena to assist,
18    specific project supervisors that were not the mentioned
19    discriminator.
20         Q.   Anyone else?
21         A.   Sounds like about it.
22         Q.   And have you handled complaints of discrimination
23    at De Moya?
24         A.   No, not until this one.
25         Q.   So tell me what happened.  What was the first
```

1    time you received Mr. Moteagudo's complaint?

2        A.   Complaint of discrimination, or just complaint

3    of supervisor?

4        Q.   Well, tell me what the distinction that you are

5    making is.

6        A.   Well, I didn't hear anything about

7    discrimination until after he was already terminated.  But

8    prior to that, when he approached me in my office and

9    requested to be relocated because he couldn't work for

10   Mr. Leon, Noel Leon.

11       Q.   Had you had any contact with Mr. Monteagudo

12   before he went to the office to complain about Mr. Leon?

13       A.   I don't believe so.

14       Q.   Did you supervise his work in any way?

15       A.   Other than driving through the project and just

16   seeing what's going on, no.  No real personal contact,

17   unless, you know, perhaps rolling down my window and

18   asking -- I tend to roll down my window when I drive

19   through and ask the crew how they're doing, good morning,

20   this, that, or the other.  But nothing specific.  Just as

21   far as the work being done concerns.

22       Q.   So what happens if somebody like an employee

23   mentions to you that they are being treated unfairly?

24            MR. CLYNE:  Objection to form.

25            Are you asking about discrimination or unfair

```
 1        treatment in general workplace issues?

 2            MS. SAAVEDRA:  Counsel, if you can just keep

 3        your objection to form.

 4            MR. CLYNE:  Well, we need clarification for the

 5        question because he can't answer it as phrased.

 6   BY MS. SAAVEDRA:

 7        Q.   Mr. De Moya, have you ever had an employee

 8   complain about being treated unfairly?

 9        A.   It's hard to say.  I assume I have.  It's been

10   quite a while if I have, other than Mr. Monteagudo.

11        Q.   Would you consider Mr. Monteagudo's complaint at

12   the office a complaint that he was being treated unfairly?

13        A.   No.  From what I took, he was being

14   disrespected.  Unfair does not come to mind.

15        Q.   Was he speaking in English or in Spanish?

16        A.   Spanish.

17        Q.   And did you understand everything he was telling

18   you when he came to the office?

19        A.   I understood the majority of it, and that's why

20   I asked for our secretary to assist to make sure I was

21   understanding correctly.

22        Q.   And who is the secretary?

23        A.   Susan Gillardo(phonetic).

24        Q.   Is she an interpreter?

25        A.   She's a bilingual woman.  Is she a licensed
```

 1    interpreter, if there is such a thing?  I don't believe

 2    so.

 3         Q.   So is it fair to say that there were some things

 4    that Mr. Monteagudo may have said that you didn't

 5    understand really what he was saying?

 6         A.   I would say for the most part because he was

 7    very upset and loud.  I understand Spanish pretty well,

 8    but if someone is talking in an animated way or a fast

 9    way, usually I can lose stuff so -- but, no, I pretty much

10    understood what was happening.

11         Q.   But it's fair to say that you didn't understand

12    everything, because otherwise you wouldn't have asked

13    somebody to be there with you, correct?

14         A.   Well, I understand he never mentioned anything

15    about discrimination.  It was a disrespect issue.  He

16    never mentioned anything about being unfair.  It was very

17    clear disrespect.

18         Q.   So what exactly is it that you recall he said?

19         A.   I mean, it's been three years.  It's really hard

20    to say, but it was -- I know specifically the "respect"

21    word came out of his mouth multiple times over and over

22    again, and that he couldn't be disrespected and -- that's

23    what stands out the most in my memory.

24         Q.   Is it possible that he mentioned that he wasn't

25    treated fairly but you just don't recall?

```
 1        A.    I don't believe so.

 2        Q.    How are you so sure?

 3        A.    Because I remember the subject of the

 4   conversation.

 5        Q.    Did you write it down?  Did you make a report?

 6        A.    No.

 7        Q.    Did you contact or inform anyone of this

 8   complaint?

 9        A.    I believe I spoke to Noel about it.

10        Q.    What do you recall your conversation with Noel

11   was about?

12             MR. CLYNE:  I'm going to object.  Outside the

13        scope of this corporate rep notice.

14             MS. SAAVEDRA:  The corporate rep, part of the --

15        one of the topics is about the formal complaints of

16        discrimination against Mr. Noel and informal

17        complaints and the facts underlying those complaints.

18        Are you instructing the witness not to answer?

19             MR. CLYNE:  I said you're starting to go

20        outside the scope.  That's what I said.

21             MS. SAAVEDRA:  I believe it falls under that

22        topic, number 12.

23             MR. CLYNE:  Okay.  Continue.

24   BY MS. SAAVEDRA:

25        Q.    What was your conversation, Mr. De Moya, with
```

```
 1    Mr. Noel?

 2         A.   I remember asking what happened with

 3    Mr. Monteagudo.  He mentioned something that

 4    Mr. Monteagudo was tasked to do a specific task.  When he

 5    returned, he did not complete the task and he was

 6    reprimanded for not doing so.  And he was told to complete

 7    the task under a separate crew because the crew he was

 8    with moved on to something, and he refused to work with

 9    the operator that he was tasked to work with.

10         Q.   And how was this conversation -- how did you have

11    this conversation with Mr. Leon?  Over the phone?

12         A.   I don't remember.

13         Q.   Do you know if anyone else was part of the

14    conversation?

15         A.   I don't remember.

16         Q.   Was it in English or in Spanish?

17         A.   Spanish.  Mr. Leon doesn't speak much of any

18    English.

19         Q.   So you spoke to Mr. Leon in Spanish?

20         A.   Yes.

21         Q.   And you understood everything that he said in

22    Spanish to you?

23         A.   Yes.

24         Q.   You didn't need an interpreter to have the

25    conversation with him?
```

```
 1        A.   No.

 2        Q.   What was the difference with Mr. Monteagudo?

 3        A.   Mr. Monteagudo was very animated, very upset,

 4    speaking loudly.  Quite frankly, disrespectful towards me,

 5    pointing his finger at my chest, which I had told him

 6    multiple times that if he wanted to talk to me, he needed

 7    to calm down.

 8        Q.   How does that affect your ability to understand

 9    what Mr. Monteagudo was saying?

10        A.   Because of the speed that he was speaking, and

11    when people speak very fast, it makes it harder for me to

12    understand.

13        Q.   So does Mr. Leon not speak fast?

14             MR. CLYNE:  Objection to form.

15    BY MS. SAAVEDRA:

16        Q.   You can answer.

17        A.   No.  He spoke to me in a respectful, slow

18    manner.

19        Q.   Did you ask Mr. Noel Leon to fill out any type of

20    report or any type of document to memorialize your

21    conversation with him?

22        A.   Not that I remember.

23        Q.   Did you memorialize your conversation with

24    Mr. Leon at any point?

25        A.   No.
```

```
 1        Q.    What was your response after he informed you what

 2   had transpired with Mr. Monteagudo?

 3        A.    What was my response?

 4        Q.    Yes.

 5        A.    That I was going to move him to another job site

 6   and see if it worked out better for him.

 7        Q.    Is that normally how the company handles

 8   conflicts between employees and supervisors?

 9        A.    Is what normal?

10        Q.    Transferring them to another project.

11        A.    It's probably happened just a couple of times in

12   my history.  I don't remember any other specifics, but we

13   try and do what's best by everyone in the company.

14        Q.    At the point that you transferred Mr. Monteagudo

15   to another project, was his work completed at the 490

16   project?

17        A.    I think he was -- I don't remember this a

18   hundred percent -- but working with like a finishing crew

19   on base rock, and I think they had finished and it worked

20   out to where we needed to move that crew or that operation

21   to another job.  I'm not a hundred percent, but that seems

22   to be what I am remembering.

23        Q.    So what was the reason that he was transferred?

24   Was it because he complained and he didn't work out with

25   Mr. Leon, or was it because he had finished the project?
```

39

```
 1        A.   I think there was both -- both reasons.
 2        Q.   So if he had not complained about Mr. Leon, what
 3   would have been the next assignment that he would have
 4   received?
 5        A.   I can't say.  That could've been the same
 6   assignment or he could have stayed on.  It depends.
 7        Q.   Was there any other work that needed to be done
 8   at 490 by Mr. Monteagudo?
 9        A.   At the second project?
10        Q.   At the first project.
11        A.   That first project was 552, and I guess,
12   possibly.  I don't know the specifics of what was
13   happening on that project at that time.
14        Q.   Who was the person in charge of making the
15   determination of moving employees from one project to
16   another?
17        A.   In this specific case or just in general?
18        Q.   In this specific case.
19        A.   Well, I'm the one that made it happen.
20        Q.   Do you receive reports as to the status of the
21   projects -- or did you receive any type of reporting as to
22   the specific project and whether or not it was finished or
23   completed?
24        A.   No.
25        Q.   At the time you made the decision to transfer
```

1    Mr. Monteagudo to another project, had you spoken to anyone

2    else other than Mr. Noel Leon?

3         A.   I called Victor Suarez on the 490 project to ask

4    if he had work for him over there.

5         Q.   What did you tell Mr. Victor Suarez?

6         A.   I don't recall.

7         Q.   Did you tell him that there were issues with

8    Mr. Monteagudo and his supervisor?

9         A.   It's possible, but I don't recall.

10        Q.   With the conversation with Mr. Suarez, was there

11   anyone else that was part of that conversation?

12        A.   I don't recall.

13        Q.   Did you fill out any paperwork to memorialize

14   your conversation with Mr. Suarez?

15        A.   I don't believe so.

16        Q.   And what was Mr. Suarez's response to you after

17   you asked him?

18        A.   I can't recall specifics, but I'm sure it was to

19   the tune that they'd find something or something like

20   that.

21        Q.   Did he tell you that right away?  Or do you know

22   if he spoke to anyone else before he told you it was okay

23   and they would find something?

24        A.   No.  He told me that they would find something.

25        Q.   At that point when you spoke to Mr. Suarez, did

1   you know which supervisor Mr. Monteagudo was going to be

2   transferred under?

3        A.   No.

4        Q.   When did you learn that Mr. Monteagudo was going

5   to be working under Manuel Comes?

6        A.   I don't know that I ever learned that

7   specifically.

8        Q.   Who did you speak to after you spoke to

9   Mr. Suarez and he told you it was okay and that they would

10  find something?

11       A.   I don't believe I spoke to anyone about the

12  topic.

13       Q.   How was Mr. Monteagudo informed that he was going

14  to be transferred?

15       A.   I don't know.  I assume Noel sent him over and

16  told him to check in with Victor, but it's an assumption.

17       Q.   But it wasn't you, correct?

18       A.   No.  After we spoke in the office, I told him

19  that I would see what I could do, and I believe within the

20  next week or so he was moved.

21       Q.   Did you make any note or report anything on his

22  file about the complaint that he made or the reasons for

23  his transfer?

24       A.   No.

25       Q.   Have you ever handled a complaint of

1    discrimination for the company?

2           MR. CLYNE:  Objection to form.  Prior to this

3       or after this?

4           MS. SAAVEDRA:  Well, counsel, if you can keep

5       your objections to form.  Let him answer the

6       question.  And if he needs clarification, he can do

7       that.

8           MR. CLYNE:  Objection to form as to clarity and

9       time frame.

10   BY MS. SAAVEDRA:

11      Q.   During your time with the company, have you ever

12   had any complaints of discrimination that you have handled?

13      A.   Personally, no.

14      Q.   Have you ever had any internal complaints, not

15   through the EEOC, but any complaints of discrimination by

16   an employee that you have received?

17      A.   No.

18      Q.   How does the company enforce its equal employment

19   and anti-discrimination policy in 2019?  Do you know?

20      A.   How do we enforce it?

21      Q.   Yes.

22      A.   Can you be more specific?  It's a pretty general

23   question.

24      Q.   I understand.  Let me see if I can make myself

25   more clear.  I'm going to pull up Exhibit 4 which we have

```
 1    previously introduced.  Then I'm going to go to page

 2    Defendant's 64, which is the Policy of No Discrimination.

 3    In this policy it says that if there is some type of

 4    discrimination or intimidation or inappropriate or abusive

 5    conduct, that The De Moya Group and Asphalt Group promise

 6    to maintain a free of discrimination place of work of any

 7    type of harassment, and no discrimination is tolerated.

 8    Correct?

 9         A.   Yes.

10         Q.   How does the company make sure that they can

11    maintain this promise to its employees?

12         A.   I guess if there is a complaint, that we would

13    do an investigation.  And if there is any proof that the

14    discrimination took place, we would act accordingly.

15         Q.   What do you mean by "act accordingly"?

16         A.   I guess it would depend on the severity of the

17    issue.  If it was a blatant act of discrimination, that

18    would be grounds for termination.  If it were an

19    accidental, or a misspoken word or words, or statement, or

20    phrase that could be taken the wrong way, there could be

21    disciplinary actions taken, but not necessarily

22    termination.

23         Q.   Who makes that determination?

24         A.   I would say it would probably be some sort of

25    committee between myself, my family, direct supervisors of
```

44

1    the person who made the discriminatory remark, and a

2    community as a team make a decision from that.

3        Q.    When you say your "family," who are you referring

4    to?

5        A.    My uncle, Alavaro; my mother, Alisa; my brother,

6    AJ.

7        Q.    Anyone else?

8        A.    We are the senior personnel.   So I would say

9    that's where it would go.

10       Q.    And you mentioned that there would be an

11   investigation, correct?

12       A.    Yes.

13       Q.    What information from those investigations are

14   recorded or memorialized, if any?

15       A.    I don't remember any.

16       Q.    I'm sorry?

17       A.    I don't remember any specifics.

18       Q.    Is there a procedure that the company has in

19   place to ensure that there is some type of record of the

20   investigation that was conducted?

21           MR. CLYNE:   Objection.   Predicate.   You have to

22       establish that there was an investigation for a

23       complaint prior to --

24           MS. SAAVEDRA:   I am asking general questions as

25       to the procedures that are in place for the company

```
1          at the time in 2020.

2               MR. CLYNE:  So you're saying hypothetically if

3          there had been a complaint, would they have done a

4          written investigation?

5               MS. SAAVEDRA:  Counsel, I'm asking the witness

6          about the policy of discrimination that is on

7          exhibit, correct, and the process that follows within

8          those policies.

9               MR. CLYNE:  Do you understand question?

10    BY MS. SAAVEDRA:

11        Q.   Mr. De Moya, you testified about the process to

12    ensure that this policy is being enforced by the company,

13    and you testified that if there was a complaint, that there

14    would be an investigation.  Correct?

15        A.   Yes.

16        Q.   Is there a procedure that is in place, or process

17    in place to ensure that whether -- how those investigations

18    are conducted?

19        A.   I don't know that we have a written procedure.

20        Q.   Is there a process --

21        A.   I don't know of any written procedure that we

22    have that documents exactly how the investigation would

23    move forward.

24        Q.   So there is no set way that these investigations

25    are handled?
```

46

1      A.   No.

2      Q.   And there is no requirement as to what needs to

3  be memorialized or written down or what isn't?

4      A.   No.

5      Q.   So it would be at the discretion of who?

6      A.   Of how to proceed?

7      Q.   Correct.

8      A.   We would discuss it internally and decide who

9  the proper people to contact are that are involved in the

10 situation to come to our conclusion.

11     Q.   So the common practice of the company was if

12 there were ever a complaint that was brought up to anyone,

13 that there would be a meeting between your family, Elena,

14 and you would make a determination as to what would be the

15 procedure to follow?

16          MR. CLYNE:  Objection to form.  You can answer.

17     A.   Generally, yes.  If there were a specific

18 situation that one of us felt strongly about one thing,

19 then they could take the action directly without

20 consulting with the other family members.

21 BY MS. SAAVEDRA:

22     Q.   So it's at the discretion of whoever receives the

23 complaint, correct?

24     A.   Yes.  For example, if I felt strongly enough

25 about something and I knew that termination had to happen

```
 1   or felt that termination had to happen because of said

 2   instance, then I would take that action.

 3          If there was some question as to what needed to

 4   be done, then I would consult, whether my uncle, my

 5   mother, my brother, what they thought.  But there is

 6   discretion there to where if I could act on my own if I so

 7   chose, as could my mother, my brother, or uncle.

 8       Q.    Did you speak to any of your family members about

 9   the complaint you received from Mr. Monteagudo?

10       A.    Before making my decision, no.

11       Q.    When did you speak to your family about the

12   complaint that Mr. Monteagudo made, if at all?

13       A.    I don't remember.

14       Q.    How did you --

15          MR. CLYNE:  By "complaint," are you talking

16       about when he met with him in the office?  Just for

17       clarification.

18   BY MS. SAAVEDRA:

19       Q.    Did you receive any other complaints, other than

20   Mr. Monteagudo coming to you at the office, from him?

21       A.    No.  I believe that was the only one.

22       Q.    So you understand when I'm asking about

23   Mr. Monteagudo's complaint, I'm referring to that meeting

24   that you had in person in your office that you testified

25   to?
```

1      A.   Yes.

2      Q.   Did you review Mr. Monteagudo's file for any

3  disciplinary history at the time that you made the decision

4  to transfer him to another project?

5      A.   No.

6      Q.   Had you had any complaints about his performance

7  as an employee at the time that you made the decision to

8  transfer him to another project?

9      A.   No.  It's not something that really comes to me.

10      Q.   If there was an issue with his performance at the

11  550 project, who would those be reported to, if anyone?

12      A.   If there was a written warning?

13      Q.   If there were any issues with his performance?

14      A.   I mean, I think Noel would probably go to

15  Fabricio.

16      Q.   Is that the normal process that the company has

17  in place?

18      A.   Yes.  I don't get involved in every day-to-day

19  employee issue.

20      Q.   But project managers are supposed to receive or

21  are aware of any issues that a supervisor may have with

22  their laborers or operators, correct?

23      A.   I mean, I wouldn't say a hundred percent of the

24  time.  A superintendent can act on his own on issues.  He

25  doesn't necessarily have to report every little issue he

49

1   has with an employee to the supervisor.

2        Q.   But whether or not they take action, are the

3   project managers required to be kept in the loop of what's

4   happening?

5        A.   Required?  It depends.  I mean, obviously

6   depends -- I mean, Noel has the authority to terminate any

7   employee he has working for him without reaching out to

8   the project manager and getting permission so to speak.

9   But if he were to say write someone up or terminate

10  someone, at that point, yes, he would present the issue to

11  the project manager.

12       Q.   Go ahead.

13       A.   I'm sorry.  And who would put that paperwork --

14  you know, turn it into the office to go into the

15  employee's file.

16       Q.   So if there is any paperwork related to

17  disciplinary action that is taken by a supervisor, the

18  project manager is aware and is the one that turns it into

19  the office?

20       A.   Should be, yes.

21       Q.   Is that the same for the project, the 490

22  project?

23       A.   Yes.  The supervisors in the field have the

24  authority to make decisions, and then the paperwork should

25  go through the project manager.

1      Q.    You mentioned that at the 490 project there were

2   multiple supervisors that worked in the field, correct?

3      A.    Yes.

4      Q.    Would those supervisors, even though they have

5   their own team, they would also have the authority over all

6   the employees whether or not they were working on their

7   particular team; is that correct?

8      A.    Yes.

9      Q.    Do you know what was the circumstances

10  surrounding Mr. Monteagudo's termination with the company?

11     A.    Yes.  I understand that he had been caught

12  taking unauthorized breaks.  I believe he was caught

13  sleeping more than once on equipment.  And the final time

14  was he was caught sleeping on a roller and I think refused

15  to sign any papers and was terminated then.

16     Q.    Who was the person that terminated him?

17     A.    I believe Jerry is the one that wrote up the

18  termination form.  Jerome Nasso.

19     Q.    And at the time that he was terminated by Jerry

20  Nasso, was Mr. Nasso -- Mr. Nasso was not the direct

21  supervisor of Mr. Monteagudo, correct?

22     A.    Correct.

23     Q.    Do you know if at that time he made the decision

24  to terminate him, did he speak to anyone else before he

25  made that determination?

1      A.   I don't know.

2      Q.   You mentioned that there was multiple reasons

3    that he got terminated, that he got caught sleeping

4    multiple times.  Can you give me a little bit more details

5    as to that allegation?

6      A.   From what I heard, that he was caught, I think,

7    hiding behind a light plant at one point.  I think Manny

8    Comes had caught him sleeping on a roller at one point.

9    And then I believe Jerry caught him sleeping on the roller

10   the final time.

11     Q.   Do you know if there were any disciplinary

12   actions taken for any of those allegations?

13     A.   I believe so.  I don't have them in front of me.

14     Q.   Those violations that you are alleging were the

15   reasons for his termination all during the time that he was

16   under Mr. Comes' supervision?

17     A.   The specific ones that I just stated, yes.

18     Q.   If there are disciplinary actions that were taken

19   on projects that were done, those would have been given to

20   Victor Suarez, correct?

21     A.   I believe so.

22     Q.   Is there a reason why there wouldn't have been?

23     A.   I can't think of a reason why they wouldn't have

24   been, no.  They enter -- they report directly to Victor. .

25           (Exhibit No. 5 was marked for identification.)

```
1    BY MS. SAAVEDRA:

2         Q.   I'm going to show you what I have marked as

3    Exhibit 5 of this deposition.  For the record, this is

4    Defendant's 99 to 101.

5              Mr. De Moya, do you recognize this document?

6         A.   It's our standard disciplinary form.

7              MR. CLYNE:  What exhibit is this now?

8              MS. SAAVEDRA:  I'm sorry?

9              MR. CLYNE:  What exhibit number is it?

10             MS. SAAVEDRA:  Five.

11             MR. CLYNE:  And it's 99 to what?

12             MS. SAAVEDRA:  To 101.

13   BY MS. SAAVEDRA:

14        Q.   Do you recall when was the first time you saw

15   this document?

16        A.   When you showed it to me a couple weeks ago -- I

17   mean the particular one that's filled out, when you showed

18   it to me a couple weeks ago.

19        Q.   All right.  And prior to your deposition a couple

20   weeks ago, when Mr. Monteagudo was terminated, had you seen

21   this document?

22        A.   No.

23        Q.   You stated that there were multiple reasons for

24   Mr. Monteagudo's termination.  He was found sleeping, and

25   multiple times, and there were other violations prior to
```

1    the day that he was terminated.

2              In this form that is dated October 7, 2020 and

3    Jerome Nasso is the supervisor, it doesn't state that

4    there were prior disciplinary actions, does it?

5        A.   Not that I see, no.

6        Q.   Is there a reason for that that you know of?

7        A.   Not that I know of.

8        Q.   Are supervisors trained as to how to fill out

9    this type of paperwork when they make a determination to

10   terminate an employee?

11       A.   I don't know that there is a specific training.

12   It's fairly self-explanatory.  Other than just put as much

13   information -- put actual information.

14       Q.   Is it reviewed by anyone prior to being added to

15   the file?

16       A.   I assume so, but --

17       Q.   By who?

18       A.   I would assume it would be reviewed by the

19   supervisor, Victor, or the project manager.

20       Q.   Anyone else?

21       A.   Victor would be the determining factor.

22       Q.   What do you mean by that?

23       A.   That he would have the say in whether the

24   termination is completed or not.

25       Q.   Was that the case with Mr. Monteagudo?

54

1      A.   I don't know.  Again, Jerry has the authority to

2   terminate an employee as well.

3      Q.   Mr. Nasso was not Mr. Monteagudo's prior

4   supervisor, right?

5      A.   At the time, no.

6      Q.   Would he have been aware of Mr. Monteagudo's

7   prior disciplinary issues?

8           MR. CLYNE:  Objection.  Calls for speculation.

9   BY MS. SAAVEDRA:

10     Q.   Do you know?

11     A.   I would assume he'd have access to that

12   information.

13     Q.   How?

14     A.   He works alongside Manny.  They work on the

15   project together.

16     Q.   Okay.  So they had made each other informed with

17   regards to their employees and make sure the project's

18   running smoothly?

19     A.   They should be.

20     Q.   Doesn't your company have a safety policy that

21   employees are working -- the laborers should be taking

22   breaks and make sure they are keeping themselves hydrated?

23     A.   I don't know specifically if it states that in

24   the safety.  But, yes, that's always important.

25     Q.   So if Mr. Monteagudo were taking breaks, it was

1   part of -- to make sure -- is it possible that he was

2   taking breaks because he was making sure that he was

3   keeping himself hydrated and out of the sun?

4        A.   I guess it's possible, but taking breaks and

5   sleeping on machinery is two different things.

6        Q.   You said that he was caught sleeping multiple

7   times.  Is that correct?

8        A.   That's my understanding, yes.

9        Q.   How did you learn that?  Who told you that?

10       A.   I heard it from Manny and Jerry.

11       Q.   When was the first time that he was found

12  sleeping on the machine?

13       A.   I don't know.

14       Q.   Who was the first person that saw him?

15       A.   I believe it was Manny.

16       Q.   Do you remember when it happened?

17            MR. CLYNE:  Objection.  Asked and answered.

18  BY MS. SAAVEDRA:

19       Q.   You can answer.

20       A.   I don't.

21       Q.   Do you remember when he told you that?

22       A.   I don't.

23       Q.   Do you remember the reason you were having --

24  that led to that being disclosed to you by Manny?  What was

25  the reason for your conversation with him?

1      A.   It was probably after he filed with the EEOC.

2      Q.   After Mr. Monteagudo filed his charge of

3  discrimination?

4      A.   I believe so.

5      Q.   Were you part of the investigation once the

6  company received the charge of discrimination?

7      A.   No.  I didn't have much involvement in that.

8      Q.   Do you have any involvement --

9      A.   Not that I recall.  Other than hearing my mother

10  talk about it.

11      Q.   Did you conduct any -- so tell me what was the

12  conversation that you had with Manny?

13          MR. CLYNE:  If there's any conversations that

14          happened when I was present, then those are

15          privilege, so --

16      A.   Yeah.  I mean, I can't recall a specific

17  conversation with Manny.

18  BY MS. SAAVEDRA:

19      Q.   Okay.  So when he disclosed to you that he had

20  found him sleeping on the machine, do you recall anything

21  else that he mentioned as to that issue?

22      A.   Not specifically.

23      Q.   Do you know why he wasn't terminated at that

24  point?

25      A.   I don't.

1        Q.    Did you ask Manny?

2        A.    I did not.

3        Q.    Why not?

4        A.    Because I guess I just wasn't interested in why

5   he did it at that point.  That was his discretion.

6        Q.    Once the lawsuit was filed, did you assist in any

7   way in collecting information or documents for the defense

8   of the claim that Mr. Monteagudo brought against the

9   company?

10       A.    I went back through any documents I may have had

11  in my emails in the archives, but other than that, no.

12       Q.    Did you conduct any investigations or interviews?

13       A.    I may have made a phone call or two to Manny and

14  Victor and Jerry, but I don't remember any specifics to

15  it.

16       Q.    What would have been the reason for your calls to

17  Manny, Victor, or Jerry?

18       A.    Just to find out exactly the sequence of events

19  which led up to his termination.

20       Q.    Did you ask him to provide any summaries or

21  documentation after your conversations?

22       A.    I believe they were asked to give some sort of

23  summary, yes.  By myself?  I don't think so.  I think that

24  had already been asked of them.  I may have actually sent

25  something out, but I can't quite recall.

58

```
 1        Q.   Did you assist in the response to interrogatories
 2   in this lawsuit?
 3        A.   Yes.
 4        Q.   What was your involvement or your participation
 5   in that?
 6             MR. CLYNE:  Objection.  Attorney-client
 7        privilege.
 8   BY MS. SAAVEDRA:
 9        Q.   I'm not asking for any conversations that you had
10   with your counsel, but did you -- well, let me just
11   introduce it as an exhibit so we can go through them.
12             MR. CLYNE:  What number does that match on your
13        corporate rep chart?
14             MS. SAAVEDRA:  Well, if he is answering
15        interrogatories for it, then it's part of number --
16        the facts underlying the complaints of discrimination
17        and lawsuits.
18             MR. CLYNE:  What number are you talking about?
19             MS. SAAVEDRA:  Topic number 12 and number 11.
20             MR. CLYNE:  You're stretching, counsel.  You
21        didn't ask for anything going over interrogatories.
22             So he's already answered what steps they took in
23        response to the allegations made by the Plaintiff.
24        He's given you all the information he knows about
25        formal and informal complaints of discrimination.
```

```
 1          There's nothing in here that says "interrogatories."
 2          MS. SAAVEDRA:  It is part of the complaints and
 3     underlying information that was provided on this
 4     case.
 5          MR. CLYNE:  I think you are stretching.
 6          MS. SAAVEDRA:  So are you allowing --
 7          MR. CLYNE:  We are going to object because it's
 8     beyond the scope of his corporate rep designation.
 9     It's not a topic covered.  He's not prepared to
10     answer.
11          (Exhibit No. 6 was marked for identification.)
12 BY MS. SAAVEDRA:
13     Q.   Mr. De Moya, my question is just if you have seen
14 this document before?  And if you can tell me -- well, have
15 you seen this document before?
16     A.   Yes.
17     Q.   And if I go through the questions, if you can
18 just let me know which answers did you provide information
19 on?
20          MR. CLYNE:  I'm going to object.
21     Attorney-client privilege.  We are not going to
22     answer.  And outside the scope.  This could've been
23     covered in his personal depo.
24          MS. SAAVEDRA:  Well, at the time, those
25     interrogatories didn't include him, so -- but that's
```

```
1        fine, counsel, we can take that up later.

2            If we can just take a break probably until

3        12:00.  I just to need to go over my notes and some

4        exhibits and see what we need to cover.

5        (A recess was taken from 11:40 a.m. until 12:01 p.m.)

6   BY MS. SAAVEDRA:

7        Q.   Mr. De Moya, you mentioned earlier that the

8   company has safety meetings every day at the job site.  Is

9   that correct?

10       A.   Weekly.  I don't know that they do them every

11  day.  They are required to do it weekly.

12       Q.   Are those meetings conducted in English or

13  Spanish?

14       A.   Both.

15       Q.   Who is the person in charge of conducting those

16  meetings?

17       A.   Supervisors.

18       Q.   And is there any paperwork that is related --

19  that has to be filled out related to those meetings?

20       A.   Yeah.  There will be a small log where everyone

21  signs in, and it will just mention like a bullet point of

22  the topics that they covered.

23       Q.   Is there a particular supervisor that is in

24  charge of conducting the meetings, or --

25            MR. CLYNE:  I'm going to object.  Because you
```

```
 1        are again outside the scope of the listed topics.  I

 2        went through them again trying to see if anything you

 3        listed had anything to do with safety meetings.

 4             MS. SAAVEDRA:  Okay.  So it's related to his

 5        termination of employment.  So I can go through it

 6        that way.

 7   BY MS. SAAVEDRA:

 8        Q.   Mr. De Moya, the reason for Mr. Monteagudo's

 9   termination, was it because of any violation of policy of

10   the company?

11        A.   Sleeping on the job is a violation of company

12   policy.

13        Q.   Of what policy?

14        A.   As a general practice.  You are sleeping when

15   you are supposed to be working, and sleeping on a job site

16   in itself is a safety hazard.

17        Q.   So is it fair to say that the alleged conduct of

18   Mr. Monteagudo that led to his termination is a violation

19   of a safety policy?

20        A.   Yes.  Sleeping on the job is a safety violation.

21             (Exhibit No. 7 was marked for identification.)

22   BY MS. SAAVEDRA:

23        Q.   Now I'm going to show you what I have marked as

24   Exhibit 7 of this deposition.  For the record, this is

25   Defendant's 172 to 215.  Do you recognize this document?
```

62

```
 1        A.    Looks like our safety policy.

 2        Q.    And is this Safety and Health Plan, is it

 3   provided to all employees at The De Moya Group?

 4        A.    Yes.

 5        Q.    Is it upon their request, or is it provided to

 6   them when --

 7        A.    I believe it's provided to them upon hire.

 8        Q.    And how often is the Safety and Health Plan

 9   revised by the company?

10        A.    I don't know the answer to that.

11        Q.    On the first page it says this that has been

12   revised on February 15, 2021.  Do you see that?

13        A.    Yes.

14        Q.    Do you know who revised this policy?

15        A.    We have our safety manager will go through it

16   and just update it to the standards, or if he sees

17   something is missing or --

18        Q.    And who is the safety manager?

19        A.    James Ankrum.

20        Q.    And I'm going to direct your attention to

21   Defendant's Bates 176.  In this section on the top of Page

22   176, it says that "all employees will be retrained

23   periodically on safety policies and procedures."  Is that

24   part of those weekly meetings that you were referring to

25   earlier?
```

```
1         A.    In addition to that, my safety manager also

2    conducts more detailed trainings, whether it be for

3    job-specific issues.

4         Q.    How often?

5         A.    There is not like a regimented time frame.  But

6    as he comes up with certain things that he wants to do, he

7    will get materials on it.  For example, I advised him that

8    like a CPR training we are going to be doing soon because

9    I saw a news program on it and thought it would be a good

10   idea.  Again, it's not a regimented every month, every two

11   months, every six months.  But as topics come up, we'll

12   try and train our guys on how to address certain topics.

13        Q.    And the last paragraph of that section says that

14   "individuals will be retrained after the occurrence of a

15   work-related injury caused by an unsafe act, and when a

16   foreman or management observes employees displaying unsafe

17   acts, practices, or behaviors."

18              Do you see that?

19        A.    Yes.

20        Q.    Do you know if that is in the policy of the

21   company retraining, if there is a violation or --

22        A.    It is.

23        Q.    Is this mandatory?  Or is that at the discretion

24   of the supervisors?

25        A.    That's discretional.  If there is -- again, it
```

1    says specifics.  If there is like a near miss of where

2    something really bad came close to happening, we

3    definitely will do a training session on it.  So it varies

4    on a case by case.

5        Q.   And I'm going to show you the Exhibit 5 of the

6    deposition that was previously entered, Defendant's 99 to

7    105, termination paperwork for Mr. Monteagudo.  In this

8    report it doesn't say that his conduct was a violation of

9    the safety rules, does it?

10       A.   It doesn't.

11       Q.   Do you know if there is a reason for that?

12       A.   Because he didn't put it on there because he's

13   got the other issues.  Perhaps Jerry didn't identify it as

14   being a safety issue, as I look at it as being a safety

15   issue.  But the other issues he does put are grounds for

16   termination as well.

17       Q.   Is that also at the discretion of the

18   supervisors?

19       A.   What's that?  What he puts on the form?

20       Q.   No.  What entitles grounds for immediate

21   termination versus a writeup or a suspension?

22       A.   That's a discretion.

23       Q.   Would you consider a violation of safety rules a

24   reason for immediate termination versus insubordination?

25       A.   Can you repeat that one more time?

 1        Q.   Sure.  Let me not -- let me strike that question

 2   and ask you a different one.

 3             Is there some training provided to the

 4   supervisors and managers as to how to determine the

 5   grounds for termination versus a disciplinary action

 6   issued?

 7        A.   No.

 8        Q.   Does a company have any procedures in place to

 9   ensure that those policies of disciplinary actions are

10   enforced vary throughout the company?

11        A.   Enforce and varied?  I'm sorry.

12        Q.   Vary.

13        A.   Is there a policy?  I don't think there's

14   anything else written, no.  It's at the discretion of the

15   supervisor, and that's it.

16        Q.   And there is no procedure in place to ensure that

17   they are being fair throughout the company?

18             MR. CLYNE:  Objection to form.

19   BY MS. SAAVEDRA:

20        Q.   You can answer.

21        A.   A written procedure?  No.

22        Q.   A regular practice?

23        A.   Yeah.  It's just practice.  Again, it's a case

24   by case basis.  We want to be fair to everyone, and part

25   of being fair is everyone's got to be putting in work, and

1  it's not fair for one person to be working lesser than the

2  others.

3      Q.   When the company receives a EEOC charge of

4  discrimination -- please forgive me.  You may have given me

5  this response already.  I just want to make that sure I

6  have that.  Have you conducted any investigations or

7  communications with anyone?

8          MR. CLYNE:  Did he personally or did the

9      company?

10 BY MS. SAAVEDRA:

11     Q.   Yes.  Did you personally?

12     A.   No.  I was not involved in that personally.

13     Q.   After Mr. Monteagudo was terminated, did you

14 receive any correspondence about his termination from

15 someone in the company?

16     A.   I believe we did get something from Elena.

17     Q.   Did you speak to anyone at that point?

18     A.   At that point?  No, I don't believe so.

19     Q.   Have you spoken to any employees who supervised

20 the Plaintiff regarding the Plaintiff's termination and the

21 reasons thereof?

22          MR. CLYNE:  Could you repeat the question?  I

23     couldn't hear you.

24 BY MS. SAAVEDRA:

25     Q.   Have you spoken, since the termination of

1   Mr. Monteagudo and -- have you spoken to anyone in the

2   company -- no.  Let me strike that question.

3           Have you spoken to Mr. Victor Suarez regarding

4   the allegations that led to Mr. Monteagudo's termination?

5       A.    Recently?

6       Q.    After he was terminated and -- any time after he

7   was terminated?

8       A.    I assume I did, but I don't remember any context

9   of any conversation that I had with him in regards to

10  that.

11          MS. SAAVEDRA:  Okay.  I have no further

12      questions.

13          MR. CLYNE:  I have a couple.

14                  CROSS-EXAMINATION

15  BY MR. CLYNE:

16      Q.    Mr. De Moya, are you a Cuban American?

17      A.    I am.

18      Q.    Is your company owned by Cuban Americans?

19      A.    It is.

20      Q.    Was it founded by Cuban Americans?

21      A.    It was.

22          MS. SAAVEDRA:  Counsel, this is outside of the

23      scope of the deposition.

24          MR. CLYNE:  That's all right.

25          MS. SAAVEDRA:  I will object to the form of the

```
 1        questions.
 2   BY MR. CLYNE:
 3        Q.    Is Noel Leon Cuban American?
 4        A.    Yes.
 5        Q.    Is Manny Comes Cuban American?
 6              MS. SAAVEDRA:   Objection.
 7        A.    Yes.
 8   BY MR. CLYNE:
 9        Q.    If Mr. Albuquerque had told you that he had been
10   discriminated against because he is Cuban American, would
11   you have recalled that?
12              MS. SAAVEDRA:   Form.
13        A.    I would have.
14   BY MR. CLYNE:
15        Q.    Did he ever say in your conversation when Susana
16   Gillardo was present that he had been subject to
17   discrimination?
18        A.    No.
19        Q.    Did he ever say that anyone used any racial slurs
20   against him?
21        A.    He did not.
22        Q.    Did he ever say that anyone berated him because
23   he is Cuban American?
24        A.    No.
25        Q.    Did he ever in any way, shape, or form mention
```

```
1    discrimination in that conversation?

2         A.   No, he did not.

3         Q.   Did you learn of the allegations of

4    discrimination for the first time when you received the

5    EEOC charge?

6         A.   Yes.

7         Q.   Did the EEOC have a finding in that case?

8         A.   Yes.

9         Q.   What was their finding?

10        A.   That we were not guilty of discrimination.

11        Q.   And this lawsuit was filed anyway?

12        A.   Yes, it was.

13        Q.   How do you feel about being accused of

14   discriminating, as a Cuban American, against a Cuban

15   American?

16             MS. SAAVEDRA:  Form.

17        A.   It's infuriating.

18   BY MR. CLYNE:

19        Q.   Is your workplace, your work force multicultural?

20             MS. SAAVEDRA:  Form.

21        A.   Absolutely.

22   BY  MR. CLYNE:

23        Q.   Could you describe like the types of people that

24   you hire?

25        A.   All types.  Haitian, Latin, black, white, male,
```

1    female.  It doesn't matter.

2        Q.   Do you hire a lot of Cuban Americans?

3        A.   Yes.

4             MR. CLYNE:  No further questions.

5                  REDIRECT EXAMINATION

6    BY MS. SAAVEDRA:

7        Q.   I just have one more question.  Mr. De Moya, what

8    does it mean to you when an employee -- what does it mean

9    to be complaining about discrimination?

10       A.   I'm sorry.  Rephrase that please.

11       Q.   What would you consider a complaint about

12   discrimination?

13       A.   Specifically that.  If there was a reason for

14   someone being treated a certain way because of their

15   nationality, sex, whatever else.

16       Q.   So would a complaint of discrimination -- if an

17   employee complains about being treated in an unfair way but

18   doesn't use the word "discrimination," would that be

19   considered a complaint of discrimination?

20            MR. CLYNE:  Objection.  Vague.

21   BY MS. SAAVEDRA:

22       Q.   Would you consider that a complaint of

23   discrimination?

24       A.   Because somebody feels they were being

25   treated --

```
1        Q.    Treated unfairly.

2        A.    Well, no.  It has nothing to do with their race.

3   I don't see why that would be discrimination.  And for the

4   record, he never said anything about unfair.  It was

5   "disrespectful," and people can be disrespected by all

6   different kinds of things.

7        Q.    Do you have a lot of employees complaining about

8   being treated disrespectful at De Moya?

9        A.    No.

10       Q.    Do you know what retaliation is?

11       A.    Do I know what retaliation is?  Sure.

12       Q.    What does it mean to you?

13       A.    Revenge.  Trying to get back at someone for

14   something they did to you.

15            MS. SAAVEDRA:  Okay.  I have no further

16       questions.

17                 FURTHER CROSS-EXAMINATION

18  BY MR. CLYNE:

19       Q.    How long has The De Moya Group been -- when was

20   it first born?

21       A.    In 1986.

22       Q.    Since 1986 until the complaint by Mr. Monteagudo,

23   had you ever received any complaints of discrimination?

24       A.    Not that I can ever remember.

25       Q.    How many hundreds of employees have you employed
```

```
 1    in that time frame?  Do you have any idea?

 2         A.   I mean I believe we employ just under 400 now.

 3    So in 30 something years, thousands.

 4              MR. CLYNE:  Thank you.  No further questions.

 5              FURTHER REDIRECT EXAMINATION

 6    BY MS. SAAVEDRA:

 7         Q.   Now I have to go through that as well.  Are you

 8    involved in every -- if there had been a complaint of

 9    discrimination against the company, is it possible that you

10    were not involved in it?

11         A.   Sure.

12              MS. SAAVEDRA:  Okay.  I have no further

13         questions.  Thank you for your time.

14              THE WITNESS:  Thank you.  Have a good day.

15              MR. CLYNE:  Do you want to read?

16              THE WITNESS:  Read what?

17              MR. CLYNE:  The depo -- yes.  We'll read.

18              MS. SAAVEDRA:  We are not going to order at this

19         time.

20              THE COURT REPORTER:  Nathaly, you are not going

21         to take a copy?

22              MS. SAAVEDRA:  Not right now.

23              MR. CLYNE:  Then we'll order the original.

24              MS. SAAVEDRA:  Thank you.

25              (Videoconference concluded at 12:21 p.m.)
```

73

1                    CERTIFICATE OF OATH

2

3        THE STATE OF FLORIDA

4        COUNTY OF BROWARD

5

6

7            I, the undersigned authority, certify that the

8    witness, CHRISTOPHER HOMER DE MOYA, appeared before me via

9    videoconference on the 13th of February, 2023.

10

11     Signed this 13th of February, 2023.

12

13

14

15        _____

16        JAMIE D. MACKRELL
          Notary Public - State of Florida
17        Commission No. HH173501
          Expires:  September 8, 2025

18

19

20

21

22

23

24

25

Daughters Reporting, Inc.
Fort Lauderdale, Florida  954-755-6401

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, Jamie D. Mackrell, Shorthand Reporter and

 4   Notary Public in and for the State of Florida at Large, do

 5   hereby certify that the foregoing transcript, Pages 1 to

 6   and including 72, is a true and correct transcription of

 7   my stenographic notes of the statement given by

 8   Christopher Homer De Moya via videoconference, on the 13th

 9   of February, 2023, commencing at 10:01 a.m.

10          I FURTHER CERTIFY that I am neither attorney nor

11   counsel for, nor related to or employed by, any of the

12   parties to the action in which this statement is taken;

13   and further that I am not a relative or employee of any

14   attorney or counsel employed by the parties hereto, or

15   financially interested in the action.

16                    Dated this 13th of February, 2023.

17          _____

18          JAMIE D. MACKRELL
            Notary Public - State of Florida
19          Commission No. HH173501
            Expires:  September 8, 2025
20

21

22

23

24

25
```