UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:22-cv-22343-KMM Moore/Louis


JORGE MONTEAGUDO ALBURQUERQUE,

     Plaintiff,

vs.

THE DE MOYA GROUP, INC.,
A Florida Profit Corporation,

     Defendant.

_____/


VIDEOCONFERENCE DEPOSITION OF
JEROME NASSO


Taken on Behalf of the Plaintiff



DATE TAKEN: February 14, 2023
TIME: 10 a.m. - 12:03 p.m.


Held remotely via videoconference



Examination of the witness taken before:

Ronni M. Kugler
Daughters Reporting, Inc.
101 Northeast Third Avenue
Suite 1500
Fort Lauderdale, Florida 33301

PLAINTIFF'S
EXHIBIT

**9**

2

```
 1    APPEARANCES VIA VIDEOCONFERENCE:

 2    Appearing for the Plaintiff:
         NATHALY SAAVEDRA, ESQUIRE
 3       PEREGONZA THE ATTORNEYS, PLLC
         5201 Blue Lagoon Drive, Suite 290
 4       Miami, Florida 33126
         786-650-0202
 5       nathaly@peregonza.com

 6    Appearing for the Defendant:
         REGINALD J. CLYNE, ESQUIRE
 7       QUINTAIROS, PRIETO, WOOD & BOYER, P.A.
         9300 South Dadeland Boulevard, 4th floor
 8       Miami, Florida 33156
         305-670-1101
 9       reginald.clyne@qpwblaw.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                           INDEX

2                                              PAGE

3    Direct Examination
       By Ms. Saavedra                         5
4

5    Certificate of Oath                       71

6    Certificate of Reporter                   72

7    Errata Sheet                             73

8    Read Letter                              74

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        E X H I B I T S

 2        EXHIBIT            DESCRIPTION            PAGE

 3           1     Defendant's Bates-stamped 99      33

 4           2     Defendant's Bates-stamped 101     40

 5           3     Defendant's Bates-stamped 104     61

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          Videoconference deposition taken before Ronni M.

 2    Kugler, Court Reporter and Notary Public, in and for

 3    the State of Florida at Large, in the above cause.

 4               --------------------------

 5          THE COURT REPORTER:  Will you raise your

 6       right hand.

 7          Do you swear or affirm the testimony you're

 8       about to give will be the truth, the whole truth,

 9       and nothing but the truth?

10          MR. NASSO:  I do.

11          THE COURT REPORTER:  Thank you.

12          Whenever you're ready.

13          MS. SAAVEDRA:  Thank you.

14    THEREUPON:

15                    JEROME NASSO,

16    having been duly sworn or affirmed, was examined and

17    testified as follows:

18                 DIRECT EXAMINATION

19    BY MS. SAAVEDRA:

20       Q.   Good morning.  May I have you please state

21    your full name for the record.

22       A.   Jerome F. Nasso.  N-A-S-S-O.

23       Q.   Thank you.

24          Mr. Nasso, my name is Nathaly Saavedra.  I

25    am one of the attorneys representing Mr. Monteagudo
```

```
1    Alburquerque in a lawsuit that he has brought against

2    the de Moya Group.  And I will be asking you some

3    questions today.

4              Have you ever had your deposition taken

5    before?

6         A.    No, I have not.

7         Q.    Okay.  Let me go over some ground rules for

8    today.  I will be asking you some questions.  If you

9    don't understand my question please let me know, and I

10   will be happy to rephrase it.  But if you do give me

11   an answer I'm going to assume that you understood my

12   question.  Is that fair?

13        A.    Okay.

14        Q.    At some point during the deposition we may

15   get a little conversational.  You may be able to

16   anticipate what my question is going to be.

17             As you can see there is a court reporter

18   here, so I will ask you to let me finish my question

19   before you give me an answer.  And I will try my very

20   best not to talk over you as well so the record is

21   clear and the court reporter can take everything down.

22   Okay?

23        A.    All right.

24        Q.    Please give me your answers out loud.

25   Although I may see you shaking your head or nodding
```

1   and understand what you mean I will try to prompt you

2   to give me a verbal response so that the record is

3   clear.

4        A.   Okay.

5        Q.   If you need a break please let me know.

6   I'll be happy to take one.  All I ask is that if

7   there's a pending question you give me an answer

8   before we go to the break.  Okay?

9        A.   All right.

10       Q.   And counsel may have an objection to my

11  question.  But unless you don't understand my question

12  or he instructs you not to answer I will ask you to

13  please give me a response.  Okay?

14       A.   All right.

15       Q.   Are you currently on any medication or other

16  substance that will prohibit you from giving true and

17  accurate testimony today?

18       A.   No, ma'am.

19       Q.   Are you currently on any medication or other

20  substance that will prohibit you from recalling events

21  from 2019, 2020?

22       A.   No, ma'am.

23       Q.   Okay.  Did you speak to anyone other than

24  your attorney to prepare for today's deposition?

25       A.   No, ma'am.  Just in an email exchange that I

```
 1    had to come to a deposition was the only conversation

 2    through an email.

 3         Q.   Okay.  An email with who?

 4         A.   Elena Valdes.  Informing me of the

 5    deposition.

 6         Q.   Did you review any documents for today's

 7    deposition?

 8         A.   I reviewed my write-up forms that I did.

 9         Q.   Anything else?

10         A.   No, ma'am.

11         Q.   Have you ever been a party to a lawsuit

12    before?

13         A.   No, ma'am.

14         Q.   Have you ever been arrested?

15         A.   Yes, I have.

16         Q.   When?

17         A.   1978.  I think I was 17 years old.  I did

18    some stupid stuff, yeah.

19         Q.   And have you ever been charged with a

20    felony?

21         A.   Yes, I was.

22         Q.   And when was that?

23         A.   Same time.

24         Q.   Okay.  And where was that?

25         A.   New York.
```

```
1        Q.    Where are you currently working?

2        A.    Excuse me?

3        Q.    Where are you currently employed?

4        A.    I'm currently employed for Asphalt Group.

5        Q.    How long have you been working for Asphalt

6   Group?

7        A.    It will be three years in May.

8        Q.    And before I continue, where are you

9   physically today?

10       A.    Where am I physically today?

11       Q.    Yes.

12       A.    I'm at my attorney's office on 9300 Dadeland

13  Boulevard in -- I'm assuming South Miami, I think.

14       Q.    Okay.  And who is in the room with you?

15       A.    That's my company's attorney.  And I'm

16  sorry, but we've been talking so much that I failed to

17  get his name.  Or he told me, but I don't remember,

18  so ...

19       Q.    Okay.  Other than your attorney is there

20  anyone else in the room?

21       A.    No, ma'am.

22       Q.    Do you have any documents in front of you?

23       A.    No, ma'am.  I have a Post-It that I'm

24  holding.

25       Q.    Okay.
```

```
 1              And what is the position that you currently
 2    have with Asphalt Group?
 3         A.   I'm a superintendent.
 4         Q.   How long have you held this position?
 5         A.   It will be three years in May.
 6         Q.   And what are your duties as a
 7    superintendent?
 8         A.   We plan and carry out the daily tasks that
 9    are associated with civil construction of highways and
10    bridges.
11              Right now we're currently employed on the
12    490 project, the Florida Turnpike.  Our project right
13    now is the 490, the HEFT, the Florida Turnpike project
14    where I supervise at the moment four gentlemen.  And
15    we plan and carry out the backfilling of roads and
16    highways, and lime rock, filling canals.  Just various
17    construction duties.
18         Q.   And have you been assigned to the 490
19    project since you --
20         A.   Yes.
21         Q.   -- started working there?
22         A.   Yes, I have.
23         Q.   And you say currently you have four
24    gentlemen under your supervision; is that correct?
25         A.   Yes.
```

1      Q.   And what are their names?

2      A.   Theodore Davis, Roberto Alcala, Donnell

3   Gonzalez, and Lusio Savae.

4      Q.   And in 2019 do you recall about how many

5   operators reported directly to you?

6      A.   In 2019?

7      Q.   Yes.

8      A.   I wasn't employed in 2019.

9      Q.   You started in 2020?

10     A.   At Asphalt Group, yes.  In 2020 I started.

11   Yes, May of 2020.

12     Q.   Okay.  So when you started in May of 2020 do

13   you recall how many operators you had under your

14   supervision?

15     A.   At that time I believe I had three.  Three

16   operators I believe.

17     Q.   Do you recall how many laborers you had

18   under your supervision?

19     A.   Two.  I believe.

20     Q.   And who do you currently report to?

21     A.   Victor Suarez.

22     Q.   Have you reported to Victor Suarez since you

23   started working with them?

24     A.   Yes, ma'am.

25     Q.   Where did you work before Asphalt Group?

```
1        A.    Odebrecht Construction.

2        Q.    What was your position there?

3        A.    I was the survey manager.

4        Q.    And how long did you work at Odebrecht

5   Construction?

6        A.    10 years.  A little over 10 years.

7        Q.    Who was your direct supervisor there?

8        A.    Gustavo Silveira.

9        Q.    What was the reason for your separation of

10  employment with them?

11       A.    The company closed.

12       Q.    So do you recall what were the names of the

13  operators that reported to you in 2020?

14       A.    Yohan Garcia, and I believe Carlos Ruiz,

15  R-U-I-Z.  And I believe I still had Teddy at that

16  time.  Theodore Davis.

17       Q.    Do you recall what laborers were working

18  under your supervision in 2020?

19       A.    I can't recall their names, no, ma'am.  I

20  know one was Ty, but I can't remember his last name.

21  And I don't remember -- I can't be sure if I had one

22  or two.  I really don't remember.

23       Q.    Okay.  That's fair.

24             And do you recall if you had any foremen

25  that reported to you?
```

1       A.    No, ma'am.

2       Q.    What is your current phone number?

3       A.    772-241-4264.

4       Q.    How long have you had this phone number?

5       A.    10, 11 years.  12 years, I guess.

6       Q.    All right.  And who's your service provider?

7       A.    Verizon.

8       Q.    Has it been Verizon for the last 10, 11

9  years too?

10      A.    Yes, ma'am.

11      Q.    Is this the phone number that you use

12  connected to your work at Asphalt Group?

13      A.    At the moment I do, yes, ma'am.

14      Q.    What about in 2020, did you use this phone

15  number for your work --

16      A.    No, ma'am.  No, ma'am.

17      Q.    What was the number that you used at that

18  point?

19      A.    I'd have to look it up.  I don't know.  It's

20  a company work phone.

21      Q.    When did you start using the 772 number?

22      A.    Approximately two months ago.

23      Q.    Does the number 863-301-3677 sound familiar

24  to you?

25      A.    I believe that's my home phone number.

1       Q.    And what about 305-992-5256?

2       A.    That will be my work number.

3       Q.    Did you use that number for the time that

4  you were working with Asphalt Group before the 772

5  number?

6       A.    Yes, ma'am.  That would be from the date I

7  started until just recently, until about two months

8  ago.

9       Q.    And who was your service provider for that

10 phone number?

11      A.    I'm not sure who the service provider was.

12 I believe it was Sprint, but I'm not sure.

13      Q.    Do you know whether Asphalt Group has a

14 policy regarding discrimination in the workplace?

15      A.    Yes, they do.

16      Q.    What is your understanding of that policy?

17      A.    That discrimination is absolutely not

18 tolerated.

19      Q.    When you started working at Asphalt Group

20 did you receive any training as to this policy?

21      A.    I don't think it was when I first started,

22 but very, very soon after.  Within the first month I

23 believe as supervisors we went through some kind of a

24 discrimination training.  I can't remember exactly

25 when, but yes, we have received training on

```
 1    discrimination.

 2         Q.    Do you recall if -- how many times you've

 3    been trained on this policy?

 4         A.    I don't know.

 5         Q.    Was it that just one time?

 6         A.    I would think it would be at least twice.

 7    It was definitely more than once, but I don't think

 8    more than three.  So at least twice in the last three

 9    years.

10         Q.    Okay.  Do you recall more or less when was

11    the last training that you received?

12         A.    Four months ago maybe.  Five months ago.

13         Q.    And the last training that you received four

14    or five months ago, who was the person that gave the

15    training?

16         A.    I believe that was Elena Valdes.

17         Q.    On the first training that you received do

18    you recall who was the person that gave that training?

19         A.    I don't remember.  I don't remember.

20         Q.    Do you recall where it was held?

21         A.    It would have been at the Asphalt Group, our

22    main office on Okeechobee Road.

23         Q.    Do you recall how long the training was?

24         A.    Approximately an hour.

25         Q.    And do you recall what was discussed during
```

1    that training?

2         A.   Discrimination, sexual harassment.  Things

3    of that nature.  I can't remember specifically, but

4    those were the two main topics that I can remember.

5         Q.   What about discrimination or sexual

6    harassment?

7         A.   What --

8         Q.   Like what was the training about exactly?

9         A.   Well, it's talking how you should treat your

10   employees, and how sexual harassment is not something

11   that we do or we condone.  And we do not condone

12   discrimination either.

13        Q.   Have you ever handled a complaint of

14   discrimination during your time at Asphalt Group?

15        A.   No, ma'am.

16        Q.   During your training were you -- did you

17   receive any training as to how a complaint of

18   discrimination should be handled, if you ever received

19   one?

20        A.   I don't remember any specific training as to

21   how to handle a discrimination case.

22        Q.   At your prior job were you ever involved in

23   any complaints of discrimination?

24        A.   No, ma'am.

25        Q.   Did you ever receive any type of complaints

1    against you for discrimination at your prior job?

2        A.   No, ma'am.  Not that I'm aware of.

3        Q.   Do you know how a complaint of

4    discrimination is processed at Asphalt Group?

5        A.   No, I don't know the specifics.  I imagine

6    it would go through human resources, but I don't know

7    the specifics.

8        Q.   What happens if an employee mentions to you

9    that they're being treated unfairly?

10       A.   I would -- is it my employee or is it

11   somebody else's employee?  Is he under my control?  Is

12   he under my supervision, or is he somebody else's?

13       Q.   Is there a difference as to how you would

14   handle it?

15       A.   I would want to go to his supervisor first.

16       Q.   Okay.  And if it was somebody that was

17   directly under your supervision?

18       A.   Then I would go ahead and handle the case.

19   I would take it up to Victor Suarez, my immediate

20   supervisor.

21       Q.   Are you required to fill out any paperwork?

22       A.   I've never had to do it, so I don't know.

23   I've never been involved in a discrimination case

24   where I had to do that, so I would say I don't know.

25       Q.   Okay.

18

```
 1            Are you aware whether there are any policies
 2   regarding disciplinary action and use of progressive
 3   discipline at Asphalt Group?
 4        A.   Can you repeat that?  I didn't understand
 5   the question.
 6        Q.   Sure.
 7            Are you aware whether Asphalt Group has a
 8   policy as to how employees are disciplined?
 9        A.   Disciplined regarding?
10        Q.   In their performance at work.  If you know.
11        A.   So I really don't understand you -- I
12   imagine if a disciplinary action -- if they do
13   something wrong, is that what you're asking?
14        Q.   Well, let me see if I can rephrase that.
15            Do you know whether there are -- there's a
16   procedure in place as to how an employee is
17   disciplined if they do something improper, violate
18   some policy at work?
19        A.   Yeah.  Yes.  If they do something wrong,
20   depending on the severity of it -- normally if it's
21   not an extreme case of neglect or something like that,
22   there is a process of a verbal warning that they're
23   given for the infraction, per se.
24            If they don't wear their safety glasses, and
25   you've told them a couple of times, and they continue
```

1    not to wear their safety glasses, "Okay, this is it,

2    we're going to give you a verbal, a verbal warning."

3    And you write it up as a verbal warning.

4         And then if they continue to keep doing that

5    and not wearing their glasses, you can remind them a

6    few more times if you'd like to.  And then, "You know,

7    I catch you one more time I'm going to have to give

8    you a written warning now."  And you write up a

9    written warning.

10        And then if they continue to keep on making

11   that same infraction you would go ahead and write up

12   the third warning, which would be a three-day

13   suspension possibly.  Or it could be worse, depending

14   on what the infraction was.

15        Q.   Have you ever issued discipline as to an

16   individual that is not under your direct supervision?

17        A.   Yes, I have.

18        Q.   And is the process the same as the one that

19   you just described?

20        A.   It would depend on what the infraction was.

21        Q.   What do you mean?

22        A.   Well, like I said a moment ago, depending on

23   the severity of the infraction -- I used safety

24   glasses as an example of an infraction to where you

25   would give a verbal warning.

```
 1              But if somebody was doing something that was

 2   extremely dangerous after they were told, that would

 3   be something that could be cause for immediate

 4   termination.  Depending if they put others in

 5   safety -- or improper use of equipment if they were

 6   using -- let's just say if they were using a roller

 7   improperly, and they were told in the morning "Do not

 8   put that roller anywhere near the highway because you

 9   may lose control of it and cause an accident."

10              There's different severities of different

11   violations that would require a different form of

12   discipline.

13         Q.   Understood.

14              Is there a difference, though, if that

15   employee is somebody that's under your direct

16   supervision versus somebody that is not?

17         A.   No, it would not.  If I believe that

18   somebody is committing a safety violation, I have the

19   obligation for the safety of everybody to go ahead and

20   take immediate action in that situation.

21              It's not just the person who is committing

22   the infraction.  I've got the other employees, too,

23   that I have to think about.

24         Q.   Okay.

25              Have you received any training as to how to
```

1   handle, you know -- or how to issue disciplinary

2   actions by the company?

3        A.   I don't recall.  I know it's been spoken

4   about, what I just mentioned to you earlier, a few

5   moments ago, you know, as far as we give a verbal, a

6   written, and then a third -- the third written, which

7   would be a suspension, so... but as far as a training

8   I don't think there's been any kind of formal

9   training.  But it's definitely been discussed, as far

10  as the procedure.

11       Q.   Discussed by who?

12       A.   Me, Victor, Elena, the superintendents, the

13  safety manager.

14       Q.   Do you recall when was the last time it was

15  spoken about between those individuals?

16       A.   No, I don't.  I wouldn't say it was all at

17  one time with everybody in the room.  It's just over

18  the course of three years.

19            I don't remember specifically sitting in a

20  room being told this is what A, B, C.

21       Q.   Understood.

22            So you mentioned that the first time there's

23  an infraction -- I mean, understood that it's

24  depending on the severity, but that when you do a

25  verbal you do it in writing, correct?

22

```
1        A.    Yes.  You'll write it up as a verbal.

2        Q.    Is there a specific form that you use?

3        A.    Yes, ma'am.

4        Q.    And then what do you do after you have

5   prepared the write-up?

6        A.    You'll speak with the employee.  You'll tell

7   him why he's being written up.  And you ask him to

8   sign it.  He can choose to sign it or not sign it.

9   And then it gets filed with human resources.

10        Q.    How do you get it to human resources?

11        A.    I would bring it there.  I would deliver it

12   to the office.

13        Q.    Do you inform anyone else about this

14   disciplinary action that you have issued?

15        A.    Do I inform anybody else?

16        Q.    Yes.

17        A.    No.  Not -- no.

18        Q.    Do you have to -- what about Victor Suarez?

19   You don't let him know whether you have --

20        A.    Yes.  Yes.  So when that -- yes, I

21   apologize.  In that particular case -- I wouldn't say

22   always, but yeah, most of the time, yeah -- yeah.

23             I'm not going to bother Victor with every

24   little thing, but yes, Victor will be informed as to

25   if somebody was written up.
```

```
 1        Q.    Are there other supervisors in the project

 2   that you work at?

 3        A.    Yes, ma'am.

 4        Q.    And who are those?

 5        A.    Allan Neuzil, Manny Comes, Luis Llanos.   I

 6   believe his name is L-L-A-N-O-S.   And Juan Carlos

 7   Cruz.   JC Cruz.

 8        Q.    Okay.

 9        A.    Manny Lima.

10              There's probably 10 superintendents.

11        Q.    Back in 2020 when you started were there 10

12   superintendents as well?

13        A.    I don't believe JC was there at the time.

14   But yeah, the project is -- it's a pretty big project,

15   and there's definitely been eight to 10

16   superintendents there since I've been there.

17        Q.    And if you have to issue discipline to an

18   employee that is under the supervision of a different

19   superintendent do you inform them of the issues and

20   the discipline?

21        A.    Yes, you would.

22        Q.    At what point would you do that?

23        A.    If not right before, during, or right after.

24   I would say pretty much immediately.   Or, you know, it

25   depends if they're available.
```

```
 1              You know, as soon as possible I guess would
 2    be the better answer.
 3         Q.   And if it's not an employee that is under
 4    your direct supervision how do you confirm whether the
 5    disciplinary action that you're issuing -- like
 6    whether it's the first time, the second time that this
 7    infraction has been committed by this employee?
 8         A.   That would be up to I imagine human
 9    resources, or that person's supervisor.  But I imagine
10    it would be human resources.
11              And then if the superintendent -- he would
12    probably know how many times, you know, he wrote
13    somebody up, so I don't...
14         Q.   Has this process and policy as you're
15    describing it, has it changed from 2020 until now?
16         A.   No, ma'am, I don't believe so.
17         Q.   Is there a difference in how you issue
18    discipline to an employee that is working under
19    Asphalt Group versus an employee that is an employee
20    of the de Moya Group?
21         A.   There should be no difference.  There would
22    be no difference.
23         Q.   In 2020 did you ever have a crew or an
24    individual transfer from another project to your
25    project or under your supervision?
```

1       A.   No, ma'am.

2       Q.   Have you ever had an individual from your

3  project under your supervision transfer out to another

4  project?

5       A.   No, ma'am.

6       Q.   Do you know if there's a procedure that has

7  to be followed if an employee or somebody in a crew

8  wants to change to a different project?

9       A.   I don't know if there's a procedure for that

10  or not.

11       Q.   As a superintendent do you hold safety

12  production meetings at the job site?

13       A.   Yes, ma'am.

14       Q.   Okay.  What is your involvement in those

15  safety production meetings?

16       A.   Involvement, as far as?

17       Q.   Are you just in attendance?  Do you --

18  actually are the one explaining things to the

19  employees?

20       A.   Yes.  In the morning we have -- there's --

21  at the moment there's three of us, and all of our

22  employees get together every morning.  And there is a

23  safety sign-in sheet.  There's a job hazard analysis,

24  which we call a JHA.  And on that sheet will be the

25  daily tasks that's going to be performed.  All the

 1   dangers that are associated with those tasks.  What to

 2   do to mitigate those dangers.  Instructions on how to

 3   carry out their tasks.  What kind of PPE they may need

 4   for those tasks.

 5          And then once a week on a Monday we'll have

 6   a specific topic, as in maybe electrical cords, how to

 7   identify, you know, bad electrical cords.  One day

 8   might be excavation hazards.  One Monday might be

 9   ladder safety.  Another Monday would be a silica

10   training.  Things of that nature.

11        Q.   And who's the person that keeps track of the

12   individuals in attendance who -- the morning meetings

13   that occur every day?

14        A.   Everybody signs the daily sign-in sheet on

15   that JHA.  They're required to sign that JHA.

16        Q.   And do you know what happens to that sign-in

17   sheet after the meeting's over?

18        A.   I'm sorry?  Say it again.

19        Q.   Who's in charge of like collecting that

20   sign-in sheet at the end of the meeting, if you know?

21        A.   The superintendent who filled it out.

22        Q.   And who determines the topics that are going

23   to be discussed during those morning meetings?

24        A.   The topic is a daily -- it's -- nobody

25   decides.  The topics that get talked about on a daily

1   basis pertain to the actual work that's going to

2   happen.

3           And then the weekly safety topic, that's

4   going to be at the superintendent's discretion, of

5   what he feels fits the tasks that we're doing at that

6   time.  You know, we might be doing a lot of

7   excavation, you know, for a long period of time.  So

8   there's really no -- you know, and you're not going to

9   use power tools, let's just say.  It's all going to be

10   shovels and equipment.  Everything would be geared

11   towards, you know, excavation.

12      Q.   Is there a meeting between the

13   superintendents prior to just daily meetings or during

14   the week to discuss anything in particular as to what

15   the issues are?

16      A.   There's not a formal meeting.  If any of us

17   notice different hazards, we talk amongst ourselves

18   and communicate.  You know, "Hey, I'm going to be

19   doing this over in this area today.  Make sure you

20   guys know about this.  We've got cones set up.

21   There's going to be a flagger there, a spotter there,

22   keep your guys out of the area."

23           So there's nothing that's formal.  It's just

24   a given that we keep everybody informed.

25      Q.   And how is it -- or who's the person in

1   charge of making the determination as to what

2   employees are going to be working under each

3   supervisor?

4       A.   I guess it depends.  For the most part you

5   have your core guys.  So in this particular -- at this

6   particular moment there's three superintendents who

7   are working within the same two mile area.  And we all

8   have a meeting at one place.  And all three of the

9   crews come together.

10          All three of the crews will be given their

11  different things to do by their superintendent.

12  Sometimes one of those crews may need an additional

13  laborer or an additional operator.  And if one of the

14  other superintendents can do without that operator or

15  laborer for that day they will go to work with a

16  different superintendent.

17          So it depends on the tasks that are going on

18  across the job, you know, what happens on a daily

19  basis for the -- I'm going to say 90 percent of the

20  time everybody stays within their groups.  And, you

21  know, on occasions we do have to, you know, loan out a

22  laborer or an operator.

23      Q.   Do you recall if the meetings -- back in

24  2020 was it the same procedure that you just

25  described, where all the three crews come together?

```
1        A.    Yes, it was the same back then.  Yes, ma'am.

2        Q.    And when you say that all the crews come

3   together it's for the morning meetings, correct?

4        A.    Yes, ma'am.

5        Q.    Do you know who Carlos Cardona is?

6        A.    Yes, I do.

7        Q.    Who is he?

8        A.    He's an employee at Asphalt Group.  He is

9   our -- he's in charge of the trucking.

10       Q.    Do you know what his title is?

11       A.    I don't know his exact title, no, ma'am.

12       Q.    And do you know who reports to him?

13       A.    Do I know who reports to him, or --

14       Q.    Yes.

15       A.    I believe he has gentlemen, laborers that

16  work for him that sign tickets.  I believe I know a

17  couple of them.  I don't know all the employees that

18  report to him.

19       Q.    Do you know who he reports to?

20       A.    Victor Suarez I would -- I believe is his

21  immediate boss.

22       Q.    Did you ever have any conversations with

23  Mr. Cardona regarding Mr. Monteagudo?

24       A.    Yes.  The conversation that I had with

25  Carlos is that I needed him to translate some things
```

1    for me.

2        Q.   When was that?

3        A.   When was that?

4        Q.   Yes.

5        A.   Approximately two years ago.  I forget the

6    exact date of the incident.

7        Q.   Tell me what happened that led you to that

8    point where you had to ask him to translate for you.

9    What was the incident?

10       A.   What was the incident?

11       Q.   Yes.

12       A.   I caught a gentleman sleeping on a roller.

13   And he didn't -- I don't speak Spanish, and he didn't

14   understand English well enough in my opinion that I

15   wanted to get a translator to make sure he understood.

16       Q.   Okay.

17            So other than that conversation did you ever

18   speak to Mr. Cardona regarding Mr. Monteagudo?

19       A.   Did I ever speak to him about

20   Mr. Monteagudo?

21       Q.   Yes.

22       A.   I told him that I was writing him up, and I

23   needed him to translate for me.

24       Q.   Okay.  Other than that conversation did you

25   guys ever have any other conversations about

```
1    Mr. Monteagudo?

2         A.    No.

3         Q.    When did you first meet Mr. Monteagudo?

4         A.    I don't remember exactly when I first met

5    him.  Years ago.  Maybe five years ago.  20 -- I

6    believe 2019, 2018.  I met him on a different job.  He

7    worked for a different crew on a project that I was

8    on.  I don't remember exactly the date, though, or the

9    year, to be honest.

10        Q.    Did you have any issues with Mr. Monteagudo

11   at that prior job?

12        A.    No, I did not.

13        Q.    Did you ever have any interactions with him

14   at that prior job?

15        A.    No, I did not.

16        Q.    Did you ever have any interactions with him

17   while working at Asphalt Group?

18        A.    "Interactions" is -- I don't know -- I don't

19   believe so.  I don't know -- what do you mean by

20   "interactions"?

21        Q.    Did you ever supervise his work directly?

22        A.    On occasion I believe I have, but I can't

23   remember.  It's -- like I say, with safety,

24   everybody -- we're all kind of acting as one I guess.

25   So Jorge, from time to time he may have been on my
```

1    crew before.  I don't remember exactly.  Other than

2    the incident that we're talking about.

3         Q.   Okay.  And you say he might have been on

4    your crew before.  Do you recall if you ever had any

5    issues regarding his performance if he ever was on

6    your crew before?

7         A.   I don't remember any issues.

8         Q.   Do you recall if there were any difficulties

9    in your working relationship with him other than the

10   incident that you're referring to?

11        A.   I do not.

12        Q.   Do you recall what his position was back in

13   2020?

14        A.   He's a laborer, or was a laborer.

15        Q.   Do you recall who was his direct supervisor?

16        A.   I believe that was Manny, or Manuel Comes.

17        Q.   Do you recall ever having any conversations

18   with Mr. Comes about Mr. Monteagudo's performance?

19        A.   No, ma'am.

20        Q.   Do you recall ever reviewing any documents

21   regarding Mr. Monteagudo's performance?

22        A.   No, ma'am.

23        Q.   Other than the incident that you're

24   referring to did you ever conduct any informal verbal

25   warnings or coachings to Mr. Monteagudo?

```
 1        A.    No, ma'am.

 2        Q.    Did you ever receive any complaints about

 3   Mr. Monteagudo?

 4        A.    No, ma'am.

 5        Q.    Other than the incident that you're

 6   referring to was -- do you know whether Mr. Monteagudo

 7   was ever advised of any employment deficiencies during

 8   his employment with the de Moya Group?

 9        A.    I didn't know of any, no.

10        Q.    I'm going to show you what I'll have marked

11   as Exhibit 1 to this deposition.  For the record this

12   is Defendant's Bates 99.

13             Mr. Nasso, have you seen this document

14   before?

15        A.    Yes, I have.

16        Q.    Okay.  Can you tell us what it is?

17        A.    It's a Termination of Employment document.

18             (Plaintiff's Exhibit 1 will be marked for

19        identification.)

20   BY MS. SAAVEDRA:

21        Q.    Is that your handwriting?

22        A.    Yes, it is.

23        Q.    And is this your signature?

24        A.    Yes, it is.

25        Q.    And was this document -- do you recall if
```

1    you prepared it the same day of the termination?

2         A.   It was done the same day as the termination,

3    yes.

4         Q.   Okay.  Can you tell us what happened that

5    day that led you to issuing this termination?

6         A.   I went to go check on an area that was being

7    constructed, and the roller should have been with the

8    grader.  And when I went there he wasn't there.  I

9    asked the grader operator "Where is the roller?  It

10   should have been here with you."

11        Jorge had some previous tasks that were --

12   where he had to roll on what was -- you can call

13   Ramp J.  It should have taken him a couple of hours to

14   do that.

15        And when he was done he was to go up and

16   work with the grader.  And when I got to the grader he

17   wasn't there.  And I was informed he's still down on

18   Ramp J.  And when I went down to Ramp J I saw the

19   roller parked.  And I pulled up to the roller.  And I

20   found Jorge sleeping on the roller.

21        Q.   And did this happen on the same day that you

22   issued the termination?

23        A.   No, it did not.  It happened the day before.

24        Q.   Okay.  So you said that you spoke to the

25   grader operator; is that correct?

```
 1       A.   Yes.

 2       Q.   Okay.  Who was that?

 3       A.   Miguel is his first name.  I believe -- I

 4  can't remember how to pronounce his last name.  I

 5  believe it starts with a Q.  Quiroz or Quiroz.  Or

 6  something like that.

 7       Q.   Miguel Quiroz?

 8       A.   I believe so, yeah.

 9       Q.   And does Miguel Quiroz speak English?

10       A.   Yes, he does.

11       Q.   Do you recall if at this time Mr. Monteagudo

12  was under your direct supervision?

13       A.   I believe at that time he was, yes.

14       Q.   Do you know for how long?

15       A.   Excuse me?

16       Q.   Do you know for how long he had been working

17  under your supervision at that time?

18       A.   I believe it was that day.  Maybe two days.

19  Those two days.

20            I forget if Manny -- I don't remember

21  exactly.  It might have been one of those situations

22  where we needed -- where somebody was needed to be

23  moved to a different area, to help out in a different

24  area.

25       Q.   Okay.  So you mentioned that Mr. Monteagudo
```

```
 1    had been given a previous task of rolling Ramp J; is

 2    that correct?

 3         A.   Yes, ma'am.

 4         Q.   Did you assign him that task?

 5         A.   Yes, ma'am.

 6         Q.   When did you assign him that task?

 7         A.   In the morning.  After the morning meeting.

 8    6:15, 6:30 a.m. when we have our meeting.

 9         Q.   Okay.  On which day?  The day before you

10    issued the termination?

11         A.   Yes.  So the termination was -- I terminated

12    him the following morning, which was the 7th.  So it

13    would have been on the 6th.

14         Q.   Okay.

15         A.   I'm not sure what day it was.

16         Q.   And approximately how long did you

17    approximate that he was supposed to be done with the

18    task of rolling that ramp?

19         A.   I would have imagined maybe a couple of

20    hours.  He was supposed to, you know, stay with the

21    grader.  It wasn't anything that -- we weren't strict

22    as far as, you know, time frame to, you know, get

23    something done.  It wasn't anything where I said, "You

24    need to get this done in an hour, and then get up

25    there, and go to Miguel."
```

```
 1              So I didn't give him a time frame to get it
 2   done.  Whatever it took.  If it was two hours or three
 3   hours or four hours.
 4        Q.   Okay.  Was he assigned this task to be done
 5   by himself?
 6        A.   Yes.  It's a one-man operation.
 7        Q.   And do you recall around what time was it
 8   that you went to speak to the grader operator,
 9   Mr. Quiroz?
10        A.   Maybe 10:30 or 11:00, or something like
11   that.  I believe I wrote the time down.  I thought I
12   did anyway.
13              11:30 is when I went -- so I imagine around
14   11:15 is when I spoke to Miguel.  And then --
15        Q.   Are you reading a document right now?
16        A.   Yeah, I'm reading a document that you have
17   in front.  The termination.  I'm reading my write-up
18   on Jorge that --
19        Q.   Okay.
20        A.   -- that termination.
21        Q.   Do you see a time on this document?
22        A.   Not on that page I don't, no.
23        Q.   Okay.  So you're looking at a different
24   document.
25        A.   Well, it's all one, I believe.  It's --
```

1   there's -- okay, I take that back.  There's a

2   disciplinary report and a termination.  So there's two

3   different documents.  They were stapled together.

4       Q.   Mr. Nasso, if you can just put those

5   documents away for now.  And if you need me to make

6   this bigger so it's easier for you to read I'll be

7   happy to do that.

8            MR. CLYNE:  We're going to keep the

9            documents in front of him.  It's what he used to

10           terminate him with.  And it should be part of

11           Exhibit 1.

12           MS. SAAVEDRA:  Counsel, I will present him

13           the exhibits.  I'm asking you to please --

14           there's two different documents, so I will go

15           through them at my pace, please.

16           MR. CLYNE:  That's fine.  But we're going to

17           keep the document there.

18           I'm not going to -- you're showing him part

19           of the document, not the full document.  We're

20           not going to play a guessing game here.

21   BY MS. SAAVEDRA:

22       Q.   Mr. Nasso, at any point during this

23   deposition if you don't recall something please let me

24   know.  And if there's any documents that I can present

25   to you to assist you I'll be happy to do that.

```
 1                Your testimony is not a test to your memory.
 2      It's simply what you remember.  Okay?  So --
 3           A.   Okay.
 4           Q.   Okay.  So as to this termination, at this
 5      point when you issued this termination do you recall
 6      if you had any conversations with anyone about
 7      Mr. Monteagudo's performance or issues?
 8           A.   No, I did not.
 9           Q.   And were you aware whether Mr. Monteagudo
10      had been previously disciplined prior to you issuing
11      this termination?
12           A.   I wasn't aware if he was or wasn't.
13           Q.   In fact, in the termination that's on the
14      screen right now it says "Corrective Measures
15      Previously Taken," and it says "None."  Is that
16      correct?
17           A.   That's correct.
18           Q.   When you issued -- when you found
19      Mr. Monteagudo allegedly sleeping was there any
20      accidents or any damage to any equipment?
21           A.   Not that I noticed, no.
22           Q.   And I'm going to show you what I'll have
23      marked as Exhibit 2 of this deposition.  Give me one
24      second.
25                For the record this is Defendant's 100 and
```

1    101.  Mr. Nasso, do you recognize this document?

2        A.   Yes, ma'am.

3             (Plaintiff's Exhibit 2 will be marked for

4        identification.)

5    BY MS. SAAVEDRA:

6        Q.   Okay.  Is this the same document you were

7    looking at a few minutes ago?

8        A.   Yes, it is.

9        Q.   When did you prepare this document?

10       A.   Excuse me?

11       Q.   When did you prepare this document?

12       A.   I forget -- it was the morning of the 7th, I

13   believe.  The following morning.

14       Q.   Okay.  And the document says the incident

15   happened on October 6th, correct?

16       A.   Correct.

17       Q.   And is this your handwriting?

18       A.   Yes, it is.

19       Q.   That is your signature, correct?

20       A.   Yes, it is.

21       Q.   Okay.  So when you issued this document did

22   you -- you issued it the same day that it happened?

23   I'm sorry.

24            MR. CLYNE:  Objection; asked and answered.

25   BY MS. SAAVEDRA:

```
 1        Q.    Or you issued it on the day after?

 2              MR. CLYNE:   Do you understand the question?

 3        A.    Can you --

 4              MR. CLYNE:   Could you repeat your question.

 5    I don't think he understood.

 6  BY MS. SAAVEDRA:

 7        Q.    Do you recall -- and I may have asked you

 8    this before.   I just don't recall your answer.

 9              When you prepared this incident report, or

10    disciplinary report did you prepare it the same day

11    that the incident happened?

12        A.    Yes.   It was both the day of and then the

13    following morning.

14        Q.    Okay.

15        A.    I wasn't able to -- because I have other

16    duties during the day I couldn't complete it on the

17    same day, and I finished it immediately the next

18    morning.   So it was the two days.   The day it happened

19    and then the following morning.

20        Q.    Okay.

21              Why did you make a determination that

22    Mr. Monteagudo should be terminated?

23        A.    Because he was sleeping on a roller.   And as

24    it says in the document there it's "Improper Conduct,"

25    "Failure to follow instructions."
```

1           He was always told when he was done with his

2     task to find supervisors.  And it's substandard what

3     he was doing.  It's inexcusable.  Like I said in my

4     report there, it's inexcusable.  He should have come

5     and found somebody.

6          Q.   You said that he had been told to find a

7     supervisor, and that's why you put "Failure to follow

8     instructions."  Correct?

9          A.   All of the -- all of our employees are told

10    if you're not sure what you need to do or you're

11    unclear of your task, or if you finish something and

12    you need something to do you're to find a supervisor.

13         Q.   Okay.

14         A.   We don't have time -- we can't just sit by

15    one guy and just watch one guy all day.  We've got

16    daily tasks where we're always driving around the

17    project.

18         Q.   Did you find yourself watching

19    Mr. Monteagudo --

20         A.   No, ma'am.

21         Q.   -- all the time?

22         A.   No, ma'am.

23         Q.   In fact, you testified earlier that you

24    never had any issues with his performance that you

25    could recall, correct?

1        A.    No, I didn't.

2        Q.    Okay.  Was there anything about the

3    circumstances that occurred that made you think that

4    the violation was so severe that it needed to be a

5    termination instead of anything else?

6        A.    No.  In my opinion sleeping on a roller is

7    inexcusable.  And it's a safety hazard.

8        Q.    In what way is it a safety hazard?

9        A.    Well, if the gentleman is too tired to stay

10   awake at work he can put himself at risk and other

11   people if he's operating heavy machinery.

12       Q.    So if it's a safety hazard why didn't you

13   put that there was some type of violation of the

14   safety rules?

15       A.    I didn't have the safety rules in front of

16   me that day.  Is it a direct violation?  I don't know.

17   At the moment it didn't matter to me.  But it was a

18   hazard without a doubt, sleeping on a piece of heavy

19   equipment.

20           So without a doubt it's a safety hazard, at

21   the least.  But for me "Substandard work," "Improper

22   Conduct," "Failure to follow instructions" so...

23       Q.    How close were you to Mr. Monteagudo when

24   you allegedly saw him sleeping?

25       A.    I pulled my truck up in front of the roller.

44

```
 1    I would have to estimate the front of my truck stopped

 2    5 feet from the roller.

 3              And I could see him through my windshield.

 4    I got out, and I slammed my door.  He didn't move.  I

 5    walked up to the roller.  I got within 3 feet of

 6    Mr. Monteagudo.  He didn't move.

 7              When I yelled "Hey," he lifted his head up,

 8    and he woke up.  It was pretty apparent that he was

 9    sleeping.

10         Q.   So his head was down when you approached

11    him?

12         A.   Yes, ma'am.

13         Q.   Did he have glasses on?

14         A.   No, he did not.

15         Q.   Do you wear contacts or glasses?

16         A.   Do I wear contacts?

17         Q.   Or glasses.

18         A.   No.  I wear reading glasses to read.

19         Q.   Was the job completed by the time you --

20    when you went and you found Mr. Monteagudo?

21         A.   Yes, it was done.

22         Q.   Was there anyone else around the area when

23    this happened?

24         A.   Not that I recall.  Not that I remember.

25    There could have been, but I don't remember.
```

45

```
 1              I know we had some work going on on a fence
 2     just to the west of Jorge.  There might have been some
 3     fence guys there.  I don't remember.
 4          Q.   And so after you approached Mr. Monteagudo
 5     and you saw him sleeping what happened after that?
 6     After you screamed "Hey," what happened after?
 7          A.   He woke up.  I asked him, you know, "What
 8     are you doing?"  And he -- I don't remember exactly
 9     what he said.  He doesn't speak very good English.
10     And I told him to go roll with Miguel.  That he should
11     have been rolling with Miguel when he was done.
12              I don't know how well he understood me
13     though.  But he knew that I told him to go to Miguel.
14          Q.   Okay.  Did he follow your instructions at
15     that point?
16          A.   He went to Miguel, yes, ma'am.
17          Q.   And at that point where did you go?
18          A.   I don't remember.
19          Q.   Did you say anything else to him?
20          A.   Not to my knowledge.  I don't remember.
21          Q.   So what did you do after that?
22          A.   I can't remember specifically.  But there
23     are other tasks going on.  And I went to go take care
24     of other things.  I don't remember exactly what I did
25     right afterwards.
```

1       Q.    Did you speak to anyone about the incident

2    that occurred?

3       A.    No, ma'am, not to my knowledge.

4       Q.    Did you speak to Victor about the situation?

5       A.    I'm sure when I wrote him up, and I told

6    Victor I was going to write him up, yes.  When I did

7    that I don't remember.

8       Q.    At what point did you present this write-up

9    to Mr. Monteagudo?

10      A.    I started filling it out in the afternoon.

11   But as I said earlier, you know, my day's busy with

12   phone calls, different things.

13           And I presented it to Mr. Monteagudo at

14   7 a.m. the next morning before we started working.  It

15   is after our safety meeting but before we started

16   working.  I didn't want to do it in front of

17   everybody.  So when everybody dispersed I went and

18   called Mr. Monteagudo aside, and had Mr. Cardona and

19   Mr. -- Miguel with us, with me.

20      Q.    Why did you have Mr. Cardona with you?

21      A.    As a translator.

22      Q.    What was Miguel there for?

23      A.    I believe he was there as a witness to it.

24   I don't remember.  I believe he was just there as a

25   witness.  I don't remember exactly.  I don't remember.

```
 1   I would have to look at the documents to see exactly
 2   why he was there.
 3       Q.    And do you recall if prior to you speaking
 4   to Mr. Monteagudo and during the safety meeting did
 5   you mention anything about the incident to any other
 6   supervisors, or speak to anyone about it?
 7       A.    I don't recall.  I would imagine, but I --
 8   that I said something to Manny, but I don't remember.
 9       Q.    To Manny?
10       A.    Yeah.  His immediate supervisor.  I forget
11   if he was there or not.  Like I said earlier, I don't
12   remember exactly.
13       Q.    But you recall at some point you had a
14   conversation with Manny.
15       A.    No, I don't remember that I had a
16   conversation with Manny.  That's what I'm saying.  I
17   don't remember if I did or I did not have.  It's two
18   years ago.
19           All I remember is asking Carlos to be a
20   translator for me.
21       Q.    Is it customary to have a witness and a
22   translator when you give somebody a termination or
23   some type of discipline?
24       A.    I don't know if it's customary.  I don't
25   remember exactly -- I know Miguel had -- he was -- I
```

48

```
 1    don't believe he wanted to be any kind of a witness or
 2    a translator.
 3            I don't remember exactly why Miguel was
 4    there.  I know it was to be some kind of a witness,
 5    but I don't remember.
 6            As far as it being customary, I don't know.
 7    Q.   All right.  So tell me what was the
 8    conversation that you had with Mr. Monteagudo at that
 9    point.
10    A.   The conversation was that it was inexcusable
11    that he was sleeping on the roller, and I was
12    terminating him.
13    Q.   And did he agree with your assessment?
14    A.   No, he did not.
15    Q.   Did he protest?
16    A.   Yes, he did.
17    Q.   What did he tell you?
18    A.   He denied that he was sleeping.
19    Q.   Did he say anything else?
20    A.   I don't recall.  The conversation that we
21    had lasted about five minutes.  I know he protested.
22    Like you said it might have went back and forth a
23    couple of times, that "Yes, I caught you sleeping."
24            And "No, I wasn't sleeping."
25            "Yes, you were.  Your head was down, your
```

```
 1    eyes were closed.  I slammed my door, you didn't move.

 2    You didn't wake up until I screamed "Hey."

 3              And then he protested and refused to sign

 4    the document.

 5         Q.   Anything else was said during that meeting?

 6         A.   I don't recall.

 7         Q.   What happened after that?

 8         A.   I believe he got in his car, and he left.

 9    And that was it.  He went -- I don't know what he did

10    after that, but he left the project.  And I went about

11    my duties.

12              I imagine one of the first things I did, if

13    not immediately, within an hour or two, I brought the

14    document up to the office.  I don't remember exactly

15    when I did that though.

16         Q.   Do you recall who you gave the documents to?

17         A.   I believe it would have been Kathy.  I'm not

18    sure of her last name.

19         Q.   Did you speak to anyone?

20         A.   I spoke to Kathy I believe, yeah, the lady I

21    gave the document to.

22         Q.   Okay.  Did you speak to anyone else?

23         A.   Not that I remember.  Not that I'm aware of.

24         Q.   Prior to this incident occurring did you

25    ever receive any -- or did you ever hear any comments
```

```
 1    about Mr. Monteagudo being a problematic employee by

 2    anyone?

 3         A.   I haven't heard anything.

 4         Q.   Did you ever speak to Mr. Manuel Comes about

 5    Mr. Monteagudo and his performance, or any other --

 6         A.   No.  No, I never had any reason to.

 7         Q.   Do you recall if Mr. Manuel Comes was there

 8    the day that you terminated Mr. Monteagudo?

 9         A.   No, I don't recall.  I would have to say no,

10    or Manny would have been the one to do it since he was

11    his direct supervisor.  So I got to think that Manny

12    was out that day or something.  I don't remember.

13         Q.   I thought you testified earlier that during

14    that time he was under your direct supervision for

15    like a day or two.

16         A.   Yes, he was -- I said I don't remember.  But

17    he was under my supervision for the part of the job

18    that I was doing.

19              And as I said, I don't remember if I

20    borrowed him from Manny for that day, or Manny -- I

21    don't exactly remember.  I just know that he was under

22    my supervision for those couple of days.

23         Q.   When you asked for additional laborers for a

24    day is there any paperwork that's filled out with that

25    request or --
```

51

```
 1        A.   No.

 2        Q.   -- does it get memorialized anywhere?

 3        A.   No.

 4        Q.   Do you know who Noel Leon is?

 5        A.   No, I do not.  I know the name, but I don't

 6   know him.

 7        Q.   Do you know who Allan Neuzil is?

 8        A.   Yes, I do.

 9        Q.   Who is he?

10        A.   He's a superintendent at Asphalt Group.

11        Q.   Did you ever have any conversations with

12   Allan about Mr. Monteagudo?

13        A.   No, ma'am.

14        Q.   Did you know if Allan knew Mr. Monteagudo

15   from a prior job?

16        A.   Do I -- say that again, please.

17        Q.   Do you know whether Mr. Allan knew

18   Mr. Monteagudo from before?

19        A.   Yes, I believe he did.

20        Q.   How do you know that?

21        A.   Allan and I worked on the same project at

22   Odebrecht Construction, and I believe Mr. Monteagudo

23   was on Allan's crew.

24        Q.   Did you guys ever speak about Mr. Monteagudo

25   or his performance under Allan's supervision at the
```

1   prior job?

2       A.   No, I haven't.

3       Q.   You're sure that you never did, or it's

4   possible that you did?

5       A.   I never had a conversation with Allan about

6   his performance.  Allan was over on the 29 project, I

7   was on the 28 project.  I was a survey manager.  So my

8   crews kind of went to both sites.  So I knew Allan in

9   general, but I really didn't know -- he would have no

10  reason to talk to me about his employees.

11      Q.   As supervisors you guys don't kind of

12  exchange information, and, you know, your experiences

13  with certain employees?

14      A.   I guess they do.  But in this -- with me I

15  didn't -- I had no -- I was a survey manager at that

16  time, so my job had no bearing on my employees to

17  Allan or Allan's employees to me.

18      Q.   But it is common that supervisors speak to

19  each other and kind of get a sense of who their

20  employees are, and what their strengths and weaknesses

21  are, is it not?

22      A.   Yes.

23           MR. CLYNE:  Object to form.

24           Go ahead.  You can answer.

25  BY MS. SAAVEDRA:

```
 1        Q.   Do you recall after the termination whether
 2   you heard about Mr. Monteagudo by anyone in the
 3   company, from anyone in the company?
 4            MR. CLYNE:   You can talk about any
 5        conversations you had where I wasn't present.  So
 6        anything you got from me, in any meetings that we
 7        had you can't discuss.  But if you have
 8        independent knowledge talking about Jorge to
 9        anyone else.
10        A.   I didn't have any conversations with
11   anybody.  I heard of an incident that happened over
12   with the gentleman Noel.  But that was over on the
13   other project.  I wasn't part of it so I didn't know
14   any specifics.  But I knew something had happened over
15   there, and he got transferred to our job.
16   BY MS. SAAVEDRA:
17        Q.   What did you hear?
18        A.   I don't -- it was nothing specific.
19   Something to do with a QC guy, and they didn't get
20   along or something like that.
21        Q.   Do you recall when you heard about this?
22        A.   No, I don't remember.  If it was before or
23   after, I don't remember.
24        Q.   Do you recall who you heard it from?
25        A.   Say that -- excuse me?
```

1      Q.   Do you recall who you heard it from?

2      A.   I can't remember in particular who I heard

3  anything -- where I heard it from.

4          MS. SAAVEDRA:   Okay.   If we can take a

5      15-minute break just so I can go over my notes.

6          (Recess from 11:15 a.m. to 11:35 a.m.)

7  BY MS. SAAVEDRA:

8      Q.   Mr. Nasso, do you recall whether you had any

9  conversations with Victor at the time that

10  Mr. Monteagudo was transferred over to the 490

11  project?

12     A.   No, I do not.

13     Q.   Do you recall if he met with the supervisors

14  and told them -- including yourself, whether -- that

15  there was going to be some individuals that were going

16  to be transferred over?

17     A.   He didn't do it with me, so I have to say

18  no, I don't remember.

19     Q.   Do you recall what was the content of your

20  conversations with Victor once you made the

21  determination -- or made the decision to terminate

22  Mr. Monteagudo?

23     A.   I just told him what had happened, and that

24  I was going to terminate him.

25     Q.   What did he tell you?

```
1        A.   I don't recall.

2        Q.   Was there anyone else there?

3        A.   I don't believe so, but I don't recall.  I

4   forget if it was on the phone or in person.

5        Q.   You mentioned that the day of the incident

6   you pulled up in your truck and Mr. Monteagudo was on

7   the ramp on the roller.  Correct?

8        A.   Yes, ma'am.

9        Q.   When you pulled up in the truck was the

10  roller and Mr. Monteagudo at eye level or did you have

11  to look up?

12       A.   He's sitting up a little higher.  You have

13  to get up on to the machine.  So I would -- kind of

14  looking up at him, maybe a five degree angle.

15       Q.   Okay.  And you said that his head was down,

16  right?

17       A.   Yes, ma'am.  Holding on to the wheel with

18  his head like this.

19       Q.   Do you recall that clearly?

20       A.   Yes, ma'am.

21       Q.   Okay.  And how do you know he wasn't looking

22  at something?

23       A.   Because I slammed my door, and he didn't

24  acknowledge me.  I would imagine or would have assumed

25  that he would have acknowledged me when I pulled up to
```

1    him.

2         Q.   Okay.  So you made the assumption that

3    because he didn't look up and he was -- he must have

4    been sleeping.

5         A.   Well, when I was in my truck, yeah.  And

6    then when I got out and I could see -- I got closer,

7    that his eyes were closed, I could tell he was

8    sleeping.

9         Q.   At that point did you make -- you were sure

10   that he wasn't looking at anything down, right?

11        A.   Yes, ma'am.  He was asleep.

12        Q.   Okay.

13             Let me pull back up Exhibit 2.  And I'll

14   give you a minute just so you can read the second

15   page, which is the narration that you wrote.

16             And let me know when you read it.

17        A.   Okay.

18        Q.   In the description it says -- on the third

19   line going to the fourth, it says "I arrived at the

20   roller at approximately 11:30 and found Mr. Monteagudo

21   sitting on the roller with his eyes closed and head

22   leaning back slightly."

23             Do you see that?

24        A.   Yes, I do.

25        Q.   Okay.  Does that refresh your recollection

```
 1    as to the position that Mr. Monteagudo was when you

 2    found him?

 3         A.   Yes, it does.

 4         Q.   Okay.  So from down -- if he's not at eye

 5    level how do you know his eyes were closed if his head

 6    was back?

 7         A.   I could see.  I could see his face.  I mean,

 8    you have your head back, you could still see my eyes.

 9              On the date that this happened when I pulled

10    up to Jorge I could see him very clearly.  So when you

11    say -- you keep referring to him being elevated, it's

12    not like he's 10 feet in the air.

13              I would imagine his head would be at

14    approximately a height of maybe 7 feet.  Me sitting in

15    my truck I'm at a height of maybe 4 feet.  When I

16    stand up I'm at a height of almost 6 feet.  So the

17    difference between our heads is only, you know, maybe

18    a couple of feet.  It's not like he's, you know, way

19    up in the air.

20         Q.   Is it possible that you don't remember that

21    very clearly as you sit here today?

22         A.   No.  Actually it's pretty apparent that I

23    didn't read my own statement before I came here.

24              And reading it now I'm going to swear by

25    everything that I put in the statement, because this
```

```
1    is exactly what happened.

2        Q.   I thought at the beginning of your

3    deposition you stated that you did review the

4    statements.

5        A.   It's if I did I didn't do it well enough

6    apparently.

7        Q.   And I also gave you an opportunity to review

8    it before I started asking you questions.  Did I not?

9            MR. CLYNE:  Objection; argumentative.

10   BY MS. SAAVEDRA:

11       Q.   You can answer.

12       A.   I did glance through these, but I didn't sit

13   here and concentrate I guess line by line and read

14   everything perfect perfect.

15           And I feel pretty embarrassed that I

16   answered incorrectly, to be honest with you.

17       Q.   Mr. Nasso, in the statement you also say

18   that -- it says "it was very apparent that he was

19   sleeping."  It says "Mr. Monteagudo keeps" -- what is

20   that word?

21       A.   Knows, K-N-O-W-S.

22       Q.   "Mr. Monteagudo knows to find a supervisor

23   if he thinks he is done with his task or has any

24   questions."

25           Do you see that?
```

```
1        A.    Yes, ma'am.

2        Q.    Then it says "This is spoken about

3   frequently in our morning safety/production meeting."

4   Correct?

5        A.    Yes, ma'am.

6        Q.    So other than the safety/production meeting

7   this conversation was never had by you with

8   Mr. Monteagudo directly before this incident, correct?

9        A.    I would say it was done indirectly on almost

10  an everyday basis with all of the employees.  But

11  never a one-on-one.  I don't remember.  I might

12  have -- that morning I might have told him.  But I

13  don't remember.  I just know that we tell everybody.

14       Q.    Why is it that it's always -- it's

15  frequently mentioned during those meetings to

16  everyone?  Is that an issue that you have found to

17  have had with other employees?

18       A.    I think because he knew better.  It's

19  something that we tell people.

20             As far as if it's happened before, I can't

21  recall of any specific incident where I personally

22  have caught somebody sleeping.

23             But there has been occasions where I'm sure

24  guys have waited for someone to find them, though

25  they're not sleeping, they don't seek out, you know,
```

1   "What should my next task be?"  They leave it up to

2   the supervisor to, you know, make sure they come

3   around.  And we can't be everywhere at every time so

4   we tell these, you know, employees "When you're done

5   you need to let us know that you're done."

6        Q.   And in those situations that you have

7   acknowledged that has happened before where employees

8   are just kind of lingering, waiting for the supervisor

9   to find them instead of the other way around, have

10  those employees been terminated?

11       A.   I don't think anybody -- like I said, I've

12  never caught anybody sleeping.  I'm sure they get

13  yelled at.

14            I know I've disciplined a few of my guys.

15  "I told you to call me, why didn't you call me?  We're

16  waiting over here to get this done and" -- so, you

17  know.

18       Q.   So no, they have not been terminated.

19       A.   They weren't sleeping, so no, they weren't

20  terminated.

21       Q.   Okay.  So the difference in this situation

22  was that, according to you, Mr. Monteagudo was

23  sleeping.

24       A.   Yes, ma'am.

25       Q.   So how is that a failure to follow

1    instructions?

2        A.   He was told when he was done with his task

3    to find a supervisor.

4        Q.   But so are the other employees that were not

5    terminated.

6        A.   On this particular day there was nobody else

7    that I had a problem with.  In the past -- I almost

8    feel like you're confusing two different things.

9            Mr. Monteagudo was sleeping.  The other

10   employees who may linger around they -- you know, it's

11   not like they sit there for two hours.

12           I have no idea how long Jorge was sleeping.

13   He could have been there for an hour for all I know.

14   I don't know.

15       Q.   You also said that you assumed that he was

16   sleeping.  You didn't --

17       A.   No.  He was sleeping, ma'am.  I would not

18   have fired Jorge if he was not sleeping.

19       Q.   Okay.  Let me show you what I'll have marked

20   as Exhibit 3 of this deposition.  And for the record

21   this is Defendant's 104.

22           Mr. Nasso, do you recognize this document?

23       A.   Yes, I do.

24           (Plaintiff's Exhibit 4 will be marked for

25           identification.)

1    BY MS. SAAVEDRA:

2        Q.   Okay.  I'm going to give you an opportunity

3    to review it and read the document in its entirety

4    before I ask you questions.  Please let me know when

5    you're ready.

6        A.   Okay.

7        Q.   Do you know what this document is?

8        A.   It's a Witness Firsthand Account of Incident

9    is what it says.

10       Q.   Is that your handwriting?

11       A.   Yes, it is.

12       Q.   Okay.  And do you recall when this document

13   was prepared?

14       A.   I believe it was that same -- on that

15   morning, when I was giving Jorge the termination

16   papers and the disciplinary papers.  The other papers

17   that I had filled out.

18       Q.   So the day after the incident.

19       A.   The next morning, yes, ma'am.

20            Like I said, I filled out -- I couldn't get

21   it all done in one day, so I started it in the

22   afternoon on the 6th, and I finished it in the morning

23   of the 7th.

24       Q.   Why did you fill out this form as if -- as

25   Miguel Quiroz?

```
 1        A.    So now looking at this form I remember

 2   exactly what had happened.  So I did not ask Carlos

 3   Cardona to be a translator.  I had asked Miguel to be

 4   a translator.  And as a witness to the -- because I

 5   filled this out on Miguel's behalf is why I called

 6   Carlos.  So that Carlos was a witness that Miguel

 7   asked me to fill this out for him.

 8             I didn't want anybody to think that I filled

 9   this out on my own and -- to get Miguel -- you know, I

10   wanted to make sure that Carlos was there to -- on

11   behalf of Miguel so that I didn't say anything that

12   Miguel didn't agree with.

13             And Miguel was there to translate and

14   witness what I was saying to Mr. Monteagudo so that

15   there would be a witness for Mr. Monteagudo and for

16   myself as to what transpired.

17        Q.    So when was it that Miguel asked you to

18   prepare the form on his behalf?

19        A.    That morning when I asked him if he could

20   come translate and be a witness he asked me to fill it

21   out because he didn't really speak that well of

22   English, I believe, or he didn't write that well.  And

23   so I asked Carlos to come over and be a witness that I

24   was filling this out for him.

25        Q.    So you didn't have the form prepared at that
```

1   moment?

2        A.   Well, no.  This would be a statement of what

3   Mr. Quiroz saw take place between me and Jorge.

4        Q.   So did you fill it out in front of

5   Mr. Miguel?

6        A.   It was done, yeah, at the same time, yes,

7   with Miguel.

8        Q.   Okay.  In the top it says that the location

9   of the incident was "Ramp J."

10            That's where you found Mr. Monteagudo,

11   correct?

12       A.   That was the location of the incident, yeah.

13       Q.   Right.  And then it says "Where were you

14   located at the time?"  And it says "Ramp J."

15            So can you explain to me how -- why is this

16   different than your testimony earlier?

17       A.   What was different?  I don't understand.

18       Q.   When I asked you about the incident, when

19   you found Mr. Monteagudo you told me that there was

20   nobody else around.

21            MR. CLYNE:  That's mischaracterizing the

22       testimony.

23   BY MS. SAAVEDRA:

24       Q.   Did you not?

25            MR. CLYNE:  He found Mr. Monteagudo the day

```
1            of the incident.  This was filled out the day

2            after the incident.  So you're mischaracterizing

3            the testimony.

4                MS. SAAVEDRA:  Counsel, please just keep

5            your objections to form.  Do not coach the

6            witness.

7                MR. CLYNE:  I'm not coaching.  Please don't

8            try to mischaracterize testimony.

9    BY MS. SAAVEDRA:

10       Q.   Mr. Nasso, can you tell me what this --

11   "Where were you located at the time?" and it says

12   "Ramp J."  What is that intended to mean?

13       A.   So to me there's two different things there.

14   The location of the incident is one thing.  And then

15   "Where were you located at the time" that I have

16   written on that statement is another topic.  And they

17   both happened on Ramp J.

18            I went to Ramp J that morning of the 7th.

19   The incident with Jorge took place on Ramp J.  And

20   this document was filled out on Ramp J at 10:07 -- or

21   on 10/7 at 6:45 a.m.

22       Q.   Okay.  Doesn't this form say "Where were you

23   located at the time?"

24       A.   At the time of this document, yes.  Ramp J.

25       Q.   So your understanding of that is at that
```

```
 1    time of the document was prepared?  That's your

 2    testimony today?

 3         A.   Everything took place on Ramp J, so I don't

 4    understand I guess.  I don't know.

 5         Q.   I just want to clarify.  This form that you

 6    filled out for Mr. Quiroz says that -- in the place

 7    where it asks "Where were you located at the time," it

 8    says "Ramp J."

 9              So I'm trying to understand whether it says

10    that he was located at Ramp J when the incident

11    occurred?

12              MR. CLYNE:  Objection; asked and answered,

13         three times.

14              MS. SAAVEDRA:  He has not answered the

15         question.

16              MR. CLYNE:  He did.  He said --

17    BY MS. SAAVEDRA:

18         Q.   Go ahead.  Go ahead.

19              THE COURT REPORTER:  One at a time, please.

20    BY MS. SAAVEDRA:

21         Q.   Go ahead and answer my question.

22         A.   Can you repeat the question, please?

23              MS. SAAVEDRA:  Sure.

24              Madam Court Reporter, could you read it

25         back, please.
```

1                 (The requested portion of the record was

2        read by the reporter.)

3                 MR. CLYNE:  Do you understand the question?

4        A.   No, I -- my only answer that I have is

5   that --

6   BY MS. SAAVEDRA:

7        Q.   Well --

8        A.   -- this --

9        Q.   -- let me -- if you don't understand the

10   question let me restate it.

11                 Do you see in the form where it says "Where

12   were you located at the time?"

13        A.   Okay.

14        Q.   Do you see that?

15        A.   Yes, I do.

16        Q.   Okay.  And the answer says "Ramp J."

17   Correct?

18        A.   Yes.

19        Q.   Okay.  And this is your handwriting,

20   correct?

21        A.   Yes.  Yes, it is.

22        Q.   And you filled this out on behalf of

23   Mr. Quiroz.

24        A.   Yes, I did.

25        Q.   Okay.  When you wrote "Ramp J" in response

1    to this question I'm trying to understand whether you

2    wrote that Mr. Quiroz was on Ramp J at the time of the

3    incident or whether you wrote Ramp J for some other

4    reason.

5         A.   No.  It pertains to when this document was

6    filled out.  We were on Ramp J.

7         Q.   And as you sit here today that's your

8    understanding of what that question is intended to be.

9         A.   That's --

10         MR. CLYNE:  Objection; asked and answered.

11   BY MS. SAAVEDRA:

12        Q.   You can answer.

13        A.   That's -- yes.  I mean, I have the time --

14   date and time written down there.

15         And then it's asking me where was I located

16   at that time.  And I was on Ramp J.

17        Q.   Okay.

18        A.   The other, "Location of Incident," to me is,

19   you know -- I don't know, it's pretty -- I guess I can

20   understand why it's a little confusing, but I take it

21   as though where that document was filled out.

22         That was solely for that witness for the --

23   for him to be a translator is all that document was

24   for, to witness me giving ...

25        Q.   And you stated that the reason why

1    Mr. Quiroz asked you to fill it out was because he did

2    not speak English?

3         A.   He didn't feel comfortable in his English

4    skills to fill it out, I guess.  Or -- I forget

5    exactly why I needed to.  I don't remember the exact

6    reason why I needed to.

7              He didn't feel comfortable.  And that's why

8    I called Carlos over.  That's all I remember.

9         Q.   Okay.  Do you know whose signature this is?

10        A.   I would assume it's Miguel's.  I don't know.

11        Q.   Do you know whose signature this is?

12        A.   I believe that would be Carlos.  I'm not

13   sure.  I would imagine that's whose it is.  Those were

14   the other two people involved.  So he's the witness,

15   and Carlos was there as the interpreter.

16             Above you have Carlos' name printed and

17   signed again.  I quoted it was Carlos was there.  And

18   he witnessed Mr. Quiroz's request that I filled that

19   form out for him.

20             MS. SAAVEDRA:  Okay.  I have no further

21        questions.

22             MR. CLYNE:  Thank you.  No questions.  We'll

23        read.  Thank you very much.  And we will order a

24        copy of the deposition if counsel is ordering the

25        first time.

70

```
 1              MS. SAAVEDRA:  I'm not ordering right now.

 2              MR. CLYNE:  All right.  Then I will take the

 3        original, and I'd like a mini and the full copy.

 4        Thank you.

 5              THE COURT REPORTER:  Okay.

 6              MS. SAAVEDRA:  Thank you.

 7              THE WITNESS:  Thank you.

 8              (Videoconference deposition concluded at

 9        12:03 p.m.)

10                        ---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        CERTIFICATE OF OATH

2

     THE STATE OF FLORIDA
3
     COUNTY OF BROWARD
4

5           I, RONNI M. KUGLER, certify that JEROME
     NASSO appeared before me remotely via videoconference
6    on the 14th day of February, 2023, and was duly sworn.

7    Signed this 24th day of February, 2023.

8

9

10   _____
     Ronni M. Kugler
11   Notary Public - State of Florida
     My Commission No.  HH 124540
12   Expires: August 25, 2025

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    REPORTER'S CERTIFICATE

 2   THE STATE OF FLORIDA
     COUNTY OF BROWARD
 3
             I, RONNI M. KUGLER, Certified Shorthand
 4   Reporter and Notary Public, State of Florida at Large,
     do hereby certify that the aforementioned witness was
 5   by me remotely first duly sworn or affirmed to testify
     the whole truth; that I was authorized to and did
 6   report said deposition in stenotype; and that the
     foregoing pages, numbered from 5 to 70, inclusive, are
 7   a true and correct transcription of my shorthand notes
     of said deposition.
 8
             I further certify that said deposition was
 9   taken at the time and place hereinabove set forth and
     that the taking of said deposition was commenced and
10   completed as hereinabove set out.

11           I further certify that I am not an attorney
     nor counsel of any of the parties, nor am I a relative
12   or employee of any attorney or counsel of any party
     connected with the action, nor am I financially
13   interested in the action.

14           The foregoing certification of this
     transcript does not apply to any reproduction of the
15   same by any means unless under the direct control
     and/or direction of the certifying reporter.
16
             IN WITNESS WHEREOF, I have hereunto set my
17   hand this 24th day of February, 2023.

18

19           _____
             Ronni M. Kugler
20           Notary Public - State of Florida
             My Commission No. HH 124540
21           Expires: August 25, 2025

22

23

24

25
```