UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 1:22-cv-22343-KMM
Moore/Louis


JORGE MONTEAGUDO ALBURQUERQUE,

                    Plaintiff,

v.

THE DE MOYA GROUP, INC.,
a Florida profit corporation,

                    Defendant.
_____/

VIDEOCONFERENCE DEPOSITION
OF
CARLOS MANUEL CARDONA


Taken on behalf of the Plaintiff via videoconference


DATE TAKEN:  Monday, February 20, 2023
TIME: 11:04 a.m. - 12:47 p.m.


Held remotely via videoconference



Examination of the witness taken before:
Jamie D. Mackrell, Court Reporter
Daughters Reporting, Inc.
101 Northeast 3rd Avenue
Suite 1500
Fort Lauderdale, Florida 33301

PLAINTIFF'S
EXHIBIT

10

3

```
 1                          INDEX

 2

 3    Testimony of   CARLOS MANUEL CARDONA

 4                                                Page

 5    Direct Examination
      by Ms. Saavedra                             5
 6

 7    Cross-Examination
      by Mr. Clyne                                56
 8

 9

10    Certificate of Oath                         60
      Certificate of Reporter                     61
11    Errata Sheet                                62
      Read and Sign letter                        63
12

13

14

15

16                        -  -  -  -

17

18

19

20

21

22

23

24

25
```

1             Videoconference deposition of CARLOS MANUEL

2    CARDONA taken remotely before Jamie D. Mackrell, Court

3    Reporter and Notary Public in and for the State of Florida

4    at Large, in the above cause.

5             THE COURT REPORTER:  Please raise your right

6        hand.

7             Do you swear or affirm that the testimony you

8    are about to give will be the truth, the whole truth, and

9    nothing but the truth?

10            THE WITNESS:  Yes.

11            THE COURT REPORTER:  Thank you.

12   Thereupon --

13            CARLOS MANUEL CARDONA,

14   having been first duly sworn or affirmed, was examined and

15   testified as follows:

16            DIRECT EXAMINATION

17   BY MS. SAAVEDRA:

18       Q.   Good morning, Mr. Cardona.

19       A.   Good morning.

20       Q.   May I please have you state your full name for

21   the record?

22       A.   Yes.  Carlos Manuel Cardona.

23       Q.   Mr. Cardona, my name is Nathaly Saavedra.  I'm

24   one of the attorneys that represents Mr. Monteagudo in the

25   lawsuit he has brought against De Moya and I will be taking

1    but if you do need a break at any point, please let me know

2    and I'll be happy to take one.  All I ask is that you give

3    me an answer if a question is pending before we take that

4    break.  Okay?

5        A.   Okay.

6        Q.   Are you currently on any medication or other

7    substance that would prohibit you from giving a true and

8    accurate testimony today?

9        A.   No.

10       Q.   Are you currently on any medications or other

11   substance that would prohibit you from recalling events

12   from 2019, 2020?

13       A.   No.

14       Q.   Where are you physically located right now?

15       A.   I believe the address is 4300 -- I'm in the

16   attorney's office, Reggie's office.

17       Q.   Are you with anyone in the room?

18       A.   Just Reggie.

19       Q.   Okay.  And for this deposition did you review any

20   documents?

21       A.   Well, I just have a copy of the depo here -- the

22   depo order.

23       Q.   Did you review any other documents?

24       A.   I did.

25       Q.   What documents did you review?

1       A.    Two years.

2       Q.    So did you start with the company around the

3  beginning of 2021?

4       A.    Yes.  It's a little complicated because I was

5  prior employed with The De Moya Group, and then I believe

6  it was in 2020 or '21 that we switched over to Asphalt

7  Group.

8       Q.    When you say "we," who are you referring to?

9       A.    Myself and some other employees that were

10  formerly with De Moya.

11      Q.    So around October of 2020, were you an employee

12  of Asphalt Group, or were you an employee of The De Moya

13  Group?

14      A.    2020?  I don't remember exactly.  I want to say

15  De Moya.

16      Q.    What position did you have with The De Moya Group

17  in 2020?

18      A.    Supervisor/foreman.

19      Q.    When were you hired by The De Moya Group?

20      A.    I started with De Moya in May of 2018.

21      Q.    Were you hired as a foreman/supervisor?

22      A.    Yes.

23      Q.    When you switched over to Asphalt Group, what

24  position did you switch over to?

25      A.    Same position.

1       A.    Yes.  It was on the turnpike from Southwest

2   Eureka to 120th Street, Southwest.

3       Q.    And as a foreman for The De Moya Group, did you

4   have anyone reporting directly to you?

5       A.    Yes.

6       Q.    How many?

7       A.    Currently I have about six.

8       Q.    Okay.  I'm asking when you were working for The

9   De Moya Group how many people did you have reporting to

10  you?

11      A.    About the same.

12      Q.    Do you remember their names?

13      A.    At that time currently, I couldn't give you

14  everybody, no.  It changes from time to time.

15      Q.    At that time did you have -- how many operators

16  do you recall having under your supervision?

17      A.    There was probably at least a dozen operators.

18      Q.    Other than Victor Suarez, did you report to

19  anyone else?

20      A.    No.

21      Q.    What were your duties as foreman when you were

22  working under The De Moya Group?

23      A.    Job safety, designating job assignments,

24  planning, moving equipment, ordering trucks.  Basic just

25  job duty preparation.

1    meetings, and they are required to sign a form stating

2    that they understand what the potential hazards are and

3    how to avoid them.

4         Q.   Where is this meeting held?

5         A.   Usually on-site wherever the work is.

6         Q.   Is it like first thing in the morning you hold

7    these meetings?

8         A.   Yes.

9         Q.   Have you ever issued any disciplinary actions --

10   well, during the time that you were at The De Moya Group,

11   were you responsible for issuing any disciplinary actions

12   to the employees that you believe were violating procedure

13   regarding safety?

14        A.   I'm not -- I can't say with a hundred percent

15   certainty.  I don't remember.

16        Q.   Any other duties as a foreman when you were

17   working under The De Moya Group?

18        A.   Part of my job also is to do inspections of the

19   job sites.  Since we work alongside active roadways, a lot

20   of times there's accidents that happen during the night

21   when no one is around, and so it's part of my job as well

22   to assess the job zone itself to make sure that everything

23   is in place, all the MOT is in line, and all our signs are

24   correctly placed and that there's no potential roadway

25   hazards, nothing laying in the roads or anything.

1        A.    Yes.

2        Q.    Who was the person that gave you that training,

3    if you recall?

4        A.    Victor Suarez.

5        Q.    Do you recall if part of that training, whether

6    it would discuss the policies regarding discrimination that

7    the company has?

8        A.    Yes.

9        Q.    What was the training that you received?

10        A.    Basically just outlines of the law that it's

11    illegal to discriminate against race, color, ethnicity,

12    gender.

13        Q.    What is your understanding of the word

14    "discrimination"?

15        A.    Discrimination, in my understanding would mean

16    holding something against someone because of what they

17    are, whether it's a man or a woman, or whether they are

18    Latino, white, black.  It's basically equal treatment of

19    everyone.

20        Q.    And the training that you received, did it

21    include how a claim of discrimination should be reported to

22    if required to?

23        A.    Yes.  It would have to go through human

24    resources.

25        Q.    Have you ever handled a complaint of

```
 1          A.    I'm sorry.  Could you ask that again?

 2          Q.    Sure.  Is there a policy regarding how employees

 3     are disciplined at The De Moya Group?

 4          A.    You mean the procedures for disciplinary action?

 5          Q.    Yes.

 6          A.    Yes.

 7          Q.    What is your understanding of that policy?

 8          A.    Well, there are steps.  The first step would be

 9     a verbal warning.  Second offense would be a written -- a

10     writeup.  Then the third offense would be another writeup.

11     And one more offense after that would be -- if it's the

12     same offense, it's a safety issue, then at that point a

13     decision would have to be made if that employee would be

14     terminated or not.

15          Q.    Who makes that decision?

16          A.    Victor would make that decision.

17          Q.    Did you receive any training as to how this

18     policy is supposed to be applied to the employees?

19          A.    No formal training.  It's just the procedure the

20     way it is, it's understood.  I mean, it's pretty

21     self-explanatory the way it works, so --

22          Q.    And is the procedure the same for Asphalt Group?

23          A.    Yes.

24          Q.    Do you know who Mr. Monteagudo is?

25          A.    Yes.
```

```
 1   the same level?

 2        A.   We are at the same level.

 3        Q.   And if you were to see somebody that wasn't under

 4   your direct supervision but was doing something improper,

 5   did you have the authority to say something to that

 6   employee?

 7        A.   I would.  The way I would handle it though, I

 8   would take it to their direct supervisor and let them know

 9   what the issue was and deal with it that way.

10        Q.   Did you ever have to do that regarding

11   Mr. Monteagudo?

12        A.   No.

13        Q.   Prior to Mr. Monteagudo being transferred over to

14   490, had you heard anything about him?

15        A.   I heard that he had gotten into, I don't know, a

16   situation with his old supervisor.

17        Q.   Who did you hear that from?

18        A.   I'm sorry?

19        Q.   Who did you hear that from?

20        A.   I don't remember.  It was just hearsay around

21   the job.

22        Q.   Okay.  What was it that you were told that you

23   remember?

24        A.   I don't remember details.  Only that, I don't

25   know, a situation had happened and he didn't want to be
```

```
 1    other supervisors about these conversations that you were

 2    hearing?

 3         A.   Not that I can remember, no.

 4         Q.   Did you have any difficulties in your working

 5    relationship with Mr. Monteagudo?

 6         A.   No.

 7         Q.   Did you think of Mr. Monteagudo in any particular

 8    way when you heard him having a situation with his old

 9    supervisor?

10         A.   Not at all.

11         Q.   Do you know who was the other supervisor that he

12    had issues with?

13         A.   Issues with where?

14         Q.   At the prior job.  Do you know who was that

15    supervisor?

16         A.   Yes.  I believe it was Noel Leon.

17         Q.   Did you know Mr. Leon?

18         A.   I know him, yes.

19         Q.   How do you know him?

20         A.   Just from work.

21         Q.   Did you work with him before?

22         A.   Not directly, but where our former project was

23    with De Moya and his project, they were together.  So

24    occasionally we had to plan things where their job ended

25    and ours started.  So, yeah, outside of the scope of work,
```

```
1    issue.  I don't know the details of it, that he wanted to

2    be transferred to the 490 job.

3         Q.   So when he was first transferred, do you recall

4    who the person was that told you he was going to be joining

5    the 490 job?

6         A.   I believe it was Victor that let us know that he

7    was going to be coming in on the day that he started.

8         Q.   When you say that "Victor let us know," who was

9    part of that conversation if you recall?

10        A.   Well, during the morning safety meetings, there

11   was a few of the supervisors that we kind of handled the

12   meeting together, and that would be Jerry Nasso, myself,

13   Alan Nuzal, and Manny Comes.

14        Q.   Do you know if Mr. Monteagudo worked under the

15   supervision of any other supervisor other than Jerry Nasso?

16        A.   I don't know.

17        Q.   Do you recall if Victor ever said anything about

18   the issues that Mr. Monteagudo had with Mr. Nasso?

19        A.   No, that wasn't mentioned.

20        Q.   Like the rumors that you heard, do you recall if

21   anyone said anything about what specific issues were there

22   between them?

23        A.   No.  Nothing was said specifically that I

24   remember.  Only that he was coming from this other job.

25        Q.   As a foreman, you stated that you created the job
```

```
 1        A.   I don't recall the events, and I vaguely
 2   remember at that time -- I believe Jerry approached me
 3   about speaking as a translator between Miguel Quiroz and
 4   himself because Mr. Quiroz had asked Jerry to write the
 5   statement for him because he couldn't really write in
 6   English.  So Jerry asked me to read this back to
 7   Mr. Quiroz to make sure that what he said and what Jerry
 8   wrote were accurate.
 9        Q.   Okay.  I'm going to give you a chance to just
10   review this document.  Please let me know once you are
11   done.  Okay?
12        A.   Okay.
13             Okay.
14        Q.   Do you recall where you were when you were asked
15   to participate in this exchange?
16        A.   I don't remember where I was, but I know that we
17   had the discussion itself on ramp J.
18        Q.   How do you remember that?
19        A.   I don't know how to say -- I just remember it
20   being there.
21        Q.   When you say you had the discussion itself on
22   ramp J, what discussion are you referring to?
23        A.   The discussion was where Jerry in front of
24   Miguel explained to me that Miguel asked him to write it
25   for him because he wasn't comfortable writing in English,
```

```
 1        A.   We usually hold it under the bridge of 170th
 2   Street and the turnpike.
 3        Q.   How far is that from ramp J?
 4        A.   Couple hundred feet.
 5        Q.   And how long are normally those meetings?
 6        A.   Fifteen to 20 minutes.
 7        Q.   And after the safety meetings is when individuals
 8   kind of go to their workstation and start getting ready for
 9   the day?
10        A.   Correct.  Correct.  We talk about safety issues
11   and we hand out assignments as well.  So everyone will
12   meet there and basically it's just hey, you know, "John,
13   you're going to do this.  Henry, you're going to do that."
14   And then the guys go -- you know, it's basically the
15   meeting point in the morning and then everyone goes to do
16   their work for the day.
17        Q.   And normally what time in the mornings are these
18   meetings held?
19        A.   We meet at 6:00 a.m.
20        Q.   All right.  So when you got to the ramp J where
21   Jerry had called you over, do you recall if -- what did
22   Jerry tell you when you got there?
23        A.   Just that in front of Miguel he explained, hey,
24   I have this -- Miguel was a witness, he wanted to make a
25   statement, but he wasn't comfortable writing in English,
```

1      Q.   Okay.  Then what happened?

2           MR. CLYNE:  Objection.  Asked and answered.

3      You can answer the question again.

4      A.   Okay.  The question again was?

5 BY MS. SAAVEDRA:

6      Q.   I said what happened after you arrived and

7 Mr. Nasso explained to you what needed to be done?

8      A.   Well, I read what Jerry wrote, and I spoke to

9 Miguel and I asked him if this was right.  I read it to

10 him and he said yes, that that's what he said.  He didn't

11 have any objections about the statement.  It was accurate.

12      Q.   So other than you, Mr. Quiroz, and Mr. Nasso, was

13 there anyone else at that time at the ramp?

14      A.   No.

15      Q.   So after you read it and he told you that that's

16 what he said, then what happened next?

17      A.   I believe at that point is when Mr. Monteagudo

18 was asked to come over.

19      Q.   Okay.  So before Mr. Monteagudo was asked to come

20 over, did you and Mr. Nasso sign this form?

21      A.   No.  I don't remember -- I only signed it just

22 to verify what was being written on the statement was

23 true.  And since my name was included, that was the only

24 reason I signed it.

25      Q.   Okay.  So I just want to make sure that I have

1    Mr. Monteagudo once he arrived there?

2         A.   No.

3         Q.   Did you translate anything about the exchange or

4    Mr. Monteagudo?

5         A.   No.

6         Q.   Mr. Cardona, I'm going to just go over the

7    statement here and it says "I, Miguel Quiroz, have asked

8    Mr. Nasso to fill this form on my behalf.  The following is

9    what I witnessed on 10/7/2020."  And then it says at

10   6:45a.m.  And then it says "I, Carlos Cardona, witnessed

11   Mr. Quiroz request that Mr. Cardona fill out this form on

12   his behalf at approximately 6:45 a.m. on 10/7/2020."

13        Do you see that?

14        A.   Yes.

15        Q.   You stated that when you were pulled over, it was

16   Mr. Nasso who explained to you that he needed you to read

17   it over.  You didn't say that it was Mr. Quiroz who asked

18   them to fill out the form.

19        A.   Well, I mean right from the opening line it says

20   that it was Miguel Quiroz have asked Mr. Jerry.  And then

21   on the third line where it says "I, Carlos Cardona,

22   witnessed Mr. Quiroz request that Mr. Nasso fill out the

23   form on his behalf at approximately 6:45 a.m."

24        Q.   But that's not true, is it?

25             MR. CLYNE:  Objection to form.

```
 1        Q.   Got it.  And you testified that the form was

 2   already prepared when you were there.  So when the next

 3   sentence it says "Mr. Nasso arrived and asked me to be a

 4   translator for a disciplinary termination he had to give to

 5   an employee."

 6             Who is the person that supposedly this is

 7   written on behalf of?  You or Mr. Quiroz?

 8        A.   Yeah.  That -- but at that point as far as my

 9   role in here when it starts to say "I was on ramp J,"

10   that's Mr. Quiroz saying that.  That's not me saying that.

11        Q.   Right.  Okay.  So when you were called over and

12   this form was already filled out and everything that was

13   written here was written at that time, wasn't it?

14             MR. CLYNE:  Objection to the form.

15        Mischaracterizes his testimony.

16             MS. SAAVEDRA:  Counsel, if you could just keep

17        your objections to form.  I don't know why we have to

18        go through this every single deposition.

19             MR. CLYNE:  Because you keep trying to put

20        words into the witness's mouth and you are basically

21        lying.

22             MS. SAAVEDRA:  If you can keep your objections

23        to form, Counsel.

24             MR. CLYNE:  He told you everything three times.

25             MS. SAAVEDRA:  Counsel, if you can keep your
```

35

```
 1   BY MS. SAAVEDRA:

 2        Q.   You can answer, Mr. Cardona.

 3        A.   I'm sorry.  Could you repeat it?

 4             MR. CLYNE:  Did you understand it?

 5             THE WITNESS:  Yeah.  No.

 6        A.   Could you repeat it for me?

 7   BY MS. SAAVEDRA:

 8        Q.   You just testified that you remember saying to

 9   Mr. Quiroz "is this what you said," or is this what

10   happened," and Mr. Quiroz saying "yes".  Correct?

11        A.   Yes.

12        Q.   That exchange happened before or after

13   Mr. Monteagudo was called over?

14        A.   I would say that happened before.

15        Q.   So --

16        A.   Yeah.  He was not present when I spoke with

17   Jerry and Miguel about this.

18        Q.   Okay.  So in this form it says "I was on ramp J

19   preparing for the day's work.  Mr. Nasso arrived and asked

20   me to be a translator for a disciplinary termination he had

21   to give to an employee.  A few moments later,

22   Mr. Monteagudo arrived.  I translated for Mr. Nasso that he

23   was terminating Mr. Monteagudo for sleeping on the roller."

24             Do you see that?

25        A.   Yes, but that's -- that's Miguel's statement.
```

37

```
 1        Q.   And as you stated earlier, you also don't have
 2    any recollection as to what happens when Mr. Monteagudo was
 3    called over, do you?
 4        A.   I don't remember.
 5        Q.   So you don't recall whether this form was
 6    complete and whether Mr. Monteagudo -- what his response
 7    was, do you?
 8        A.   No, I don't remember.
 9        Q.   Were you present when Mr. Monteagudo was told
10    that he was being terminated?
11        A.   I don't even remember that.
12        Q.   Do you remember --
13        A.   It's been so long ago.  I don't -- I don't
14    remember.  I honestly don't.
15        Q.   Do you remember having any conversations with
16    anyone after you left ramp J?
17        A.   No.
18             (Exhibit No. 2 was marked for identification.)
19    BY MS. SAAVEDRA:
20        Q.   Let me show you what I will have marked as
21    Exhibit 2 of this deposition.  Mr. Cardona, can you tell me
22    what your email was at the time you were working for The De
23    Moya Group?
24        A.   It was carlos.cardona@demoya.com.
25        Q.   So I'm showing you what I have marked as Exhibit
```

```
 1        Q.   Okay.  I would just ask you to look at the one in

 2    the computer if you have an issue --

 3             MR. CLYNE:   It's too blurry.

 4        A.   Yeah, it was just a little blurry.

 5             MS. SAAVEDRA:   Is that better?

 6             MR. CLYNE:   Yes.  But then your picture blocked

 7        part of it, the pictures of him, you, and the court

 8        reporter.

 9             MS. SAAVEDRA:   Is that better?

10             MR. CLYNE:   No.  It's still blocking the

11        document.  I don't know how you make it not block it.

12             MS. SAAVEDRA:   Okay.  You can move the little

13        square of the picture to the top so you can see it

14        better.

15             MR. CLYNE:   I tried.  That's why I gave him the

16        document that you are showing.  It's the same

17        defendant's 103.  It's just easier to see.  He can

18        see it better.

19    BY MS. SAAVEDRA:

20        Q.   Okay.  So tell me, Mr. Cardona, what do you

21    recall from those events now that you have reviewed this

22    document?

23        A.   Well, based on the email from two years, it

24    looks like what I'm saying is that I was there.

25        Q.   Okay.  But do you have any personal recollection
```

41

1      Q.   Okay.  But you were there, were you not?

2      A.   Yes.

3      Q.   Okay.  So as you sit here today, you have no

4   personal recollection as to what was exchanged when Jorge

5   was presented with this termination, correct?

6      A.   I'm sorry.  Could you rephrase the question?   I

7   didn't understand --

8      Q.   Do you have any recollection as you sit here

9   today, other than what the email says, you don't have any

10   personal recollection as to what was that exchange when

11   Mr. --

12      A.   I couldn't tell you what was said.  I don't

13   remember how and what was said or how it was said.   I

14   don't remember specifically.

15      Q.   Okay.  And I'm going to just go to the top of the

16   same page of Exhibit 2.  In this email that you sent to

17   Alisa, you said "his time on our job 490 was limited.  From

18   day one, I know he wasted no time in talking negatively

19   about Noel Leon in his previous position.  He said he felt

20   disrespected.  In my experience, any time an employee

21   speaks negatively about a former supervisor, it's usually

22   the employee that has some issues, and since his remarks

23   were about Noel, I was all the more suspicious."

24           Do you see that?

25      A.   Yes.

```
 1    had a conversation with you about this conversation with

 2    Mr. Monteagudo?

 3         A.   I don't know what Mr. Manny knew or not.  Manny

 4    and I have not -- never spoken about it.

 5         Q.   And you personally did not speak to

 6    Mr. Monteagudo about it?

 7         A.   No.  Not that I remember, no.

 8         Q.   So you don't know what he said, if anything?

 9         A.   Correct.

10         Q.   And you don't know whether all this hearsay in

11    fact did come from Mr. Monteagudo or come from somebody

12    else?

13         A.   Well, no one else was talking about it except

14    for him.  No one else knew.  It wasn't knowledge him

15    coming from an entirely different job to our job.  And,

16    you know, him speaking with other coworkers about his

17    negative experience, that solely came from him.  That

18    doesn't --

19         Q.   Well, how do you know that it solely came from

20    him?

21         A.   I don't see where else it would come from.

22         Q.   So you're assuming.  You are guessing that it

23    came from him, aren't you?

24         A.   I think it's a pretty safe bet because it wasn't

25    coming from anywhere else.  There was no other source.
```

1    performance.  Yet, in this email you put that "he avoided

2    work and wandered from assigned work areas."

3            How did you know about that?

4       A.   I don't remember how.  But, yeah, it was spoken

5    of after the fact when he was let go that, you know, there

6    was other instances with other people.  I don't know who,

7    if it was from Jerry or from Manny.  But, yeah, this

8    wasn't the first incident of him, you know, falling asleep

9    on the roller apparently wasn't the first incident.

10      Q.   So you learned that this wasn't the first

11    incident after the fact, after Mr. Monteagudo was

12    terminated, correct?

13      A.   Yes.

14      Q.   While Mr. Monteagudo worked on 490 and during the

15    time that you saw him every day doing the work, you never

16    saw him wandering around or sleeping on a running roller,

17    did you?

18      A.   No.  I never witnessed.

19      Q.   And you never heard any complaints about him

20    wandering from work areas or sleeping on a roller from

21    anyone else, did you?

22      A.   No.  And I wouldn't hear that.  He wasn't

23    directly under my supervision.

24      Q.   I understand.  But as a supervisor, you had the

25    safety meetings, wouldn't that be something that would be

1    that statement is based on whatever was told to you after

2    Mr. Monteagudo was terminated, correct?

3        A.   Yeah.  Honest -- I don't know.  I don't remember

4    if it was before or afterwards, but, yeah, it was from

5    what I had heard from other supervisors.

6        Q.   What do you mean you don't remember if it was

7    before or afterwards?  I thought that's what you stated.

8        A.   Yeah.  No.  I don't remember.  Again, this was

9    so long ago, the events of the way things happening.  Even

10   him present, I -- if he was -- if he walked by me in the

11   hall, I wouldn't be able to remember his face.

12       Q.   Do you ever recall any of the supervisors, either

13   Mr. Nasso or Manuel Comes, ever telling you anything about

14   having an issue with Mr. Monteagudo's performance?

15       A.   I don't remember specifically.

16       Q.   If they had, would you have paid more attention

17   to Mr. Monteagudo?

18       A.   Sure.  Yeah.  If --

19       Q.   But did you?

20       A.   My capacity of work, the superintendents, they

21   all have their areas.  My scope of my job is -- I'm all

22   over the entire job.  We have 15 miles of turnpike that I

23   cover.  So whether -- I don't catch everything.  You know,

24   so if -- I never had an incident where I was around him

25   that I saw him do anything that he wasn't supposed to.

49

```
 1              MR. CLYNE:  Objection.  Triple compound
 2       question.  Can you break it up, please?
 3  BY MS. SAAVEDRA:
 4       Q.  Mr. Cardona, if you understood my question, you
 5  can answer.
 6       A.  Could you repeat it, please?
 7              MS. SAAVEDRA:  Sure.  Miss Court Reporter, can
 8       you read that back, please?
 9  (Whereupon, the requested portion of the record was read
10  back by the Court Reporter.)
11       A.  I wouldn't have, no, because he was under
12  Jerry's supervision.  So if Jerry mentioned it to me, it
13  wasn't my place to discipline him.
14  BY MS. SAAVEDRA:
15       Q.  If there was an accident on the job site,
16  wouldn't all the supervisors be held somewhat responsible?
17       A.  I would only assume responsibility if let's say
18  I happen to be the one driving by and I was the one that
19  found Jorge asleep, then I would have got involved at that
20  point, but --
21       Q.  Have you had any other employees engaged -- like
22  have you ever found an employee who was wandering from an
23  assigned work or an assigned work area --
24       A.  Sure.
25       Q.  -- that you had to discipline?
```

```
 1    incident or another one after that that took place.  I

 2    don't remember.

 3         Q.   Was it you that terminated him?

 4         A.   Yes.

 5         Q.   Any other incidents that you recall?

 6         A.   Specific to what?  What do you mean?  Like

 7    incidents where I had to write someone up?

 8         Q.   No.  Incidents of employees engaging in similar

 9    conduct as what you just described with Joel Romero.

10         A.   No.  That one was pretty a standout because he

11    avoided work a lot.  So that would not -- you don't see

12    that a whole lot.  Generally, the men that come to work

13    understand that they have a job to do and stay busy.  So

14    when someone avoids work, you kind of remember a little

15    better.

16         Q.   And at that point you don't recall -- you

17    remember that it wasn't the first time, right?

18         A.   Yes.  There were a few incidents.

19         Q.   But you don't remember whether or not you

20    terminated him?

21         A.   Again, yeah.  I don't remember if that was the

22    incident of termination, or if there was something else

23    that happened after that.  I don't remember the sequence

24    of events how that happened.

25         Q.   If it had been the first time that you had found
```

53

```
 1        Q.   When did you find out about the situation?

 2        A.   It wasn't long after.  Within 15, 20 minutes of

 3   it happening.

 4        Q.   And what happened after you found out?

 5        A.   I went straight there and talked to Joel and

 6   asked him what he was doing and why he was there and --

 7   yeah.

 8        Q.   So you found out -- how did you find out?

 9        A.   Victor.  Victor -- Al called Victor and sent him

10   pictures and then Victor sent me the pictures.

11        Q.   Did Victor say anything other than sending you

12   pictures?

13        A.   Oh, of course.  He said, listen, Al sent me

14   these pictures, who is this?  Why is there?  What's going

15   on?  Apparently Al watched him for sometime back there so

16   -- yeah, I went to go find out what happened.

17        Q.   Okay.  So when you talked to Joel, was anyone

18   else there?

19        A.   No.

20        Q.   What was the conversation like?

21             MR. CLYNE:  Objection.  Asked and answered.

22        You can answer again.

23   BY MS. SAAVEDRA:

24        Q.   You can go ahead and answer.

25        A.   Okay.  No.  Just asking why he was there.
```

```
 1    did result in a writeup though.
 2         Q.   So when you talked to Joel, did you tell him that
 3    he was going to be subject to discipline?
 4         A.   Yes.
 5         Q.   Did you tell him what kind of discipline at that
 6    point?
 7         A.   Yes.  But again, I don't remember -- I can't be
 8    a hundred percent at this point if that was the incident
 9    that led to his termination or if there was something else
10    after that.
11         Q.   So after you spoke to Joel, you spoke to Victor
12    again?
13         A.   Yes.
14         Q.   Did you speak to anyone else?
15         A.   No.
16         Q.   And who made the decision to what discipline was
17    going to be issued?  Was it Victor?
18         A.   Victor and I, yeah, we both spoke about it.
19    Victor -- since I worked more directly with Noel, Victor
20    asked me what kind of worker he is, is this something out
21    of the ordinary.  You know, he would -- he would ask me
22    questions, more details since I worked more directly with
23    him, and then we would make a decision together.
24         Q.   Is that normally the procedure that the company
25    has to follow to issue discipline to individuals?
```

57

1        A.    Yes.

2        Q.    Okay.  And in this letter, in this email you were

3     writing to Alisa, do you know if this was prompted by him

4     filing an EEOC charge of discrimination?

5             MS. SAAVEDRA:  Form.

6        A.    I believe that, yeah, the email request was

7     that, yeah, there was something -- he was pursuing

8     something, he was trying to say he was wrongfully fired

9     and that she sent out kind of a group email and she asked

10    us if we could write anything pertaining to this, anything

11    that we could remember about him that -- and about this

12    situation.  So that was why I sent the email.

13    BY  MR. CLYNE:

14       Q.    So it says, "Good morning.  In regards to Jorge

15    Monteagudo's work performance, his time on our job 490 was

16    limited.  From day one, I know he wasted no time in talking

17    negatively about Noel Leon in his previous position.  He

18    said he felt as if he was disrespected."

19             Do you recall him saying that he felt he was

20    disrespected by Noel when he was working with you?

21       A.    Again, I don't remember him saying anything

22    specific to me about it, but that was the gist of it, that

23    Noel had disrespected him.  That's what the hearsay was.

24       Q.    And then go into paragraph two.  It says "in

25    reading some of the statements included in this chain, I

59

```
 1      Q.    And is Chris De Moya Cuban?

 2      A.    Yes.

 3      Q.    And you're Puerto Rican?

 4      A.    I'm Puerto Rican.

 5      Q.    Why would a Cuban think he's being discriminated

 6   against by other Cubans?

 7           MS. SAAVEDRA:  Form.

 8      A.    For being Cuban.  Yeah.  No, it makes no sense.

 9           MR. CLYNE:  That's all the questions I have.

10   Thank you very much.

11           MS. SAAVEDRA:  I have no further questions.

12   Thank you, Mr. Cardona.

13           MR. CLYNE:  That's it.  Okay.  Take care.

14   We'll read and take a copy.

15           MS. SAAVEDRA:  I'm not ordering right now.  I

16   will send you copies of the exhibits.

17           MR. CLYNE:  I will then take the original.

18   Mini and a full.

19      (Videoconference concluded at 12:47 p.m.)

20

21

22

23

24

25
```

```
 1                    REPORTER'S CERTIFICATE

 2

 3           I, Jamie D. Mackrell, Shorthand Reporter and

 4   Notary Public in and for the State of Florida at Large, do

 5   hereby certify that the foregoing transcript, Pages 1 to

 6   and including 59, is a true and correct transcription of

 7   my stenographic notes of the statement given by CARLOS

 8   MANUEL CARDONA via videoconference, on the 20th of

 9   February, 2023, commencing at 11:04 a.m.

10           I FURTHER CERTIFY that I am neither attorney nor

11   counsel for, nor related to or employed by, any of the

12   parties to the action in which this statement is taken;

13   and further that I am not a relative or employee of any

14   attorney or counsel employed by the parties hereto, or

15   financially interested in the action.

16                    Dated this 20th of February, 2023.

17           _____

18                    JAMIE D. MACKRELL
                      Notary Public - State of Florida
19                    Commission No. HH173501
                               Expires:  September 8, 2025
20

21

22

23

24

25
```