1           IN THE UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF TEXAS

3                MIAMI DIVISION

4  JORGE MONTEAGUDO ALBURQUERQUE,   )
                               )

5      Plaintiff,          )
                               )

6  versus                   )Case No. 1:22-cv-22343-KMM
                               )

7  THE DE MOYA GROUP, INC.,      ) MAY 9, 2023
                               ) MORNING SESSION

8      Defendants.        )
  _____) MOTION HEARING

9

10              TRANSCRIPT OF PROCEEDINGS

11        BEFORE THE HONORABLE LAUREN F. LOUIS

12          UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20  SUSAN A. ZIELIE, CVR-CM-S, FCRR
    FEDERAL OFFICIAL STENOGRAPHIC COURT REPORTER
21  United States District Court
    Eastern District of Texas
22  211 West Ferguson Street
    Tyler, Texas 75701
23  903-590-1065
    susan_zielie@txed.uscourts.gov

24

25



PLAINTIFF'S
EXHIBIT

50

```
 1

 2

 3                              APPEARANCES

 4

 5    For the Plaintiff:
      NATHALY SAAVEDRA, ESQ.
 6    PereGonza The Attorneys, PLCC
      1414 NW 107th Avenue
 7    Suite 302
      Doral, FL 33172
 8    786-650-0202
      nathaly@peregonza.com
 9
      JOCELYN REBECCA ROCHA, ESQ.
10    PereGonza The Attorneys, PLCC
      5201 Blue Lagoon Drive
11    Suite 290
      Miami, FL 33126
12    786-650-0202

13

14

15    For the Defendants:
      REGINALD JOHN CLYNE, ESQ.
16    CHANELLE ARTILES, ESQ.
      Quintairos, Prieto, Wood & Boyer, PA
17    9300 South Dadeland Boulevard
      4th Floor
18    Miami, FL 33156
      305-670-1101
19    reginald.clyne@qpwblaw.com
      chanelle.artiles@qpwblaw.com
20

21

22

23

24

25
```

1

2                              HEARING INDEX

3   TESTIMONY OF:

4       ALISA DE MOYA

5           Direct by Mr. Clyne          43

6           Cross by Ms. Rocha           50

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MIAMI, FLORIDA; TUESDAY, MAY, 9, 2023

2                      MORNING SESSION

3          JUDICIAL ASSISTANT:  Calling Case Number 22-22343,

4  civil, Judge Moore, Jorge Alburqueque versus the De Moya

5  Group, Inc.

6          Counsel, please note your appearance for the

7  record.

8          MS. SAAVEDRA:  Nathaly Saaverda, Jocelyn Rocha on

9  behalf of the plaintiff.

10         MR. CLYNE:  Good morning, Your Honor. Reginald

11  Clyne of Qiomtaorps, Prieto, Wood & Buyer, and Chanelle

12  Artiles, for the defendant, the De Moya Group.

13         THE COURT:  Okay.  Good morning.  Have a seat.

14         MR. CLYNE:  I have Chris De Moya and Alica De Moya.

15  They are the two corporate reps.

16         THE COURT:  All right.  Let me tell you how we're

17  going to proceed this morning.

18         Let me just double-check with the court reporter,

19  are you hearing all okay?

20         OFFICIAL COURT REPORTER:  I am hearing everything

21  fine.

22         THE COURT:  With that, I wanted to make sure,

23  logistically, that my court reporter was following us.

24         I'm going to ask, Mr. Clyne, you to start, with a

25  laser-focused explanation of what it is that you intend to

1   prove at an evidentiary hearing, what fact that you've

2   advanced in your motion that's in dispute and requires

3   evidentiary proof that you will do and with whom, what

4   witness.  Because it's my impression, at least, that your

5   motion starts off like it travels on a failure to investigate

6   facts and a lack of access to facts -- or evidence, rather --

7   that would have formed a good-faith belief that there was a

8   cause of action, but it seems to end up at an absence of

9   legal research.  So I really -- I got to understand exactly

10  what your theory is before you do.

11          Let me just tell everybody how things are going to

12  move.  Because I am going to sequester witnesses, so

13  everyone's going to be outside while this happens.  Because,

14  after that, I want a laser-focused, like the jury is here,

15  explanation of your case, complete with the evidence that you

16  will elicit that goes to proving each and every one of those

17  elements.  Summary judgment is over, discovery is over, there

18  are no secrets here.  And I don't understand from your

19  response to certain things.  Okay?  So that's how I want to

20  do it, but I don't want the witnesses listening.

21          MR. CLYNE:  You want me to excuse them now, Your

22  Honor?

23          THE COURT:  Yes.

24          MR. CLYNE:  Even the corporate reps?

25          MR. CLYNE:  Well, I don't think your corporate

1  representative is going to testify today, between you and me.

2  I've looked at your witness list, and I don't think that's

3  going to happen.  Your corporate rep can stay.

4          MR. CLYNE:  Because there's two.

5      I don't mind if everyone's out.

6          THE COURT:  The rule permits you to keep one.

7          MR. CLYNE:  So I will keep Chris and ask everyone

8  else to step out.

9          THE COURT:  So, just to be clear, so that everyone

10  understands why I'm doing it -- before you leave, sir, before

11  you leave -- I just want to make sure that everyone

12  understands, I want to not have any witnesses or lawyers

13  speaking to anyone who may testify about either what the

14  attorneys intend to elicit or what has been said in the

15  courtroom.  If you testify -- and we'll get to that -- I want

16  to take your cleanest, freshest understanding of the events.

17  So that is why -- it's not because we don't want you here.

18  It's just, I don't want you to hear what happens next.

19          The reason I say that, too, is so that the lawyers

20  understand that you cannot speak to witnesses who are under

21  oath.  Okay?  All right.

22          With that, thank you.

23          Where is the plaintiff?

24          MS. SAAVERDRA:  Your Honor, I advised the Court

25  that my client seems to be lost.  He's not allowed to bring

1   the phone so I can't reach him.  But I think that he must be

2   either in a different courthouse ...

3              THE INTERPRETER:  Your Honor, I am the interpreter,

4   and I'm wondering if I can help in any way, because I'm just

5   sitting there until he comes.

6              THE COURT:  I would take that offer of help.

7              When was the last time you had communication with

8   him?

9              MS. SAAVEDRA:  I spoke to him yesterday, Your

10  Honor, at, like, 6:00 in the afternoon, and he has all the

11  information and everything.  I'm just -- he's never late so

12  I'm sure that he's probably in a different courthouse.

13             We tried to go look for him but we wanted to make

14  sure we were here on time.

15             THE COURT:  There's so much wrong that has happened

16  in this case.  It's just like one thing after another.

17             I wanted the plaintiff to, obviously, hear your

18  opening.

19             MR. CLYNE:  Okay.

20             THE COURT:  And I just assumed --

21             MR. CLYNE:  We're at your pleasure, Your Honor.

22  So, if you want us to hold, then we can hold.  And maybe

23  three or four of us will go look for him, I don't know.

24             THE COURT:  I have a court reporter and an

25  interpreter.  There's a limit to how much I can abuse the

1    court's resources.

2              Why don't we maybe just wait until the interpreter

3    comes back and see if she had any success.

4              MR. CLYNE:  I don't know, counsel.  Do you want me

5    to go look for him?

6              MS. SAAVEDRA:  She already went to one of the

7    courthouses, but she didn't have her bar license so they

8    wouldn't let her in.

9              MR. CLYNE:  Do you want to just take a 15-minute

10   recess?

11             THE COURT:  No.  Sorry, but we're already 20

12   minutes late.

13             MR. CLYNE:  Can we deal with a preliminary matter

14   then, Your Honor?

15             THE COURT:  Okay.

16             MR. CLYNE:  Okay.  So I filed an amended witness

17   list.  It's late.  And I listed opposing counsel.  Looking

18   at, particularly, one of your cases, I realize I need to have

19   opposing counsel justify why she filed her pleadings.  I

20   don't think that I'm going to invade any attorney-client

21   privilege because our case is based on the facts that have

22   come out in the case, not, per se, conversations between her

23   and her client.  So it would be things like questioning a

24   witness as to you got the statement of determination from the

25   Miami-Dade Commission of Human Rights, you saw the

1   depositions in this case, and you still continued.  So it

2   wouldn't invade anything dealing with that.

3          THE COURT:  Right.  I saw the witness list, and I

4   saw that a protective order was filed.  Candidly, I haven't

5   reviewed it because I'm pretty sure I can guess what it says.

6          One of the reasons that I'm going to have you do

7   this exercise -- and then I'm, likewise, going to hear from

8   plaintiff's counsel -- I have my suspicions that there aren't

9   facts in dispute that are advanced in the motion that would

10  justify the relief that is here sought.  Meaning, when I saw

11  a Rule 11 motion, no investigation, no facts to justify it, I

12  set it for an evidentiary hearing.  But I suspect that that

13  is not really the theory of the motion.

14         So I hear you when you characterize it as a

15  preliminary matter, but I am not sure that I agree that

16  that's something we're going to deal with before I have a

17  better sense of what it is that you would do if you had

18  unlimited time and tolerance from me to put on whatever you

19  want.  I'm going to try to gauge what I think is appropriate

20  and what I think may be premature.

21         I mean, in terms of preliminary matters, I'm not

22  sure -- I might have missed it, but I didn't feel like your

23  reply addressed the plaintiff's observation that this motion

24  is premature, or the citation to the *Almeida* case by Judge

25  Torres.

1   So, again, one of the reasons why I want to hear

2   what it is that you want to do at this hearing is so that I

3   can assess whether or not that should take place today,

4   including inquiry of plaintiff counsel.

5   MR. CLYNE:  We filed the motion for summary

6   judgment first and then we filed the motion for sanctions.

7   THE COURT:  Still pending.

8   MR. CLYNE:  I know.

9   THE COURT:  Judge Moore has not decided it.

10   One of the cases that you cited affirmed -- the

11   Eleventh Circuit affirmed the challenged decision by the

12   district court to delay its decision on the Rule 11 sanctions

13   motion while the merits of that decision, the discrimination

14   piece, was undecided by the Eleventh Circuit.

15   So your motion would have me decide, I think,

16   plaintiff's legal theory before Judge Moore does.

17   MR. CLYNE:  And that's a problem that is not quite

18   of my making, because Judge Moore ordered us to come to a

19   hearing today, and so I did follow that mandate.  When I

20   filed the motion for summary judgment, I was hoping that

21   would be heard and ruled on before we got to the motion for

22   sanctions.  So I'm not in disagreement with either you or

23   opposing counsel that the motion for summary judgment should

24   be done first.

25   THE COURT:  I'm not criticizing.  When you say it's

1   not a problem of your making, I don't disagree with you on

2   that.

3           You have cited the *Latele* case.  And, if you know

4   its complicated history, that, too, was a Rule 11 motion that

5   was filed, denied without prejudice, while the case was

6   pending, and I didn't deal with the Rule 11 sanctions until

7   it was deposed of, sort of, on the merits.  At least, that

8   merit question was over.

9           MR. CLYNE:  To be honest, right now, the summary

10  judgment is just about -- the judge rejected their disputed

11  facts and had them redo it, and we just file a response last

12  night.

13          THE COURT:  Did you say that Judge Moore has you

14  coming in to a hearing today?

15          MR. CLYNE:  Well, he said you have the sanction

16  hearing.  He did a minute order --

17          THE COURT:  Okay.  I was like, Judge Moore does not

18  have a hearing set today.

19          MR. CLYNE:  No, no, no.  He set it before you

20  today.

21          When he set it, I thought maybe he was going to

22  rule on the summary judgment before.  And then he did another

23  ruling where he rejected their disputed Statement of Facts,

24  so they just redid it.  We just did a -- or we're doing a

25  response to that as we speak.  So the summary judgment is off

1  track, definitively, and so I know it's not going to be ruled

2  on in any short order, until all of the statement of facts

3  are finalized.  So, you may be right, this is premature

4  today.

5            I have -- half of my client's office is coming

6  today, so that's -- I don't know if you would like to hear it

7  and then wait on the summary judgment and then rule.

8            THE COURT:  No.  I understand.  And I'll be candid

9  with you, that, as I kept thinking about what your theory is,

10  I thought:  Should I tell them not to bring witnesses?  And I

11  thought:  Nope, that's their call; let me see how this goes,

12  let me talk to them first; I could be wrong.

13            I don't know that we're getting a plaintiff so I'm

14  going to have you go ahead and tell me -- you've heard my

15  concerns about with whether or not this is a Rule 11 motion

16  that requires evidentiary findings.  If you read the perhaps

17  overly-lengthy *Latele* opinion, then you understand the

18  evidence that I took there and what findings were implicated

19  by the plaintiff's filing something that claimed a basis for

20  a jurisdiction that they then and there knew was not true.

21  Right?  And that is what I had to tease out in an evidentiary

22  hearing.

23            I don't understand from your motion what fact it is

24  that you will elicit at this evidentiary hearing on which I

25  would make that finding, that the plaintiffs filed the motion

1    in the absence of evidence that would have supported their

2    claims.  Please don't be as general as:  The plaintiff knew

3    he didn't have a discrimination claim.

4          MR. CLYNE:  Okay.  So I'll start with the

5    preliminary issue.

6          We believe that the plaintiff's initial complaint,

7    which --

8          THE COURT:  I'm going to interrupt you again.

9    Because you do know that, under Rule 11, there are no

10   sanctions that I can recommend imposition of based on the

11   filing of the original complaint?

12         MR. CLYNE:  I understand that.

13         THE COURT:  Just a back-story.

14         MR. CLYNE:  I have a two-prong approach.  If you

15   just give me two seconds, I think I can make my argument and

16   you will understand.

17         THE COURT:  Okay.

18         MR. CLYNE:  I think, when the lawsuit was filed,

19   opposing counsel should have done an investigation, looked at

20   the statement of determination by the Miami-Dade Commission

21   of Human Rights, and realized that there was not sufficient

22   grounds to bring the suit.  They dropped the national origin

23   discrimination claim.  They kept the retaliation claims.

24         The retaliation claim is based on -- the first

25   prong is that you engaged in some sort of protected activity.

1   After the depositions were taken in this case, as to the
2   meeting that was held with regards to the protected activity,
3   all of the witnesses, including the plaintiff and the two of
4   my clients that were deposed, said that he complained that he
5   was told by his supervisor to go to a new job site, 874, and
6   that he was disrespected.  Right?  That kernel of evidence,
7   when you had three witnesses all saying that all he
8   complained was about disrespect, that is not a basis for an
9   unlawful discrimination act.  That's not -- disrespect by a
10  supervisor telling you to do something is not a violation of
11  Title VII.
12         So the evidence that came into this case, even if
13  you say, okay, she had some doubts; let me throw my dice and
14  see what I got, when you heard the testimony from Chris De
15  Moya, Susan Geraldo, and your own client, and all he said in
16  his deposition was "I was disrespected by my supervisor,"
17  that doesn't create a Title VII claim.
18         THE COURT:  Okay.  So it's legally insufficient.
19         MR. CLYNE:  It's legally insufficient.
20         THE COURT:  There's not a fact that was alleged in
21  the absence of a good-faith basis to believe the evidence
22  would bear it out.
23         MR. CLYNE:  I think there was not a good-faith
24  basis to bring the suit, and there's not a good-faith basis
25  to continue the suit.

1          THE COURT:  I know, but you are not hearing the

2     question that I'm asking.

3          MR. CLYNE:  Sorry.

4          THE COURT:  Sir, are you the plaintiff?

5          MR. ALBURQUERQUE:  Yes.

6          THE COURT:  Welcome.  Our hearing started at 10.  I

7     did my best to wait for you.

8          Thank you.

9          Okay.  The question that I'm asking, that I want

10    you to answer, is whether there is a fact that you would ask

11    me to find that the plaintiffs alleged in the absence of a

12    good-faith basis to believe there was evidence.

13         That there was discrimination is a legal

14    conclusion.  That he engaged in protected activity might be a

15    mixed question but it's really conclusory.

16         So, is there a fact -- for example, that there was

17    systemic insults?  That would be a fact that the plaintiff

18    may have alleged, but the evidence didn't bear it out and

19    they knew it wouldn't bear it out.  That's the difference I'm

20    drawing.

21         I think your main argument is, once she heard all

22    the evidence, plaintiff's counsel should have known, under

23    Eleventh Circuit law, this is not sufficient to carry a

24    retaliatory claim of retaliation.  I think that's your

25    primary argument.

1    MR. CLYNE:  Yes.

2    THE COURT:  I am trying to make sure that I

3 understand there's not a fact I am listening for from this

4 evidence that was never true, she should have known it was

5 never true, she alleged it anyway, like in the *Latele* case.

6 Draw a comparison.

7    MR. CLYNE:  I think there are facts that --

8    THE COURT:  Were alleged and --

9    MR. CLYNE:  -- that were not properly or truthfully

10 alleged in the initial complaint.

11    THE COURT:  But the initial complaint is not

12 actionable.

13    To the extent you are successful on the merits and

14 you ultimately move under frivolity to be recouped all of

15 your attorneys fees and costs, that would go back to the

16 origin of the original complaint.  But Rule 11 only travels

17 on a pleading she hasn't withdrawn, so that's just the

18 amended complaint.

19    MR. CLYNE:  And I'll say, with regards to the

20 amended complaint, the first deposition we took of the

21 plaintiff, there was no allegation, whatsoever, of any type

22 of discrimination.  No "they called me a Cuban," nothing.

23    The second deposition, he used the word

24 "discrimination," but he applied it to the same set of facts

25 where his supervisor told him to go to a new job site.  He

1  said "I had a flat tire, I can't go."  And that was the basis

2  of discrimination.

3          So, based on those two depositions, the plaintiff

4  never enunciatedI:  I was called a racial slur; I had

5  disparate treatment; I had something that would be the

6  genesis for the unlawful --

7          THE COURT:  Let me ask you, because, in preparation

8  for this hearing, I think I've read the entire docket, so I

9  don't know where I picked this up.  I know it's mentioned in

10  the charge.  I don't remember where else.  But are you saying

11  he did not, at deposition, testify that he was, by one

12  supervisor, told:  You Cubans are lazy, or you Cubans are of

13  another expletive?  That evidence didn't come out at

14  deposition?

15          MR. CLYNE:  That did not come out in deposition.

16          There was an affidavit filed, and she relies upon

17  the EEOC charge and the statement of determination where

18  those were alleged.  But, in the deposition itself, I asked

19  him how were you discriminated against, and he gave me the

20  diatribe about his supervisor telling him what to do.

21          There was one statement -- that we don't think is

22  credible -- where the supervisor says, "I'm American and

23  you're Cuban, and that's why I can do what I'm doing," when

24  he was being terminated.  But that supervisor is here today.

25  He doesn't speak Spanish.

1          THE COURT:  But I'm not going to make a credibility

2     determination.  That's why, when I looked at your witness

3     list, I was like, we're not having a trial today.  Do you

4     know what I mean?  I'm not going to listen to two competing

5     pieces of evidence and say that the plaintiff's counsel

6     should have known that your clients were telling the truth

7     and yours weren't.

8          MR. CLYNE:  I thought you could rule on the

9     pleadings, Your Honor.  But when you said come down here and

10    we're going to have an evidentiary hearing, I figured the

11    Court needed some clarifications or illumination of some

12    facts.

13          I've brought three witnesses that I think can talk

14    about three different parts of this case.  Ultimately, one is

15    going to talk about how she responded to everything, gave

16    them all the evidence, and that they should have known that

17    there was just no basis of a lawsuit.  She will testify about

18    what happened in that meeting, where there was no report of

19    any type of discrimination.

20          And then I have Mr. Nasso to say, "I found him

21    sleeping, and that's why I terminated him, and I used an

22    interpreter to talk to him".

23          THE COURT:  You understand, and I hope agree,

24    though, that the evidentiary standard that I would apply is

25    not what I might find today, but, rather, what plaintiff's

1   counsel knew or upon reasonable investigation should have

2   known, none of which would relate to what your witnesses that

3   you just proffered would say; right?

4           MR. CLYNE:  No.  They would.

5           THE COURT:  You don't -- she wouldn't know that.

6   Meaning, the finding that I would make, plaintiff counsel

7   knew or should have known the testimony of your witnesses,

8   she was not in a position to have interviewed them.  She did

9   not as a matter of fact historically -- like, they're not

10  going to say:  And I told Ms. Saavedra this.  Right?

11          MR. CLYNE:  No.  But she did depose Chris De Moya

12  and Susan Geraldo.

13          THE COURT:  So the depositions will be the evidence

14  of what plaintiff --

15          MR. CLYNE:  And her own client.

16          And they all concurred that the only thing he

17  complained about was a lack of respect.  And, you know, Title

18  VII is not to deal with petty workplace grievances.  That

19  goes from the Supreme Court, the Eleventh Circuit, every

20  which way you look.

21          THE COURT:  So, when I say laser-focused, I'm back

22  to the facts that would be in dispute that are the bases of

23  your motion and that you would intended to prove today.

24          So my question again -- and, candidly, it's okay if

25  you don't agree with me -- but it's Rule 11 asks what

1    plaintiff's counsel knew at the time she filed the offending

2    pleading or should have known with reasonable investigation

3    if she didn't conduct that investigation.

4          I'm not hearing from your proffer of witnesses any

5    information that would go to that factual finding.  Like, for

6    a moment, if this were state court and I was going to make

7    you draft my order for me, what findings would you advance

8    for me to make at this hearing that's coming from those

9    witnesses.

10          MR. CLYNE:  If you had interviewed your own client,

11   who testified under oath in his deposition that he was

12   treated with a lack of respect when his supervisor told him

13   to go to a job site, that would have told you that you didn't

14   have the basis for a retaliation claim because there was no

15   protected activity.

16          So, I mean, you have a duty to interview your

17   client.  Right?  And if your client tells you something, and

18   then you don't listen to him and you file this lawsuit, it

19   has no legs.  If you can't meet the first prong of a

20   retaliation claim, then there's no case.

21          THE COURT:  Okay.

22          MR. CLYNE:  And so there is no pending EEOC charge

23   that he participated in.

24          The only thing that could happen was he reported

25   it, and what he reported did not constitute discrimination.

1  She should have known that when she interviewed her client.

2  She should have known that when three depositions all said

3  the same thing, he complained about lack of respect.

4         So, at the inception of the case, you should have

5  interviewed your client.  And, if you did, and you saw what

6  the statement of determination showed you from the

7  Miami-Dade -- and I speak fast --

8         THE COURT:  Just for the court reporter.

9         MR. CLYNE:  I know.  I'm horrible about that.  It's

10  the New Yorker.

11         So, if you'd done that, you would have known there

12  was no case.

13         And if you thought maybe something would come up in

14  the case, and you did three depositions, and they all said

15  the same thing, at that point there was 100 percent certainty

16  that you could not meet the first prong.

17         THE COURT:  Okay.  So then I agree with you that

18  that would be the most relevant pieces of the Rule 11

19  motion.

20         MR. CLYNE:  Right.

21         THE COURT:  And none of that would purport to come

22  from those three witnesses.  So it's my observation that the

23  witnesses that are on your list don't provide salient

24  testimony that I could possibly use for this motion.

25         MR. CLYNE:  I would agree with you.  I brought them

1    because the Court said have an evidentiary hearing.  And so I

2    said, okay, maybe there's something I don't see that's not in

3    the record.

4         But I think, if the Court looks at the three

5    depositions that were taken in this case, it's clear that

6    that was enough for her to know we didn't need to keep going.

7              THE COURT:  Okay.

8              MR. CLYNE:  And so -- and I'm an older attorney.  I

9    admit it.  I've got gray hair.  I'm telling you, hey, look, I

10   don't see anything here.  You're making a small company bring

11   in one witness after another.  I mean, I've got six people,

12   seven people, nine people coming here today, and she wanted

13   six.

14             THE COURT:  So we might want to go ahead and excuse

15   those folks so that they're not losing an entire day.

16             MR. CLYNE:  But you're emptying out my company.

17        Sometimes I think we forget, as lawyers, what the

18   impact is of a lawsuit on someone.  And when you are taking

19   my supervisor off the job site -- there's only one that can

20   supervise the people that are there.  You're taking my risk

21   manager out.  You are taking my -- I mean --

22             THE COURT:  I hear you.  And I don't mean to sound

23   callus, I think the intended audience for those comments is

24   plaintiff's counsel.

25        But, again, in terms of what I have to decide here

1    today, I'm not unmindful of the impact on your company; and,

2    again, hope that you have the time now to release them to go

3    back to their jobs.

4              MR. CLYNE:  All right.

5              THE COURT:  Again, I did not want to make the

6    determination for you, and you might have known something I

7    didn't about what those witnesses were going to say.

8              MR. CLYNE:  No.

9              THE COURT:  But, based on the motion, it struck me

10   as what are we going to do here.  So that's my observation.

11             Let me hear from plaintiff's counsel.

12             MR. CLYNE:  Thank you, Your Honor.

13             THE COURT:  Thank you for that thoughtful

14   presentation.

15             And I want to make sure -- I'm going to --

16             MR. CLYNE:  So, before I let them go -- because six

17   of them are witnesses that the plaintiff wants to call -- so

18   I don't know if you want to hear from her first as to why she

19   thinks they need to be called.

20             THE COURT:  That's fine.  She's shaking her head

21   though.

22             MS. SAAVEDRA:  Your Honor, I agree with you, if

23   we're not going to -- the reason why we have listed these

24   individuals is in the event the Court was going to entertain

25   the request from the defendant of asking of who

1    do you believe question, right, the testimony.

2          THE COURT:  That's agreement.  You can go ahead and

3    let them go.  Okay.

4          So I do this more with my criminal lawyers than I

5    do with my civil lawyers because they're used to me, so I

6    apologize if this comes on a little strong.  I'm going to

7    tell you my observations about the motions; and, in response,

8    I want to hear your responses.

9          From my perspective, frankly, your strongest point

10   in the response is:  This is premature.  I tend to agree, now

11   that I have a better understanding of what it is that the

12   defendant is really attacking.

13         If there had been, for example, an allegation about

14   an act of discrimination that would have supported that

15   claim, that then the plaintiff later backed away from, you

16   know, renounced on deposition, this might have been a timely,

17   for me, to decide Rule 11 motion.

18         I am strongly disinclined to send Judge Moore a

19   recommendation on the merits of your case before he reaches

20   it.  And I think that the case law strongly favors, frankly,

21   waiting until the case is deposed of.  So, from where I sit,

22   your citation to *Almeida* was about the most on point case in

23   the entire response.

24         On the other side, however, I think the response

25   misses in a number of ways and really fails to address,

1  frankly, the role that the discrimination facts or evidence

2  plays into your case.  Like, whether there's a current

3  appreciation or understanding of how that evidence is crucial

4  to your retaliation claim.  And that is why I would like to

5  hear, notwithstanding my impression that this is premature --

6  I sit here open-minded.  As I came out, I didn't set you guys

7  for no reason.  But this is why I want an explanation of your

8  case as you will present it to the jury, supported with

9  citations to specific evidence.

10       MS. SAAVEDRA:  Yes, Your Honor.

11       The first document that would I cite is one of the

12  exhibits that counsel added to his motion for sanctions,

13  which is the first exhibit, which is a determination by the

14  Miami-Dade County.  On page 4, paragraph number 3 --

15       THE COURT:  Is that admissible?

16       MS. SAAVEDRA:  There has been a ruling on the

17  motion in limine, and the judge allowed it.

18       THE COURT:  The judge is letting it in?

19       MR. CLYNE:  He let it in with regards to the

20  retaliation claim.

21       THE COURT:  That it happened, or as evidence of

22  discrimination?

23       MR. CLYNE:  It's coming in to show that -- I mean,

24  I was bringing it in to use it to show that they knew from

25  the start that there was no lawsuit.  That was the basis as I

1   was going to use it for at trial.

2          THE COURT:  What's the ECF number of Judge Moore's

3   ruling?

4          MR. CLYNE:  That, I don't have.

5          MS. SAAVEDRA:  We can get it for you, Your Honor,

6   if you give us a second.

7          JUDICIAL ASSISTANT:  It's 61.

8          THE COURT:  Now tell me which paragraph.

9          MS. SAAVEDRA:  It is page 4, paragraph number 3.

10          THE COURT:  Respondant reported that ...

11          MS. SAAVEDRA:  That is the charging party's

12   rebuttal.

13          So once the Miami-Dade County Commission received

14   the --

15          THE COURT:  I'm sorry.  I just wanted to make sure

16   I'm in the right place.

17          MS. SAAVERDRA:  So sorry.

18          THE COURT:  It is page 4, paragraph number 3, and

19   it begins:  Respondent reported that on February 21 ..

20          MS. SAAVEDRA:  No, Your Honor.

21          THE COURT:  Sorry?

22          MS. SAAVERDRA:  It's 58-1, page 4, paragraph number

23   3.  Starts with:  Charging party reported that ...

24          So, maybe for you, it's page 5.

25          THE COURT:  Okay.  I was looking at the documents

1   numbering page 3.

2           Got it.  Okay.

3           So Judge Moore's motion in limine, if I don't

4   misunderstand it, denied your motion to exclude this

5   document, and he concluded that the agency's summary of

6   findings may be admissible.

7           Do I misunderstand Judge Moore's ruling?

8           MS. SAAVEDRA:  That was my understanding, Your

9   Honor.

10          THE COURT:  So the part you're reading to me is the

11  respondent's response?

12          MS. SAAVEDRA:  This is the decision by the

13  Miami-Dade County.  Like, the summary of their findings.  So

14  paragraph number 3 is charging party's rebuttal.

15          THE COURT:  So that's their rebuttal.  Okay.

16          I'm not convinced that this is admissible under

17  Judge Moore's ruling, or excluded, but go ahead.

18          MS. SAAVEDRA:  When the Miami-Dade County County

19  commissioner received the response by defendant to the --

20          THE COURT:  I'm so sorry.  Okay.  This is just your

21  client's statements to the EEOC?

22          MS. SAAVEDRA:  Correct, Your Honor.

23          THE COURT:  Okay.

24          MS. SAAVEDRA:  But, from the beginning, my client

25  has stated that he has complained about -- and the complaint

1   was about discrimination because he was Cuban and the

2   comments that Leon -- that Noel Leon made and the way that he

3   was being treated by him.

4          THE COURT:  Okay.  So the discrimination claim is

5   based on these two undated comments?

6          MS. SAAVEDRA:  Yes, Your Honor.

7          THE COURT:  Okay.  So, under the law, it's your

8   burden to show that there is a good-faith basis to believe

9   that there was a discriminatory practice, subjectively and

10   objectively.

11          I understand the thrust of the defense argument to

12   be, under no Eleventh Circuit case law would this rise to

13   discriminatory treatment.

14          MS. SAAVEDRA:  And we disagree, Your Honor.

15   Because it's not just the two comments, it's the way that he

16   was being treated by Noel.  And he also testified as to that

17   in his deposition.

18          THE COURT:  Which is exactly why I asked you to

19   advance the evidence that you will put forth before a jury.

20          So we have these two comments.

21          MS. SAAVEDRA:  Yes, Your Honor, we have those two

22   comments.

23          We also have plaintiff's deposition transcript, the

24   second deposition.

25          THE COURT:  Was it attached it your response?

1      MS. SAAVEDRA:  Your Honor, it's 50-2.  We filed all
2  the different exhibits, and that's part of that record.
3      THE COURT:  Okay.  50-2.
4      MS. SAAVEDRA:  Yes, Your Honor.
5      THE COURT:  Deposition.
6      MS. SAAVEDRA:  Yes.
7      THE COURT:  Okay.  And where?
8      MS. SAAVEDRA:  And it's the actual page on the
9  transcript, page 18.  Line 8 is where it starts the
10  questioning, and then my client's response.
11      THE COURT:  Okay.
12      MS. SAAVEDRA:  So he testified that he felt he was
13  being treated differently by Noel Leon because he was Cuban,
14  because he didn't speak English, and because he was not a US
15  citizen.
16      Now, whether or not his subjective belief
17  ultimately would have established a discrimination claim is
18  not something that we have to prove for the retaliation
19  claim.  Because after he complained, under *Little*, there is
20  no requirement that we have to prove that the discrimination
21  actually happened; we only have to prove that there was a
22  subjective belief.
23      THE COURT:  And objective.
24      MS. SAAVERDRA:  And objective belief.
25      So if --

1          THE COURT:  If the belief was objective,

2   objectively reasonable.

3          MS. SAAVEDRA:  Right.

4          But if he believed that --

5          THE COURT:  But you as the attorney are sort of

6   that filter.  So it's not limited to whether or not you

7   believe your client, that he thought he was the subject of

8   discrimination.  But your task, consistent with the case law,

9   to say this conduct has previously -- or something similar to

10  it -- been recognized as actionable.

11         MS. SAAVEDRA:  Which, there has been, Your Honor,

12  under the retaliation prong, if you're looking at the

13  retaliation analysis on *Monaghan*, I believe is the case.

14         THE COURT:  I know you've cited that case.  I don't

15  think that is analogous.  The conduct there was so much more

16  pervasive than the evidence that I've seen.  And, again, why

17  I'm asking you to advance what it is that supports your

18  claim.

19         MS. SAAVEDRA:  We also cited to the *Castaneda*

20  *versus Partida* case where it says that -- because counsel's

21  argument was, that because they were both Cubans, that there

22  won't be discrimination.

23         THE COURT:  I know it's not procedurally analogous,

24  but the Court did use those words.

25         What I'm telling you is, frankly, despite my

1   continued sense that this is premature, it is a much closer

2   Rule 11 case than I've had in a while, and I am struggling a

3   little bit against the concern about what Rule 11 requires

4   the courts to do to prevent frivolous cases from continuing

5   to cost the system and the parties money.

6          If there is a basis for me to defer ruling on this,

7   I need hear to from you.

8          MS. SAAVEDRA:  Yes, Your Honor.  I know that there

9   are cases.  I don't have the cite for you right this second

10  but I can find it.

11         I know that there were -- I looked up the objective

12  standard and what the courts would evaluate in order to make

13  a determination of whether this would be sufficient to carry

14  on.  Because my understanding from the case law that I read,

15  *Clover* included, is that there was --

16         THE COURT:  Did -- *Clover*, you said?

17         MS. SAAVEDRA:  Yes, Your Honor.

18         THE COURT:  So, again, *Clover* -- I mean, the

19  allegations were systemic, persistent, explicitly racist,

20  violent even, witnessed.  I combed your cases.  I disagree

21  that there was one cited that stood for the proposition that

22  this would satisfy that objective standard.

23         MS. SAAVEDRA:  When the Court says that it doesn't

24  require to prove the case but it requires for it to be

25  enough, like, sufficient --

1          THE COURT:  Right.

2          MS. SAAVEDRA:  My client has testified that Noel

3   Leon has treated him differently.  That they would give

4   him -- that he would give him the less -- the less desirable

5   jobs.

6          THE COURT:  Where did he testify to that?  Where is

7   that evidence?  I didn't see that cited in your response.

8          MS. SAAVEDRA:  Part of that is the complaint about

9   the job that he was being assigned to and sent to right

10  before he went to make a complaint.  That was one example.

11         THE COURT:  I'm looking for evidence, not a general

12  description.

13         MS. SAAVEDRA:  It's on 50-2, starting on page 31,

14  line 21.

15         THE COURT:  Sorry.  Hang on.  I have lost my

16  transcript.

17         What page?

18         MS. SAAVEDRA:  Page 31, is where the question

19  starts.

20         MR. CLYNE:  Which depo are you in?

21         MS. SAAVEDRA:  The second one.

22         THE COURT:  What line?  Sorry.

23         MS. SAAVEDRA:  Give me one second, Your Honor.

24         THE COURT:  I'm not seeing that on this page.

25         On page 31, you said?

1       MS. SAAVERDRA:  Starting on actual page 31 of the

2  deposition.  In the deposition, it says page 31.  Line 21 is

3  where counsel starts asking.

4       THE COURT:  Okay:  Were you advised on -- da, da,

5  da, da.

6       Okay.  And where is his testimony that he was

7  treated differently?

8       MS. SAAVEDRA:  If you go on to page 32, Mr. Clyne

9  asked him about September 4th, which is the date that went to

10  complain.

11       And then my client said that -- that with whom --

12  who were the operator, and he said that that day he told him

13  that he assign him the 874 project, and he had issues with

14  his car and he couldn't go, and there were other employees

15  that were available to go, and he told him that he had to go

16  or he would be fired.

17       THE COURT:  Okay.

18       MS. SAAVEDRA:  So his explanation to me was that

19  that was part of the way that he was being treated

20  differently by Noel Leon, that he will give him those

21  assignments that were more physical and more demanding and

22  less desirable, I guess you could say, than other employees.

23       THE COURT:  Okay.  That is not clear from the words

24  on the page.

25       Do you disagree with the observation I made, that,

1    in the event that this cause of action -- that the claims on

2    this cause of action, if, ultimately the plaintiff does not

3    prevail on motion by the defense and a finding of frivolity,

4    the fees for the entire case are shiftable to the defense.

5            MS. SAAVEDRA:  Your Honor, I disagree with that.

6            THE COURT:  You disagree?

7            MS. SAAVEDRA:  Yes.  I think that there is case law

8    on that issue of cases where the law allows for the plaintiff

9    to recover fees and costs if they prevail but it's not

10   fee-shifting, it's not whoever prevails.  So there is case

11   law as to the attorney fees that could be granted, and I

12   would be happy to brief that for the Court.

13           THE COURT:  Oh, no.  I'm not asking for me.  I'm

14   wondering and making sure that there is a cognizant approach

15   to the rest of this litigation, because that's not in front

16   of me.

17           I raised the question internally when I saw -- when

18   I sort of got to the meat of what I think the defense motion

19   is, and one of my questions was:  Well, why do it now; why

20   not do it at the end of case.  Because the frivolity

21   standard, if the Court were to make that finding, then at the

22   end of the case, I think, would entitle the defense to seek

23   the fees.  But I think that -- I'm not positive whether or

24   not that fee-shifting would be from the party or counsel.  I

25   think only Rule 11 triggers any liability for counsel, but I

1    am not sure.  I didn't do a deep-dive.  And that's why I was

2    asking whether you agree or disagree.

3           I'm going to ask you each one last question.

4           Mr. Clyne, I think that you have already indicated

5    that you agree with me, and that a decision or recommendation

6    is -- what you're looking for is a recommendation, and a

7    dispositive one, by me, before the summary judgment order

8    would be premature.  And that it would be, I think, your

9    desire to have this in abeyance until that is done.  Is that

10   correct?

11          MR. CLYNE:  That is correct, Your Honor.

12          THE COURT:  Okay.  Let me ask if plaintiff counsel

13   has a different desire.

14          Do you want this adjudicated on its merits now?  Or

15   do you, likewise, agree that this should not be decided

16   before the summary judgment motion?

17          MS. SAAVEDRA:  I agree, Your Honor, that we should

18   wait until the motion for summary judgment gets ruled on.

19          THE COURT:  Okay.  I am not going then to either

20   hold you for the next six hours at your own expense, or,

21   frankly, entertain the evidence that I don't think goes to

22   the ultimate question as it will be presented at the end of

23   the case if that's how it goes.  Right?  As we are all

24   sitting here, for the purposes of this argument, there's been

25   somewhat of an assumption that you're right and how would

36

1    this go, and Judge Moore still has this motion.  And I think

2    that there is very little that the evidence could advance,

3    and I'm fairly convinced that I can't decide this yet.

4         Again, so that, I guess, by way of apology, when I

5    saw the motion and thought that it was predicated on a fact

6    that was alleged and that the case was premised on, that the

7    discovery has dispositively shown you could not have been

8    true and she knew could not have been true, I thought it was

9    critical to set the evidentiary hearing and give you the

10   opportunity to show that as early as possible, but I think

11   that's your theory of the Rule 11 motion.

12        MR. CLYNE:  I wouldn't say it's not.  My theory is

13   that, if you did a proper investigation, you wouldn't have

14   brought this lawsuit.

15        And, if you would have listened to your client, you

16   wouldn't have brought this litigation.

17        And, if you would have looked at the three

18   depositions, you would have seen there was no protected

19   activity in that meeting.

20        And, at that point, when I asked you to please stop

21   this, it's costing us money, that you don't have any legs for

22   this case, that you should have ended it.

23        So, when I filed the motion for summary judgment, I

24   thought that that would be heard first, and then the Rule 11

25   would be heard.  But the summary judgment has gotten snarled

1   up, and I know it's  ready to be heard on.  He's not going to

2   rule on it until we respond to the second statement of facts.

3          I only ask -- because this has cost my client a lot

4   of money to bring everyone here -- if there's any questions

5   of anybody that you think we need to do today and now, while

6   we're all here, I'm willing, ready and able.

7          THE COURT:  I know, and I appreciate it.  It's just

8   that I don't make witness lists.  I just want to see who

9   you're presenting so that I have a sense of where we're going

10  with it, and I need to know how much time I need my court

11  reporter.  So, that's why I require the witness lists, in

12  case we have to do this again.

13         But I can't think of a fact that we would draw from

14  your clients other than:  And I told plaintiff's counsel this

15  when she called, when she tried to serve me with a demand

16  letter, pre-suit.

17         I'm not making this up, but it's literally the only

18  thing that I can imagine.

19         MR. CLYNE:  That's exactly what I have for you.

20         THE COURT:  That:  I told plaintiff's counsel

21  before suit?

22         MR. CLYNE:  I have her response to the EEOC charge

23  where she literally answers every allegation and shows facts

24  that support her.

25         And then the complaint comes out, and it's just,

1    like, the facts that you should know don't -- aren't

2    reflected in the complaint.

3           So, for instance, he's an exemplary employee.  No,

4    he'd been counseled and given written reprimands two or three

5    times.  So how can you make the allegation in the complaint

6    that he's an exemplary employee, when we gave you evidence to

7    the contrary?

8           So there's stuff that would come out from Ms. De

9    Moya that would show that, pre-suit, when they were going

10   back and forth, that she gave her evidence.

11          I mean, we have a 70 percent Hispanic workforce.

12   Spanish is spoken all the time in our workforce.  Most of our

13   employees are, you know, new immigrants.  They are the ones

14   who pick up shovels and do the hard, dirty work in this

15   country.  That's who we employ.  So it's things like that

16   that would show that you didn't have a good-faith basis to

17   begin.  And then, once you did start, you didn't have a

18   good-faith basis to continue.

19          So there really are two parts to my case, and I

20   think that --

21          THE COURT:  Doesn't all of that speak to

22   credibility?  To the extent that an attorney has an

23   obligation, a duty of loyalty to the client, to the extent

24   the client is giving her a story that is contradicted by your

25   client's evidence --

1          MR. CLYNE:  Should make you think.  Should make you

2  pause.

3          THE COURT:  Okay.  But I don't know that that is --

4          MR. CLYNE:  I mean, I think, if you'd looked at the

5  -- I mean, a Rule 11 is, there's no factual basis and no

6  legal basis.  Right?  So look at the cases coming out of the

7  Elevevnth Circuit that say that an isolated remark is not

8  sufficient to bring a case.  And I cite to *Little versus*

9  *United Technologies Carrier Transicold Division*, 103 F.3d

10  956, 961, Eleventh Circuit, 1977:  A racially derogatory

11  remark by a coworker, without more, does not constitute an

12  unlawful employment practice.

13          So, on her best day, you have one or two isolated

14  comments.  That doesn't get you to the basis of filing a

15  discrimination lawsuit.

16          I mean, I've been a plaintiff's attorney and a

17  defense attorney, and I got to the Eleventh Circuit and I won

18  a trial in front of Judge Ferguson, and I got shot down

19  because I had evidence coming in that the supervisor said:

20  That nigger keeps bugging me for a job.  And, yes, my client

21  was asking for a promotion.  And the Eleventh Circuit said

22  that isolated remark is not enough.

23          So that's why I know -- I mean, I felt the pain of

24  going through a full trial, and then getting reversed by the

25  Eleventh -- that you can't bring just one.  And I had

1   corroborating witnesses.  I had disparate treatment charts

2   and impact charts showing, statistically, that Publix was not

3   promoting women and minorities.

4           When you bring one of these lawsuits, you got to

5   bring it strong.  And, otherwise, you're -- my clients feel

6   like they've been crucified.  Here is Cuban immigrants.  We

7   hire all these people.  And you took 10 people out of work,

8   in a small company, out of 15 people?  I mean, yes, we have a

9   lot of laborers, but, I mean, my management team?  And you're

10  accusing of them discriminating against their own people,

11  when all they do is hire everybody and anybody?

12          And so, yeah, there's some justifiable reasons why

13  I brought this.  And I didn't bring it --

14          THE COURT:  I am not saying it's not --

15          MR. CLYNE:  I didn't bring it frivolously.

16          THE COURT:  I'm not --

17          MR. CLYNE:  I tried two or three times --

18          THE COURT:  I'm not.  I'm trying to make a good

19  plan for its disposition in the status of this case.

20          Again, I think that, in all candor, once I had the

21  the benefit of everybody's briefing -- I didn't want to deny

22  you an evidentiary hearing once we had set it.  But it could

23  have been canceled and the whole thing could have been

24  postponed because, frankly, I was like:  Let me hear from

25  them; they might disagree with me.

41

1          MR. CLYNE:  I have a judge in Brouwer that's going

2     to be very upset with me because I had a special-set hearing,

3     and I said I got an order from a federal judge.  I've got to

4     go to an evidentiary hearing that I think should only take an

5     hour or two.  With nine witnesses, it could take six.

6          THE COURT:  How about an hour?  How about an hour

7     and 10 minutes?.

8          The bottom line is, I think that every one of the

9     lawyers in the room recognizes that the case law and better

10    practice here is to wait for the ruling on the summary

11    judgment.

12         MR. CLYNE:  I understand.

13         THE COURT:  I'm not going to deny it without

14    prejudice.  I'm going to hold it in abeyance, so that it is

15    filed.

16         In the event that it becomes live again, what I

17    will ask is that the parties -- I mean, we may spur you with

18    an order requiring action within a particular date.

19         But to the extent that evidence -- that either side

20    thinks that there's a factual dispute that needs resolution

21    by evidence, then we'll reset the hearing and just be -- you

22    have the benefit of my observations about whether or not the

23    witnesses, the underlying witnesses from your company, would

24    provide salient testimony at a Rule 11 motion where the issue

25    is what plaintiff and his counsel knew or should have known

1    and what investigation was undertaken.  It seems to me like

2    it would be incredibly limited, but you are the master of

3    your facts in your case.  So, for whatever that is worth,

4    that's the way that I think that we should proceed.

5              MR. CLYNE:  All right.  I hate to bring them here

6    and not call her.  So is there any way that you could hear at

7    least one witness?

8              THE COURT:  That's fine.

9              MR. CLYNE:  And then -- because then I don't have

10   to call her back.

11             THE COURT:  That's fine.

12             MR. CLYNE:  Because she's sitting here now.

13             THE COURT:  Yeah.

14             MR. CLYNE:  I think --

15             THE COURT:  You had me at yes.

16             MR. CLYNE:  Thank you.

17             I need to learn to shut up.

18             I'd like to call Alisa De Moya, Your Honor.

19             THE COURT:  I don't want you to take up any papers

20   with you.  Go ahead and leave that at counsel table.

21             MR. CLYNE:  I'm going to give you some papers.

22             Your Honor, if I could approach?

23             THE COURT:  You have a copy for plaintiff's

24   counsel?

25             Go ahead.

1        ALISA DE MOYA, being first duly sworn, testified as

2   follows:

3            THE WITNESS:  I do.

4            JUDICIAL ASSISTANT:  Speak into the microphone.

5   State your name, spell your last name for the record.

6            THE WITNESS:  Alisa De Moya,  D-e M-o-y-a.

7            MR. CLYNE:  If I could, Your Honor, I'm going to

8   direct the witness to Exhibit 12, and I'm bringing her that.

9            THE COURT:  Actually, I apologize.  But, rather

10  than have her testify from an exhibit, it's my practice to

11  allow you to go ahead and ask questions.  If an exhibit comes

12  in and she needs it -- but I limit the witness's viewing of

13  an exhibit to refresh recollection.

14            MR. CLYNE:  I'll do it your way, Your Honor, but I

15  think the exhibit is important too.

16            THE COURT:  Okay.

17            MR. CLYNE:  So I'll start out with just some basic

18  questions.

19                   DIRECT EXAMINATION.

20            BY MR. CLYNE:

21  Q.  Can you tell us your name, please.

22  A.  Alicia De Moya.

23  Q.  Where do you work?

24  A.  The De Moya Group.

25  Q.  Can you tell us how the De Moya Group came into

44

1   existence.

2   A.    My husband lost his job, and he said he was going to

3   make his own company, and we started the company in our

4   one-car garage.

5   Q.    What is your current position at the company?

6   A.    I'm secretary-treasurer.

7   Q.    And how long have you worked at the company?

8   A.    Since 1987.

9   Q.    And what is the ethnicity of the founders of company?

10  A.    They are Cubans.  Some of them became Americans, some of

11  them didn't.  There are five brothers, and there were two

12  sisters that also invested.  And myself.  I'm an

13  American-born.

14         We started off with a $64,000 turning lane.  That

15  was our first job.

16  Q.    What percent of your workforce is Hispanic?

17  A.    I would say it must be beyond 70.  Maybe even 80.

18  Q.    Is Spanish commonly spoken in the workplace?

19  A.    Oh, yes.  Most all of our supervisors do speak Spanish

20  except for we have several Americans, you know, that do not

21  speak Spanish.  But there's always somebody, or a foreman or

22  somebody who can come and help.

23  Q.    Translate?

24  A.    Translate, yes.

25  Q.    Did you receive an EEOC charge?

1    A.   I did.

2    Q.   What did you do in response to that EEO charge?

3    A.   I immediately started to investigate, and I -- I asked

4    everybody to respond to his allegations.  And I already had

5    knowledge of him because, on September 4th, he came to our

6    office, which has been testified in the depositions.  He was

7    very angry, pointing fingers, yelling.  My son Chris actually

8    spoke to him.  And my son Chris told him, after listening to

9    everything he had to say, told him that he would look into

10   moving him to another project.

11   Q.   Okay.  I'm going to direct you a little bit so that the

12   judge -- we're going to be very streamlined here.

13   A.   Okay.

14   Q.   Did you respond to the EEOC charge?

15   A.   I did.

16   Q.   Did you respond in writing?

17   A.   I did.

18   Q.   Did you send the response to opposing counsel?

19   A.   I don't know.  They weren't the counsel back then.  Was

20   there a -- I can't remember.  I'm not a lawyer so I just do

21   the best I can.

22   Q.   I understand.

23        Did you send the response to the EEOC?

24   A.   I did.

25   Q.   And did the response include all of the discipline that

1   he'd been subject to?

2   A.   Yes.

3   Q.   Did the response -- were you required by the EEOC to

4   show your workforce?

5   A.   Yes.

6   Q.   Like, who was Latino, who wasn't?

7   A.   Yes, yes.

8   Q.   And who had been fired and who had been hired?

9   A.   Yes.

10   Q.   And you sent all that to the EEOC?

11   A.   I did.

12   Q.   Did you get a response back from the Miami-Dade

13   Commission on Human Rights?

14   A.   Yep.  It took about a year.

15   Q.   Okay.  And what was the response back?

16   A.   That there were no findings of discrimination.

17   Q.   Both, under retaliation claim --

18   A.   Or retaliation.

19   Q.   -- and the discrimination claim?

20   A.   Yes.

21   Q.   Does your company have a policy against

22   discrimination?

23   A.   Yes.

24   Q.   Do you investigate complaints of discrimination?

25   A.   Yes.

1    Q.   Was this a complaint of discrimination, when he spoke to

2    Chris?

3    A.   No.

4    Q.   What was it?

5    A.   Disrespect.

6    Q.   Did both parties get the statement of determination?

7    A.   I assume they sent it to him.

8    Q.   In your response to the EEOC charge, did you go

9    fact-by-fact and counter each fact?

10   A.   I did the best I could, yes.

11   Q.   And so did you provide evidence to support what you

12   had?

13   A.   I did.  I had statements from our employees, our

14   supervisors.

15   Q.   Did you provide the termination documents that showed --

16   A.   Yes.

17   Q.   -- that he had been found sleeping when he was

18   terminated?

19   A.   Yes.

20   Q.   Did you put the ethnicity of different people on the

21   documents --

22   A.   I did.

23   Q.   -- to show who was making the decisions?

24   A.   I did.  I just wanted them to see that we do not

25   discriminate.  We will hire anybody from whatever country

```
1    they are from.  They just need to do their job and be

2    truthful.

3    Q.   So before the plaintiff filed her lawsuit -- before the

4    plaintiff's attorney filed the lawsuit, they would have had

5    the statement of determination, just like you did?

6    A.   Yes.

7              MS. SAAVEDRA:  Objection, Your Honor.

8              THE COURT:  Basis?

9              MS. SAAVEDRA:  Speculation.

10             THE COURT:  Sorry.

11             Ms. Rocha.

12             MS. ROCHA:  Yes.

13             I'm sorry, Your Honor.  I should be standing.

14             THE COURT:  How do you know the plaintiff's counsel

15   had it?

16             THE WITNESS:  I would assume that -- it wasn't them

17   that filed the EEOC.  It was another attorney.  So that

18   attorney would have gotten it.

19             THE COURT:  Okay.

20             THE WITNESS:  I don't know that I had given them

21   anything.

22             THE COURT:  Were you represented through this

23   process?

24             THE WITNESS:  No.

25             THE COURT:  So you just sent it to the EEOC?
```

1          THE WITNESS:  I did.  I did.

2          THE COURT:  Did the EEOC tell you, like, you're

3    preparing this for us and for the charging party's attorney?

4          THE WITNESS:  I don't remember.  It was a couple

5    years ago.  I'm sorry.  I don't remember.  I just know --

6          THE COURT:  I appreciate you telling me what you

7    don't remember and not guessing.

8          Go ahead, Mr. Clyne.

9          BY MR. CLYNE:

10   Q.   When you investigated internally, what did you find out

11   about Noel Leon and his interaction with him?

12   A.   I found out that -- well, I already knew he was well

13   respected.  But I did get a lot of responses from other

14   supervisors saying that no one has ever had a problem with

15   Noel.  He's a super nice guy.  He doesn't speak English, very

16   good English either.

17   Q.   And where is he from?

18   A.   He's from Cuba.

19   Q.   Was there any evidence that corroborated any of the

20   allegations made by Mr. Monteagudo?

21   A.   No, I don't believe so.  I didn't see anything -- I

22   mean, if it had been my choice, I probably would have

23   terminated him in August.

24   Q.   Again, I don't want you to go beyond my questions.

25   A.   All right.  It's just that I want you to know that he

50

1  was not a good employee.

2  Q.   All right.

3       Have you terminated employees after an investigation

4  where you found that there was discrimination or you believed

5  that there was discrimination?

6  A.   The only --

7  Q.   Just answer yes or no?

8  A.   No.

9            MR. CLYNE:  Thank you.  No further questions.

10            THE COURT:  Cross.

11                        CROSS-EXAMINATION

12  BY MS. ROCHA:

13  Q.   Good morning, Ms. De Moya.  How are you today?

14  A.   Good.  Thank you.

15  Q.   So you just testified that you -- I'm sorry, this

16  microphone is a low speaking.

17            So you just testified that you are the secretary

18  and treasurer for the De Moya Group; correct?

19  A.   Yes.

20  Q.   So you're not in the Human Resources department?

21  A.   Well, we're a family business, so I'm involved in Human

22  Resources also, and my sister.  I mean, we have a lot of

23  family.  And so, basically -- and then, Elena, also who you

24  deposed, she also does some of the HR too.  So we don't have

25  a, per se, HR person.

1   Q.   Okay.  So, if there's any human resources issues that

2   arise, they go to Elena; correct?

3   A.   Elena, yeah, because she speaks Spanish, and most our

4   employees are Spanish.

5   Q.   And she's also the one who is in charge of investigating

6   claims for your company; correct?

7   A.   Yes, she is.

8   Q.   Yet, for this claim, you investigated it personally?

9   A.   Yes, I did, because I know our people.  I have the

10  knowledge.

11  Q.   And, when you say you have the knowledge, what do you

12  mean by that?

13  A.   I mean that I know all the different supervisors.  And I

14  know Noel has been with us since 2007, with not one

15  complaint.  So -- and then I just got verification from our

16  other supervisors and employees.

17  Q.   Well, when there were three sets of interrogatories --

18  well, one set of interrogatories that was corrected three

19  times, you were never listed as the person to have knowledge

20  as to those topics; correct?

21  A.   I'm not sure what you're asking.

22  Q.   Do you remember when plaintiff served interrogatories to

23  your company?

24  A.   Yes.

25  Q.   And on one of -- and on none of those sets of

1  interrogatory responses were you named or listed as a person

2  that would be answering those questions; correct?

3  A.   Not that I know of.  But I did do the EEOC myself, so I

4  kind of had to be involved.

5  Q.   So it's your testimony that you were the most involved

6  person in the company with this claim?

7  A.   With the claim, yeah.  It was -- along with Elena.

8  Q.   Okay.  And you stated that you were involved in this

9  claim because you knew about Mr. Monteagudo?

10 A.   I had never met him.  This is the first time I'd ever

11 seen him.  But did he come to our office, and through what

12 occurred at the office with Chris and with Susan -- who you

13 also deposed -- that's where I got their statements.

14 Q.   But you weren't a part of that conversation in the

15 conference room?

16 A.   I don't speak Spanish so I would not have been able to

17 even understand it.

18 Q.   Okay.  So, the answer is no, you were not part of that

19 conversations?

20 A.   I was not.

21 Q.   And you only know about the conference based off what

22 your son told you?

23 A.   No.  What Susan told me also.

24 Q.   Okay.  So you only know about what happened in that

25 conversation based off what other people told you?

1  A.    Yeah.

2  Q.    And you knew that he complained that day?

3  A.    He came in very angry, yes.  And he was yelling, waiving

4  his hands.

5  Q.    But you didn't do anything about Mr. Monteagudo's

6  complaint that day?

7  A.    My son told him he would look into getting him another

8  project to go to, which is exactly what he did.  On September

9  14th.

10  Q.    I'm sorry, I didn't mean to interrupt.

11  A.    Sorry.

12  Q.    But you yourself didn't do anything?

13  A.    No.

14  Q.    And you testified as to Mr. Monteagudo's work history

15  and how you would have fired him yourself earlier.  However,

16  you, as you've just testified, have never spoken to

17  Mr. Monteagudo before?

18  A.    I know.  But there was a warning about him, that he

19  refused to work with a Mexican operator, equipment

20  operator.

21  Q.    So you're testifying -- it's your testimony today that

22  his work history is based off of one instance that you heard

23  of?

24  A.    No, no, no.  It was over and over again.  And, once

25  Chris transferred him to the new project, he started having

1   issues right away with multiple supervisors.

2          THE COURT:  Ms. Rocha, while I'm going to permit

3   you to cross within the scope of the direct, I have not yet

4   heard a question that goes to any issue in dispute in this

5   motion.  So, if you could be cognizant about why we're here,

6   I would be grateful.

7          MS. ROCHA:  Your Honor, if we may, the reason that

8   we are here today is because of the Rule 11 sanctions.  And

9   it is the defendant's testimony that, because of his poor

10  work history, that there is a legitimate basis for his

11  termination, and that that is very much in dispute.

12         THE COURT:  Goes to the merits of the case and

13  isn't part of the Rule 11 motion.

14         MS. ROCHA:  Yes, Your Honor.

15         THE COURT:  So the thrust what I really took from

16  the direct was what information was conveyed to the

17  plaintiffs and his attorneys at the EEOC charge time period.

18  Meaning, what the plaintiff and his attorney knew or with

19  reasonable investigation would have known.  Right?

20         MS. ROCHA:  Yes, Your Honor.

21         THE COURT:  Okay.

22     BY MS. ROCHA:

23  Q.   For the EEO charge, you said that you were the person

24  who was in charge of responding for your company; correct?

25  A.   Right.  I collected all the statements, yes.

1  Q.   And, when you collected all those statements, there is

2  evidence that Mr. Monteagudo complained about how he was

3  treated; correct?

4  A.   The only time I heard about that was when he came to the

5  office.

6  Q.   And were you aware of an investigation that happened in

7  order for the Miami-Dade Commission of Human Rights to find a

8  determination?

9       THE COURT:   Sorry.   Say that question again.   I

10 didn't understand it.

11      THE WITNESS:   I don't either.

12      BY MS. ROCHA:

13 Q.   That, for the Miami-Dade Commission of Human Rights to

14 find a determination, are you aware of an investigation that

15 occurred by the commission?

16 A.   Yes.  Yes.  She told me.  Basically, because I had --

17 well, I'm not going to -- I'm just going to say yes, because

18 I'm talking too much.  Sorry.

19 Q.   No problem.

20      So, in that investigation, were you aware of the

21 contents from the interview with Mr. Monteagudo?

22 A.   I had the -- what came from his attorney.

23 Q.   And, when you say that, what do you mean?

24 A.   The complaint from his attorney.

25 Q.   Okay.  But you just testified that you're aware of the

1   investigation, and that there was an interview with the

2   plaintiff?

3   A.    I am aware that she told me -- the woman from the EEOC

4   told me -- first, she asked me, do I want her to investigate.

5   And then I said:  Well, you know, I don't know, I haven't

6   really done this but ...

7        And then she said:  Well, you know, I'm reading this,

8   and I think we should investigate.

9        I said:  Okay, yes, let's investigate.  And it took a

10  year.

11  Q.    And is it your testimony today that this is the first

12  charge of discrimination, a complaint of discrimination, that

13  has ever been brought to your company?

14  A.    No.

15  Q.    So, when you say you've never done this before, what do

16  you mean?

17  A.    I've never spoken to the EEOC before.  I've never

18  actually spoken to anybody.  She called me, and that's how I

19  ended up speaking with her.  No one's ever called me before.

20        And, yes, we have had a couple of EEOCs.

21  Q.    And so, when she told you about the charge, what exactly

22  did she tell you?

23        Did she tell you about the interview she had with

24  plaintiff?

25  A.    No.  Nothing like that.  She just said she was going to

1  investigate.  That's all.

2  Q.  And so what -- did she tell you any facts about what she

3  was investigating?

4  A.  Not at all.  Not at all.

5  Q.  I'm sorry.

6  A.  It's probably not her job to do that.

7  Q.  Do you know anything about the investigation process at

8  all?

9  A.  I don't.

10  Q.  So then the next -- what is the next thing you know

11  about the -- after the investigation process?

12  A.  I got the note, the letter in the mail.  That's it.  A

13  year.

14  Q.  Okay.  And, at that point, did you ever -- did you ever

15  interact with the plaintiff or plaintiff's counsel?

16  A.  No.

17  Q.  Did you ever -- you never told the investigator that she

18  should know that this is a frivolous lawsuit?

19  A.  No.

20  Q.  Did you allow her to investigate and let her know that

21  there's no basis for this?

22  A.  I just gave her all -- everything that I collected.

23  That's all I did.

24          MS. ROCHA:  Moment to confer, Your Honor.

25          THE COURT:  Okay.

```
1              [PAUSE IN PROCEEDINGS]

2              BY MS. ROCHA:

3    Q.   Now, when you were investigating on behalf of your

4    company for the Miami-Dade Commission for the EEOC charge

5    response, you said that you stated that you received

6    statements from the employees; correct?

7    A.   Yes.

8    Q.   And, in any of those statements, was there someone who

9    told you that this was frivolous, this claim?

10   A.   No.

11   Q.   And, other than preparing the response to the charge,

12   did you do anything else?

13   A.   Not really.

14   Q.   And what happened after the termination?

15   A.   We just -- we got the notification from EEOC, and I have

16   nothing -- have had nothing to do with him.

17   Q.   With -- when you say him, do you mean Mr. Monteagudo?

18   A.   Yes.

19           MS. ROCHA:  I have no further questions, Your

20   Honor.

21           THE COURT:  Okay.

22           Do you have any redirect?

23           MR. CLYNE:  None, Your Honor.

24           I would like to call Ms. Saavedra.

25           THE COURT:  I'm not going to entertain that at this
```

 1  time.

 2          MR. CLYNE:  Okay.

 3          THE COURT:  As I said, I'm going to keep the motion

 4  in abeyance.

 5          MR. CLYNE:  Okay.

 6          THE COURT:  I'm not going to deny it.  In the event

 7  that, you know -- regardless, I mean, at this point, however

 8  the case pans out, I will likely ask you back, at least first

 9  for a status conference, and evaluate your request or need

10  for evidence at that time.

11          But while the case remains undecided by Judge

12  Moore, I think we have consensus that there's not going to be

13  a ruling on this motion.  And so, in the event that you are

14  in a posture to take evidence from her, we'll do it after

15  summary judgment.

16          Your questioning is going to be different then

17  anyway.

18          MR. CLYNE:  Yeah.  I understand.

19          THE COURT:  Right.  So rather than do it twice.

20          MR. CLYEN:  Okay.  I just -- I got everybody here.

21          THE COURT:  I know.  I know.  Listen, again,

22  sometimes I think that I understand exactly what you're

23  advancing on the papers, and sometimes you come in here and I

24  find out that I'm wrong.  And I didn't want to, you know,

25  aggressively make assumptions about your case without hearing

```
 1   from you.
 2            Sometimes I'm right.
 3            MR. CLYNE:  I appreciate it, Your Honor.
 4            THE COURT:  This was just one of those times where
 5   it turns out that I was right before I came to the hearing.
 6            So I only just wanted to ask one question.
 7            You told me that the plaintiff was represented by a
 8   different attorney during the EEOC charge.
 9            THE WITNESS:  Yes.
10            THE COURT:  Does that mean then that you did not
11   have contact with either of the two plaintiff's counsels that
12   are here until perhaps you were deposed sometime --
13            THE WITNESS:  I haven't been deposed.
14            THE COURT:  So you have never had contact with
15   either of these two?
16            THE WITNESS:  No.  No.
17            MR. CLYNE:  Could I refresh her recollection?
18            Well, that's why I wanted to call the counsel.
19            THE COURT:  You may but not today.  We're just
20   going to wait until all of the factual circumstances.  If
21   they then exist, then you can question.
22            Ms. De Moya, thank you for being here today.
23            I think you would have been here either way, so I
24   don't feel quite as bad about the time.
25            THE WITNESS:  Don't worry about that.
```

1           THE COURT:  Ms. Saavedra.

2           MS. SAAVEDRA:  Yes, Your Honor.  I just wanted to

3    point out two more cases with regards to the protected

4    activity issue as to the objective standard.

5           THE COURT:  Yes, ma'am.

6           MS. SAAVEDRA:  The *Howell versus Gormet Serve*.

7           THE COURT:  Powell?

8           MS. SAAVERDRA:  Howell, H-o-w-e-l-l.

9           THE COURT:  I think I looked that one.  Give me the

10   case cite again.

11          MS. SAAVEDRA:  It's 612 F.Appx 590.

12          THE COURT:  590?

13          MS. SAAVEDRA:  Yes, Your Honor.

14          THE COURT:  Okay.  Yeah, okay.

15          MS. SAAVEDRA:  And also that other cite that was in

16   the response, the *Graywood versus Sky Applications*

17   *International*.

18          THE COURT:  Looked at it.

19          MS. SAAVEDRA:  Thank you, Your Honor.

20          THE COURT:  Of course.

21          Let me just make sure, Ms. Saavedra, that you have

22   had the opportunity that you wanted to present anything in

23   opposition to this motion that you intended to today or that

24   you now want to.

25          MS. SAAVEDRA:  Not at this time, Your Honor.

1          THE COURT:  Okay.  Then you know how I tend to

2   proceed.  I'm going to enter an order that just says that the

3   hearing was conducted, that the matters has been taken under

4   advisement.  That, once the summary judgment motion is ruled

5   upon, I am likely to set a status conference.  For example,

6   if Judge Moore grants parts and denies in part, I'm going to

7   want to know what your posture is on the Rule 11.  If he

8   denies it in full and it heads to trial, I will hear from you

9   first, but at that point I might deny it without prejudice to

10  bring back up at the end, something along those lines.  Or

11  you may at that point want a dispositive ruling on it.

12          I'm going to wait for Judge Moore to weigh in on

13  your legal theory of the case and the evidence that's been

14  collected, but then at that point I'll likely -- and just

15  telephonically so it's as inexpensive as possible -- hear how

16  you want to move forward on this motion.  But it will remain

17  pending until the case is resolved.  Okay?

18          If anyone takes issue with that course of action,

19  this is your last best chance to tell me.

20          Mr. Clyne.

21          MR. CLYNE:  No, I don't take issue with that.

22          THE COURT:  Okay.

23          Ms. Saavedra?

24          MS. SAAVEDRA:  No, Your Honor.

25          THE COURT:  Then that's exactly what we'll do.

1          Good luck, and I am going to give you back your

2    binder of exhibits.  Okay?  You may want to hold on to this

3    exact same binder.  But the exhibits didn't come in so I'm

4    not going to make use of them at this posture.

5          We will be adjourned.

6          [PROCEEDINGS CONCLUDED]

7

8

9          OFFICIAL COURT REPORTER'S CERTIFICATE

10

11   I (we) certify that the foregoing is a correct
     transcript of proceedings in the above-entitled matter.

12
                                    /S/ Susan A. Zielie, CVR-CM-S, FCRR
13                                  Susan A. Zielie, CVR-CM-S, FCRR
                                    May 23, 2023

14

15

16

17

18

19

20

21

22

23

24

25